# ATTACHMENT A

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

ANDREA GOGEL,                               :
                                            :
        Plaintiff,                          :        CIVIL ACTION FILE
                                            :
vs.                                         :        NO. 2014-CV-247952
                                            :
KIA MOTORS MANUFACTURING OF GEORGIA,        :        JURY TRIAL DEMANDED
INC.                                        :
                                            :
        Defendant.                          :
                                            :

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

TO:   KIA MOTORS MANUFACTURING OF GEORGIA, INC.
      c/o Jonathan Martin, Esq.
      Constangy, Brooks & Smith, LLP
      577 Mulberry Street, Suite 710
      Macon, Georgia  31201-8588

        A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the Complaint is attached.

        This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver in accordance with O.C.G.A. Section 9-11-4(d). To avoid these expenses, you must return the signed waiver within 30 days from the date shown below, which is the date this notice was sent. Two copies of the Waiver Form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

        If you return the signed waiver, I will file it with the Court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the Complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

        If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

        Please read the enclosed statement about the duty to avoid unnecessary expenses.

        I certify that this request is being sent to you on the date below.

Date: 6/24/14                    _____
                                Signature of the attorney or unrepresented party

                                Meredith J. Carter
                                Matthew C. Billips
                                BILLIPS & BENJAMIN LLP
                                One Tower Creek, Suite 190
                                3101 Towercreek Parkway
                                Atlanta, Georgia  30339
                                (770) 859-0751

 **COPY**

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

ANDREA GOGEL,                          )
                                       )
        Plaintiff,                     )       CIVIL ACTION NO.:
                                       )
Vs.                                    )       2014CV247952
                                       )
KIA MOTORS MANUFACTURING               )
OF GEORGIA, INC.,                      )       JURY TRIAL DEMANDED
                                       )
        Defendant.                     )

### COMPLAINT

COMES NOW, Plaintiff Andrea Gogel, by and through undersigned counsel, and files her

Complaint for Damages against Defendant Kia Motors Manufacturing of Georgia, Inc., hereinafter

("KMMG") or ("Defendant"), and shows the Court as follows:

### JURISDICTION

1.

This is a lawsuit brought due to discrimination on the basis of race, alienage, and retaliation

in violation of 42 U.S.C. § 1981; and for discrimination based on gender, national origin, and

retaliation in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq.

("Title VII"). This Court has subject matter jurisdiction over this action.

2.

Plaintiff timely filed Charges of Discrimination against Defendant with the Equal

Opportunity Commission ("EEOC") on November 10, 2010 for gender and national origin, and

on February 8, 2011 for retaliation. On March 21, 2014, the EEOC issued Plaintiff two "Notices

of Right to Sue", but Plaintiff did not receive either one until thirty days after issuance for her

initial charge and sixty days after issuance for her retaliation charge.  Despite the untimely receipt, Plaintiff files this Complaint within ninety (90) days of the Right to Sue issue date.

## VENUE

3.

Venue is appropriate in this Court as Defendant KMMG has its registered agent for service in Fulton County.

## PARTIES

4.

Plaintiff is a resident of the State of Georgia and is entitled to bring actions of this type and nature.

5.

Defendant Kia Motors Manufacturing of Georgia, Inc., is a Korean corporation, incorporated in Delaware, which conducts business in Georgia, with its principal office in West Point, Georgia, and is authorized to do business in the State of Georgia.

6.

Defendant KMMG may be served with service of process through its Registered Agent, CT Corporation System, 1201 Peachtree Street, NE, Atlanta, GA 30361.

7.

Defendant KMMG at all times relevant to her claims was Plaintiff's employer.

## FACTUAL ALLEGATIONS

8.

Plaintiff is a white American female citizen.

- 2 -

9.

KMMG hired Plaintiff on March 17, 2008 as a Team Relations Manager, which was initially a section within Human Resources. She was recruited from Toyota by her supervisors Randy Jackson and Bob Tyler.

10.

Randy Jackson was Director of Human Resources and at all times relevant to Plaintiff's employment, was Plaintiff's supervisor. Bob Tyler was Manager of Human Resources at the time of Plaintiff's hire and was her peer. It was not until March 2009 when the initial Head of Department (HOD) designations were made that Tyler became Plaintiff's supervisor for the remainder of her employment.

11.

Plaintiff's job duties included management of Human Resources professionals; employee advocate that assisted employees in understanding policies and procedures; investigation of internal American employee complaints; and development of policies and programs.

12.

KMMG's organizational structure included an American and a Korean counterpart in just about all leadership positions. However, KMMG's President and other higher level leaders were all Korean males. During Plaintiff's employment, there were no Americans, male or female, that were in positions of significant power.

13.

When Plaintiff first began working at KMMG, Randy Jackson and Eddie Jin, Korean male, told her she had to understand the Korean culture and adhere to its beliefs. One of those beliefs

was that younger employees were preferred and she should help the Koreans figure out which job candidates were younger so the older candidates could be weeded out.

14.

Ms. Gogel soon learned that the Korean culture and beliefs as exemplified by Defendant's Korean management were contrary to American workplace laws and often violated American laws. In addition, the Korean culture, as exemplified by Defendant's Korean management, held negative stereo-types against women in the workplace and expected American employees to show up to work, do as told, and to not complain about anything they were told to do by a Korean manager, even if it were unlawful.

15.

In June 2008, a Korean male cautioned Ms. Gogel to never disagree or argue with any of the Koreans. If she disagreed with a policy or anything else, she should let him address the situation.

16.

In and around November 2008, Ms. Gogel received numerous complaints about Mr. Ahn, Korean male President of KMMG, and a black American female and Assistant Manager of General Affairs. The complaints alleged they were in a sexual relationship and that the female was using her relationship with Mr. Ahn to threaten subordinates who disagreed with her and to "pad" her work hours in order to receive more pay.

17.

During the same month, Kevin Kim, Korean male, told Ms. Gogel that Head of Department ("HOD") designations would begin happening soon, but only for production and that Human

Resources would not have one named at the time.  However, no HOD designations were made at all at this time for production or any other department.

18.

Also in November 2008, Ms. Gogel learned that KMMG only wanted young, pretty women for the General Affairs Department.  When Ms. Gogel protested, as this constituted discrimination on the basis of both age and gender, Randy Jackson laughed and said the decision had already been made.

19.

In December 2008, Hyung Sook "Justin" Yoo, Korean male, was hired as Ms. Gogel's counterpart in Team Relations.  He rarely interacted with Ms. Gogel and instead chose to interact primarily with her male subordinate, even on issues which should have been taken to Ms. Gogel.

20.

In February 2009, Kevin Kim asked Ms. Gogel to conduct a "secret" investigation into Mr. Ahn's and the black female's relationship, even though Randy Jackson had told Ms. Gogel she could not investigate.  Ms. Gogel was instructed not to share anything written because it was supposed to be very "confidential."

21.

In March 2009, Kevin Kim announced HOD designations would be made at this time for all departments. Prior to the announcement, Kevin Kim showed Ms. Gogel documents that showed Team Relations would now be a separate department instead of a section within Human Resources. The organization chart that was ultimately prepared showed Human Resources and Team

Relations as separate departments, but that Bob Tyler was made HOD over both of them, rather than Ms. Gogel being HOD over Team Relations.

22.

Also, in March 2009, Kevin Kim told Ms. Gogel to immediately stop any investigation into Mr. Ahn's relationship and to destroy any related documents. From March 2009 to June 2009, Ms. Gogel's and Mr. Kim's relationship seemed to change drastically. Mr. Kim was sometimes rude to Ms. Gogel and decreased her resources. Mr. Kim appeared to not want anything at all to do with Ms. Gogel anymore. In addition, it was around this time that Ms. Gogel began to feel as if she were being treated differently than similarly situated men in her Department and other Departments.

23.

More specifically, she began to look at Head of Department ("HOD") designations throughout KMMG and noticed that no HODs were women. When Ms. Gogel confronted Randy Jackson about how the HOD designations had been made, he told her it was automatic and that any American Manager that was in the role when the designations were made was automatically placed in that position.

24.

Ms. Gogel then asked Mr. Jackson about whether the fact that Team Relations had just been made a separate department from Human Relations impacted the HOD designations and he replied "Yes, it was a timing issue." He assured Plaintiff that it was not because of her performance and "they" would take care of her in April 2010.

25.

Soon thereafter, Plaintiff began to feel overly scrutinized by Jackson and Kim. In addition, more and more employees and supervisors complained to her about the way females were being treated at KMMG. Since Ms. Gogel was experiencing much of the same treatment, she began to believe that she was receiving extra criticism and reduced resources for her job because she is woman.

26.

The complaints Ms. Gogel heard included female security guards being hidden when Korean VIPs visited; a female security officer being terminated because she was not pretty; and about a female server being dismissed from a company function because she was pregnant.

27.

In or around September 2009, after a meeting between Randy Jackson, Bob Tyler, Ms. Gogel, Charlie Webb, Kevin Kim and KS Kim, Mr. Jackson told Ms. Gogel that Mr. Kim did not want her to speak so strongly as she did in the meeting. When Ms. Gogel asked for more of an explanation, Jackson told her that she really shouldn't speak at all in meetings. In response, Ms. Gogel asked Jackson if he had a problem with two of her male subordinate employees speaking in meetings and Jackson replied "no".

28.

In October 2009, Ms. Gogel met with Bob Tyler and Randy Jackson to express her concerns about the way she was being treated and that she believed she was being singled out because of her gender. In addition, Ms. Gogel complained about a new male hire coming into KMMG with a HOD designation when she was told that she could not be made a HOD until April.

- 7 -

In response, Jackson asked Ms. Gogel if Toyota might take her back. After the meeting, Jackson told her he was sorry and if he had known what KMMG would be like for her, he would not have ever brought her to KMMG. He said change around KMMG was "very slow."

29.

In November 2009, Ms. Gogel followed up with Jackson about the October conversation and he acted like he did not know what she was talking about. Ms. Gogel asked him again if there was a plan to designate a HOD for Team Relations and Jackson said he didn't understand and that Team Relations was just a part of Human Resources, not a department that could have a HOD designation. This explanation was contrary to prior conversations Ms. Gogel had with Jackson when he had confirmed Team Relations was separate from Human Resources. Moreover, on various documents, Justin Yoo, Korean male, was listed as being the HOD for Team Relations.

30.

In January 2010, Ms. Gogel asked Bob Tyler about the HOD designation for Team Relations and he said that it was a separate department with no plans to change that. Again, Ms. Gogel went to Jackson after this conversation and he said he would get the changes made for Ms. Gogel by the end of the year.

31.

Ms. Gogel received her first and only performance appraisal the end of January/beginning of February 2010. Bob Tyler, Randy Jackson and Hyung Sook Yoo "Justin" were the reviewers. Ms. Gogel received an overall rating of a "B" which is "Fully Meets Expectations".

32.

In April and May 2010, a few American female employees resigned from KMMG citing

treatment towards women as one of the reasons for their resignation. One American female was told by Richard Park, Korean male and Senior Manager of Legal, that mothers should be home with their children and working mothers are "bad moms." Park's statement was relayed to Randy Jackson by Bob Tyler for further follow-up. Upon Ms. Gogel's information and belief, Jackson did nothing. Another white, American female resigned because "work environment was not favorable for women in management positions."

33.

In or around September 2010, a "Management Workshop" was scheduled, which was supposed to offer the opportunity to review some issues uncovered in a cultural assessment survey and to provide team-building between Korean and American management. However, no one had ever seen the results of the Cultural Assessment, even though KMMG had previously stated that the results would be shared as a team building exercise.

34.

Ms. Gogel did not expect to receive an invitation for the Workshop since she had regularly been left out of management meetings. Ms. Gogel and one other American female, the black female that was allegedly having an affair with Mr. Ahn, were the only females invited to the meeting and were the last two names on the invite. After the meeting was over, Mr. Yoon, Korean male and COO, and KS Kim, Korean male, requested everyone go in the hallway for a picture. Specifically, Yoon and Kim were yelling for Ms. Gogel and the other female to be displayed more prominently in the photographs and continuously kept yelling out their names. Ms. Gogel remained where she was, slightly hidden, because she realized she and the other female had been invited to the predominantly male meeting for this picture. Several days later, Kevin Kim affirmed Ms. Gogel's suspicions when he pointed out that she was barely visible in the photo.

35.

In addition in September 2010, Ms. Gogel provided a list of her concerns about working at KMMG to Bob Tyler.  Mr. Tyler wanted the list in order to include as a compilation of the American Management Team's concerns.  In this email, Ms. Gogel provided multiple issues and examples for inclusion.  The document was provided to members of management the end of September 2010.  The "Report of Concerns" document included several issues regarding gender and national origin discrimination and the manner in which females and Americans are treated vs. males and Koreans.

36.

In October 2010, Ms. Gogel was interviewed by Randy Jackson and Charlie Webb, American in-house lawyer, with Bob Tyler present as well regarding the Report of Concerns document.  After the interview, Webb and Jackson portrayed Ms. Gogel to be uncooperative in their "investigation", and expressed regret that her concerns could not be addressed based on the document.  Webb and Jackson were the ones that ended the interview, not Ms. Gogel.  Webb and Jackson never followed back up with Ms. Gogel again after this meeting.

37.

In or around the beginning of November 2010, Ms. Gogel learned the "investigation" into her concerns was closed.  As a follow up to learning this information, she sent an email to Webb, Jackson and Tyler, and carbon copied KS Kim on November 3, 2010.   In the email, Ms. Gogel expressed her disappointment that KMMG was not going to investigate her complaints and basically chose to disregard anything she had to say.

38.

On November 10, 2010, Ms. Gogel filed a Charge with the EEOC for Sex and National Origin.

39.

On November 15, 2010, Mr. Ahn invited all managers to the Training Center for a dinner. During the dinner, he stood up and gave a speech. After his speech, he shouted at the Americans in attendance chastising them for complaining about KMMG and attempted to compare loyalty the Americans feel towards veterans and the loyalty Americans should feel towards KMMG.

40.

In or around November 23, 2010, KMMG had received notice of Ms. Gogel's EEOC Charge. Multiple employees overheard Jackson and Webb talking on the phone about her charge.

41.

On December 3, 2010, Ms. Gogel was placed on administrative leave pending her signature on an "acknowledgement" document created by KMMG. Ms. Gogel returned the following Monday after agreeing to sign the document. Ms. Gogel signed the document on December 6, 2010. The document, among other things, asked Ms. Gogel to agree not to discuss her EEOC Charge and not to seek documents in support of her Charge.

42.

On December 22, 2010, Ms. Gogel received a $12,000 bonus check from Jackson. Jackson told Ms. Gogel she was doing a good job.

43.

On January 7, 2011, Ms. Gogel received a call that morning from Randy Jackson who

asked her to come into work. When she got to work, Jackson and Webb called her into a meeting about Diana Ledbetter, American female, regarding her filing her own EEOC Charge against KMMG. During this meeting, Ms. Gogel reminded Jackson that she had requested from Jackson on numerous occasions to investigate the gender discrimination issues that Ms. Ledbetter had at work and he had ignored her requests. Jackson and Webb then proceeded to interrogate Ms. Gogel about her relationship with Ms. Ledbetter and about meetings she had with Ms. Ledbetter.

44.

Ms. Gogel told them that her meetings were mainly about food service/canteen issues and the reason they went to conference rooms for privacy because of the open floor environment at KMMG. The meetings lasted maybe 30 to 45 minutes at a time, and not the hours and hours she was accused of by Jackson and Webb.   In addition, Webb and Jackson accused Ms. Gogel of encouraging Ms. Ledbetter to file a Charge with the EEOC, which Ms. Gogel denied. The meeting ended with Ms. Gogel being put on administrative leave for alleged "collusion" with Ms. Ledbetter with regard to the fact that Ms. Ledbetter had filed a Charge of Discrimination with the EEOC.

45.

On January 20, 2011, Randy Jackson announced to employees at KMMG that Ms. Gogel had been terminated and that they should not have any work-related contact with her.

46.

On January 21, 2011, Ms. Gogel received the termination letter, which was effective as of January 18, 2011.

47.

The letter accused Ms. Gogel of violating the December 6, 2010 document she had signed

by encouraging Ms. Ledbetter to file a Charge of Discrimination with the EEOC.

48.

Ms. Gogel was terminated two months after filing her EEOC Charge.

49.

On February 8, 2011, Ms. Gogel filed another charge with the EEOC for Retaliation.

50.

The termination of Ms. Gogel was sufficiently harmful and intimidating that it could well dissuade a reasonable person in Plaintiff's position from making or supporting a charge of discrimination and was intended to have such effect.

51.

As a result of Defendant's misconduct, Plaintiff has suffered mental and emotional distress in an amount to be determined by the enlightened conscience of an impartial jury.

52.

Defendant's conduct was willful and deliberate and taken in reckless disregard of Plaintiff's protected rights, justifying an award of punitive damages in an amount to be determined by the enlightened conscience of an impartial jury.

## CLAIMS FOR RELIEF

### COUNT ONE:  RACE AND ALIENAGE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

53.

Plaintiff was discriminated against because of her race, white, and alienage, American citizen, in violation of 42 U.S.C. § 1981.

54.

A reasonable person subjected to such treatment would have found it to be abusive, as did Plaintiff, and to alter the terms or conditions of employment.  As a result of Defendant's conduct, Plaintiff suffered damages.

55.

During Plaintiff's employment, Defendant subjected Plaintiff to disparate terms and conditions of employment based on race and alienage, including failing to promote Plaintiff to a Head of Department position because of her race and alienage.

56.

Ms. Gogel was continually led to believe that she would be elevated to the status of HOD up until she filed her Report of Concerns in September 2010, yet it never occurred.

57.

Although the HOD designation was a promotion, it would not have constituted a separate contract of employment, as Ms. Gogel was performing the duties and held the responsibilities of a HOD, without the title or compensation associated therewith.

58.

During Plaintiff's employment, Defendant maintained a culture that subjected other American citizens, both white and non-white to disparate terms and conditions of employment based on their race and alienage, such as the Korean culture's propensity for hiring younger candidates for positions; view that American citizens should be loyal to Koreans whether or not they were treated equally in the workplace; and an overall general dismissive attitude towards American workplace laws.

59.

As Defendant's conduct was willful and deliberate, Plaintiff is entitled to all relief afforded under the statute, including an award of punitive damages.

### COUNT TWO:  RETALIATION FOR OPPOSING RACE AND ALIENAGE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

60.

Following Plaintiff's internal complaints of racial and alienage discrimination and her filing of an EEOC Charge, Defendant failed to designate Plaintiff as a HOD; excluded her from management meetings; labeled her as uncooperative; took away her resources; prohibited her from advising employees of their right to file a charge with the EEOC; and ultimately terminated her employment.  Defendant's retaliation violated 42 U.S.C. § 1981.

61.

Defendant's proffered reason for terminating Plaintiff was itself protected activity. Plaintiff's termination occurred two months after she filed a Charge of discrimination with the EEOC and was causally connected to the filing of her EEOC Charge, in that (a) because she filed a Charge, she was forced to sign an agreement not to discuss her pending Charge or "similar claims"; and (b) Defendant fired her because they believed she had "colluded" with another employee with regard to that employee filing an EEOC Charge, in violation of an agreement that was imposed on her solely because she had filed a Charge with the EEOC.

62.

Defendant's reason for terminating Plaintiff's employment was itself retaliation for protected activity under the participation clause of Title VII's anti-retaliation provisions and

violated her right to engage in protected activity.

63.

Defendant's retaliation against Plaintiff was on account of her participation in the EEOC charge filing process and because of her opposition to discrimination to race and alienage discrimination in violation of 42 U.S.C. § 1981. But for her act of filing an EEOC Charge, she would not have been terminated.

64.

As a result of Defendant's unlawful conduct, Plaintiff has suffered mental and emotional distress in an amount to be determined at trial by the enlightened conscience of an impartial jury. Plaintiff has also suffered lost wages and the benefits of employment, which she seeks to recover from Defendant.

## COUNT THREE:  GENDER DISCRIMINATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, AS AMENDED

65.

Plaintiff is a female who was subjected to disparate terms and conditions of employment because of her gender.

66.

Instances of decisions Defendant made based on gender include failing to promote Plaintiff, or any female to a Head of Department position; excluding Plaintiff from management meetings; asking her to not speak in meetings; maintaining a general dismissive attitude towards women at KMMG, which resulted in several women leaving KMMG because of the way women were treated; and terminating her employment. All of these examples constitute a violation of 42 U.S.C. § 2000e et seq.

67.

As Defendant's conduct was willful and deliberate, Plaintiff is entitled to all relief afforded under the statute, including an award of punitive damages.

68.

As a result of Defendant's unlawful conduct, Plaintiff has suffered mental and emotional distress in an amount to be determined at trial by the enlightened conscience of an impartial jury. Plaintiff has also suffered lost wages and the benefits of employment, which she seeks to recover from Defendant.

## COUNT FOUR:  NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

69.

Plaintiff is a female who was subjected to disparate terms and conditions of employment because of her national origin, American in violation of 42 U.S.C. § 2000e et seq.

70.

Instances of decisions Defendant made based on national origin include failing to promote Plaintiff to Head of Department; singling out American employees and questioning their "loyalty" to the Koreans and KMMG; ignorance and indifference to American workplace laws; retaliating against Americans who do not follow the "Korean way"; and terminating her employment.

71.

As Defendant's conduct was willful and deliberate, Plaintiff is entitled to all relief afforded under the statute, including an award of punitive damages.

72.

As a result of Defendant's unlawful conduct, Plaintiff has suffered mental and emotional distress in an amount to be determined at trial by the enlightened conscience of an impartial jury. Plaintiff has also suffered lost wages and the benefits of employment, which she seeks to recover from Defendant.

## COUNT FIVE:  RETALIATION FOR OPPOSING GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

73.

Defendant KMMG retaliated against Plaintiff for complaining internally about gender discrimination and for filing a charge with the EEOC regarding gender discrimination.

74.

Defendant retaliated against Plaintiff by failing to promote Plaintiff to a HOD position, excluding her from management meetings; labeling her as uncooperative; taking away her resources; prohibiting her from advising employees of their right to file a charge with the EEOC; and ultimately terminating her employment.  Defendant's retaliation against Plaintiff violated 42 U.S.C. § 2000e et seq.

75.

Defendant's proffered reason for terminating Plaintiff was itself protected activity and violated Title VII's anti-retaliation provision.  Plaintiff's termination occurred two months after she filed a Charge of discrimination with the EEOC and was causally connected to the filing of her EEOC Charge, in that (a)  because she filed a Charge, she was forced to sign an agreement not to discuss her pending Charge or "similar claims"; and (b) Defendant fired her because they believed she had "colluded" with another employee with regard to that employee filing an EEOC

charge, in violation of an agreement that was imposed on her solely because she had filed a Charge with the EEOC.   But for her act of filing an EEOC Charge, she would not have been terminated.

76.

Defendant's reason for terminating Plaintiff's employment was itself retaliation for protected activity under the participation clause of Title VII's anti-retaliation provisions and violated her right to engage in protected activity.

77.

As a direct result of Defendant's actions, Plaintiff has suffered lost wages, mental and emotional distress, humiliation, outrage, damage to her reputation, the deprivation of her rights under federal law, and is entitled to compensatory and punitive damages.

78.

As a consequence of Defendant's unlawful conduct, Plaintiff has suffered lost wages and other benefits of employment.

## COUNT SIX:  RETALIATION FOR OPPOSING NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII

79.

Defendant KMMG retaliated against Plaintiff for complaining internally about national origin and for filing a charge with the EEOC regarding national origin.

80.

Defendant retaliated against Plaintiff by failing to promote Plaintiff to a HOD position, excluding her from management meetings; labeling her as uncooperative; taking away her resources; prohibiting her from advising employees of their right to file a charge with the EEOC; and ultimately terminating her employment.  Defendant's retaliation against Plaintiff violated 42

- 19 -

U.S.C. § 2000e et seq.

81.

Defendant's proffered reason for terminating Plaintiff was itself protected activity and violated Title VII's anti-retaliation provision.   Plaintiff's termination occurred less than two months after she filed a Charge of discrimination with the EEOC and was causally connected to the filing of her EEOC Charge, in that (a) because she filed a Charge, she was forced to sign an agreement not to discuss her pending Charge or "similar claims" and (b) Defendant fired her because they believed she had "colluded" with another employee with regard to that employee filing an EEOC charge, in violation of an agreement that was imposed on her solely because she had filed a Charge with the EEOC.    But for her act of filing an EEOC Charge, she would not have been terminated.

82.

Defendant's reason for terminating Plaintiff's employment was itself retaliation for protected activity under the participation clause of Title VII's anti-retaliation provisions and violated her right to engage in protected activity.

83.

As a direct result of Defendant's actions, Plaintiff has suffered lost wages, mental and emotional distress, humiliation, outrage, damage to her reputation, the deprivation of her rights under federal law, and is entitled to compensatory and punitive damages.

84.

As a consequence of Defendant's unlawful conduct, Plaintiff has suffered lost wages and other benefits of employment.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)     That this Court declare that Defendant's actions, policies and practices complained of herein violate the rights of Plaintiff as secured by federal law;

(b)     Temporarily, preliminarily, and permanently enjoin Defendant from future discriminatory acts relative to discrimination based on race, national origin, alienage and gender and for opposing such discrimination;

(c)     General damages for mental and emotional suffering caused by Defendant's misconduct;

(d)     Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(e)     Special damages for lost wages and benefits;

(f)     Reasonable attorneys' fees, costs and expenses of litigation under Title VII;

(g)     Injunctive relief and prohibition of Defendant from engaging in further unlawful conduct of the type described herein;

(h)     Trial by jury as to all issues;

(i)     Prejudgment interest at the rate allowed by law; and

(j)     All other relief to which she may be entitled.


Respectfully submitted, this 19th day of June, 2014.

Matthew C. Billips
Georgia Bar No. 057110
Meredith J. Carter
Georgia Bar No. 325422

- 21 -


COPY

# General Civil Case Filing Information Form (Non-Domestic)

**Court**          County  FULTON _____          Date Filed _____
☒ Superior                                                                    MM-DD-YYYYY
☐ State          Docket # _____

**Plaintiff(s)**                                          **Defendant(s)**

Gogel     Andrea                                          KIA Motors Manufacturing of GA, Inc.
Last    First    Middle I. Suffix Prefix    Maiden        Last    First    Middle I. Suffix Prefix    Maiden

_____                          _____
Last    First    Middle I. Suffix Prefix    Maiden        Last    First    Middle I. Suffix Prefix    Maiden

_____                          _____
Last    First    Middle I. Suffix Prefix    Maiden        Last    First    Middle I. Suffix Prefix    Maiden

_____                          _____
Last    First    Middle I. Suffix Prefix    Maiden        Last    First    Middle I. Suffix Prefix    Maiden

**No. Of Plaintiffs** 1                                   **No. Of Defendants** 1

**Plaintiff/Petitioner's Attorney**    ☐ Pro Se

Carter, Meredith J.
Last    First          Middle I.    Prefix

325422
Bar #

---

**Check Primary Type (Check only ONE)**

☐ Contract/Account

☐ Wills/Estate

☐ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☐ Equity

☐ Habeas Corpus

☐ Appeals, Reviews

☐ Post Judgement Garnishment, Attachment, or
   Other Relief

☐ Non-Demestic Contempt

☐ Tort (If tort, fill in right column)

☒ Other General Civil

   Specify Title VII; Section 1981

---

**If Tort is Case Type**
(Check no more than **Two**)

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☐ Other

   Specify_____

_____

**Are Puntive Damages Pleaded?**

☒ Yes

☐ No

COPY
DISCLOSURE STATEMENT
CLERK OF SUPERIOR COURT

CASE NUMBER _____
Assigned by Clerk

Andrea Gogel
PLAINTIFF

VS.
KIA Motors Manufacturing
of Georgia, Inc.
DEFENDANT

## TYPE OF ACTION

1. ____ Divorce without Agreement Attached
2. ____ Divorce with Agreement Attached
3. ____ Domestic Relations
4. ____ Damages arising out of Contract
5. ____ Damages arising out of Tort
6. ____ Condemnation
7. ____ Equity
8. ____ Zoning – County Ordinance violations (i.e. Injunctive relief-zoning)
9. ____ Zoning Appeals (denovo)
10. ____ Appeal, including denovo appeal – excluding Zoning

11. ____ URESA
12. ____ Name Change
13. X Other
14. ____ Recusal

____ Adoption

* Title VII
  Section 1981

## PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court?  (Whether pending simultaneously or not.)

X NO

____ YES – If yes please fill out the following:
1. Case # _____
2. Parties _____ vs. _____
3. Assigned Judge _____
4. Is this case still pending? ____ Yes ____ No
5. Brief description of similarities:

_____

_____

Meredith ___
Attorney for Andrea Gogel

Form #0122
Revised 05/20/02