IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

ANDREA GOGEL,
Plaintiff,

vs.

KIA MOTORS MANUFACTURING GEORGIA, INC.,
Defendant.

CIVIL ACTION FILE
NO. 3:14-cv-00153-TCB-RGV

DEPOSITION OF
ANDREA GOGEL

July 22, 2015
10:25 a.m.

Mays & Kerr
235 Peachtree Street, NE
Atlanta, Georgia

Shari L. Snow, CCR #B-2258



APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

MEREDITH J. CARTER
Attorney at Law
Mays & Kerr, LLC
235 Peachtree Street, NE
North Tower - Suite 202
Atlanta, Georgia 30303
404-410-7998
Meredith@MaysandKerr.com

On behalf of the Defendant:

W. JONATHAN MARTIN II
- and -
JOSEPH M. MURRAY, JR.
Attorneys at Law
Constangy, Brooks, Smith & Prophete, LLP
577 Mulberry Street - Suite 710
Macon, Georgia 31201
478-750-8600
JMartin@Constangy.com
JMurray@Constangy.com

DEBORAH M. WALKER
Attorney at Law
7777 Kia Parkway
West Point, Georgia 31833
706-902-7533
Deborah.Walker@kmmgusa.com

Also Present:

J. Randy Jackson, J.D.
Latesa K. Bailey



INDEX OF EXAMINATION


| | Page |
|---|---|
| Examination by Mr. Martin | 7 |
| Examination by Ms. Carter | 244 |


INDEX OF EXHIBITS


| | | |
|---|---|---|
| Exhibit 1 | Kia Employment application | 27 |
| Exhibit 2 | A. Gogel resume | 28 |
| Exhibit 3 | 2007 W-2 | 76 |
| Exhibit 4 | 2/13/08 Offer of Employment | 78 |
| Exhibit 5 | Job description - Manager, Team Relations | 106 |
| Exhibit 6 | 3/7/08 HISNA document | 107 |
| Exhibit 7 | Confidentiality Agreement | 108 |
| Exhibit 8 | Code of Ethical Conduct | 108 |
| Exhibit 9 | 2/23/ 09 Organizational Chart | 109 |
| Exhibit 10 | 3/11/09 Organizational Announcement | 113 |
| Exhibit 11 | Performance Appraisal | 129 |
| Exhibit 12 | Forecast of Potential | 135 |
| Exhibit 13 | Resume of Bob Tyler | 143 |
| Exhibit 14 | EEOC Intake Questionnaire | 150 |
| Exhibit 15 | 11/10/10 Charge of Discrimination | 151 |
| Exhibit 16 | Notice of Right to Sue | 153 |





| | | |
|---|---|---|
| Exhibit 17 | 1/5/11 Timeline of Key Events | 155 |
| Exhibit 18 | 9/17/08 e-mail re: Kia photo | 178 |
| Exhibit 19 | Organizational Announcement | 179 |
| Exhibit 20 | 4/28/10 Merit Adjustment letter | 188 |
| Exhibit 21 | 12/23/10 Bonus letter | 189 |
| Exhibit 22 | 9/23/10 e-mail re: Real Examples | 191 |
| Exhibit 23 | Report of Concerns | 192 |
| Exhibit 24 | 11/3/10 e-mail re: Ongoing Investigation | 194 |
| Exhibit 25 | 9/15/10 e-mail re: HR Director Opportunity | 196 |
| Exhibit 26 | 12/10/08 handwritten notes | 204 |
| Exhibit 27 | 12/6/10 signed document re: EEOC charge | 209 |
| Exhibit 28 | Handwritten notes | 212 |
| Exhibit 29 | 1/19/11 Discharge letter | 214 |
| Exhibit 30 | 2/8/11 Charge of Discrimination | 216 |
| Exhibit 31 | Responses to Interrogatories | 217 |
| Exhibit 32 | 6/14/11 Goodyear Offer | 219 |
| Exhibit 33 | 2011 Payroll Register | 220 |
| Exhibit 34 | Kone Offer | 226 |
| Exhibit 35 | BlueCross BlueShield remittance slip | 230 |
| Exhibit 36 | 6/23/10 e-mail re: Request | 236 |
| Exhibit 37 | Team Relations Policy Statements | 242 |


(Original exhibits attached to original transcript.)

DEPOSITION OF ANDREA GOGEL
July 22, 2015
MR. MARTIN: Good morning, everybody. This is the deposition of Andrea Gogel, taken for all purposes authorized by the Federal Rules of Civil Procedure.
Miss Carter, we spoke before the deposition, and you indicated at that time that your client wishes to read and sign the deposition. Is that correct?
MS. CARTER: Uh-huh (affirmative). Yes.
MR. MARTIN: Okay. And we also, in accordance with Judge Vineyard's published rules, have reserved for trial all objections except to the form of the question, the responsiveness of the answer, correct?
MS. CARTER: Yes.
MR. MARTIN: Madame Court Reporter, could you swear the witness, please.
ANDREA GOGEL,
being first duly sworn, was examined and testified as follows:
MR. MARTIN: As I mentioned, this is the deposition of Andrea Gogel. It is taken by



defendant, pursuant to notice under Rule 30 of the Federal Rules of Civil Procedure. It's being taken for purposes of discovery, for use at trial, and all other purposes permitted by the Federal Rules of Civil Procedure.
Today's date is July the 22nd, 2015. The time is approximately 10:30 a.m. This deposition is being taken at the offices of Mays & Kerr, LLC, which is located at 235 Peachtree Street, NE, North Tower, Suite 202, Atlanta, Georgia 30303.
Is that the correct address?
MS. CARTER: Suite 202? Did you say that?
MR. MARTIN: Yes.
MS. CARTER: Yes.
MR. MARTIN: All right. The court reporter is Shari Snow. Other persons present in the room, in addition to the deponent Andrea Gogel: Meredith Carter, her attorney; Joe Murray, my law partner; Latesa Bailey, the human resources director for Kia Motors Manufacturing Georgia; Randy Jackson, the senior vice president, human resources administration for Kia Motors Manufacturing Georgia; and Deb Walker, the



general counsel for defendant Kia Motors Manufacturing Georgia.
Ms. Carter, are there any other preliminary matters or stipulations that we should address before we begin with the examination?
MS. CARTER: No.
EXAMINATION
BY MR. MARTIN:
Q Miss Gogel, for the record, would you please state your full name and your address.
**A Andrea Lenora Gogel. My address is [redacted], in Pine Mountain, Georgia.**
Q Miss Gogel, we've had the occasion to meet before, but let me explain how we will proceed today. Have you ever been deposed before?
**A Not that I recall.**
Q During the course of this deposition, I'll be asking you a series of questions regarding the allegations in your lawsuit. If you don't understand any one of my questions, please let me know and I'll repeat it or rephrase it until you do understand the question. Do you understand this?
**A Yes.**
Q As you can see, a court reporter is present, and she'll be taking down verbatim all of my questions



and all of your answers, as well as anything else that is said on the record.
Obviously, out of respect for our court reporter, it is very difficult for her to capture nods of the head and gestures, much of the nonverbal communication that we're generally accustom to in everyday life. So I will do my very best to let you know if you're nodding your head, but I'd like you to concentrate on giving me audible answers to all of my questions.
Will you commit to doing that?
**A Yes. Thank you.**
Q Obviously, it's important for our court reporter for us to enunciate. I'll do my very best. It's also very important for our court reporter for us not to talk over one another.
Again, in everyday conversation, it's sometimes easy for us to talk at the same time. Because this is a legal transcript, I will do my very best to wait until you finish an answer before I ask the next question. If you'll extend to me the courtesy of waiting until I finish my question until you proceed to answer.
Is that acceptable?
**A Yes.**

Q If for some reason I break this rule, and I've been known to do that from time to time, if you haven't finished with your answer, would you please hold up your hand or otherwise indicate that you haven't finished, and I'll do my best to wait until you finish before I ask my next question.

The magistrate judge in this case, Judge Vineyard, he has certain rules about how depositions are going to be conducted. One of his rules are, he wants us to go about 90 minutes, you know, before we take a break.

Obviously, if we get to a point where you need to take a break, please let me know and we'll take one. Otherwise, we'll probably go about 90 minutes before we take a break.

MS. CARTER: I object to that, that you're limiting when she can take a break. I mean, he says that just as guidance. So I'd just say we play it by ear. I don't think we're going to have any excessive breaks, but I disagree that you're just entitled to go 90 minutes without a break, in case one is needed.

MR. MARTIN: I understand. Objection noted.

BY MR. MARTIN:



Q Your counsel and I spoke, as a preliminary matter, about you reading and signing the transcript. Obviously, you're under oath, you know, and truthful testimony is required. Again, now, I want to emphasize, if you don't understand my question, you know, please let me know, because I will assume that you understand the question if you respond. Okay?

**A (Witness nods head affirmatively.)**

Q The defendant in this case is Kia Motors Manufacturing Georgia, Incorporated. I may use the word "Kia", "KMMG", or "The Company" to refer to that organization. Is that acceptable?

**A Yes, I understand.**

Q Miss Gogel, do you have any questions before I begin?

**A No.**

Q Do you have any physical or mental conditions that might affect your ability to understand my questions, recall events, or give truthful responses?

**A No.**

Q Are you under the influence of alcohol or any medications that would affect your ability to understand my questions, recall events, or give truthful responses?



**A No.**

Q What did you do to prepare for today's deposition?

**A I reviewed my own notes.**

Q And which notes did you review?

**A Primarily, what was in the interrogatories, as well as the items that Meredith Carter and I discussed.**

Q Okay. And I don't want any information about your discussions with your counsel. That's privileged. But can you describe, with specificity, what items you reviewed?

**A I jotted down dates that were critical.**

Q Other than jotting down dates -- where did you get these dates?

**A I had given the information to Meredith about dates, when I had specific dates, as well as approximate dates of situations that had occurred.**

Q During the course of discovery, you have turned over some handwritten notes, which we'll discuss, and you had also turned over a timeline to the EEOC. Are those the notes that you're referring to?

**A Yes, sir.**

Q Are there any other notes that you recall



you referring to?

**A I referred to a calendar to look at dates in reference to where they fell on the calendar.**

Q And just to be clear. Was that a calendar in which you had already taken notes or was it just a regular blank calendar that you used as a reference point?

**A It was a calendar that I looked up online. It did not have any notes, and I didn't -- I didn't print it. I simply looked at it.**

Q Thank you. Other than the interrogatories, the calendar that you referred to online, the handwritten notes that you have produced, and the timeline that you had produced to the EEOC, can you recall any other documents that you reviewed to prepare for your deposition?

**A I'm sure there are more, but I can't recall at this time.**

Q Other than your attorney, have you discussed today's deposition with anyone?

**A Do you mean that it was occurring?**

Q Yes, that it was occurring. Let's start with that.

**A Yes.**

Q With whom did you discuss the fact of the

13

deposition?
**A (There was no response.)**
Q The fact that it was occurring.
**A My husband.**
Q Anyone other than your husband?
**A My children. My mother. I don't recall that I've shared that with anyone else. I did request vacation time from work.**
Q Other than your husband, your children, your mother, and asking for vacation, did you discuss the fact of the deposition with anybody else?
**A Not that I recall, no.**
Q Did you discuss the content of the deposition with any of these folks?
**A I discussed it with my husband, yes.**
Q Did you discuss the contents of the deposition with your children, your mother, or your co-workers?
**A I don't believe so.**
Q Have you corresponded with anybody about today's deposition, other than your attorney?
**A No, I don't believe so.**
Q And specifically, I mean, have you sent any e-mails or text messages to anybody about either the fact of the deposition or the contents of the

14

deposition?
**A No, sir.**
Q Miss Gogel, what's your current age?
**A Can I stop for a moment?**
Q Sure.
**A Not stop, but I want to complete the question you asked me. There was a person via Meredith that I received information about -- information from.**
MS. CARTER: That's part of the firm.
THE WITNESS: Okay.
MR. MARTIN: Oh, okay. Yeah.
MS. CARTER: And she's referring to all the documents that were produced by the parties. She's looked at those.
MR. MARTIN: Okay. So that's somebody on your administrative staff?
MS. CARTER: Yes.
MR. MARTIN: Okay. And thank you for that clarification.
BY MR. MARTIN:
Q Miss Gogel, how old are you?
**A (There was no response.)**
Q That's generally impolite to ask, but this is a slightly unique circumstance.

15

**A Item 45 years old.**
Q Where were you born?
**A I was born in Tell City, Indiana.**
Q And you currently reside at [redacted] Pine Mountain, Georgia?
**A Yes.**
Q How long have you been at that address?
**A Since September of 2008.**
Q With whom do you reside?
**A With my family.**
Q Specifically, you're married, correct?
**A Yes, with my husband Thomas Gogel.**
Q And do you have children who live with you?
**A I do.**
Q And who are they?
**A [redacted].**
Q And how old is [redacted]?
**A [redacted] is 12. And my adult son Isaac. But he has a different last name. It is Sabelhaus, S-A-B-E-L-H-A-U-S.**
Q And how old is Isaac?
**A Isaac is 25.**
Q Has anyone else resided with you at this current address?
**A The entire time I lived there?**

16

Q Yes, ma'am.
**A Okay. There was a brief period of time, approximately... one... between one and two months, where a co-worker utilized my basement apartment.**
Q Who was that co-worker?
**A Regina Farmer.**
Q And when you say co-worker, at what company?
**A At Kia Motors.**
Q Has anyone else resided with you at that address?
**A No, sir.**
Q Do you have any children other than [redacted] and Isaac?
**A Yes, I do.**
Q Who are your other children?
**A My oldest son is Richard William Sabelhaus.**
Q And how old is he?
**A He's 27.**
Q Anyone else?
**A No, I don't have any more children.**
Q Thank you. Do you rent or do you own the residence?
**A Own.**
Q And what's your current rental or mortgage payment?

17

A Current mortgage is 2,900.
MS. CARTER: What did you say?
THE WITNESS: 2,900 per month.
BY MR. MARTIN:
Q Where did you live before you moved to Pine Mountain?
A I lived in Winchester, Kentucky.
Q Do you recall the address?
A [redacted] That's it.
Q And who lived with you at that address?
A The same people who live with me at my current address.
Q And how long did you live in Winchester, Kentucky?
A Four years.
Q Where did you reside before that?
A I lived in Oakland City, Indiana.
Q And do you recall that address?
A I'm sorry, but I don't.
Q Don't feel bad. I don't recall my address before last, either.
All right. Your husband Thomas, what's his full name?
A Thomas Joseph Gogel.

18

Q And how long have you been married?
A 10 years.
Q So I take it you married when you were in Kentucky?
A Yes, sir.
Q Did you marry in Winchester, Kentucky?
A Correct.
Q Your two adult sons, Richard and Isaac, are they married?
A No.
Q You mentioned that Isaac lives with you. Where does Richard live?
A He lives in Petersburg, Indiana.
Q Have you ever been married to anybody else?
A Yes, I have.
Q Who was that?
A Richard Alan Sabelhaus. The middle name is the distinction.
Q Is that A-L-A-N or A-L-L-E-N?
A I don't know.
Q And how long were you and Mr. Sabelhaus married?
A 12 years. I believe.
Q From when to when?
A From 1987 until 1999.

19

Q Did you divorce or did Mr. Sabelhaus pass away?
A We divorced.
Q Where did you divorce?
A Pike County, Indiana.
Q Was it a contested or an uncontested divorce?
A (There was no response.)
Q Do you know the difference?
A I want to say it was uncontested because we both wanted to do it.
Q Well, I infer from your comment earlier that you don't recall ever being deposed, that your deposition wasn't taken as a part of that divorce?
A Oh, no.
Q Do you recall whether or not there were any hearings that were associated with your divorce?
A No, there were not. That I had to attend.
Q Thank you. Have you ever filed for bankruptcy?
A No.
Q Other than a traffic violation, which I think we've all committed, have you ever been charged with a crime?
A Yes, I have.

20

Q And what was that?
A It was... I'm not sure what it was called.
Q Describe the circumstances for me, please.
A I was traveling from where I was working in Virginia back home to Atlanta. And I was fully licensed for a firearm; however, I forgot to remove it from my bag when I went through airport security.
Q Approximately when was this?
A 2011 or 2012. I don't recall the exact date.
Q What airport?
A Greensboro, North Carolina.
Q All right. So they found your gun as you were going through security. What happened?
A They asked me if anyone had placed something in my bag. At the time, obviously, I had forgotten that it was in there. And I told them that I had a bottle of contact lens solution that may be too large, which was what I assumed they were asking me about. And then they said no, that wasn't it, did I have a -- did I have a gun in my bag.
And at that point I remembered, and I was very upset. I was very embarrassed. And they asked me to read a citation and sign it. It was accurate, and I signed it. And they rescheduled my flight for

**me because I had missed my flight. And they kept my gun and then they told me I could leave.**
Q And what was the resolution of that citation?
**A It was dismissed. And then, I believe the correct term is expunged from my record.**
Q Do you remember what court it was in?
**A No, sir, I don't.**
Q Do you still have paperwork related to that incident?
**A I'm sure I do.**
Q All right. Do you have your firearm with you today?
**A No, sir.**
Q Other than the incident with the gun going through security, have you ever been charged with any other crimes?
**A No.**
Q Obviously, if this case were to get as far as a jury, they draw a jury pool from a large part of Georgia, so I'd like to ask you about your relatives, either by blood or marriage, who happen to reside in Georgia, if you have any.
We've mentioned your husband and we've mentioned your two adult sons, which one of them lives



in Indiana. Do you have any other adult relatives, by blood or marriage, who reside in Georgia or have resided since January of 2010?
**A I believe there are only two adults.**
Q And who are they?
**A My husband's cousin.**
Q Who's he, or she?
**A I can't recall his first name right now. I know his wife's name is Deb Gogel.**
**Chris, is his first name.**
Q And where does Chris Gogel live?
**A He lives... somewhere in Troup County.**
**And they have a child as well.**
Q Just for the courtesy of our court reporter and for a clean record, if it's a name that's not obvious, you know, like, for example, Troup, if you could spell it for us.
Is Troup, T-R-O-U-P?
**A Correct.**
Q And who are Mr. and Mrs. Gogel's, who is their child?
**A [redacted].**
Q [redacted]
**A I believe so.**
Q And how old is [redacted], to the best of your



estimation?
**A Perhaps seven or eight.**
Q You mentioned another relative of your husband other than Deb and Chris Gogel. Who's that?
**A No.**
Q So when you said he had two, it's Deb and Chris?
**A Correct.**
Q Understood.
What civic clubs or organizations have you and your husband been involved in while you've lived here in Georgia?
**A United States Pony Club. Enoch Ministries.**
Q Can you spell that for us?
**A E-N-O-C-H.**
Q Any others?
**A SHRM.**
Q And that's S-H-R-M?
**A Yes, sir.**
Q And that stands for the Society for Human Resource Management?
**A Yes.**
Q Which particular SHRM chapter are you involved in?
**A I'm not. I'm a national member.**



Q Other than the U.S. Pony Club, Enoch Ministries, and SHRM, can you think of any other clubs or organizations that you or your husband have been involved in?
**A I can't think of any others.**
Q And if you'll allow me to display my ignorance. What is the U.S. Pony Club?
**A It's an organization that promotes learning and responsibility for young people through equine activities.**
Q And is there a particular chapter that you're involved in or a location where you're involved in that?
**A It's Midland Foxhounds Pony Club.**
Q And where is that? Where does that club meet?
**A Poplar Place Farm in Hamilton, Georgia.**
Q What about Enoch Ministries, where does that meet?
**A Pine Mountain, Georgia.**
Q And is that a church?
**A Again, it's equine-related activities to promote... promote therapy for young people.**
Q Speaking of churches, have you and your husband been involved in any churches or religious

groups while living in Georgia?
**A We've attended the United Methodist Church Pine Mountain.**
Q Are you members of --
**A No. We've also --**
MS. CARTER: Let him finish the question.
THE WITNESS: Sorry.
BY MR. MARTIN:
Q That's okay. It happens. Anyway. You were saying.
**A We've also attended a non-denominational Christian church in La Grange.**
Q Do you recall the name of it?
**A No.**
**As well as Christmas programs at a Baptist Church in Phenix City, Alabama.**
Q Miss Gogel, do you currently have a cellphone?
**A Yes, sir.**
Q And who's your cellphone provider?
**A Verizon.**
Q And what's your current cellphone number?
**A** [redacted]
Q And who --



**A I utilize a cellphone for work.**
Q And who's the cellphone provider for your work phone?
**A I don't know.**
Q And what's your work phone number?
**A** [redacted]
Q How long have you had the Verizon number?
**A Years.**
Q Was that the cellphone that you had during your employment with Kia?
**A Yes. As well as a phone that was provided by Kia. Although I don't remember the phone number.**
Q Other than your, let's call it your Verizon number, your work number, and the Kia phone, have you had any other phone numbers since 2008?
**A No home phone number.**
Q No home. What about cellphones, any other cellphone numbers?
**A I pay for other cellphone numbers. They're not mine.**
Q I'm very familiar with that dilemma.
Other than your children's cellphones, did you have any other cellphones that you used on a regular basis?
**A No.**



**(Document marked for identification as Defendant's Exhibit 1.)**
BY MR. MARTIN:
Q Miss Gogel, I'm showing you what's been marked as Defendant's Exhibit 1. It is a four-page document. Are you familiar with this document?
**A Yes.**
Q What is this document?
**A It is an application for employment with Kia.**
Q Whose handwriting is on this document?
**A It appears to be mine.**
MS. CARTER: You're only looking at the first page. Look through the document.
**A (Witness examining document.) I was looking at the front page. Yes, this all... is my handwriting.**
Q Is that your signature on page four of four?
**A Yes, it is.**
Q I notice on the document, you have your Verizon cellphone number for home phone. You also list an alternate phone. What phone number is that?
**A That was my home phone number in Winchester.**
MR. MARTIN: Miss Carter, I wish to note for the record that this employment



application does have her social security number. And at the first break, why don't we, in accordance with the northern district's local rules, redact her social security number from the original that will be in the deposition transcript. Is that okay?
MS. CARTER: Yep. At least the court reporter's copy.
MR. MARTIN: Correct. The one that's in the record.
(Document marked for identification as Defendant's Exhibit 2.)
BY MR. MARTIN:
Q Miss Gogel, I'm showing you what's been marked as Defendant's Exhibit 2. It's a one-page document. Are you familiar with this document?
**A Yes.**
Q What is that document?
**A It is a resume. It is my resume.**
Q And did you prepare this document?
**A Yes, I did.**
Q And did you submit this as part of your application process to KMMG?
**A I'm certain I did.**
Q I'd like you to look at both your resume and

your application, and tell me if there's any information on either one of these documents that is incorrect.

**A (Witness examining documents.) Not that I see.**

MR. MARTIN: Can we go off the record for a second?

MS. CARTER: Yes.

(Discussions were held off the record.)

BY MR. MARTIN:

Q Miss Gogel, I notice from your employment application that you went to Western Kentucky College. What years did you attend Western Kentucky College, or was it -- no. Kentucky Wesleyan College.

**A 1987 to 1991.**

Q And did you graduate from Kentucky Wesleyan College?

**A I did.**

Q Graduated in 1991?

**A Yes.**

Q And what degree do you possess?

**A I possess a bachelor's of arts degree.**

Q Have you attained any advanced degrees since then?



**A I have not.**

Q Your resume indicates that your majors were human resources administration and sociology.

Did you have a double major?

**A Yes.**

Q And you list your grade-point average as a 2.8; is that correct?

**A If I recall, I put a question mark because I have no idea what my grade-point average was.**

Q Did you have any academic or disciplinary problems while you were at Kentucky Wesleyan College?

**A No.**

Q Have you taken college classes at any other college or university?

**A Not for credits.**

Q So your answer implies that you've taken classes that were not for credits. What classes did you take?

**A HR-related classes.**

Q And where was that?

**A Evansville, Indiana, and Lexington, Kentucky, I believe.**

Q And when, approximately, was that?

**A I don't recall.**

Q Do you remember the names of the



institutions?

**A No, because they were focused on the topic versus anything for credit. For example, it may have been at USI in Evansville. I took a SHRM certification course. There was, in Lexington, Kentucky, something related to lean manufacturing, perhaps coaching. But I don't recall the exact location, the school.**

Q Your resume indicates that you have the SPHR certification. What's an SPHR certification?

**A Senior professional in human resources.**

Q When did you achieve that distinction?

**A I believe it was 2004. But I have not maintained that.**

Q And for those who might be unfamiliar with the SPHR, tell us what that indicates.

**A That indicates a certain level of experience and knowledge, applicable experience and knowledge in the area of human resources management.**

Q And what do you have to do to get that designation?

**A You must work in the field for a specific period of time and then pass a certification exam.**

Q Do you recall how many years you have to have of experience?



**A I do not.**

Q Now, you've been in human resources pretty much since 2004 when you achieved that designation, right?

**A Oh, yes.**

Q So how is it that your certification lapsed?

**A You have to submit a certain number of credits every year in order to maintain the certification.**

Q Do you recall approximately when that certification lapsed?

**A I don't recall.**

Q Do you have any records that could help us determine when it lapsed?

**A No.**

Q Do you have any idea where we could find any documentation that could help us narrow how long you held that designation?

**A Society for Human Resources Management.**

**Can I ask you a question?**

Q Sure.

**A What year did I tell you?**

Q My notes indicate that you said you achieved that designation in 2004. Is that incorrect?

**A No, I believe that is correct. I was trying**

**to think back. Yes, I believe it was 2004.**
Q Ballpark, do you have any idea how long you held that designation? A year, two years, five years?
**A Somewhere between three and five years, I believe.**
Q Thank you. Now, on your resume, if you'll turn your attention to page two of four, it has abilities, interests, hobbies, or personal associations. It's in the second fill-in-the-blank box that's labeled "career objectives". Do you see that?
**A Yes.**
Q And you have SHRM, which I believe we established is the Society for Human Resources Management, right?
**A Correct.**
Q Were you affiliated with a SHRM chapter when you were in Kentucky?
**A I don't recall.**
Q And then you have Certified Sherpa Coach. Can you describe for us what that means?
**A I was certified in what's called the Sherpa Method of Coaching, which is a methodology around coaching.**
Q And is that based on the book entitled "The



Sherpa Guide: Process-Driven Executive Coaching," by Brenda Corbett, C-O-R-B-E-T-T, and Judith Colemon, C-O-L-E-M-O-N, Kinebrew, K-I --
**A Right, it's exactly that program.**
Q Okay. Just for the record. Kinebrew is K-I-N-E-B-R-E-W.
Thank you. When did you attain the Sherpa certification?
**A I believe it was 2007.**
Q And what requirements do you have to satisfy to achieve that certification?
**A You go through a two-week course, and then, on a continuing basis, go through the process of coaching another individual, with periodic follow-ups with the Sherpa folks. And after you've completed those successfully, then you are considered to be certified.**
Q Thank you. Other than the SPHR certification that you held and the Sherpa certification -- do you still hold that certification?
**A There's not a time limit on that one.**
Q I understand. Just for the record, you nodded your head up and down to indicate yes. Is that right?
**A Yes.**



Q Do you hold any other certifications or designations that aren't listed on your resume or your employment application?
**A No.**
Q Other than the few non-credit classes that you took in Kentucky and Indiana, have you attended any other college or post-college educational classes?
**A No.**
Q Tell me about your background in human resources.
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q When did you start in human resources?
**A My first position in human resources was an unpaid internship in 1990.**
Q And who was that internship with?
**A Kimball International.**
Q Can you spell Kimball, please.
**A K-I-M-B-A-L-L.**
Q Where's Kimball International?
**A Their headquarters are in Jasper, Indiana, J-A-S-P-E-R.**
Q Describe your duties for me at Kimball International.
**A Basic HR functions: Building personnel**



**files, preparing documents and packets for training.**
Q And how long were you in this unpaid internship?
**A Maybe a couple of months. It was during one semester of school.**
Q So you graduated in 1991 with, of course, your sociology and human resources degree.
When did you obtain your first human resources job?
**A First paid human resources job was with a small hospital, Perry County, P-E-R-R-Y, Perry County Memorial Hospital in Tell City, Indiana.**
Q And what positions did you hold with Perry County Hospital?
**A I was the human resources coordinator.**
Q And for those who are unfamiliar with human resources, what does that mean?
**A That meant that I took care of... in a small location like that, particularly, that meant I took care of benefits questions that arose, developing their handbook, answering human resources-related questions, such as job postings, salary or wage questions. I also worked on payroll every other week.**
Q My condolences.
**A I did -- yes. I did work comp**

**administration. It's everything related to someone coming on board in the organization and helping them with benefits and maintaining records related to their employment, as well as making sure they were paid correctly.**

Q Thank you. How many employees did the hospital have?

**A It was over a hundred.**

Q And how many folks were in the HR department?

**A One.**

Q There was just you?

**A (Witness nods head affirmatively.)**

Q Is that a yes?

**A Yes.**

Q Gotcha. So what about --

**A I'm sorry. Initially, there was one. Can I correct myself?**

Q Please.

**A Initially, I was the only one. There was another person who worked for accounting, who worked purely in payroll and taxes and budgeting. As we grew, that person was promoted to be what they called the personnel manager. And I then worked for that person for the last two years I was there.**



Q That was my next question, you know, why your role wasn't a manager position.

Do you remember who the person who was the personnel manager was?

**A Yes. Her name is Sheila Gaynor.**

Q Can you spell Gaynor for us?

**A G-A-Y-N-O-R.**

Q And how long did you work at the hospital?

**A Four years.**

Q Now, what about EEO matters, did you work on any of those while you were there?

**A I don't believe we had any EEO matters.**

Q And just for clarification on the record. EEO stands for "equal employment opportunity"?

**A Yes.**

Q And in human resources circles, that's the general terminology that's used for compliance with the various civil rights laws, right?

**A Yes.**

Q And by "civil rights laws," the Civil Rights Act of 1964.

**A Yes.**

Q And that's the law that prohibits discrimination based on race, color, national origin?

**A Correct.**



Q And then there's also the Americans with Disabilities Act, right?

**A Yes. Which actually started right around the time that I started in human resources.**

Q And then the Age Discrimination Employment Act, right?

**A Yes.**

Q And generally, when human resources professionals, you know, throw out the term "EEO," they're talking about those laws combined, right?

**A Correct.**

Q And is it your understanding that those law are enforced by the Equal Employment Opportunity Commission?

**A Yes.**

Q That's sometimes referred to as the EEOC?

**A Yes.**

Q So how long did you work at the hospital?

**A Four years.**

Q And what prompted you to leave the hospital?

**A I wanted to be in a faster-paced manufacturing environment, and professional growth.**

Q How did that opportunity come about?

**A I received a call from the person who had been my manager when I interned with Kimball**



**International, and he told me -- his name was Gary Huffman. And he indicated that they had a human resource manager position available in Fordsville, Kentucky, and he felt like I would be a great candidate and that I should apply, so I did.**

Q And Huffman, is that H-U-F-F-M-A-N?

**A I don't recall the spelling of his name.**

Q And where was Mr. Huffman working when he recruited you for that position?

**A He was working at the Heritage Hills division of Kimball International.**

Q And when did you leave the hospital and begin with Kimball International?

**A It was in 1995, May, I believe, 1995.**

Q And what was your title there?

**A Human resources manager.**

Q And what did your duties include?

**A They included similar duties to what I had at the hospital at the prior job. However, they included more recruiting and selection processes for new employees, as well as more disciplinary action type of duties.**

Q And how many employees were at that division of Kimball?

**A It doubled during the period of time I was**

**there. So I believe there were 180, 185 when I started, and we were over 300 when I left.**
Q And you indicated earlier that you don't recall having any EEO matters at the hospital. What about at Kimball, did you ever have any EEO matters there?
**A No.**
Q And how long did you remain with Kimball?
**A Two years.**
Q Where did you go after that?
**A Toyota Motor Manufacturing.**
Q And what prompted the move from Kimball to Toyota Motor Manufacturing?
**A Opportunity to work in a larger organization, as well as opportunity to learn Toyota manufacturing methods and philosophies.**
Q Which Toyota facility did you work in, your first time?
**A I started in Georgetown, Kentucky.**
Q Okay. And what was your role in Georgetown, Kentucky?
**A I was -- my title was employee relations specialist.**
Q Okay. And what does an employee relations specialist do?



**A In that situation, I had responsibility for human resources functions in one particular part of the facility. It's a very large manufacturing plant, at that time, with over 8,000 employees.**
**So I had a responsibility for paint, which was one section within that manufacturing plant. And it included building relationships with the employees, understanding issues, helping them resolve issues, also selection processes for promotion, development of front line managers, investigations.**
Q All right. You said part of your job responsibilities were understanding issues. What does that mean?
**A That means if an employee was having difficulty, you were quickly aware of it and were supporting efforts to correct the situation, whether it be an employee had an... a personal issue where they needed assistance from EAP and you could provide that information to them. Teaching about FMLA and medical leave and our processes.**
**As well as if they had concerns about the work, about how, you know, how they were able to perform the work, they would frequently talk to their employee relations specialist.**
Q And you mentioned an acronym a few minutes



ago, EAP. What does that stand for?
**A Employee assistance program.**
Q You also mentioned that as an employee relations specialist at Toyota, you were in charge of investigations. What kind of investigations were you in charge of?
**A At that time, at that level, front-line investigations. If a person reported that they felt another employee was treating them badly or behaving inappropriately, you would conduct an investigation.**
**And they had, in my chain of command, was an assistant human resources manager who I then would review results and make recommendations.**
Q Now, when you said the investigation would -- if somebody felt like they were uncomfortable, did that include allegations of discrimination?
**A It could have.**
Q So if I understand correctly, I guess your job was in aiding and assisting the assistant HR manager in resolving problems, including discrimination?
**A Can you repeat that, please.**
Q Sure. You said you reported to the assistant HR manager, right?



**A Correct.**
Q Okay. And so I guess my question is, you know, you said you conducted investigations, right?
**A At times, yes.**
Q And you would report those results to the assistant HR manager?
**A Yes.**
Q So would you make recommendations as part of your report?
**A Yes.**
Q And did those recommendations ever include how to respond to, you know, a discrimination allegation?
MS. CARTER: Object to the form. Vague.
BY MR. MARTIN:
Q Did you ever investigate discrimination allegations?
**A In that position, I cannot recall if I investigated discrimination allegations. That would have been -- investigations would have been a small part of my duties in that role. And most of the time, investigations were related to attendance problems, inappropriate behavior, not necessarily where someone complained of discrimination.**

Q What do you mean by "inappropriate behavior"? Give me an example.
**A Cursing at somebody that they became angry with because they didn't do something right.**
Q Okay. And how long were you in that job at Toyota?
**A About a year and a half.**
Q And where was your next HR job?
**A It was still with Toyota, and I believe the title changed slightly. It was team member relations specialist at the Indiana facility for Toyota.**
Q And describe form me what a team member relations specialist does.
**A Very similar to what I described about employee relations specialist at Toyota in Georgetown. It also included a lot of recruiting duties, interviewing duties for manufacturing employees, because they were in a startup situation.**
Q So you listed your duties the first time as an employee relations specialist, as building relationships with the employees.
Now, how do you build relationships with the employees? What sort of things do you do?
**A You spend a tremendous amount of time on the shop floor. You learn people's names. You attend**



**meetings that they have. You introduce yourselves to people and get to know who they are.**
Q And so you identified your duties as the employee relations specialist, as building relationships with employees, identifying issues, conducting investigations. I believe you said selecting employees.
Can you think of any other duties you had as a team member relations specialist?
**A I'm sure there are many more, but I can't think of any right now.**
Q And your first Toyota job, for what year period was that; do you recall?
**A It was -- I started there in September of 1997. I transferred to Indiana in January of 19... -- January or February of 1999.**
Q And how long were you in the Indiana position?
**A I was in that position for approximately two years. But my position did change during that time.**
Q Okay. How did it change?
**A Initially, I was doing similar to what the work that I had done at Kentucky but with different groups of -- different departments of people. And during that time, I was then put into what they called**



**a project specialist. It was still considered a team member relations specialist, but my focus was on plant-wide projects.**
Q Backing up to when you were the employee relations specialist in Kentucky. How many people did you have working for you?
**A I had none working for me.**
Q All right. And what about when you became the team member relations specialist in Indiana, how many direct reports did you have there?
**A None.**
Q What about as the project specialist, how many direct reports did you have for that?
**A At different points, one or two. But they were not full-time employees. So under my direction would be a co-op or an intern, or something like that.**
Q Now, moving from team member relations specialist to project specialist, was that a promotion?
**A It wasn't a promotion.**
Q It was just a different set of duties?
**A Yes.**
Q What kind of projects did you work on?
**A I worked on plant-wide communication processes and systems. I worked on policy**



**development. I worked on special presentations for our vice president of human resources. Anything HR related that was plant-wide. Because it was a startup, there were many things that needed to be done and programs that needed to be set up, and that was my responsibility to make those happen.**
Q Now, was Toyota the first foreign national company that you worked for?
**A Yes.**
Q Was there anything, I guess, unique or were there any challenges in working for a Japanese-based manufacturer?
MS. CARTER: Object to the form.
THE WITNESS: Do I answer?
BY MR. MARTIN:
Q If you understand the question.
**A I believe I do.**
Q Okay. Tell me what struggles or challenges you had working for a Japanese-based company.
MS. CARTER: Same objection.
**A Communication.**
Q Okay. How so?
**A Language.**
Q So there were some language barriers. I take it that there were some Japanese expatriates that

worked there?
A **Yes.**
Q And by "expatriates," we're talking about Japanese citizens who are in the United States for some period of time for purposes of working for the company, right?
A **Uh-huh (affirmative).**
Q Okay.
MS. CARTER: Is that yes?
THE WITNESS: Yes.
BY MR. MARTIN:
Q Thank you. All right. So you had some language bar -- language challenges with the Japanese expatriates. Any cultural issues?
A **No, not really.**
Q So you said the Indiana plant, that that was a startup?
A **Yes.**
Q What type of policies did you develop?
A **Drug-testing policy, weekend overtime policy. There were many, and I can't recall all of them.**
Q Okay. EEO policy, did you develop one of those?
A **I don't believe I developed that policy.**



Q Okay.
A **I believe that was in place.**
Q That was already in place.
A **Uh-huh (affirmative).**
Q All right. What about a policy against sexual harassment?
A **I believe that was already in place as well.**
Q All right. So the harassment and the equal employment opportunity policies were already in place.
So you remember developing a drug-testing policy, overtime policy. Can you remember any other specific policies that you helped develop?
A **Shift-movement policy.**
Q What's the shift-movement policy?
A **The movement of people between day shift and night shift or night shift to day shift. As you can imagine, when you have a two shift operation or a multi-shift operation, many times people who are on anything other than day shift want to move to day shift. So I developed -- I helped develop the policy related to how that movement occurred.**
Q Thank you. How long did you hold this project specialist position?
A **Around a year.**
Q And after you left that, did you remain in



the Indiana plant?
A **Yes. I was promoted.**
Q What were you promoted to?
A **I was promoted to the assistant manager for staffing.**
Q And what did those duties include?
A **They included sourcing, hiring the appropriate people to staff the plant as it grew.**
Q And when you use the word "sourcing," what does that mean?
A **Finding people.**
Q All right. So the plant grew. How so?
A **It just about doubled. We constructed a mirror image of the original plant, so that required staffing it with the appropriate personnel.**
Q So it went from what number of employees to what number of employees?
A **Off the top of my head, I can't remember exactly. I believe we grew to around 5,000.**
Q Now, when you said that you went to Indiana as a startup, was that the startup of the original plant or the startup of the expansion?
A **They were starting up the original plant.**
Q And how long did you work in the Indiana plant, from 1999 until when?



A **Until 2004. February of 2004.**
Q And what position did you hold at the time you left?
A **Assistant human resources manager. I had picked up responsibilities for training and OD as well as staffing.**
Q Training and what else?
A **Organizational development.**
Q OD. Gotcha. All right.
And what does organizational development mean?
A **It means that you consistently look at what the continuing needs are to improve the leadership development capabilities and the overall capabilities of the organization and provide tools to improve it.**
Q When you were the assistant manager, did you have responsibility for, I guess, determining employees' issues?
A **(There was no response.)**
Q Identifying issues is how you put it earlier as the employee relations specialist. Was that part of the duties of the assistant manager?
A **In that position?**
Q Yes, in that position.
A **It was not.**

Q What about investigations?
**A In that position, it was not. It was a very different role. It was more on the administrative and training side of human resources versus employee relations.**
Q All right. So you left in February of 2004. Where did you go then?
**A I went back to Georgetown, Kentucky.**
MS. CARTER: Are you at a good stopping point for a break?
MR. MARTIN: Uhmm.
MS. CARTER: We need to take a quick break.
MR. MARTIN: We can do that, or... you want to do that right now?
MS. CARTER: Uh-huh (affirmative).
MR. MARTIN: Okay. Let's take a break.
(Deposition in recess, 11:48 a.m. to 12:03 p.m.)
MR. MARTIN: Back on the record.
BY MR. MARTIN:
Q All right, Miss Gogel. When we took our break a few minutes ago, you were telling me about your role in Kentucky before you -- I mean your role at Toyota in Indiana right before you transferred back



to Kentucky, and you were working as this -- as a project specialist at -- well, you had worked as team member relations specialist, correct?
**A Yes.**
Q And then you were a project specialist, correct?
**A It was the same title.**
Q Same title. All right. But you were just -- so you were a team member relations specialist, but you went from general duties to working on projects?
**A That's correct.**
Q Okay. And then you went to being the assistant manager, which included also training and organizational development, in addition to staffing, right?
**A Yes. I was promoted into that position in 2001.**
Q That's right. You started off as the assistant manager... human resources manager for staffing, and then they expanded the role to include training and organizational development at the time you left.
**A That's accurate, yes.**
Q All right. Thank you.



MS. CARTER: Can you stop one second.
MR. MARTIN: Right. Off the record.
(Discussions were held off the record.)
BY MR. MARTIN:
Q Back on the record. So what prompted the move back to Kentucky?
**A In 2004?**
Q Yes, ma'am.
**A There were multiple reasons. I was recruited by a couple of my former managers at TMMK.**
Q Who recruited you?
**A For the TMMK position, it was Mark Daugherty.**
Q Can you can spell his last name for us?
**A D-A-U-G-H-E-R-T-Y.**
**And Paul O'Brien, O-B-R-I-E-N. I know he interviewed me. And April Mason, M-A-S-O-N.**
Q And what job did they recruit you to come back and take?
**A They -- during the time I was gone, they had started an investigation department, and they were discussing the possibility of investigations, running that department, or, if I remember correctly, power train, the power train HR team.**



**And I had always loved Kentucky. My mother had moved away from southern Indiana. And from a personal and professional perspective, I felt like it would be a good move. I enjoyed working at that facility.**
Q So you liked the people, it was new and maybe expanded roles, and closer to mom?
**A Not entirely. I don't know that it was closer to my mother.**
Q Okay.
**A But yes, I did like the people. I liked the people in Indiana as well, but I did not see the same level of opportunity in the Indiana plant, simply based on structure. The structure was broader at TMMK. And I liked Lexington, Kentucky.**
Q When you talk about it, I mean, based on structure, could you describe for me what you mean? Because I'm not familiar with the location at all.
**A The Georgetown facility is larger from a people, number of people perspective, as well as the diversity of the products they work on. So there is a power train facility there, there's a dye manufacturing and stamping facility there. So there's a broader range of activities that occur at the Georgetown, Kentucky plant.**

57

**Based on that, the organizational structure for HR was... there were more manager positions, and there was -- they had a structure that was slightly different than the Indiana plant, in that it was closer to manufacturing. The positions are typically closer to the manufacturing activities.**

Q Okay. I understand. So at the Indiana plant, how many HR managers were there?

A **There were two.**

Q One over each of the, I guess, wings or each of the plants?

A **No. There were two, and they were split by function. There was one, you had responsibility for the administrative personnel types of activities, and there was one that had the employee relations functions.**

Q Okay.

A **So it was split into two different aspects of HR.**

Q And when you say the two different aspects of HR, describe what those mean, employee relations versus admin.

A **In the Toyota environment at that time, employee relations worked very closely with production employees and production management employees. And it**

58

**was all around the ongoing effort to make sure that it was a positive work environment. Policy interpretation fell under that.**

**And then on the other side, there was staffing and recruiting, and training and development, and payroll and benefits, and the more administrative functions.**

Q Okay. I understand. So when you moved to Kentucky, what was your job title there?

A **My job title was assistant human resources manager.**

Q Just for the record, I'm referring to when you moved to Kentucky back --

A **Yes.**

Q -- a second time, back in 2004.

A **Yes, I understand.**

Q All right. So assistant human resources manager. Was there anything else to the title?

A **No.**

Q Okay. And was it in a -- was it along a functional line or...

A **Yes.**

Q Describe that for me, please.

A **It was in the investigations area. They had a department that solely focused on disciplinary**

59

**action that needed to occur and conducting investigate- -- internal investigations.**

Q What types of things would you investigate?

A **Anything that would occur in an 8,000-employee manufacturing plant.**

Q All right. Can you give me some examples of the types of things you investigated?

A **Could be a very basic, straightforward attendance issue. Theft. Theft from other employees. Harassment, whether it be general harassment or sexual harassment. Hostile work environment types of issues.**

**It would be very difficult for me to name all the -- all of the policy violations that could occur in a plant of that size.**

Q I understand. 8,000 employees, I'm sure there's -- there are a lot of opportunities for misconduct.

A **Yes.**

Q All right. So you were the assistant HR manager over investigations. How many people did you have working for you?

A **At different points, anywhere between four and seven.**

Q And how many assistant managers were at the plant? I mean, how many people held that assistant

60

manager for human resources designation?

A **I can't recall the exact number. I suspect it would be around between 10 and 15.**

Q Okay. And how long did you hold that position as the assistant human resource manager over investigations?

A **I held that position for almost a year. They wanted someone to help them put in visual tracking processes, standardize the processes, do staff development. And given that the scope, in my mind, was relatively narrow, it wasn't -- it was a job that I was able to complete in about nine to ten months to get it into the -- operating as they wanted it to operate.**

Q So you were in investigations for a year, and then you went into this role where you were helping with tracking, standardization, and staff development.

MS. CARTER: Object to the form.

MR. MARTIN: I'm just trying to get clarification.

MS. CARTER: It was just multiple questions.

BY MR. MARTIN:

Q As I understood your testimony, you said you

worked in investigations for a year. And I asked what you did next, and you gave me several things.
A What I gave you was a part of what I did in investigations.
Q Understood.
A I didn't personally conduct very many investigations. But I managed a group of people with some specific goals toward where we would take that department in a definitive period of time. And we initially anticipated it would be one year. I actually completed that in a little less than a year.
Q Understood. Thank you for that clarification.
Now, you used the word "visual tracking". What does that mean?
A There's a concept of around visual controls in the Toyota systems, and it is to ensure that you're doing -- that you're watching all of the appropriate metrics and acting upon those in a timely manner.
And if you use visual controls and you display those things -- so, for example, if I have three investigations -- and this is a very simplistic way of looking at it. But if I had three investigations, call it investigation one, investigation two, and investigation three. I want to



track, When did that call come in? Where are we at in the investigation as far as the processes and steps that we followed? Had the appropriate communication mechanisms been put in place? And what is the current status?
And we used red, yellow, green. So if it was green, you were right on track with standard. If you were yellow, you were at risk of not meeting standard. And if you were red, you were out of standard and there was a problem and you needed to look at that more closely and determine where the problems were.
So that's a very basic way of explaining visual controls.
Q Understood. That makes perfect sense.
So when you say "out of standard," did y'all have metrics for how many days it should be for to conduct an investigation? Is that what you're talking about?
A Yes.
Q Did the metrics, the number of days necessary for investigation, did they vary based on the type of investigation?
A Yes.
Q Describe for me what would... what would be



an investigation that would result in a shorter metric versus an investigation that would have a longer metric?
A A basic attendance and tardiness issue would be very fast, and it should be -- there should be a call back and it should be addressed in... if I remember correctly, two to three days, closed out. Because it's a very straightforward, simple process.
Q Sure. And what would result in a longer close-out period?
A Off the top of my head, I think about a theft case, a theft situation, where there were allegations of theft, but the process where fact finding was very complex and involved many different departments and many different types of facts.
Q Okay. And ballpark, how long would that be given on your board for an investigation before it was, you know, goes from green to yellow to red?
A That type -- the one in particular I'm thinking of, you have that discussion at the front end about what are the potential places that you need to go look for facts and gather facts. And I would think at two weeks you would start putting more resources or attention to it.
Q That makes sense. Okay.



Now, when your investigators investigate, you know, matters in accordance with your visual tracking, when they concluded their investigation, would they make recommendations?
A Yes, they would.
Q Was the chain of command for the investigation for the recommendations to go to you for approval and then to go from you to another person, or would it go directly from the investigator to a decision maker?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q How would the -- if an investigator makes a recommendation, who would the approval parties be?
A It would depend on the level of corrective action that was recommended, the action that was recommended. If it were the lowest level of corrective action, it would probably be -- you could do that at the recommendation of the investigating specialist and the department assistant manager.
As you go up that level of severity around corrective action, it required more approvals. So if it went above a basic written reminder, then it would need my approval as well as the approval of the department manager. That's an example.

**So as you -- there were multiple levels of corrective action which we would utilize in order to correct behavior. And it, of course, it went all the way up to the level of recommending termination of employment at times, and that required a very high level of approval. And, if eligible, a review of peers, a panel of peers.**

Q Was there any point where you would be the decision maker?

**A Help me understand. Define that for me, please.**

Q Sure. If I understood you correctly, you said if it was a very low level, say some sort of a written counseling, that the investigator would coordinate with the team member's manager.

**A Uh-huh (affirmative).**

Q And the manager would decide, Yes, we're going to do that; No, we're not. Is my understanding of that correct?

**A It would be a consensus decision.**

Q It would be a consensus decision.

**A And that was the environment there, that decisions were consensus decisions. So if you ask was I a decision maker, many times I was one of the decision makers as part of a consensus.**



Q Understood. Help me understand the concept of consensus. People don't always agree. You can debate the subject. And say you have several people involved in a consensus decision, would it be majority rule? Is that how the consensus was arrived?

**A No. There were multiple factors that you considered. It was my job, in investigations, to make sure that they understood the history, the history of that team member, the history of that particular issue within the plant, past practice, and standards that had been developed in that plant as we progressed.**

**So, for example, if the standard was, if you have three absences, unexcused absences, you receive a written reminder. And what I can tell you is that that required a consensus decision between the specialist and the department assistant manager.**

**But many times there was history and precedents that had been set previously which needed to be taken into consideration. That individual person and their history with the company, the other factors involving other situations and how we had responded to those prior situations, you know, standard protocol. All of those things go into those decisions.**

**Whenever it's something that is very**



**frequent and very consistent over time, it's a consensus, but it's not like it's an argument in any way.**

Q All right. So how long were you -- you said you were in the investigative area for about a year. Where did you go after that?

**A I went to staffing.**

Q Again?

**A Yes.**

Q All right. And how long were you in staffing?

**A It was a short assignment. I believe it was around six months, because I also had -- during the -- the goal was to go to staffing and implement a new promotion process. And because of my history and my experience, they also gave me OD and training, and then... a month or two into it, compensation. So I had somewhat of a hodgepodge on the administrative side of HR.**

Q And you mentioned ODN. Organizational development...

**A (There was no response.)**

Q You said you had ODN training.

MS. CARTER: OD and.

MR. MARTIN: Ah.



MS. CARTER: A-N-D.

MR. MARTIN: A-N-D, okay.

BY MR. MARTIN:

Q Organizational development and.

**A Training.**

Q Thank you. How long were you in that next role with staffing, organizational development -- how long were you in that role, after investigations?

**A Approximately six months.**

Q When was your first -- and you held the designation "assistant human resources manager"?

**A Yes, sir.**

Q When was the first time you held the designation "manager" without the word "assistant" in front of it?

**A That was whenever I joined Kia.**

Q Now, you joined Kia in 2008; is that correct?

**A Correct.**

Q And you went there directly from Toyota?

**A Yes, I did.**

Q If I can draw your attention back to Exhibit 1, your application. If you'll look in the first block, about halfway down, it says "referred by," and there's a handwritten name. Do you see that?

A **Yes.**
Q Is that your handwriting?
A **Yes.**
Q And the name is Bob Tyler?
A **Yes.**
MS. CARTER: Are you on page two?
MR. MARTIN: Yes, page two of four. Thank you for that.
BY MR. MARTIN:
Q How did you first come to know Mr. Tyler?
A **I don't think I met him until I was working at TMMI. Sometime between the years of 1999 and 2001.**
Q And TMMI, that's Toyota Motors Manufacturing Indiana?
A **Yes.**
Q What was Mr. Tyler's role at Toyota Motors Manufacturing Indiana relative to your role?
A **At one time, he was -- he worked in a different functional area of HR, and then for a -- for a brief period of time he was my supervisor.**
Q So he was your supervisor when you were an assistant manager?
A **Yes.**
Q So did he hold the title manager?
A **Yes.**



Q And how long did you work in a supervisor-subordinate role with Mr. Tyler?
A **I don't recall the exact time frame.**
Q And was it only on that one occasion at TMMI, or was he your supervisor at some other time before Kia?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Prior to 2008, was he your supervisor on more than one occasion?
MS. CARTER: I'm objecting to the word "supervisor".
BY MR. MARTIN:
Q Okay. What was your -- I understood you to say he was the manager and you were the assistant manager. Was he not your supervisor?
A **I did report to him for a period of time while I was at Toyota Motor Manufacturing Indiana.**
**There was movement during that time, which resulted in me not working -- reporting to him anymore. There was a period of time where he was in that administrative side of HR that I described of the two managers. He was in that side. I reported to him during that time frame, and then there was a shift where he and the employee relations manager swapped.**



Q Understood. Well, during the time when -- and you used the word "report" to him. You said you don't -- do you recall how long it was that you reported to him?
A **I don't recall the exact amount of time, no.**
Q Was it more than six months or less than six months?
A **(There was no response.)**
Q You don't recall?
A **I don't recall.**
Q Did he ever conduct a performance evaluation? Was he ever your appraiser during that period of time?
A **I can't recall if he did a performance appraisal on me at that time.**
Q Your counsel objected to my use of the word "supervisor". You used the word "report" to.
When you use the word "report" to, what does that mean?
A **That means that is the individual that I went to for approval of vacation time, to when I felt like I needed to elevate an issue to the next level up, that was the avenue for me to elevate it. I considered that my chain of command.**
Q Did you have anybody else, at that particular time frame that you reported to Bob Tyler, who you would have considered your supervisor, other than Bob Tyler?



A **I don't understand what you're getting at.**
Q Well, I asked if he was ever your supervisor, and your counsel objected on the form of my question, presumably that the word "supervisor" was vague.
So I just wanted to know, was he your supervisor or was he not, based on your common understanding of that word?
A **Yes, during a portion of that time.**
Q Okay. Thank you.
And using that common understanding of the word "supervisor," did he hold that connotation on more than one occasion prior than 2008, or was it just on that one occasion?
A **I believe it was only that one occasion.**
Q So Mr. Tyler recommended you for the job with Kia. How did that come about?
A **I, of course, was working for Toyota in Georgetown. I was considered, for lack of a better term, very promotable, and I had been waiting for that to happen.**
Q Understood.

**A And that -- however, I enjoyed my work and my job. And I believe that Bob called me one day while I was at work and he told me that he was either getting ready to start a new job or had just started a new job and explained that it was with Kia, that it was in West Point, Georgia.**

**And he didn't go into a lot of detail about anything related to it except that he was very excited and it was going to be the first North American manufacturing plant for Kia. And I don't recall everything we talked about.**

**What I do recall was that he had contacted me and asked me if I might have an interest in working for Kia. And initially, I believe I said I'm really not sure, I'm not looking for a job. And so there were -- there was definitely more than one conversation about Kia and potential opportunities with Kia.**

**And it got to the point where, apparently, they had a position available that -- he mentioned Randy Jackson, that Randy Jackson was also there, and they felt that there was a position that I would be well qualified for.**

Q Okay. And was that position a promotion over the role you had at Toyota?



**A If you're considering only title, yes.**

Q Okay. What about money?

**A If I remember correctly, I took a pay cut.**

Q I'd like to draw your attention back to Exhibit 1, and I'd like you to look at page three of four. At the top of the page, it has a place that indicates previous employment. Do you see that?

**A Yes.**

Q And it said that from 1997 to the present, you were working at Toyota in Kentucky; Georgetown, Kentucky. Do you see that?

**A I do.**

Q And it says that your starting salary was 44K. I understand that to mean $44,000. Is that what you understand it to mean?

**A Yes.**

Q And it has "Final, 92K". And I understand that to mean $92,000. Do you see that?

**A Yes.**

Q Okay. Underneath that, it has "other considerations". It has dollar sign 19 bonuses. And then it has dollar sign, the number 10, plus OT. Can you describe for us what those mean?

**A That means that that particular year I must have received $19,000 in bonuses, as well as $10,000**



**in overtime.**

Q So you were a non-exempt employee?

**A There's an interesting thing in automotive, where exempt employees can... are compensated for hours over a certain amount in a week, and that was the case at Toyota.**

Q All right. Did you receive a substantial bonus in the year 2008? Well, let me ask you. When you filled this out, were you talking about your 2007 compensation or your 2008 compensation?

**A If I remember correctly, I added up, based on my check stub, where I was at the end of the year, how much money I would make total.**

Q Now, the application date on page one of four is January the 25th, 2008. Do you see that?

**A Yes.**

Q Is that when you filled out the application?

**A I would have to assume so if I put that date on there.**

Q I just want to direct your attention to page four of four. You signed the application in two places, right?

**A Yes.**

Q And that is your signature, correct?

**A It is my signature.**



Q And the date that is beside your signature is January the 25th, 2008, correct?

**A Correct.**

Q Okay. And that's your handwriting?

**A Yes.**

Q So if I understand your testimony correctly, if you made a $92,000 base salary, plus a $19,000 bonus, plus $10,000 in overtime, is that $121,000?

**A (There was no response.)**

Q Is that correct?

**A I believe so, yes.**

Q All right. So were you representing that your compensation at Toyota was $121,000 when you filled out this application?

**A It was approximately $120,000.**

**(Document marked for identification as Defendant's Exhibit 3.)**

BY MR. MARTIN:

Q Now, Miss Gogel, I'm showing you what we've marked as Defendant's Exhibit 3.

MS. CARTER: What you handed me was different. She has 2007. I have 2008.

MR. MARTIN: (Handing document.)

MS. CARTER: Thank you.

BY MR. MARTIN:
Q I'm showing you what's been marked as Defendant's Exhibit 3, a one-page document. It appears to be an IRS form W-2. Do you see that?
**A I do.**
Q And it appears to be for the year 2007. Is that correct?
**A Yes.**
Q And it appears to be for Andrea L. Gogel. Do you see that?
**A Yes.**
Q And it has the Combs Ferry address that you testified about earlier. Do you see that?
**A Yes.**
Q Do you have any reason to doubt that this is a true and accurate copy of your 2007 W-2?
**A I don't.**
Q And it has your wages, tips, and other compensation as $101,873.76. Do you see that?
**A I do.**
Q That seems to be significantly less than 121,000.
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Is that less than $121,000?



**A That is. You do recognize that box one of a W-2 does not necessarily reflect the entire income.**
Q Okay. Let's look at box five. It has a slightly higher number. Do you see that?
**A I do.**
Q And that's $112,693.78. Do you see that?
**A I do.**
Q Is that less than 121,000?
**A Yes, it is.**
**(Document marked for identification as Defendant's Exhibit 4.)**
BY MR. MARTIN:
Q Let me show you what's been marked as Defendant's Exhibit 4, which is a two-page document. Are you familiar with that document?
**A Yes.**
Q And how are you familiar with that document?
**A It looks like the offer letter that I received from Kia Motors and that I signed.**
Q That's your signature on the -- on page two of two?
**A Yes.**
Q Now, this has a base salary of $115,000. Is that right?
**A Yes.**



Q And were you actually paid, when you began working at Kia, a base salary of $115,000?
**A That was my base salary, yes.**
Q And your base salary at Toyota was 92,000?
**A That is correct.**
Q All right. Now, item three says you will receive a $20,000 sign-on bonus. Do you see that?
**A Yes.**
Q Did you receive a sign-on bonus?
**A I'm sure I did. Quite frankly, I had forgotten about that.**
Q Okay.
**A Can I clarify?**
Q Please.
**A My Toyota income?**
Q Please.
**A This annual 112,6... sorry. I can't read that (indicating). Unless perhaps you --**
MS. CARTER: Do you have glasses that you need to get?
THE WITNESS: No.
MR. MARTIN: I suffer from the same thing.
MS. CARTER: Let me clarify. I meant did you have some in your purse in the office



that you wanted to get?
THE WITNESS: No, I don't. Thank you, though.
MS. CARTER: Okay.
**A It's around 113,000. Based on when the timing of their salary increases, the way I completed this was looked at my base salary.**
Q Okay.
**A I looked at a check stub to see how much I had earned in overtime, and looked at how much I knew my bonus amount was, to complete this.**
**I know I got a really good raise that year for some specific performance events. And so I don't know what my base was the first, what, nine months of that year, but what I'm trying to explain to you is that this came directly out of information that I had available to me.**
Q At the time?
**A At the time, yes, sir.**
**Now, I didn't copy it off the W-2. I didn't have a W-2 in my hands at that time. I took my base salary, what I had check stubs that showed how much overtime and how much I knew my bonus was that year. So that's how I completed that information.**
Q Now, I believe what got us off on this

tangent is you thought you took a pay cut by going to -- from Toyota to Kia. How do you arrive at the conclusion that you took a pay cut?

**A In that I knew I would make, at minimum, 120,000 at Toyota, based on history and based on my base salary, that upcoming year. And I accepted a salary of $115,000 without the opportunity for overtime and not knowing what their bonus structure would be.**

**However, I had forgotten about the $20,000 sign-on bonus.**

Q So with the $20,000 sign-on bonus, that would have taken you to $135,000, if my math is correct. Is my math correct?

**A I believe it is.**

Q Okay. And so at least in year one, you would have made more money than you made at Toyota?

**A Yes, that would be accurate.**

Q But, I mean, I guess it gets to an interesting question. If you believed that you might take a pay cut, why would you move?

**A Because I was so excited about the opportunity, the potential to be a part of the first North American startup for Kia. I was excited about what I would learn, about what we could accomplish,**



**about the impact we could have to the community that we were building in. And that excitement and hope around the opportunities was why I did it.**

Q Okay.

**A Toyota offered me a promotion to manager when I resigned, to stay there. And I left anyway because of how excited I was about that opportunity.**

Q All right. So when you left Toyota, you went from an assistant manager to the designation "manager" at Kia. How many direct reports did you have when you left Toyota?

**A At the time I left, I don't recall exactly. Maybe eight or 10. I had as many as 14 at different points in my work at Toyota.**

Q How many direct reports did you have when you were working in team relations at Kia?

**A As?**

Q The team relations manager. Wasn't that your title?

**A At Kia.**

Q At Kia.

**A Okay. I'm sorry. Can you repeat that question so I can make sure I am focused on the correct employer.**

Q Sure. At Kia, when you were hired at Kia,



you were hired for the position of team relations manager, correct?

**A Correct.**

Q How many direct reports did you have in the team relations department?

**A When I started, there were three. And directly to me, when I left, I believe there were three.**

Q Who were those three?

**A They were Bryan Rathert, Paul Grimes, and Arthur Williams.**

Q All right. Are they men or women?

**A They're all men.**

Q You said that you had the same three direct reports when you left. Did they have anybody that reported to them?

**A Two of them did, yes.**

Q Who were the two that had people reporting to them?

**A Arthur Williams and Paul Grimes.**

Q And how many folks did they have reporting to them? Start with Arthur. How many reports did he have?

**A I would guess four or five.**

Q What about, you said Paul also had direct



reports?

**A Yes.**

Q How many direct reports did he have?

**A It would be about the same.**

Q About four or five. Okay.

So you had -- you were the manager of team relations, correct?

**A Correct.**

Q You had three assistant managers - Paul, Bryan, and Arthur - correct?

**A Correct.**

Q And two of those three assistant managers had... what was the title beneath them on the org chart?

**A It should have been team relations specialist.**

Q Team relations specialist.

What specific skill set did you bring when you joined Kia?

MS. CARTER: Object to the form.

BY MR. MARTIN:

Q What is it that you thought you could contribute based on your background?

**A (There was no response.)**

Q You said you were very excited about the

opportunity. What is it that you thought you'd contribute?

A **What I thought I could contribute was the same thing that Bob Tyler and Randy Jackson thought I could contribute. And that was to set up an outstanding team relations department and supplier support.**

Q Now, you mentioned Randy Jackson. Randy Jackson was the one who signed your offer letter with Kia, correct?

A **Yes.**

Q And do you have any reason to doubt that he was the one who made the decision to hire you?

A **I would expect that it was a consensus decision, because there were four people who interviewed me.**

Q Who were the four people that interviewed you?

A **If I remember correctly, it was Randy Jackson, Bob Tyler, IB Jang.**

Q And IB, those are two initials?

A **They are.**

Q IB. And his last name, for the record?

A **Jang, J-A-N-G.**

Q And then there's a fourth.



A **I believe Eddie Jin was there.**

Q And that's J-I-N?

A **J-I-N.**

Q So those are the four people that interviewed you. And you would assume that it would be a consensus of those individuals who made the decision to hire you?

A **Say that again, please.**

Q Sure. You said you assumed that it was a consensus decision, correct?

A **If there are four people in a room interviewing me, my assumption is that all four have a decision-making responsibility in that.**

Q Okay. And let me just be much more pointed in my question. You don't actually know who made the decision to hire you, do you?

A **I suppose I... I don't. It was one of those people or all of those people.**

Q Okay.

A **My offer letter came from Randy Jackson.**

Q Okay. Now, you knew Randy Jackson from your career at Toyota, correct?

A **That is correct.**

Q When did you first come to meet Mr. Jackson?

A **I met Randy as a part of ongoing development**



**of what we called, at that time, employee relations specialist, around promoting a positive... positive employee relations work environment.**

**He worked at our North American headquarters in Erlanger, Kentucky, and many times led... led sessions around promoting positive employee relations.**

Q Did you ever work with him directly at their worldwide headquarters?

A **I don't recall.**

Q Did you ever work at the worldwide headquarters?

A **No. Not specifically. I worked on some projects that were joint projects between the Georgetown facility, or the Indiana facility, and the Toyota headquarters office. But as far as being assigned there full time, no.**

Q Okay. What did the team relations department at Kia do?

A **(There was no response.)**

Q What was the purpose of that department?

A **The overall purpose was to create and support an environment of positive team relations, where policies were developed, standards were developed around behavior, and helping set a positive culture in that environment, as well as help people**



**understand what the rules and guidelines of the workplace were.**

**So that included doing training and development as people came into the organization, as well as supporting similar activities with our suppliers, through... - and you're very well aware of this - by offering training opportunities and systems that were appropriate for our suppliers to also maintain positive employee relations, positive team relations within their environment.**

Q When you use the word "positive team relations," what sort of training would you do?

A **You would do training for HR professionals in supplier facilities and manufacturing leaders, as well as, with new employees, teaching them what the parameters of our environment were, what the work rules were, what the culture was and what we wanted it to be, as well as, whenever things went awry with employees, you know, investigating issues, providing an employee handbook.**

**As far as training goes, I'm sure there are many more, but I can't recall more right now.**

Q Now, you said you had three assistant managers that worked for you. What were their titles?

A **(There was no response.)**

Q Why did you have three?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Okay. Did they have different responsibilities?
**A One had specific responsibilities around supplier support.**
Q Who was that?
**A Bryan Rathert.**
Q Okay. What about the other two, what are their unique roles, if any?
**A They were not unique roles.**
Q Okay.
**A They were similar roles.**
Q Okay. What were their roles?
**A Initially, they were to... in a startup situation, there were many things to be done, and all of us did whatever needed to be done. And for assistant managers in team relations, the goal was for them to start developing policies and start preparing for the influx of the hourly workforce.**
Q Functionally, if you have two assistant managers who have similar roles, or -- I mean, how did that functionally work? Was one on first shift and one on second shift? Is that why there were two?



**A It was designed, from my understanding -- they were there when I arrived. I did not develop that structure.**
**My understanding was that it was based on two shifts, that eventually there would be a split to more than one shift, and those assistant managers would then support those shifts.**
Q Did that split ever occur while you were employed with Kia?
**A I just drew a blank. There was so much preparation. Yes, I believe it did.**
Q And obviously, you were the team relations manager. I'm just -- it's not a trick question. I'm trying to get you to help me understand the distinction between these two guys.
I mean, why do you have two assistant managers and how, functionally, were they different?
**A Whenever we only had one shift, they were functionally different in that we split the plant for them. So Arthur had general assembly and one or two other things. Paul had paint and body operations. So we split the plant until the shifts split. So the organizational structure had to change as that evolved.**
Q Now, you mentioned that when you were at



Toyota in Indiana, that part of the appeal was that it was a startup and that you were... that the challenge of a startup was part of what influenced you to... to that job, if I recall your testimony correctly. Is that right?
**A I believe that's close.**
Q Okay. Tell me how I'm wrong.
**A What attracted me to Kia.**
Q No, no. Let's go back to Toyota. You said --
**A Indiana. All right.**
Q When you went to Toyota in Indiana, you said that -- my question was, Why did you go? And you said it was a startup and that that was something that you thought would be a good career move.
MS. CARTER: Object to the form.
**A I don't know that that's what I said.**
Q Okay. Was Toyota in Indiana a startup?
**A It was.**
Q Did that -- was the fact that it was a startup have any influence on your decision to quit your job and start there?
**A I didn't quit. I transferred.**
Q You transferred.
**A And there were multiple factors.**



Q Was that one of the factor?
**A That was one factor, was startup was a factor. The fact that it was on day shift was a significant factor, because I was working night shift in Georgetown. And the location was also a factor, based on my family situation at that time.**
Q Did you have any challenges with the startup at Toyota?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Did you have anything that you would have considered a challenge in starting up a plant?
**A There are many challenges in starting up a plant.**
Q What were some of the ones at Toyota?
**A Hiring enough people on time, finding enough qualified people. Based on the volume, the screening of that volume of people. Helping them understand the manufacturing processes is a challenge. Those are the primary ones that I can think of.**
Q Was there a distinction in the challenges you faced as a human resources professional at Kia that were different than the challenges you faced at Toyota?
**A There were.**

Q Okay. What were those differences?
**A I started at an earlier point in the process.**
MS. CARTER: With who?
THE WITNESS: With Kia.
MS. CARTER: Okay.
**A With Kia, it was much earlier than it was in the process in Indiana. At Indiana, there was a corporate entity who offered a lot of support and provided templates, so to speak, on policy development, on many of the things you have to develop.**
**And at Kia, it was earlier, and it was the first in North America, so it was a bit different in that regard, just starting at a different point. But in a very positive way, in my mind, was the fact that it was very early and that I felt it was -- would be a good utilization of my skill sets, not to mention from my prior experience, as well as developing learning.**
**Other differences about the startup. One difference was the construction phase. At Indiana, the plant was built when I got there and they added the second plant. But at Kia, there was no plant. They were moving dirt.**
**And, you know, seeing that construction**



**process and then being the first ones to move into the building and the development of the floor plans, that was different. Otherwise, not tremendously different.**
Q How long did you work at Kia before the plant -- the construction phase was completed?
**A For about a year.**
Q So the plant was completed sometime in 2009?
**A Yes. We moved in in 2009.**
Q When did the first vehicle leave the assembly line?
**A I can't recall the exact date.**
Q Can you give me a ballpark?
**A In late 2009.**
Q Okay. Once manufacturing started, was there a distinction or was there a change in what team relations did as a department?
**A It did change slightly, although the duties that had already existed continued. Bringing new people in, interviewing, because the hiring was something that just continued and continued.**
**But then as we had people that were working in manufacturing, they did become more intense. It did become more intensive for the specialists, and for all of us, because then suddenly people were no longer in a training mode. They were in full manufacturing**



**mode.**
**And it's a different... it's very different than being -- from training to actually being on a line and the line doesn't stop. So, so the people issues did pick up a little bit at that time.**
Q Well, when you first started in March of 2008, you said they were still moving dirt, to, I guess, grade the lot to begin construction. Is that right?
**A It was in the midst of construction, yes.**
Q Okay. And do you know how many employees were employed there at that time?
**A When I first started?**
Q When you first started in 2008.
**A Very few. There were less... less than a hundred, I think.**
Q And the less than the hundred, how many folks were in human resources and team relations?
**A Full-time, there were some contractors, contract recruiters. I believe full time, there were maybe six or seven in human resources and team relations.**
Q And the six or seven would have been Bob Tyler, right?
**A Yes.**



Q Yourself?
**A Yes.**
Q Paul Grimes?
**A Yes.**
Q Bryan Rathert?
**A Yes.**
Q Arthur?
**A Yes.**
Q Can you think of anybody else?
**A Yes.**
Q Who?
**A Ted Williams.**
Q Who else?
**A Amanda Modling. And then of course, IB Jang, Randy Jackson.**
**And I can't recall if Eddie Jin was responsible for just... I don't believe he was responsible for just human resources. I believe he had a broader responsibility.**
Q Okay. And just the chain of command, Randy Jackson was the director of human resources and administration? Was that his position?
**A Can I look at the document?**
Q Well, I'm just asking what's your recollection. I mean, who did you report to?

A **Randy Jackson.**
Q Okay. He was your boss?
A **I considered Randy Jackson to be my boss.**
Q And that was in 2008?
A **Yes.**
Q All right. And Bob Tyler, what was his title at that time?
MS. CARTER: What year are you talking about?
BY MR. MARTIN:
Q 2008, when you were first hired.
A **Manager.**
Q Manager of what?
A **I think it was human resources manager.**
Q So you were the team relations manager and he was the human resources manager?
A **Yes.**
Q What was -- what's the distinction between the human resources department and the team relations department?
A **Initially, it wasn't entirely clear to me, except that similar to the environment I had worked in at Indiana was the administrative, personnel, recruiting, hiring side of human resources, and then the employee relations and policies side of human**



**resources. So I saw those as -- I saw that as the distinction.**
Q Okay. That was your understanding of the distinction. Was there a time that that distinction became clear?
A **Yes.**
Q Okay. When did that distinction become clear to you?
A **When... it was... in 2000... either late 2008 or early 2009, IB Jang was on medical leave. He was no longer in the plant, or in the facility. And Kevin Kim had assumed responsibilities for not only training but also human resources and team relations. And I say "responsibility". I mean as a -- as the Korean counterpart to the American management member in those areas.**
Q Now, the counterparts as you, I guess, describe them, did they hold the designation coordinator?
A **I believe that's... I believe that may have been how they were referred to.**
Q Did Toyota have a similar situation?
A **Yes.**
Q What were they called at Toyota?
A **I believe it was coordinator.**



Q Now, after the initial hiring and you said that you thought the first vehicle left the assembly line in, you said, late 2009, by then had you written the policies and procedures?
A **It was an ongoing process. We had prioritized the policies that needed to be developed by those that we thought were of the most critical nature. And so the policies were developed over a period of time and... and every organization is consistently changing or updating policies. So, I mean, that's an ongoing process is what I'm saying.**
Q Okay. Now, you said obviously there were certain policies that were given priority. What policies were given priority?
A **I don't recall the exact priority list in order. Many times we had as many as 10 policies that were written that were being -- that were going through the process of reviews and approvals. Some of them we needed a tremendous amount of input from other departments on.**
**Obviously, the ones on harassment and our EEOC policy, those were -- we had a tremendous amount of input from legal. Our uniform policy, we had a tremendous amount of input from general affairs. So, I mean, there were many policies that were going**



**around at the same time. I can't tell you exactly which policies were where on the priority list.**
Q Did you have an equal employment opportunity policy in place before you began manufacturing?
A **I don't recall the exact date that policy was signed and considered approved.**
Q Did you have a handbook before you started manufacturing?
A **No.**
Q Did you have a harassment policy before you started manufacturing?
A **That, again, was one that took a tremendous amount of review and approval. And as I said, I can't recall the exact date.**
Q Okay. Was there an EEO policy at the time you left?
A **Yes, there was.**
Q Was there a harassment policy at the time you left?
A **Yes, there was.**
Q Now, your team relations department, was it -- you testified earlier you had an extensive background in investigations. Did your department conduct investigations?
A **Yes, they did.**

Q What type of investigations would they conduct?
**A It was anything that came up that was a potential policy violation could lead to an investigation. So it could be treatment, you know, the way someone is treating someone else. It could be an attendance or tardiness or issue like that. I don't recall many theft investigations at Kia. But that could have, you know, it could have been.**
**I can't tell you all of the investigations that we would have done. I can just tell you that similar to what I dealt with at Toyota, you have a large population of people, there are issues that arise that go outside of policy, and you then... you then investigate them.**
Q You said treatment of people. Would that have been, clearly, the allegations of discrimination?
**A Yes, it would.**
Q Would it have included allegations of harassment?
**A Yes, it would.**
Q Would it have included EEO?
**A We would have worked directly with legal on anything like that.**
Q But the investigation would have been



conducted by your department?
**A Under the direction of legal counsel.**
Q Okay. Your, I guess, assistant managers and specialists, is that the type of thing that you would have, I guess, been involved in?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q If they conducted an investigation into treatment, would you have reviewed the investigative results?
**A Yes.**
Q Would you have been involved in making a recommendation as to disposition?
**A Yes, I would. And in further explanation of that, because we were brand new and all of the people there were brand new, I made it a point to involve the team relations team, which included specialists and assistant managers, in having open discussions about investigations, where that fell in the continuum of acceptable behavior, and talked about appropriate outcomes.**
**It was not only about the investigations we may have in front of us right at that time, it was also about training and making sure that everyone... we were considering all the perspectives of the team.**



Q All right. So the team relations department assisted the HR director in resolving problems of discrimination facing team members?
**A That's a pretty broad statement. Can you...**
Q Sure. The director of HR and administration was Randy Jackson, right?
**A Yes.**
Q And the team relations department, did it assist Randy Jackson in resolving potential discrimination problems?
**A Yes.**
Q Okay. Did it aid Randy Jackson in investigating potential discrimination problems?
MS. CARTER: Object to the form.
**A Can you explain more, please.**
Q Sure. If there was a complaint about mistreatment, ultimately the person responsible would have been the director of human resources administration; is that correct?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Is it correct or is it not correct?
**A I would say it's partially correct.**
Q Okay. What part of it is incorrect?
**A Randy Jackson had other people that he**



**worked with and that he reported to as well.**
Q Okay. Fair enough. So your specialists would make recommendations to the assistant managers; is that right?
**A Yes.**
Q The assistant managers would make a recommendation to the team relations manager. That would be yourself, right?
**A Yes.**
Q You would make recommendations to Randy Jackson?
**A Yes. But it was not always that linear. So Randy provided overall direction, and depending on the level involved and the severity involved, would really determine the level to which it was escalated.**
**So, for example, I would not ask a team relations specialist to go conduct an investigation where there were allegations against an assistant manager or manager. I would want additional involvement from a higher level within the organization. For two reasons. Well, a multitude of reasons.**
**But I never wanted to put people in a position where they were investigating someone who was at a higher level than them, and, you know, the**

**problems that could be created by that. Not to mention, to make sure that, that -- being a new organization, that we were on the same page, aligned properly.**

**But like I said, that decision making and that escalation was always -- not always that linear. Just based on the situation and circumstances.**

Q Sure, I understand. So if it would have been, say, an allegation against an assistant manager, it wouldn't have been a specialist who would have been involved in that investigation; it probably would have been somebody at your level, at a manager level.

**A Yes, I -- I would, generally speaking, get involved in something that involved an allegation of a member of management.**

Q Okay. And then you would provide advice to Randy Jackson as to what you thought was the appropriate resolution based on your investigation.

**A I would provide facts and, I suppose, advice, if that's... I'm not sure if that's the right word. But I would provide facts.**

Q Did you ever provide a recommendation?

MS. CARTER: Object to the form.

BY MR. MARTIN:

Q Subject to her objection, you can answer.



**A At some point in my career there, I know I submitted a recommendation to Randy Jackson.**

Q Okay.

**A Specifically about what, it would depend.**

MS. CARTER: Are you at a stopping place? It's 1:30.

MR. MARTIN: That's actually a perfect time to stop.

MS. CARTER: Okay.

(Whereupon, a lunch break was taken from 1:29 p.m. to 2:47 p.m.)

MR. MARTIN: Back on the record.

BY MR. MARTIN:

Q Miss Gogel, I'd like to pick up a little bit with our questions before we broke. I'd like to show you what we have marked as Defendant's Exhibit 5.

(Document marked for identification as Defendant's Exhibit 5.)

BY MR. MARTIN:

Q Are you familiar with this document?

**A Yes, it appears to be the job description for team relations manager at Kia.**

Q Does it appear to be accurate?

MS. CARTER: You can look at all of the pages.



MR. MARTIN: And it's a three-page document, for the record.

**A (Witness examining document.)**

Q Does it appear to be accurate, to the best of your recollection?

**A The first page, yes, I'm very familiar with. The second and third page I don't recall as clearly.**

Q Now, you are familiar with the, I guess, onboarding process at Kia. Is that what they call the new employee orientation process?

**A They called it new hire orientation.**

Q New hire orientation. You're familiar with that, correct?

**A Yes.**

Q And you yourself went through a type of new hire orientation, correct?

**A Yes.**

Q And you had to sign documents during that?

**A Yes.**

**(Document marked for identification as Defendant's Exhibit 6.)**

BY MR. MARTIN:

Q I'd like to show you what's been marked as Defendant's Exhibit 6. It's a one-page document. Is that your signature at the bottom of the page?



**A Yes, it is.**

**(Document marked for identification as Defendant's Exhibit 7.)**

BY MR. MARTIN:

Q I'd like to show you what's been marked as Defendant's Exhibit 7. It's a two-page document. Is that your handwriting on the first page where it says "Andrea Gogel"?

**A I can't tell.**

Q On page two, is that your signature above the printed word "team member"?

**A Yes.**

**(Document marked for identification as Defendant's Exhibit 8.)**

BY MR. MARTIN:

Q I'd like to show you what's been marked as Defendant's Exhibit 8. It is a 13-page document. It's titled Code of Ethical Business Conduct.

Are you familiar with this policy?

**A I don't recall it specifically.**

Q Does it look like a policy that you would have enforced in the team relations department?

**A By format, yes, absolutely.**

Q You don't have any reason to doubt that this is a true and accurate copy of their policy, do you?

**A Say that again.**
Q I said, you don't have any reason to doubt that this is an accurate copy of the code of ethical business conduct that KMMG had in place in 2010, do you?
**A I don't. This is a legal policy, so I don't -- I don't know how much I would have seen it. But I don't have any reason to doubt that it was a legal department policy.**
**(Document marked for identification as Defendant's Exhibit 9.)**
BY MR. MARTIN:
Q I'm showing you what's been marked as Defendant's Exhibit 9. It's a 15-page e-mail. And I notice that you're not copied on the e-mail, but I did want to ask about the attachment to the e-mail, which is an Excel spreadsheet. And it bears a date of February 2009. Do you see that?
**A (There was no response.) On the spreadsheet?**
Q No, the e-mail, page one.
**A Yes.**
MS. CARTER: Did you just break up the spreadsheet so you could print it out on legal?
MR. MARTIN: Yes.



MS. CARTER: Okay.
BY MR. MARTIN:
Q And I'd like to draw your attention to the first page of the spreadsheet. It's page two of the exhibit, and it's marked as KMMG-Gogel 1485, page one on the Bates stamp. Do you see that?
**A Yes.**
Q And it appears to have some sort of an organizational chart that includes HR and team relations. Do you see that?
**A Yes.**
Q And under HR, there appears to be a designation that is HOD. And next to that there is the word "open". And then team relations, it also has HOD, and next to that it is open. Do you see that?
**A Yes, I do.**
Q Okay. HOD, does that stand for head of department?
**A Yes.**
Q What is the significance of the head of department?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Well, when you worked there, did you have any understanding of what head of department means?



**A Yes. It was a form of... if I remember correctly, it was a form of trying to streamline the reporting mechanisms within the organization. And it was a designation that was something that I became aware of toward the end of 2008.**
**And there was -- from Kevin Kim, he showed me an org chart, very briefly, because org charts were very secret at that time. And he showed me an org chart that showed two distinct departments, and he pointed out HOD HR, HOD team relations. And he said that was important to understand, that there were two different departments and two different HODs.**
Q All right. Now, do you have any reason to doubt that there was nobody designated as the HOD for team relations in February of 2009?
**A What does that show underneath?**
Q This spreadsheet shows that the HOD was open in February -- in team relations, was open in February 2009. Is that correct?
**A It says "open" up there, but then there's Bob Tyler's name right below that.**
Q I understand. But next to HOD -- so are you saying that Bob Tyler was the head of the department in February of 2009?
**A Are you looking at the same org chart I am?**



**Because his name is right there under it.**
MS. CARTER: He's talking about right here.
**A In that box right there, it says open.**
Q Yes. On page one.
MS. CARTER: But in team relations. He's asking about team relations.
BY MR. MARTIN:
Q Team relations.
**A Yes. In that box, it says open.**
Q Okay. Was the head of department in team relations open in February of 2009?
**A In February of 2009, I believe it was. Shortly thereafter, it was not.**
Q What happened shortly thereafter?
**A There was an announcement regarding designations of heads of departments. And they were -- people were slotted into those HOD designations.**
MS. CARTER: Are you done?
**A I don't know if I answered your question appropriately. Can you please ask me again.**
Q Sure. To your knowledge, was the head of department in team relations open in February of 2009?
**A In that time frame, around that time frame,**

**it was open and then became, supposedly, filled, dually, by someone else besides me.**
Q I'd like to draw your attention to the document that has been marked Defendant's Exhibit 10.
(Document marked for identification as Defendant's Exhibit 10.)
BY MR. MARTIN:
Q It's a seven-page document. It appears to be an e-mail and an attachment. Do you see that?
**A Yes.**
Q The date's March the 11th, 2009. Do you see that?
**A I do see it.**
Q The recipients of this e-mail is "KMMG all". Would your e-mail have been included in KMMG all?
**A Yes.**
Q Okay. And you were working there on March the 11th, 2009, correct?
**A Correct.**
Q And the e-mail appears to have been sent from Bob Tyler, right?
**A Yes.**
Q And the subject matter is KMMG organizational announcement. Do you see that?
**A Yes.**



Q Do you recall receiving this e-mail?
**A I do.**
Q Is this an accurate copy of the e-mail you recall receiving?
**A It appears to be.**
Q Do you have any reason to doubt that Bob Tyler sent this out to everybody?
**A No.**
Q Do you have any reason to doubt that Bob Tyler drafted this?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Do you know whether or not anybody other than Bob Tyler drafted this?
**A No, I don't know that.**
Q Okay. I'd like to draw your attention to the third page, which is Bates stamped Gogel doc 152. Do you see that?
**A Yes.**
Q Is this a document that you produced to us in discovery?
**A I believe so.**
Q Is that the announcement that you referred to a few minutes ago designating a head of department for team relations and human resources?



**A Yes.**
Q And if you look at departments, the caption, and it appears to be paragraph number seven, who was made the head of the department in March of 2009?
**A Bob Tyler. For both human resources and team relations.**
Q And if I understand your complaint correctly, it's your contention that you should have been made head of the department at that time; is that right?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Do you understand the question?
MS. CARTER: Which complaint are you referring to?
MR. MARTIN: The complaint in this lawsuit.
BY MR. MARTIN:
Q Are you alleging that you should have been made the head of department in March of 2009?
**A Well, as a piece of the total complaint, yes. Because initially, I was told by Kevin Kim that the significance of team relations and HR being two separate departments was that then there would be HOD designations made at a future point. And this was**



**toward the end of 2008.**
**And he said these things were coming and those areas within the facility who did not currently have a higher level above them, the people who were currently managers, would go into those HOD positions.**
Q Do you know who made the decision to promote Bob Tyler to the head of the department?
**A I don't know. Randy Jackson was the -- was my supervisor, my director at the time. And I received differing stories for why I was not made head of department for team relations.**
Q Just to be clear, so your answer is you don't know who made the decision; is that right?
**A I don't know.**
Q You assume it was Randy Jackson, but you don't know?
**A I don't know.**
Q At any point in time, did you express to anyone at KMMG your dissatisfaction at not having been promoted to the head of the department in March of 2009?
**A Yes.**
Q To whom did you voice that dissatisfaction?
**A I immediately voiced it to Randy Jackson, explaining that my understanding of the significance**

**of the separation between team relations and human resources, they're two separate departments. The other departments were... the manager that was in place, they immediately slid up into that position. I, however, had someone go up beside me and across and over me.**

**And I approached Randy Jackson about it at that time and said, I don't understand why this -- why I wasn't made a designation -- wasn't designated as HOD. And he told me that it was because of timing, because the team relations had recently been made -- had, at the same time, been made a department. And so it was a timeline issue of why I was not.**

**I asked him specifically, So you're saying this is purely a timing issue? Make sure, you know, if there's anything else that we need to talk about, we need to talk about it. And his response was, Oh, no, no, no, you're doing a great job. It's purely, it's purely timing. Just be patient. Purely timing.**

**We had multiple discussions about this, and I was always put off with a different reason as the situation progressed.**

Q Do you recall when you had that conversation with Randy, approximately? You said earlier, "at that time". Can you be more specific for me?



**A At the time these designations were communicated. So at that time, the comment was that it was a matter of timing.**

Q And again, just, I'd like to make sure the record is clear. Can you give me a month and year, when you say "at that time"?

**A It was in the spring of 2009.**

Q Thank you. And is it your contention that your failure to be promoted in March of 2009 is a form of discrimination?

**A Yes.**

Q What type of discrimination do you contend that to be?

**A I think that there were a combination of things going on. There were some extreme cultural differences between the Korean culture and American culture. And associated with that, with the standard employment laws.**

**After I initiated or requested to do an investigation into an improper relationship between our company president and Kisha Morris, who was an assistant manager in general affairs, the -- I felt as though the attitudes toward me changed. And I was not allowed to do that investigation. I was not allowed to investigate the complaints that were made.**



**And, and, you know, I'm an American woman and... I do believe that there was a combination of issues, which included the cultural differences as far as where women were thought to be in the structure, as well as just the fact, you know, I am a woman, and...**

**So I felt there were multiple things that led me to that belief, and it wasn't simply the designation of HOD. There were multiple other things that went on that made me believe that.**

**There were issues with hiring young women in general affairs and being told that only young pretty women can be hired in general affairs. And I complained about that, that that seemed inappropriate to me. And I was told by Randy Jackson that that decision had already been made, and it was said with a laugh and went on.**

**There was... I mean, there were multiple, multiple instances. There were investigations. There were -- there was the treatment of females by some of our Korean staff that was inappropriate in nature. And so there were many things combined that led me to that belief.**

Q All right. Let's take it apart, because I'm not sure you answered my question. You said that there were many things. And the first thing that you



mentioned was your desire to investigate a relationship between Kisha Morris and Mr. Ahn. Is that right?

**A Yes.**

Q And when did you express your desire to investigate the relationship between Miss Morris and Mr. Ahn?

**A In late 2008 was the first time that it was brought to my attention. And I immediately went to Randy and requested that we conduct an investigation and asked his advice on how we should do that appropriately, given the circumstances and the level of individual that was being complained about.**

Q And can you be more specific? You said late 2008. Can you give me an approximate month?

**A It was in the fall of 2008, September or October time frame.**

**And shortly thereafter, my first comment, my first discussion was with Randy Jackson. And then Kevin Kim came to me and asked me to conduct an investigation into Kisha Morris's -- he did not indicate Mr. Ahn. He indicated that I should investigate Kisha Morris around falsification of time and the treatment of other team members, but that it should be very secret and that I could not tell Randy.**

Q So let me get the sequence of events down. In March of 2008, you left Toyota, where you were an assistant manager, and you started working At Kia Motors Manufacturing Georgia, where you became a manager, correct?

**A Yes.**

Q Okay. And in September or October of 2008, you approached Randy Jackson, who was your direct report, and you suggested to him that you wanted to conduct an investigation into a relationship between Miss Morris and Mr. Ahn; is that right?

**A Yes.**

Q And he responded to your suggestion by telling you that you could not do it.

**A Correct.**

Q Was there any ambiguity in what he said? I mean, he said you couldn't do it, right?

**A There was no ambiguity.**

Q Okay. Sometime thereafter, Kevin Kim asked you to conduct an investigation without Randy's knowledge.

**A Yes.**

Q What approximate month and year did that suggestion happen from Mr. Kim?

**A It was within two to three weeks after my**



**discussion with Randy.**

Q And did you undertake such a secret investigation?

**A I did.**

Q Then we fast forward. So that would have been in the October, perhaps November time frame of 2008 that you had the conversation with Mr. Kim?

**A Around that time frame.**

Q In March, a designation was made for the head of your department, team relations, and Bob Tyler was designated as the head of the department, not you. Correct?

**A Yes.**

Q And it's your contention that your failure to be given that designation was due in part to the request you made to investigate the relationship between Mr. Ahn and Miss Morris?

**A I don't know that. It may have been a factor. In addition, after Kevin Kim asked me to conduct that investigation and I started gathering the information he requested, Kevin Kim came to me and told me to stop the investigation, do not gather any more information, and destroy all information related to anything that I had done. And his attitude toward me changed.**



Q When did Mr. Kim have that conversation with you?

**A It was October, November 2008.**

Q Within a few days?

**A It was within a few weeks.**

Q All right. So he told you to immediately stop within a few weeks of telling you to start, and then a few months later, you were, for lack of a better phrase, passed over for head of department. And you believe that there's a connection between the two; is that right?

**A I believe there was a connection between those two. I also believe that there was a connection to my gender.**

Q All right. And that was my second question. So you believe that your being passed over for head of department in March of 2009 was related to your request to conduct the investigation, in part, because of your gender, in part. For any other reason?

**A As I said, there are multiple factors that fed into that belief. But that's primary.**

Q If those are the two primary, what are the secondary bases?

**A The other things that I saw occurring. The other things that I was hearing. And right around**



**that time, also, Arthur Williams, who worked for me, came to me and said that he -- he expressed that he felt bad for me because of... because of the way I was treated. And I asked him -- I just said I didn't understand what he meant. And he said, Well, because -- he said, The way these guys, these Koreans do you is not right.**

**And I said, I believe it's our responsibility to educate about what the laws in this country are and about how, you know, how the differences in gender are looked at differently in this country. So I don't know that what you're saying is correct. And this is what I said to Arthur.**

**And just, and it went on. But that's just another example of the kinds of things that were occurring at that time.**

Q Other than the fact that Mr. Tyler's a man and you're a woman, what evidence do you have that the decision was based on your gender?

MS. CARTER: Object to the form.

BY MR. MARTIN:

Q Do you have any evidence that the decision was based on your gender? And by "decision," I mean the failure to promote -- or, the failure to designate you as head of department in March of 2009.

125

**A Every other person in the same situation I was in that was a man was designated head of department. I was the only female that was in that situation, and I was the only female that was not designated as head of department that was in a similarly situated situation.**
Q Okay. So is it your testimony that during your employment with KMMG, every department manager was automatically designated as a head of department except for you?
**A No. That is not accurate.**
Q Okay. Was there ever a man who was a manager who was not made head of the department?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Do you know of a man who held the designation manager who did not hold the designation head of department?
**A If it was a man who was a manager who had a higher level... American above him, he would not have been designated head of department, because that person above him would have received that designation.**
**For example, Stuart Countess was a senior manager over managers in the general assembly department, and there was a male manager who worked**

126

**for him who was not made head of department because Stuart was head of department.**
**So in those areas where there were higher levels already present in the structure, they were made head of department. So the statement that you made would not be accurate, and, no, that is not my contention.**
**My contention is that people that were in similar situations as mine, where there was not a higher level that was in that HO -- that would have been in the HOD spot, those males were designated HOD.**
Q Okay. Who are they?
**A Bob Tyler, Gary Langswager, Steve Garner, Paul Maenhoudt, James Watson, Rick Douglas, Chris Miller, Ted Arnold. And that was them.**
Q Okay. So it's your contention that because in March of 2009 the head of department designations were all given to men, that it therefore follows that there was gender bias against you?
**A Initially, I chose to believe Randy and believe that, okay, I'm going to go with this and he's telling me it's a timing issue and that for the timing of the next designation, because team relations is now a department, you will receive that designation.**
**Because my question to him was, Were these**

127

**designations automatic? Were they an automatic, you know, promotion into that HOD? And the answer was yes.**
**And so that followed with my, you know, my question followed of, Well, then why wasn't I? And the response was, It's purely a timing issue, because team relations was just now split off and made its own department.**
Q Did he ever explain to you what he meant by, quote, a timing issue, unquote?
**A He did later.**
Q What explanation were you given?
**A That he would take care of me in April.**
Q Okay. I understand that. But when he used the phrase, It's a timing issue, unquote, were you ever given any explanation as to what that phrase meant?
**A Yes.**
Q What explanation were you given?
**A The explanation was that organizationally, team relations had just, at that point in time, been made its own department, and because it happened at that time was why I was not automatically placed into that HOD position.**
Q Okay. So to your knowledge, the phrase

128

"it's a timing issue" meant that it was because team relations had just become its own department?
**A Yes, that is what Randy explained to me.**
Q Do you know whether or not anybody within the organization held the opinion that you had some room for improvement before you were eligible for a promotion?
MS. CARTER: Object to the form. Speculation.
MR. MARTIN: I asked her if she knew. It's not speculation. If she doesn't know, she doesn't know.
MS. CARTER: And vague.
BY MR. MARTIN:
Q Do you know?
**A No.**
Q What was your opinion of your -- whether or not you had any room for improvement while you were working at KMMG?
**A (There was no response.)**
Q And let me give you a more specific question. Did you have any areas where you needed improvement in March of 2009?
**A I'm sure I did. No one's perfect.**
Q I'd like to show you what's been marked as

Defendant's Exhibit 11.
(Document marked for identification
as Defendant's Exhibit 11.)
BY MR. MARTIN:
Q It's a seven-page document. You've seen this document before, right?
**A Yes, I have.**
Q It is the one and only performance appraisal that you had while you were employed by Kia, correct?
**A Yes.**
Q And the appraisal process started, at least so far as you were aware based on your one appraisal, with the employee making a self-assessment, correct?
**A Correct.**
Q And this self-assessment was done in January of 2010?
**A (There was no response.)**
Q Let me help you. If you can look on the last page, you have a signature block that appears to be yours, with a signature that appears to read "Andrea Gogel". Is that your signature?
**A Yes.**
Q Okay. Below that is a date of January the 29th, 2010. Do you see that?
**A Yes.**



Q Is that the date that you signed this?
**A I'm sure it is.**
Q Okay. So you conducted --
**A Uhmm. Not necessarily.**
Q Okay. Explain your answer, please.
**A That would have been the date that I submitted my self-appraisal.**
Q Ah, okay. So you would have done the appraisal sometime before then?
**A Uh-uh (negative). No, I did the appraisal on the January the 29th. These signatures wouldn't come into play until everyone had completed them and it was all reviewed and we signed off.**
Q Okay. I understand. Thank you for that clarification.
All right. So you submitted your self-appraisal on January the 29th, 2010.
**A Yes.**
Q I'd like to draw your attention to the fourth page in this document. It is Bates stamped KMMG Gogel 0065. Sorry. Fifth page.
**A Okay.**
Q At the top, there are two columns. One is self-evaluation, the other is appraiser. Do you see that?



**A Yes.**
Q And did you complete this, the self-evaluation?
**A Yes, I'm sure I did.**
Q Okay. Do you have any reason to doubt that your self-evaluation was that you needed improvement in multitasking?
**A That's what it says on here.**
Q Okay. You needed improvement in performance management?
**A That's what it indicates on this form.**
Q And you needed improvement in routine job duties, correct?
**A Yes.**
Q Now, your appraiser agreed with your self-evaluation, correct?
**A Yes.**
Q And if you'll turn to the last page --
**A Can we --**
MS. CARTER: Let her read that.
That's the appraiser comments. Did you read that?
**A (Witness examining document.) This written-in part, that's... that's new. That's different.**



Q I'm not asking about the written-in part. I'm asking about the column that says "appraiser".
MS. CARTER: I thought you were asking about -- I'm sorry. I thought you were asking about the appraiser part that says comments.
MR. MARTIN: There are two columns at the top of the page.
MS. CARTER: I can't read it on mine.
THE WITNESS: So you're only talking about these top two columns?
MR. MARTIN: Exactly.
MS. CARTER: Yeah, I can't see it on mine.
BY MR. MARTIN:
Q Let me clarify, for the record. There are two columns at the top of the page, correct?
**A Yes.**
Q One of the columns is labeled "self-evaluation".
**A Yes.**
Q And in there there were three areas that you said you needed improvement.
**A Yes.**
Q Immediately to the right of that is another column that is labeled "appraiser," correct?

A **Yes.**
Q And the appraiser agreed with you that you needed improvement in three areas?
A **Yes.**
Q Now, if you'll look at the last page of the exhibit. Your appraiser was Bob Tyler, correct?
A **Correct.**
Q Do you recognize his signature?
A **Yes.**
Q Does that appear to be his signature?
A **Yes.**
Q Now, there are typewritten appraiser comments. Do you see that?
A **Yes, I do see it.**
Q And that's on page -- it's labeled as page five. Do you see that?
A **Yes.**
Q And it reads, Andrea should focus on building positive relationships and communicating more frequently with Korean leadership. Is that what it says?
A **Yes.**
Q Did Bob Tyler put that in?
A **(There was no response.)**
Q Do you know?



A **I don't know.**
Q Did you write that in?
A **No.**
Q Okay. It also reads, She should show more patience and understanding regarding management decisions she disagrees with. Do you see that?
A **Yes.**
Q Do you know who wrote that in there?
A **No.**
Q Now, if I understood your objection, or your counsel's objection earlier, you said you don't recall seeing the handwritten comments prior to this day. Is that your contention?
A **Correct.**
Q Do you have any reason to doubt that this is a true and accurate copy of the appraisal that is in your personnel file?
A **(There was no response.)**
Q And I understand that you disagree with the handwritten -- except for the handwritten notation which you take issue with, otherwise, does this appear to be an accurate copy of your appraisal as you recall it?
A **Yes. I simply don't know... that was not on my copy.**



Q Do you know whether or not a forecast for potential was ever done on you while you were employed at KMMG?
A **I know that now.**
Q Are you familiar with the document which is called "Forecast For Potential"?
(Document marked for identification as Defendant's Exhibit 12.)
MS. CARTER: Object to the form. Do you mean has she seen it?
MR. MARTIN: Does she know whether or not such a form was ever used while she was employed by KMMG.
THE WITNESS: I did not know this while I was employed at KMMG. I only became aware of this through the process of documents being produced.
BY MR. MARTIN:
Q I'd like to draw your attention to Defendant's Exhibit 12. It's a two-page document, which is entitled Forecast For potential. The name of the person being evaluated is Andrea Gogel. Do you see that?
A **Yes.**
Q Okay. And on the second part or on the



second page, there appear to be a few signatures down at the bottom of the page. Do you see that?
A **Two.**
Q Okay. Next to HOD, there's a signature. Whose signature is that?
A **It's Bob Tyler's signature.**
Q Are you familiar with Mr. Tyler's handwriting?
A **I've seen his signature. I don't know about the rest of his handwriting, but I've seen his signature.**
Q All right. Based on the handwritten comments on page two of Exhibit 12, do you know whether or not that's Bob Tyler's handwriting?
A **I don't know.**
Q Okay. Can you dispute that that's Bob Tyler's handwriting?
MS. CARTER: Object to the form. She just said she didn't know.
BY MR. MARTIN:
Q So I guess that means you can't dispute it, correct?
A **No, I can't dispute it, because I don't know.**
MS. CARTER: Not an expert.

137

BY MR. MARTIN:
Q Now, the forecast for potential has a number of criteria at the bottom of the first page. Do you see that?
**A Yes.**
Q And it has a scale which is marked in a box at the bottom of the page. Do you see that?
**A Yes.**
Q And the scale is one to four, correct?
**A Yes.**
Q And one represents poor or not demonstrated, right?
**A Yes.**
Q Two means fair or seldom demonstrated, correct?
**A Correct.**
Q Okay. Three is good or has demonstrated, right?
**A Yes.**
Q And four is superior or usually demonstrates, correct?
**A Correct.**
Q The evaluator who completed this document marked that "demonstrates superior leadership skills" as a one, "poor or not demonstrated". Do you see that?

138

**A I do.**
Q Okay. It also -- the evaluator, whoever it was, also mentioned that there were a number of categories that in that person's estimation were fair or seldom demonstrated. Do you see that?
**A I do.**
Q And those categories include "draws conclusions based on data", correct?
**A Yes.**
Q "Demonstrates skills expected of somebody at a higher level in the organization," correct?
**A Yes.**
Q "Leads and champions change". Do you see that?
**A Yes.**
Q "Influences the decision making of superiors".
**A Yes.**
Q "Demonstrates values and behaviors expected of someone at a higher level in the organization," correct?
**A Yes.**
Q And then finally, "creates a positive impression," correct?

139

**A Yes.**
Q And if I understand your testimony, you said the first time you've ever seen this document was when it was provided in discovery in this lawsuit; is that right?
**A Correct.**
Q Have you ever seen Mr. Tyler's performance evaluation?
**A No.**
Q Now, is it your contention that you and Mr. Tyler were equals? When you say people who were similarly situated, are you comparing yourself to Mr. Tyler?
**A Not necessarily. To Mr. Tyler and... Gary Langswager and Steve Garner and Paul Maenhoudt and James Watson and Rick Douglas and Chris Miller and Ted Arnold. That's who I'm comparing myself to.**
Q Which of those individuals had a role or a job in human resources? Did Ted Arnold work in human resources?
**A Not that I'm aware of.**
Q What about Gary Lang- -- and by the way, Langswager, we've been bad about that, was that L-A-N-G-S-W-A-G-E-R?
**A Yes.**

140

Q Was he in human resources?
**A No.**
Q Steve Garner, G-A-R-N-E-R?
**A Uh-uh (negative), no.**
Q Paul Maenhoudt, M-A-E-N-H-O-U-D-T, was he in human resources?
**A No, he was not.**
Q Other than Bob Tyler, was anyone else in human resources and team relations?
**A Bob Tyler wasn't in team relations. He was in human resources. I was in team relations.**
Q Okay. Within, at least, the human resources reporting chain, how many different departments were under the general, I guess, human resources reporting chain?
**A (There was no response.)**
Q The head of human resources, the director of human resources, was Randy Jackson, right?
**A Right.**
Q He was the director of human resources and administration, correct?
**A Correct.**
Q What departments reported to Randy Jackson?
**A From memory, human resources, team relations, general affairs, safety. Finance was**

**separate. Production was separate. I think those were the ones that reported to Randy, the ones I mentioned.**
Q The only three that dealt with the employer-employee relationship would have been team relations, human resources, and safety, correct?
**A Correct.**
Q So is it your contention that as far as experience, skills, education, that you and Bob Tyler were similarly situated?
**A No.**
MS. CARTER: Want to take a break? We've been going an hour?
MR. MARTIN: Sure, we can do that.
(Deposition in recess, 3:43 p.m. to 3:59 p.m.)
MR. MARTIN: Back on the record.
BY MR. MARTIN:
Q Miss Gogel before we broke a little while ago, I asked you about your background relative to Bob Tyler's background in human resources. And my question was, As far as your background, your education, your experience, your training, you know, were you and Bob Tyler similarly situated? And your answer was no.



So my follow-up question is, Of the two of you, when it comes to a human resources background, which of you was more qualified?
**A For human resources? The way it was defined within Kia?**
Q Yes.
**A Which was the administrative aspects of human resources. I believe Bob was.**
Q Okay.
**A Now, when it comes to team relations, that's a different story.**
Q So is it your contention that when it comes to team relations, you are better qualified than Bob Tyler?
**A Absolutely.**
Q Did you ever make the comment to Randy Jackson, quote, Bob doesn't know shit about team relations, unquote?
**A I don't know if I said that.**
Q Could that have been something that you said?
**A I could have said, I am so much better than Bob at team relations. I don't know. I don't know.**
**But it was frankly no secret that Bob was very strong on the administrative side and I am very**



**strong on the employee relations, team relations side.**
Q Now, prior to your employment with Kia, you had never held the designation "manager of team relations," correct?
**A That title, manager of team relations?**
Q Yes.
**A No.**
Q Do you know whether or not Mr. Tyler ever held that designation?
**A He did for a brief period of time, that I'm aware of.**
Q Do you know where he held that designation?
**A I believe it was with -- at TMMI, Toyota Indiana.**
**(Document marked for identification as Defendant's Exhibit 13.)**
BY MR. MARTIN:
Q I want to show you what's been marked as Defendant's Exhibit 13. It's a three-page document. Have you ever seen this document before?
**A I don't know.**
Q Do you know whether or not this accurately describes Mr. Tyler's background and qualifications prior to his employment with Kia?
**A As you know, I've only known Bob Tyler since**



**2001. I believe it was 2000 or 2001. And this looks like it could be accurate as far as the position he was in when he left the position. What he was doing the majority of the time when he was in the position.**
**What I can tell you is in Princeton, Indiana the majority of the time he was in the position it was on the human resources side of the house, not the employee relations side.**
Q But you don't have any reason to doubt the accuracy of this resume?
**A Well, if you're comparing the two of us, the devil's in the details, because the amount of time and the content within the employee relations or team member relations aspects of things are what would be important, and that's not necessarily here.**
Q Understood. All right. And then, now, you've never held the designation, at least prior to working at Kia, you never held the designation "senior HR manager anywhere," did you?
**A No.**
Q Speaking of Bob Tyler, you said you met him around 2001, when you worked with him at TMMI, correct?
**A I believe I said around 2000.**
Q Around 2000. When was the last time you

talked to Mr. Tyler?
A I don't recall.
Q Has it been within the last month?
A I don't think so.
Q Within the last two months?
A Possibly.
Q And in what context did you talk with Mr. Tyler?
A He had gotten a new job.
Q How often have you communicated with him over the last year?
A Not often. It would depend on how you would define "often". I've stayed in contact with him. Necessarily wouldn't talk on a weekly basis or probably not even a monthly basis.
Q I guess, let me ask a more specific question, which is, how many times have you had contact with him over the last year?
A I don't... I couldn't give you a specific number.
Q Less than 10 or more than 10?
A Probably less than 10.
Q What's your primary means of communication with him?
A I'll call him or he'll call me.



Q On your cellphones?
A I don't know what he calls me from. But he would call me on a cellphone, because I don't have a home phone.
Q Understood. All right. Have you had any e-mail correspondence with him?
A In the last year?
Q Yes.
A I don't recall.
Q Has he provided you with any documents relating to Kia since your termination?
A No.
Q Have you e-mailed him about this lawsuit?
A I don't recall that I have.
Q Have you talked to him about this lawsuit?
A Yes, I talked to him initially about this lawsuit.
Q What did y'all talk about?
A Whenever I received my right-to-sue letter... and I'm assuming if there's anything that I talk about... I'm assuming that my attorney can step in here if there's anything I talk about that I'm not -- that you're not -- I don't have to talk about with you.
But --



Q I'm not asking about any conversations you've had with your attorney. I'm just asking you about conversations you had with Bob Tyler.
A The conversation was, I received a right-to-sue letter. My attorney, who was a different attorney at the time, had contacted me about --
MS. CARTER: Don't talk about anything you and that previous attorney talked about.
THE WITNESS: Okay.
MR. MARTIN: Yes. I won't --
MS. CARTER: He's just asking about you and Bob.
MR. MARTIN: Yes, that's right.
A So the conversation was, What are you gonna do?
And around -- what are you going to do?
I don't know. What are you going to do?
And I said, Well, I'm going to find a different attorney.
Q Your conversations with your attorney or attorneys are privileged, and I'm not asking any questions about that. But anything that you say to Tyler or anybody who is not your attorney is fair game.
So what did you tell Mr. Tyler?



A That I was going to find a different attorney.
Q What did Mr. Tyler tell you about what he was going to do?
A He said he thought he would do the same.
Q What else did you talk about with him?
A It's of a personal nature. It was about his son being very sick and... and having a grandchild living in his home, and it was personal.
Q And when did that conversation occur?
A I don't remember the exact date.
Q Has Mr. Tyler provided you, at any time, with any documents relating to his employment at Kia?
MS. CARTER: Are you -- can you be more specific? Are you talking about in the context of this litigation or ever?
BY MR. MARTIN:
Q Well, in the context of this litigation. Or in the context of... let's say from June of 2010 until now, has he ever provided you with any documents?
A He provided me with a document. It was a long document. I believe it was 10 to 12 pages long, report of concerns. I was actually one of the... the manage- -- there were many concerns and there was much strife within the American management staff about

**the way they were being treated and some of the business practices.**
**And Bob collected information, my understanding, at Randy's request, regarding the content of those concerns and providing a summary of those concerns. I contributed to that document, and then he gave me a copy of that document. I believe it was in September of 2010.**
Q Okay. Is that the only document he's ever provided you?
**A If you're talking about in context to this.**
Q In the context of, you know, your dissatisfaction with your employment at Kia.
**A I don't -- not that I can recall. I don't recall him giving me anything that was not completely related to the work that I did.**
Q Now, at some point in time, you filed a charge of discrimination with the United States Equal Employment Opportunity Commission, correct?
**A Correct.**
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Did you go to the United States Equal Employment Opportunity Commission at any point in time?



**A Yes, I did.**
Q When did you first have contact with them?
**A In November of 2010.**
**(Document marked for identification as Defendant's Exhibit 14.)**
BY MR. MARTIN:
Q I'm showing you a four-page document which was marked as Defendant's Exhibit 14.
Your handwriting is on this document, correct?
**A Yes, it appears to be.**
Q Okay. You filled this out?
**A Yes.**
Q Did you fill it out at the EEOC or did you fill it out someplace else?
**A I believe I filled it out at the EEOC's office here in Atlanta.**
Q The date, page four of four, has a signature. Do you see that?
**A Yes.**
Q Is that your signature?
**A Yes.**
Q And the date is 11/10/10. Does that represent November the 10th, 2010?
**A Yes, it does.**



Q Was that your first contact with the EEOC?
**A In regard to this matter?**
Q Yes.
**A Yes. I believe I called them first to see what the process is. I was not familiar with the entire process and the logistics of it. And then I went to that office and followed their instructions.**
Q Okay. And so when you went to their office for the first time, that's when you completed this form?
**A I believe so, yes.**
**(Document marked for identification as Defendant's Exhibit 15.)**
BY MR. MARTIN:
Q Showing you what's been marked as Defendant's Exhibit 15, which is an EEOC charge. Is that your signature on the document?
**A It is.**
Q Is there anything on this document that is incorrect?
**A Yes.**
Q What's incorrect?
**A My date of employment. The blanket statement of "All male manager positions were upgraded to head of department". The dates of the**



**discrimination. That doesn't encompass the entire period.**
Q All right. That's your signature on the document, correct?
**A It is.**
Q The date is November the 10th, 2010, right?
**A That's correct.**
Q So did they complete this document right after you completed this questionnaire, which is Exhibit 14?
**A It was completed by the lady who was doing -- who was interviewing me.**
Q All right. So it was all done the same day?
**A Uh-huh (affirmative).**
Q Is that a yes?
**A Yes.**
Q Now, you said that there's some corrections on here. I mean, I'd like to draw your attention to the statement right above your signature that says, I declare, under penalty of perjury, that the above is true and correct.
My question is, why did you sign this document if it's incorrect?
**A Because... to be honest, I was very upset. It was... I'm sorry. It makes me emotional talking**

**about it. I never thought I would do this. I never thought I would have to do something like that, and I was... I had done everything within the rules and guidelines of everything I knew and everything that I had ever been taught, as well as the policies of the company I worked for. And I was sitting there completing an EEOC charge.**

**The person who was doing the interview took the information, she typed it out and handed it to me, and I don't feel as though I reviewed it as closely as I should have whenever I signed it.**

**(Document marked for identification as Defendant's Exhibit 16.)**

BY MR. MARTIN:

Q I'm showing you what's been marked as Defendant's Exhibit 16. That's a notice of right to sue. Do you see that?

**A Yes.**

Q Now, the notice of right to sue is on charge Number 410-2011-00549. Do you see that?

**A Yes.**

Q And that's the same number that is on Exhibit 15?

**A Yes.**

Q Okay. So this is the notice of right to sue



that relates to this charge?

**A Yes.**

Q Now, you provided some documents to the EEOC as part of your charge, correct?

**A I don't recall.**

Q All right.

MS. CARTER: I think she had counsel by then.

MR. MARTIN: Let's go off the record for a second.

(Discussions were held off the record.)

MR. MARTIN: We're back on the record.

BY MR. MARTIN:

Q We had a brief off-the-record discussion that some of the documents that were provided to the EEOC may have been provided through counsel. So let me ask my question a slightly different way.

Miss Gogel, did you either personally or through your attorney ever provide any documents to the EEOC? Do you know?

**A I don't know.**

**(Document marked for identification as Defendant's Exhibit 17.)**



BY MR. MARTIN:

Q I'm showing you what's been marked as Defendant's Exhibit 17. It's a five-page document which we obtained from the EEOC through the Freedom of Information Act.

Are you familiar with this document?

**A Yes, I am.**

Q How are you familiar with this document?

**A As I started trying to explain to my attorneys what -- why I believed what I believed about the situation, I felt like I needed to collect my thoughts, and this was my first attempt at doing so.**

Q So you drafted this document?

**A I did.**

Q I'd like you to take a look at the document briefly and see if there's anything in this document that is incorrect.

MS. CARTER: Take your time to read it all.

**A (Witness examining document.) Some of the dates are messed up.**

Q Okay. Which dates are incorrect?

**A Page two.**

Q Let's start with page one. There appears to be a pen and ink change at the top of the page. So



that was typed on January the 5th, 2011, not 2001?

**A Correct.**

Q Page two, you said that there is...

**A Starting at the top, it says March 2008. The date is wrong.**

Q Okay. That should be 2009.

**A The next one, it says 2008.**

Q Okay.

**A (Witness examining document.) This is a lot of information. Other than the corrections I told you about, it otherwise looks... looks to be correct, although there's, there's obviously more that is not in here, but -- and it's incomplete. But as far as what is here, the -- with the exceptions of the corrections I just told you about.**

Q Can you describe for me each and every act of discrimination that you contend was taken against you while you worked at Kia.

MS. CARTER: I'm sorry. Can you repeat the question?

MR. MARTIN: Yeah.

BY MR. MARTIN:

Q You claim that you're the victim of discrimination based on your alienage, your national origin, and your gender, right?

A **Yes.**
MS. CARTER: And race.
BY MR. MARTIN:
Q And race.
And what I'd like you to do is, you mentioned that you believe that you were the victim of gender discrimination when you were not given the designation HOD. I believe you corrected me earlier. I had used the word promotion. An HOD is a designation, not a promotion, correct?
A **It depended when you asked.**
MS. CARTER: Explain what he's talking about.
A **Sometimes I was told it was a designation and that it was not a promotion, and other times I was told that it was a promotion and that I reported to the HOD that was placed in team relations over Bob Tyler. So the answer was different at different times.**
Q Did the HOD title include a compensation increase that you're aware of?
A **I don't know.**
Q Other than the HOD designation in March of 2009, which was given to Bob Tyler, which you contend was the product of gender discrimination, how do you



believe that you were discriminated against based on your gender, your race, and your national origin?
MS. CARTER: I'm going to object to the form. Mischaracterizes testimony. Those weren't the only reasons she gave for 2009.
MR. MARTIN: I agree. She contends that it was also because of the investigation of Mr. Ahn.
BY MR. MARTIN:
Q But what else do you contend was done toward you that you contend is a form of discrimination?
A **During the entire period of time I was employed by KMMG?**
Q Yes.
A **Not being invited to meetings that I otherwise should have been invited to. Being excluded from conversations that I should have been included in. Being treated disrespectfully, where I was asked to not speak in meetings whenever male subordinates of mine were allowed to speak in meetings. Not being invited to the company Christmas party.**
**But that was retaliation. That wasn't necessarily based on my gender or the fact that I'm an American.**
**I was embarrassed in front of people who**



**worked for me. I would be talked to by KS Kim and yelled at and told he didn't understand what I was explaining to him and asked for someone else to explain it to him. And if I brought my male subordinate into the room who explained the same situation, the same policy, using the same words that I had used, say, Oh, now I understand.**
**I was sent on a trip to Korea with many hourly employees and left at the Kia Hyundai hotel for an entire weekend without... without being... this is embarrassing. Without having access to, to food and, you know, very limited food and... and I didn't see -- I didn't see others being treated that way.**
Q Okay. What else?
A **I was requested to become -- to make myself prominent in photographs whenever I was invited to a meeting that I typically would otherwise have not been invited to.**
Q Anything else that you can recall?
A **I'm sure that there are many more, but I cannot recall them right now.**
Q Let's take these one by one. You said that you were not invited to meetings. Were there any Americans that were invited to those meetings?
A **Yes.**



Q Okay. Were there any Caucasians that were invited to those meetings?
A **Yes, I believe so.**
Q And when I use the word "Americans," I mean American citizens, people who share the same national origin as you.
A **Yes.**
Q You said you were excluded from conversations. Let me ask you about the meetings. Do you know whether or not there were any females in those meetings?
A **I don't know.**
Q You said you were excluded from conversations. Who were the conversations between?
A **There were conversations that were held between Randy and KS Kim and my male counter- -- or my male subordinates that I would then have to rely on them to come back and tell me about, otherwise I wouldn't receive the information that I needed.**
Q All right. Your race is Caucasian, correct?
A **Correct.**
Q Randy's Caucasian?
A **Yes.**
Q Your alienage is you're a U.S. citizen, correct?

**A I am.**
Q To your knowledge, is Randy Jackson a U.S. citizen?
**A To my knowledge, yes.**
Q Your subordinates, were they U.S. citizens?
**A Yes.**
Q Do you know whether or not there were any females included in those conversations?
**A What conversations?**
Q The ones that you said you were excluded from.
**A I do not believe so.**
Q Okay. You claim that KS Kim yelled at you. Do you know whether or not he ever yelled at -- and you contend that was discrimination based on your gender, based on your alienage, and based on your race.
Do you know if Mr. Kim ever yelled at any Korean nationals?
**A Can you please repeat that, because something that you stated I would not say is accurate.**
Q As I understand your lawsuit, you claim that you are the victim of discrimination based on your gender: female; your race: Caucasian; and your alienage: United States citizen. And when I asked you



to give me examples, you said that it was KS Kim that yelled at you that he did not understand.
And my question is, do you recall KS Kim ever yelling at a man?
**A I believe so.**
Q Do you recall whether or not Mr. Kim ever yelled at somebody who was a Korean national?
**A I don't recall.**
Q Do you recall whether or not Mr. Kim ever yelled at an African-American?
**A No.**
Q You can't recall or you don't know?
**A I have not observed that.**
**There was another situation where Kevin Kim actually yelled and he shouted and was very degrading. Because I was approached by a general affairs specialist regarding his concern about the way they were bidding work and awarding contracts. And he was very upset and concerned because he did not feel like it was ethical to request bids and do scopes with American companies, and then take all of the data that they provided and give it to a Korean company and tell them, then, what they should do and how much they should bid.**
**And in trying to discuss this initially with**



**Justin, and then Justin Yoo brought Kevin Kim into the conversation, I explained to him what the person's concern was. And he proceeded to get very red faced and very angry and got close to my face and screamed that I was making up things about Koreans and that... he said I was a bad... a bad person and that I was telling him rumors that... about, about Koreans.**
**And I was -- it was upsetting and I didn't know... I didn't know what to do except for saying, I need to leave this room because I don't feel comfortable with the way that you're treating me, and these things that you're saying are not true.**
Q Do you know whether or not Mr. Kim ever had an occasion to confront a man who he thought was spreading a rumor?
**A No.**
Q Do you know if there were ever any men who spread rumors regarding bidding practices?
**A I don't know.**
Q Okay. Who was the person that came to you about this bidding issue?
**A Andy... I can't recall Andy's last name right now. He's a specialist in general affairs. And he was very concerned when he came to me because he was afraid of -- he was afraid he would be retaliated**



**against for complaining about his concern.**
Q All right. You mentioned your trip to Korea with hourly employees, and you said you were left for the weekend.
How many employees went to Korea with you?
**A There were two groups.**
Q Okay. How many?
**A Approximately 200 in each group.**
Q Were you the only woman?
**A No.**
Q Were you the only Caucasian?
**A No.**
Q Were you the only U.S. citizen?
**A No.**
Q Do you know if there were any women that were given access to food?
**A I was the only one left there.**
Q All right. So presumably, the other women who went were able to eat?
**A The other women -- there were two groups, so I went -- I arrived in Korea with one group. They were there for the period of their training. I went with them to the airport and saw them off, and then I went back to the facility where we were staying, where it was almost deserted. I mean, there were almost no**

**people there.**

**And I stayed there for that weekend. Justin Yoo was there as well, but he had a vehicle and he left and went -- left for the weekend, and I was there at the hotel.**

**And so I was the only woman, the only Caucasian woman that I saw in the hotel that weekend. Then on Sunday, Justin came back to the hotel, we went back to the airport and welcomed the next group of team members who were going to be there for that week of training.**

Q So it was just you and Justin who saw the one group in and then saw the next group -- I guess, one group out and the next group in, correct?

**A Correct.**

Q Okay. And so Justin left you, basically?

**A He did.**

Q Okay. And you're claiming that that's because you're a woman?

**A I don't know why that was.**

Q Are you claiming that that's because you're a U.S. citizen?

**A I suspect that's why.**

Q And you claim that's because your Caucasian?

**A I would say that is probably the case.**



Q What was Justin's position relative to yours? Was he your boss?

**A Well, that's a confusing answer, because I didn't know at different times. There was -- he was -- his title was manager, was my understanding, when he joined KMMG. He knew very, very little English, initially.**

**And then during the period of time I began -- it was in late -- Justin started signing off on things as the HOD of team relations further into his employment there as though he was my... as though he was my supervisor.**

Q During this trip to Korea, when did this trip to Korea occur?

**A I believe it was in the summer of 2009. It was very hot.**

MS. CARTER: Summer of what? What did you say?

MR. MARTIN: 2009 is what I understood.

**A But I don't have the exact time frame.**

Q So the receiving party or, I guess, the welcome wagon, was it just you and Mr. Yoo?

**A When the next group came?**

Q Yes.

**A Yes. We were at the airport, and I bought a**



**box of Dunkin' Donuts.**

Q You had mentioned earlier that you thought part of the reason -- other than not being invited to meetings, being excluded from conversations, not being invited to the Christmas party, KS yelling at you, Kevin Kim yelling at you, and the trip to Korea where you were left for the weekend, and the instance where you claim you were told not to speak, can you think of any other things that you contend were discrimination based on your race, your gender, and your status as a United States citizen?

**A Yes.**

Q What is that?

**A There is one other that I as well as many other Americans in the room were very offended by in November 2010. Mr. Ahn came to the facility and there was a dinner, and at the conclusion of that dinner, he made a very emotional speech. And in that speech, he shouted at the American staff, saying, Why you complain? You could be at home sitting on the couch.**

**And then he went into a long... piece of his speech where he talked about loyalty and commitment, and somehow compared... our lack of loyalty... complete opposite to that of American soldiers and veterans.**



**And it was a very... it was a very insulting speech. It was very insulting to Americans and veterans as a whole, American veterans. And I was offended. Others were offended.**

Q And you claim that was also a form of discrimination?

**A (There was no response.)**

Q That speech was discrimination?

**A I felt that the fact that the insults were... created a very uncomfortable environment.**

Q Now, again, your discrimination claims are threefold: Race, alienage, and gender.

Were there any men in the room?

**A There were.**

Q Were there any non-Caucasians in the room?

**A Yes.**

Q Were there any Korean expatriates in the room?

**A Yes. The focus was not on the Korean expatriates.**

Q Now, what was Mr. Ahn's position?

**A He was the president of KMMG and Kia Motors America.**

Q And is that the same Mr. Ahn that you were seeking to investigate in 2008?

**A Yes.**
Q And what was the purpose or the focus of your proposed investigation?
**A The complaints that I had received were that because of an inappropriate relationship or a relationship of an intimate nature between Kisha Morris and president Ahn was creating a situation where Kisha treated others badly and abused her position. And the other allegation was that she falsified time.**
Q Why was it any of your business if Kisha had an affair with Mr. Ahn?
MS. CARTER: Object to the form.
**A Can you ask that again, please.**
Q Sure. Why was it any of your business whether or not two consenting adults had an affair?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Had a relationship, as you put it. Why was it of any concern to you?
**A There were two areas of concern for me. The first was that... was that Miss Morris was utilizing that relationship to the detriment of others and as a... as a reason that others could not -- should be fearful to complain about the way she treated them.**



**The other concern that I discussed with Randy was not that... not that it's my business what two consenting adults do from a relationship perspective, I was concerned about the risk that it could create for the company, which was a part of what my responsibility was.**
Q Okay. What type of risk?
**A That Miss Morris could be involved in something that she wasn't consenting to, because there was such a dramatic difference in the levels. That there -- that she may be uncomfortable with the situation and not reporting it. That -- there were -- there were many possibilities that could be... that could be there.**
**And my goal was not to investigate Mr. Ahn. My goal was to make sure that we weren't putting ourselves at risk, people being treated in a way differently than they should be treated, from a legal and an ethical perspective. And that's why I talked about it with Randy.**
Q When you say "from a legal perspective," you're talking about from a Title VII perspective and EEO perspective?
**A Yes, sir.**
Q Okay. And you had done similar



investigations into other folks in the organization, correct?
**A You're going to have to be more specific, because I don't recall.**
Q Sure. Do you recall an instance with an individual by the name of Michael Terry?
**A I do.**
Q And you were involved in investigating Mr. Terry?
**A I was involved. I didn't conduct the investigation.**
Q Okay.
MS. CARTER: Are you talking about KMMG?
MR. MARTIN: Yes.
BY MR. MARTIN:
Q And you forwarded, I guess, a report regarding Mr. Terry to Randy Jackson?
**A I probably would have, yes.**
Q Okay. And those types of reports were put in writing?
**A Most of the time, yes. If it was a formal investigation, then we would document them.**
Q Okay. Now, you had also made an allegation about that you were told not to speak. Who told you



not to speak?
**A Randy Jackson.**
Q Tell me about that conversation.
**A It was following a meeting about a person who was being recommended for termination of employment, and those decisions were consensus decisions, and we included Randy, Mr. -- at that time, Mr. KS Kim, Kevin Kim, Justin Yoo, Bob Tyler, the specialist who conducted the investigation, the assistant manager who supported that specialist, myself, and the management group from whatever shop that person was in.**
**And so those discussions were typically where the specialist would present the information about the team member and the facts leading up to that recommendation, and the... team member relations and the departments would have discussions before we got to that point, to talk about was it appropriate, was it the right thing to do, and reach a consensus among themselves. Then go into that room, present the information, open it up to questions, discuss the facts and ultimately come out with a recommendation about whether to move forward with the termination of employment or to give the person another opportunity to improve behavior.**

Q Okay. So did you reach a consensus in team relations and with Randy?

A We had reached a consensus. It was a... if I recall correctly, it was an attendance situation, so it was pretty much straightforward. And the department was there, and... and there was a lot of discussion and questions about the consistency related to, you know, historical decisions that were in similar situations, that sort of thing.

I can assure you that I didn't, in that particular meeting, I wasn't raising my voice. I was stating information based on the investigation and the information that had been reported to me by my specialist, by my assistant manager, and by the department.

Q Okay. So you had a specialist who conducted an investigation, right?

A Yes.

Q Okay. So they relayed their information to you, right?

A Yes.

Q So you and the specialist got together with Randy to reach some type of a consensus, right?

A No.

Q Okay.



A The specialist, assistant manager -- within team relations, we had frequent meetings. And in those meetings, we would bring up the cases that we had going on, and issues, concerns. We talked about anything going on within team relations. And they were frequent meetings.

And within those, we would talk about current issues, cases, and whenever it got to the point where someone was being recommended for termination, that was a very, very serious thing at KMMG. It was not... people weren't frequently terminated from employment. It was something we took very seriously. And we wanted to make sure there was a lot of data and facts and it was presented to that group of people where any concerns could be raised.

And the consensus was with the department, between team relations, the specialist and assistant manager, and myself, and the department that the employee worked in.

Q Okay. And you said Randy told you not to speak?

A After the meeting, Randy asked me -- wanted to talk to me, and he said, I'd like for you to -- something to the effect of, I'd like for you to not speak so strongly in those meetings.



And I said, In the review meetings?

And he said, Yes, in the review meetings, and, you know, sometimes other meetings.

And I said, I -- I don't really understand what you're asking me as far as not speaking strongly. I'm not raising my voice, I'm not behaving inappropriately, and I'm presenting facts and information about prior situations. So I don't really understand.

And the specialist and the assistant manager, who both were male in this particular situation, had spoken -- I mean, my assistant managers frequently spoke much more strongly than I did.

Q Now, your assistant managers who spoke, were they Americans?

A It was, it was -- in this particular situation, it was Arthur Williams. He's an African-American.

Q Okay.

A And, and so I kept asking more questions about, Is it okay for Arthur to, you know, voice his opinion and the facts and... and that in the meeting?

Yes.

Is it okay for Tim to voice in the meeting?

Yes.



Q Who's Tim?

A Tim Wilbanks. He's the specialist.

Q Okay. Is he Caucasian?

A He is.

Q Okay. So, are they of American alienage, U.S. alienage?

A Yes.

Q Okay.

A Yes. And he -- so I kept asking more questions, and ultimately, he said, I don't want --

MS. CARTER: "He" who?

A Randy said, I don't -- well, you know, KS has concerns and, you know, I really don't want you to speak at all.

And I did not know how to respond to that. And I just said, I need to think about that. And I left the conversation.

Q How many times did Randy say that to you?

A That particular instance sticks in my mind. I don't recall. I don't recall. I'm sure there are more. I just simply can't recall at this time.

MS. CARTER: Are you at a stopping point?

MR. MARTIN: Sure.

(Deposition in recess, 5:05 p.m. to

5:24 p.m.)

MR. MARTIN: Back on the record.

BY MR. MARTIN:

Q Miss Gogel, do you know whether or not Randy Jackson has ever told anyone else not to speak during a meeting?

**A During "a" meeting or during meetings?**

Q Either "a" meeting or meetings. Does it make a difference?

**A No. No, I don't recall any.**

Q Now, I believe earlier you said that one of the other areas where you felt discriminated was in that you were asked to be involved in a photograph of the managers.

**A Yes.**

**(Document marked for identification as Defendant's Exhibit 18.)**

BY MR. MARTIN:

Q I'd like to show you what's been marked as Defendant's Exhibit 18. Are you familiar with somebody named David Bolton?

**A I don't recall.**

Q This appears to be a series of e-mails. And do you see the second string in this series of e-mails is from you to David Bolton, dated Wednesday,



September 17th, 2008. Do you see that?

**A Yes.**

Q And the fourth sentence -- well, the third sentence reads, One other question. Have you considered having any females in the chute? I would hate for people to think that we are not hiring women.

Did you write that?

**A It appears as though I did, yes.**

Q Now, there was an occasion when Mr. Tyler was definitely given a promotion to senior manager, human resources, correct?

**A Yes.**

**(Document marked for identification as Defendant's Exhibit 19.)**

BY MR. MARTIN:

Q I'd like to show you what's been marked as Defendant's Exhibit 19. It's a promotional announcement. Do you see that? Or organizational announcement is how it's captioned.

**A Yes.**

Q And it announces that Bob Tyler would be promoted from manager, human resources to senior manager, human resources and team relations. Do you see that?

**A I do.**



Q And the effective date of that promotion is April the 12th, 2010. Do you see that?

**A Yes.**

Q Is that the date that his promotion became effective? Do you know?

**A I don't know the exact date his promotion became effective.**

Q Is it your contention that you should have been promoted at that time, as well?

**A To senior manager?**

Q Yes.

**A Not necessarily. It made it more apparent to me that the HOD designation was an expansion of duties and a promotion, and gave you that opportunity to be -- to receive the title senior manager.**

**So do I think I should have received that senior manager position? It appeared to me that the prerequisite to that was being designated HOD.**

Q So at least as of April the 12th, 2010, it was clear that you would not be made HOD; is that right?

**A That's probably... that's probably whenever I brought it up again, whenever it didn't happen and it was supposed to.**

Q And you said you brought it up again. To



whom did you bring it up?

**A I brought it up... I brought it up in the... in the meantime... a long conversation with Bob and Randy in October 2009, giving them specific examples of why I was concerned that there was a bigger issue at work than simply timing, and my concerns.**

Q What were those concerns?

**A There was a man named Steve Thompson who was hired as the manager of general affairs. He personally told me that he was to be named the HOD of general affairs. I previously had been told that those designations were only made one time a year. And so I asked Bob Tyler if the plan was to make Steve Thompson HOD, and he responded that was the plan.**

**There were many things that were happening along the way that made me very concerned, and that was... investigation being requested against another female manager.**

Q Who requested the investigation?

**A Kevin Kim.**

Q When was that request made?

**A That request was made, I believe it was in August of 2009.**

**There was a situation where a female security guard was hidden, and then later the same**

female security guard -- her name was Tina. She was hired through the contract service that we had providing security there. And she was at the front desk. Her name was Tina. She was hidden during a visit of our higher level executives from Korea because she was not pretty.

We forced Diana Ledbetter to sit in as the receptionist because she's pretty.

Q When did that occur?

A That occurred... sometime in the late summer of 2009.

Q Who made the decision to hide the less-than-pretty security guard?

A I don't know. It was reported to me by Mark Jackson and then confirmed by... by Gary Langswager. And I then went to Randy about my concerns about the situation, that it was inappropriate. It was inappropriate to... ask our general affairs, the young professional women that were pretty to present like they were the front desk receptionist.

Q When did you voice that concern to Randy Jackson?

A At the time that it occurred.

Q Okay. And remind me again when that was.

A Late summer of 2009.



Q Okay.

A So Kevin Kim approached me to do an investigation on a lady named Terren Bonkowski, who was a manager in our stamping department, saying that she was a very bad woman and he... I felt threatened by the way he communicated to me about this investigation. He told me that I should be very careful, Mr. Yoo was watching me and was watching how I conducted this investigation.

And I asked him, I don't know -- understand what you mean.

And he told me that she's a very bad woman and Mr. Yoo is watching. He's watching you.

Q Okay. And when you use the pronoun "she," you're talking about Miss Bonkowski?

A Miss Bonkowski.

Q And when did that occur?

A That occurred in the fall of 2009.

And during that investigation, the other -- another stamping manager, Steve Youngblood, expressed to me how concerned he was about the way Terren was treated and that he felt it was because she was a woman. That --

Q Treated by whom?

A By the Korean management staff.



And that --

Q Be more specific about Korean management staff.

A The folks who were... the managers. The Korean management staff in the stamping department.

And there was a gentleman named Chong Yi, who was a specialist. Chong Yi, C-H-O-N-G, last name Yi, Y-I, who was a specialist, two levels down from Terren, who, during the course of investigation -- the course of the investigation against Terren, we did not find that Terren was treating people badly.

What we did find was that Chong Yi was very disrespectful and said she was nothing but a young girl, commenting on the fact she wore makeup. Many comments.

Q You didn't work for Mr. Yi, did you?

A I didn't work for Mr. Yi. And Terren Bonkowski didn't work for Mr. Yi. He was a specialist.

However, he seemed to have been elevated, even though he was a specialist. And I'm not sure how. And he -- it was as though he was protected because he was Korean.

Because I went to Kevin Kim and I went to Randy that he should have, you know, that Chong Yi



needed to be disciplined for his behavior. And... and finally, Kevin Kim said that it was taken care of, that he was coached.

Within our -- the way we approached corrective action, that would not have been an appropriate level of action based on what Mr. Yi's infractions of policy were.

So I was uncomfortable with the fact that he was being treated much better, as a male Korean, than this woman who was a stamping... a Caucasian American stamping manager. And...

Q Did you voice concerns about the decision?

A I voiced concerns about the decision being tremendously different than the -- than what the facts indicated.

Q To whom did you voice that concern?

A To Kevin Kim and Randy Jackson.

Q And that was in August of 2009?

A It was.

Not only Steve Youngblood expressed concerns, there were multiple times that the gentleman who was the senior manager over that area, Bobby Locke, expressed concerns to me about the way Terren was being treated, and he felt it was based on her gender.

185

Then we had the issue where Steve Thompson was hired as a manager in general affairs, and he was supposed to be designated as an HOD.
Q When did that decision occur?
A September of 2009.
Q Okay.
A Ultimately, Steve was terminated from employment; his tenure at KMMG was very short, for inappropriate behavior. I did not participate in that investigation. Arthur Williams did the investigation.
Q Let me ask you. I want to back up for a second. The speaking too strongly, the comment. When did you say that occurred?
A (There was no response.)
Q I'm not sure that we established when that occurred.
A It was later.
Q By "later", 2010?
A There's so many dates that -- I believe it was after the fall of 2009.
Then in October 2009, I met with Randy and Bob and told them I felt like I was being treated differently, specifically because of my gender, and I felt -- I had great concern about the explanations of HOD designations versus a new hire coming in with that

186

designation and that that was contrary to explanations that had been provided to me previously.
During that meeting, Randy asked me if I thought Toyota would take me back, and I felt that was irrelevant whether Toyota would take me back. My, my... there was nothing in that conversation or any conversations leading up to that where there was -- there were any concerns regarding my willingness to continue working for KMMG and to... continue and, and --
But I wanted to have the same opportunities that... that other people there had, that men and -- men... the American men were treated differently than I was, and I wanted the same opportunities.
And during that conversation -- or after we left that conference room, Randy called me to his desk, and I did believe that what he said was heartfelt, and he said, I'm sorry; I wouldn't have brought you here if I had known what it was going to be like.
Q Just to clarify on the record. Steve, he was also a U.S. citizen, to your knowledge?
A Yes, he was.
Q And was he Caucasian?
A He was a Caucasian and he was a man.

187

After that, I followed up with Randy and... about my concerns, and I asked him about the HOD designation for team relations. And he said he just didn't understand, he acted like we had not even had the conversation. He seemed completely baffled and said, Oh, no, team relations is just a part of human resources.
That was completely contrary to what had been told to me before.
Q And that conversation was in the fall of 2009, correct?
A It was.
And I explained to him that I had noticed that Justin Yoo had started being designated as the HOD for team relations on signature documents, which I also didn't understand. Because I thought the HOD was Bob Tyler, and then I see Justin Yoo being designated as HOD. And it didn't make any sense.
Q Do you recall ever seeing an announcement that a change had been made and Justin had been made the HOD?
A No. So I asked Bob Tyler in January of 2010, and he said, No, team relations is still a separate department. I'm not aware of any plans to make it a part of human resources. It's a separate

188

department.
Q Was this before or after he was promoted to senior manager of human resources and team relations?
A It was before.
Q Now, in 2010, April of 2010, you received a salary adjustment, correct?
A (There was no response.)
Q I'd like to show you what's been marked as --
A Thank you.
Q -- as Exhibit 20.
(Document marked for identification as Defendant's Exhibit 20.)
A Yes.
Q And you received a lump-sum payment of $4,138.65?
A Correct.
Q Now, that's not the only time you received some type of a bonus, correct?
A Correct.
Q And at the end of 2010, you received a $12,000 bonus, right?
A Yes, I received it on December 22nd.
(Document marked for identification as Defendant's Exhibit 21.)

BY MR. MARTIN:
Q I'd like to show you what's been marked as Defendant's Exhibit 20.
MS. CARTER: One.
MR. MARTIN: 21, thank you.
BY MR. MARTIN:
Q And that is the $12,000 bonus you received on December the 23rd, correct?
**A Yes.**
Q Now, speaking of concerns, there came a time when you were solicited to provide input regarding concerns you had at the facility, correct?
**A Yes.**
Q And is it your understanding that the genesis of that was a request by Randy Jackson for information?
**A Not exactly.**
Q Okay. What's your understanding of how that came about?
**A Throughout 2010, there were many... there were many concerns brought up by American members of management about not having appropriate decision-making authority, not being consulted on issues that they were held accountable for, not -- did not feel like they had a voice as appropriate -- or as**



**they felt appropriate. And there was a cultural assessment that was performed by Georgia Quick Start.**
**And the crux of that was around the relationship between the American management staff and the Korean management staff. And we -- I'm not aware of anyone ever seeing the results of that. Or actions following that.**
**And so there... there was a meeting; I'm not sure what the intent was, except perhaps team building, where there were mixed teams who worked on projects. And then that was part of the report of concerns. And within that... things were coming to a head as far as those relationships. And Bob had gathered -- I mean, multiple people were going to Bob, me included, regarding their relationships and the concerns around those relationships.**
**And the way it was communicated to me was that Randy had requested that Bob gather information from the American management team about what the concerns were. And so he asked me, and I provided information to him.**
Q So it is your understanding that Randy had asked for specific information?
**A Yes.**
Q Okay.



**A Well. Yeah, information around the relationships and the concerns, yes.**
**(Document marked for identification as Defendant's Exhibit 22.)**
BY MR. MARTIN:
Q I'd like to show you what we've marked as Defendant's Exhibit 22. It's a two-page document. And I'd like you to look at the bottom of the second page.
It appears to be an e-mail from Randy Jackson to Bob Tyler, and the subject is Real Examples. Do you see that?
**A Yes.**
Q So Randy asked Bob for specific examples, and Bob asked you, Gary, Paul, and Robert for specific examples, correct?
**A It appears as though he asked those people, as well as other people. There are many people in this string.**
Q All right. Did you provide specific examples to Bob Tyler?
**A Yes.**
Q All right.
(Document marked for identification as Defendant's Exhibit 23.)



BY MR. MARTIN:
Q I'd like to show you what's been marked as Defendant's Exhibit 23. It's a 14-page document.
Can you tell us which sections of the report of concerns you provided information regarding?
**A I'll need to review it. (Witness examining document.) Number 7. I don't believe those are all my words, but there was a portion of that that I did contribute. Because I was shocked whenever I was invited, as all managers were not invited, and it was uncommon that I would be invited to a meeting that all managers were not invited to.**
**And then whenever they wanted to take a photo and Mr. Kim was shouting to get me and Kisha, get me and Kisha - Kisha Morris - to pull us up in a more prominent position in the photograph.**
Q So that's page two, number 7?
**A Number 7.**
Q Do you know if there were any other women managers who were not included?
**A Yes.**
Q Okay. Who were the women managers who were excluded?
**A Deb.**
Q Okay. Can you think of any men that were

excluded from this meeting?
A **Yes.**
Q Who were the men who were excluded from this meeting?
A **There are other -- you would have to give me a list of the attendees.**
Q Sure. And I realize I'm asking you to go from memory.
Do you recall any men, off the top of your head, who were excluded from this meeting?
A **I know there were, because I specifically thought about it at the time. And I cannot offer you the names.**
Q That's fine. Can you think of any other sections of the report of concerns that you contributed information to?
A **I probably contributed some to item nine, but that was a common theme. I was not the only one who had similar feelings.**
MS. CARTER: What page are you on?
THE WITNESS: I'm on page two.
BY MR. MARTIN:
Q Miss Gogel, did you have a chance to review this document before it was submitted?
A **I don't recall.**



Q Were you aware that this document was being submitted?
A **Well, yes.**
Q Who made you aware of that?
A **It was either Charlie Webb or Bob Tyler.**
Q Do you know who authored the document?
A **Well, I believe it was a compilation of information from many different sources. That was my understanding of how it would work.**
Q Sure. I mean, and I guess, is there one person who compiled the information and actually drafted the document, to your knowledge?
A **I believe Bob Tyler did. Charlie Webb may have helped. I don't know.**
Q I would like to draw your attention to what we've marked as Exhibit 24.
(Document marked for identification as Defendant's Exhibit 24.)
A **Do you not want me to review this?**
Q Well, let's move on to Exhibit 24.
A **Okay.**
MS. CARTER: There's no Bates stamp number on it. Was it not produced?
MR. MARTIN: Let's go off the record.
(Discussions were held off the



record.)
MR. MARTIN: Back on the record.
BY MR. MARTIN:
Q All right. Miss Gogel, Exhibit 24 is an e-mail, and it appears to be from you to Randy Jackson, Charles Webb, and Bob Tyler, as well as KS Kim. Did you draft this document?
A **I did.**
Q And the date is November the 3rd, 2010. Do you see that?
A **Yes.**
Q And does that comport with your recollection of when it was drafted?
A **Yes.**
Q Miss Gogel, were you aware that Bob Tyler was looking for a position for you in September of 2010?
A **I think that... I had mentioned to him that I wasn't sure what was going to happen at KMMG and I had lost confidence in my management and that I may be considering other -- looking at another job. I didn't follow through on that, actually.**
MS. CARTER: You didn't answer his question. Did you know?
A **Did I know?**



Q Yes. Did you know that he was looking for places for you to go?
A **He may have sent me a job posting. I don't know that I would consider that him looking for a job for me, or looking for a place for me to go.**
**(Document marked for identification as Defendant's Exhibit 25.)**
BY MR. MARTIN:
Q I'm showing you what's been marked as Defendant's Exhibit 25. It's a seven-page document. And if you'll look at the bottom of the first page, there appears to be an e-mail from somebody by the name of Brian Courtney, C-O-U-R-T-N-E-Y, to Bob Tyler. And if you'll look on the third line, it says, Thank you for referring Andrea Gogel.
Were you aware that that reference had been made to Mr. Courtney of The Courtney Group?
A **I don't recall. It's not uncommon to receive calls from recruiters who say somebody mentioned your name. They usually don't tell you who mentioned your name. So I don't know in this particular situation. I don't remember Mr. Courtney.**
MS. CARTER: Can we go off the record real quick?
(Discussions were held off the

record.)
MR. MARTIN: Thank you. Back on the record.
BY MR. MARTIN:
Q Are you familiar with Mr. Courtney and The Courtney Group?
**A It's not ringing a bell.**
Q Are you familiar with a person by the name of Robert Marzan, M-A-R-Z-A-N?
**A Yes.**
Q Do you know if he was ever the head of a department?
**A I don't recall.**
Q Could it be that he was also a person who held the position of manager but, yet, was not made the head of a department?
**A He could have been, although I believe his structure, again, was different than the structure in the situations that I was referring to that were similar to mine. I can't recall what area Robert was the manager of, but I believe that it was somehow related to legal and fell under... fell under that umbrella for a period of time. But I -- I can't recollect for sure.**
Q Miss Gogel, I'd like to go through, I guess,



what, the fall of 2010 with you.
**A Okay.**
Q You contributed to the report of concerns in August 2010; is that correct?
**A Yes.**
Q And the report of concerns was given to the company somewhere around the end of September of 2010?
**A Yes.**
Q And you sent an e-mail to the company voicing your disapproval of the way the investigation into the report of concerns was conducted, and that was the 3rd of November 2010?
**A Yes.**
Q And then you filed your EEOC charge on the 10th of November of 2010.
**A Yes.**
Q And do you have any idea when the company received your EEOC charge?
**A It was sometime before November 23rd.**
Q And how can you be certain that it was sometime before November the 23rd?
**A Because Randy Jackson was talking about my EEOC charge in a very loud way, and talking -- reported to me... I was told by Arthur Williams and Diana Ledbetter that Randy was talking about my EEOC**



**charge in a very loud way in the open office environment.**
**There were not offices. There were cubicles throughout the administrative office areas.**
Q Okay.
**A And so many people overheard, on November 23rd, comments and conversations regarding my EEOC charge.**
Q And I was just about to ask you. So there were no private offices, even for somebody at a director level; it was cubicles?
**A Not at that time. I don't know if it's still that way. But there were cubicles. There were many conference rooms available on -- banks of conference rooms around the... around those cubicles. So if you needed to have a private conversation, you could do so in an office -- or, in a closed space, in a conference room.**
Q Speaking of conference rooms. You're familiar with the fact that Diana Ledbetter also filed a charge of discrimination, correct?
**A Yes.**
Q Were you aware that she was going to file a charge prior to her filing a charge?
**A I was aware that she had concerns. I was**



**not -- I did not know whether she was going to file a charge.**
Q So she never told you she was going to file a charge?
**A I don't think so.**
Q When did you first start meeting with Diana Ledbetter?
**A Oh, I met with Diana Ledbetter multiple times throughout my employment there, for different reasons.**
MS. CARTER: I object to the form.
BY MR. MARTIN:
Q When did you first meet with Diana Ledbetter regarding her complaints about Kisha Morris and Mr. Ahn?
**A That was back in the fall of 2008.**
Q To your knowledge, did she ever have any other disagreements or dissatisfaction with regard to her terms of employment?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Did you ever meet with her where she told you that she was unhappy with something that happened at work?
**A Yes.**

Q Okay. When was that other occasion or when were those other occasions?
A There was one occasion where -- I didn't meet with Diana, but Arthur Williams talked to Diana, and I believe that that was the concern brought up regarding a... there was a server at an event who was pregnant, and Diana was planning the event and she was requested to have the pregnant server removed from that event.
I don't recall the specific instances where Diana complained to me beyond those -- those first times whenever I asked Randy if -- about conducting an investigation, she -- Diana complained about not being hired for team relations versus general affairs. She complained about the Kisha-Ahn relationship.
Q When did she complain about not being transferred to team relations?
A It was right around -- I mean, she was actually hired as a specialist in general affairs. She had been a contractor up to that point as a recruiter.
Q Up to what point?
A Until her hire date, which was, I believe, toward the end of 2008.
And she had interviewed for a team relations



specialist position and she had interviewed for a general affairs position. And... I believe it was Paul told me that we wouldn't get Diana for team relations because she was young and pretty, and the rule is you gotta hire young pretty girls for general affairs.
And Arthur Williams made a joke about their -- yeah, we gotta... gotta build up EB's stable over there. And I coached him about the fact that was inappropriate.
The communication that I made to Diana was, There are needs in both areas, and I appreciate --
You know, initially, I thought she was coming to team relations. I said, you know, you're an excellent candidate, and -- and communicated with her, and then there was a decision made that no, she can't go to team relations; she's going to general affairs.
And she complained to me about that, and I told her that it was, you know, it was based on company need and, you know, with her skill sets, we felt like that would be the best place for her. Something to that effect.
And during the times that -- sometimes Diana expressed to me concerns that were not concerns that were policy violations. They were things that upset



her about her job duties. And I had coached Diana on the fact that it was... that many of the things that she was doing were very important and that I recognized we had strides to make in culture and that I would, you know, I felt confident that we could just keep working hard to... to change things.
And that was very much a reiteration of the things that Randy had told me over time, was change is very slow, just be patient, just be patient, just be patient. Change is very slow. We just have to keep working toward change.
And so I used those words whenever other people talked with me about concerns that were not policy violations or discriminatory practices but were simply complaints. And... so I didn't have a lot of meetings with Diana about Diana's complaints. I had -- I did have a lot of meetings with Diana about work related things.
Q And where did you have those meetings?
A Typically in the conference room by team relations. She and I -- I do recall one conversation she and I had in the summer of 2010, when it became -- started becoming apparent that she was pregnant. And she expressed to me -- and Diana and I were casual friends. We had a lot in common and we, you know, we



talked about non-work-related issues: Houses, farming, goats, children. And she revealed to me that she was pregnant.
And she said that she had been trying to hide it because she was concerned about how it would impact her ability to get promoted. And I said, Your pregnancy should not impact your ability to be promoted. And I reiterated to her at that time --
She said, Andrea, I just don't know how long I can stay. And I said... I think you should continue to stay. And I, I -- you know, if I ever get to a point where I don't feel like I can, can positively impact things and teach our culture and our laws, I'll tell you.
Q So from -- well, let's start with this.
(Document marked for identification as Defendant's Exhibit 26.)
BY MR. MARTIN:
Q I'd like to show you what's been marked as Defendant's Exhibit 26. It's a seven-page document.
Whose handwriting is that?
A It's mine.
Q The date at the top is December the 10th, 2008. Do you see that?
A Yes.

Q To the best of your recollection, was that the first time that you met with her to discuss some of the issues that are described herein?

**A It could be.**

Q How many times did you meet with her to discuss the issues that you had mentioned, the pregnant server who was asked to leave, her issues with Kisha Morris? At some point in time she requested, I think, a transfer to team relations. From 2000... you know, 8 to December of 2010, how many times did you meet with her about those issues?

**A I don't know.**

Q More than 20 or less than 20?

**A Oh, way less than 20.**

Q Okay.

**A Many times -- and I hope you understand. Many times complaints would come to me not via the individual who's complaining, but via someone who worked for me.**

**So many times when I would hear complaints coming out of general affairs, it would be coming to me via Paul Grimes or Arthur Williams.**

Q Did you and Bob Tyler and Miss Ledbetter ever have occasion to meet, the three of you?

**A Not very often.**



Q Not very often, but that implies that it did happen.

**A It absolutely could have.**

Q Do you recall where those meetings took place?

**A It would have -- if we met, it would either be in the conference room upstairs by where general affairs was or it would be in a conference room somewhere.**

Q And the conference rooms, they have glass doors?

**A Most of them do.**

Q When did you first become aware that Diana Ledbetter had filed an EEOC charge?

**A It may have been wherever Charlie and Randy met with me.**

Q And would that have been in January of 2011?

**A That would have been in December.**

Q Okay. So December of 2011.

**A Uh-huh (affirmative).**

MS. CARTER: Uh-uh (negative).

BY MR. MARTIN:

Q I mean 2010.

**A 2010. I simply don't recall.**

Q Was it at or near the time you were placed



on administrative leave?

**A The first time or the second time?**

Q The second time.

**A I don't recall when I became aware of it.**

Q Okay. But if I recall your testimony correctly, you said that she didn't tell you in advance that she was filing an EEOC charge.

**A I don't think she did, no.**

Q Now, what about Mr. Tyler, he filed an EEOC charge at some point, correct?

**A Yes.**

Q When did you first become aware that he was going to file an EEOC charge?

**A In November of 2010.**

Q Did he tell you before he filed it or after he filed it?

**A I believe he told me he intended to. And then I'm pretty sure he told me that he did. But I don't know when that was.**

Q And I know it's been a long time.

Now, you and Miss Ledbetter and Mr. Tyler all had the same law firm representing you, correct?

**A Yes.**

Q How did it come to be that all three of you used the same lawyer?



**A Diana asked me, whenever I reached the conclusion that... that I could not get help internally for the discrimination, whenever there was supposedly conversations with me and those conversations were twisted and portrayed in a manner different than what they occurred, I knew. And that was at the top levels of the organization. And with our attorney Charlie Webb. I knew that I had to turn to an external source for assistance.**

**And whenever I saw all of these other women experiencing significant damage to their careers and I saw the same thing coming for myself, and I couldn't protect them and I couldn't protect myself, and the people that I reported to either could not or would not protect us, I decided that I was going to seek assistance from the Equal Employment Opportunity Commission.**

**And I told Diana that I didn't feel like I could trust the people internally to listen to or deal with any concerns that I had and that I was going to seek outside assistance. And she asked me if I had an attorney.**

**And I, I believe at that time, I didn't -- had not yet gotten an attorney, but I had chosen an attorney and was going to meet with that attorney.**

**And I told her that attorney's name.**
Q Now, at some point in time --
**A She actually asked me, Who are you going - Who are you going to? And I told her.**
Q I'm showing you what's been marked as Defendant's Exhibit 27.
(Document marked for identification as Defendant's Exhibit 27.)
BY MR. MARTIN:
Q You're familiar with this document, correct?
**A I am.**
Q And that's your signature?
**A Yes, it is.**
Q And the printed name "Andrea Gogel," did you print that?
**A Yes, I did.**
Q And it bears a date of December the 6th, 2010. Do you see that?
**A That is correct.**
Q Is that the date when you were offered that document?
**A No.**
Q When were you offered that document?
**A I believe it was December 3rd.**
Q Okay. And if memory serves, December



the 6th was a Monday; is that right?
**A Uh-huh (affirmative).**
Q So you were offered this document on a Friday; is that December the 3rd?
**A I believe so.**
Q Okay. Now, you initially refused to sign the document, right?
**A Yes. I explained that I had legal counsel and that I did not feel comfortable signing the document until my legal counsel had an opportunity to review the document.**
Q What time of the day were you offered this document?
**A (There was no response.)**
Q Do you recall?
**A I think it was midday, late morning, around lunchtime, maybe.**
Q And when you refused to sign the document, were you asked to go home?
**A Yes.**
Q But then you signed it the following Monday?
**A Yes.**
Q I'd like to draw your attention back to Exhibit 26, your handwritten notes regarding Diana Ledbetter. Do you see these?



**A Yes.**
Q Down at the bottom it bears, you know, Gogel doc, which is the designation we use for documents received from you.
How is it that you still have a copy of these notes?
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Do you still have a copy of these notes?
**A (There was no response.)**
Q Do you have the originals?
MS. CARTER: I didn't understand the question was my objection.
BY MR. MARTIN:
Q Let me back up. You produced these to us in response to our discovery requests.
MS. CARTER: Her counsel did.
MR. MARTIN: Yeah.
**A (Witness examining document.)**
Q Do you still have a copy of these in your personal possession?
**A I don't believe so, because I don't recall seeing this for a very long time.**
Q Do you know how these came into your attorney's possession?



**A (There was no response.)**
Q Did you provide them?
**A I would assume I did. I don't know.**
Q Now, there are other notes from Miss Ledbetter that you produced.
(Document marked for identification as Defendant's Exhibit 28.)
BY MR. MARTIN:
Q I'm showing you what's been marked as Defendant's Exhibit 28. It is a 16-page document. Have you seen this document before?
**A I have.**
Q What is this document?
**A These are notes.**
Q Whose notes?
**A These are notes that Diana Ledbetter made and gave to me. And now I can answer your last question.**
Q Okay.
**A The answer to your last question about these notes, no, I do not have these in my possession.**
MS. CARTER: You're pointing to Exhibit 26?
THE WITNESS: Exhibit 26.
MS. CARTER: Go ahead. Sorry.

213

BY MR. MARTIN:
Q Continue, please.
**A I carried these notes around with me, in my bag, after Kevin Kim said, Destroy all notes related to Kisha Morris.**
**I carried these around in my bag because I was afraid to destroy them because I didn't know what Kevin's motives or intentions were. And... I had not destroyed all of the information that he had asked me to, because, again, I was concerned about what his intentions were after he started behaving very oddly.**
**And I had no idea, I felt as though perhaps I was being set up. I didn't know. And I carried these around in my bag because I didn't know where they would be safe. And obviously, it was a very sensitive topic, and...**
**Whenever I was terminated from KMMG, anything that I had in my possession that was KMMG property, which this was done while I worked for KMMG, I returned to KMMG. But I did have it in my possession whenever I initially met with my attorney.**
Q All right. So you made a copy for your attorney and then you returned the originals?
**A Yes.**
Q When did you return the originals?

214

**A I met... if I remember correctly, I contacted Gary Langswager about recovering my personal property from KMMG. And I was to return any KMMG property to KMMG, and I returned it.**
Q And from the context of your answer, I take it that this transaction took place following your termination?
**A Yes.**
**(Document marked for identification as Defendant's Exhibit 29.)**
BY MR. MARTIN:
Q Are you okay? Do you need a break?
**A No, I'm just choking.**
MR. MARTIN: Why don't we take a quick break.
(Deposition in recess, 6:32 p.m. to 6:44 p.m.)
MR. MARTIN: Back on the record.
BY MR. MARTIN:
Q Miss Gogel, prior to our break, I had handed you Defendant's Exhibit 29. It's a two-page document to you from Randy Jackson. Do you see that?
**A Yes.**
Q It indicates, on the first page of the document, that it was sent via certified and regular

215

U.S. Mail.
Did you in fact receive this document?
**A Yes, I did.**
Q Is this how you were notified that your employment was being terminated?
**A That's how I was officially notified.**
Q Okay. Were you unofficially notified?
**A I was. Unfortunately.**
Q How were you unofficially notified?
**A People that I was close to in the plant contacted me, the day before I received this letter, with comments like, I'm so sorry; we heard you were terminated. Uhmm... if I remember correctly... there were multiple people who reached out and did not discuss -- they didn't discuss what the issues were. They said -- they basically just said, I'm so sorry; I hope you're okay, kind of thing.**
**And initially, I didn't know what they were talking about.**
Q Okay.
**A But it didn't take me long to figure it out.**
Q Understood. Who were those people?
**A I think, maybe, James Watson, Regina Farmer, Dama Smith. Those are the ones I can think of off the top of my head.**

216

**Arthur Williams called me and said something to the effect of -- Arthur Williams had been calling me almost every day during the period of time after I was placed on administrative leave. And the day of or the day after, Arthur called me and said something to the effect of... I've been instructed to -- that it would be in my best interest to not communicate with you anymore. Something like that. And that was it.**
Q Okay.
**A It was a bizarre... conversation.**
Q The letter is dated January the 19th. Do you recall when you received it?
**A I believe I received it two days after that.**
Q Now, following your receipt of that letter, did you file another EEOC charge?
**A Yes, I did.**
**(Document marked for identification as Defendant's Exhibit 30.)**
BY MR. MARTIN:
Q I'd like to show you what's been marked as Defendant's Exhibit 30. Is that the EEOC charge that you filed?
**A Yes.**
Q And is that your signature on the document?
**A Yes, it is.**

217

Q Same question as earlier. After reviewing the charge, is there anything in the charge that is inaccurate?
**A No. I'm looking at the body. The particulars are... one, two, and three. That appears to be accurate.**
Q The date on the charge is February the 8th, 2011. Do you see that?
**A Yes.**
Q That's both next to your signature as well as the, I guess, received stamp from the EEOC. Does that comport with your recollection of when you filed this?
**A Yes.**
**(Document marked for identification as Defendant's Exhibit 31.)**
BY MR. MARTIN:
Q Miss Gogel, I'm showing you what's been marked as Defendant's Exhibit 31. These are your responses to our interrogatories. You're familiar with this document, correct?
**A Yes.**
Q You had a chance to review it before it was sent to us?
**A Yes.**

218

Q I'd like to draw your attention to page 19. Strike that. Page 20. Interrogatory number 13, which begins on page 19, was our request for information regarding every employer with whom you've sought employment from your termination date to the present.
And you listed a number of companies with whom you applied. Do you see that?
**A Yes.**
Q Is your response to our interrogatory, is it truthful?
**A Yes.**
Q Now, if you received the termination letter a day or two after it was sent, presumably January the 21st, why did you wait until March the 8th to begin seeking employment?
**A Because I was emotionally devastated, and I needed to get myself together, prepare a resume, and prepare myself for a serious job search.**
Q Now, you eventually wound up receiving employment with Goodyear, correct?
**A Correct.**
**(Document marked for identification as Defendant's Exhibit 32.)**
BY MR. MARTIN:
Q I'd like to show you what's been marked as

219

Defendant's Exhibit 32. It's a letter from Goodyear to you dated February the 14th, 2011. Do you see that?
**A Yes.**
Q And they offered you a position with a starting salary of $[redacted]. Is that right?
**A That's correct.**
Q You also received a sign-on bonus of $[redacted] correct?
**A Yes.**
Q And you were given a relocation allowance of up to $[redacted]
**A Yes.**
MS. CARTER: Wait. Will you repeat that question.
BY MR. MARTIN:
Q The company gave her a relocation bonus allowance of $[redacted]
MS. CARTER: Objection.
MR. MARTIN: Up to $[redacted]
MS. CARTER: Not a month. You said a month.
MR. MARTIN: I thought I just said a relocation allowance.
MS. CARTER: Yeah, one time. I thought

220

you were asking her a month.
MR. MARTIN: No, no. Just a one-time relocation allowance.
MS. CARTER: Oh.
BY MR. MARTIN:
Q Let me clarify if it was unclear. You received a one-time sign-on bonus of $[redacted], correct?
**A Yes.**
Q And you also received, to Ms. Carter's point, a one-time relocation allowance of up to $[redacted], correct?
**A I don't recall if I received the relocation allowance. I know I received the sign-on. I never... I never moved my permanent residence. So again, I simply can't recall.**
Q Okay. Maybe we can help you.
(Document marked for identification as Defendant's Exhibit 33.)
BY MR. MARTIN:
Q I'm showing you what's been marked as Defendant's Exhibit 33. And it's a document that we received from Goodyear. And your name appears at the top of the payroll registry. Do you see that?
**A Yes.**
Q And it has an employee ID number. Was that

your employee ID number?
A I don't know. I didn't deal with employee ID numbers. I didn't utilize an employee ID number for anything. You'll have to point out exactly where it is you're looking at for employee ID.
Q Right next to the name Andrea Gogel. It actually is, the name is Gogel, Andrea. And it has EMPL number. And the number appears to be the same as your social security number. Do you see that?
A I'm sorry, but I don't.
MS. CARTER: I don't either.
MR. MARTIN: All right.
MS. CARTER: Because it's changing as you go down the line.
BY MR. MARTIN:
Q Let me draw your attention to -- it is page three of three, at the top.
MR. MARTIN: And we need to redact that.
BY MR. MARTIN:
Q We're page three of three. At the top, it has Gogel, Andrea L. And then it has EMPL number next to it. Do you see that?
A I do see it now.
MS. CARTER: Can you redact that?



MR. MARTIN: Yes, we will. We will redact all social security numbers before the final transcript's completed.
MS. CARTER: You mean you'll mark it out today, though, with a black maker?
MR. MARTIN: If we can. Let's go off the record.
(Discussions were held off the record.)
MR. MARTIN: Back on the record.
BY MR. MARTIN:
Q This three-page document that appears to be a payroll register, if you will look on the first page, and it's Bates stamped page 1514, it appears that a check or a payment was made on 7/31/11. Do you see that?
A (There was no response.)
Q And it appears to be the amount of [redacted] without deduction. Do you see that?
A Yes.
Q If you look on the third of the three pages.
MS. CARTER: I'm sorry. I see a deduction on here.
MR. MARTIN: Okay. Pardon me. A gross amount.



MS. CARTER: But it's deductions on it.
MR. MARTIN: Understood. Correction is noted.
BY MR. MARTIN:
Q Okay. It is a gross amount of $[redacted], with deductions.
A Yes.
Q Is that correct?
A (Witness nods head affirmatively.)
Q If you look at the third of three pages, there appears to be another payment of $[redacted] on September the 15th, 2011.
A Okay. Then I did receive the sign-on and the relocation allowance. But the [redacted] it was -- it was actually...
Q Yes, you were saying.
A It appears as though it was $[redacted] net that was paid. I believe they grossed it up.
THE WITNESS: What I'm looking at is...
MS. CARTER: But he was asking you about page three. So you're on the wrong page. You gotta listen. He's asking you about that one.
THE WITNESS: Yes. Then, yes, that was paid to me, $[redacted]



MS. CARTER: And gross is different there.
BY MR. MARTIN:
Q I also notice that on the first page, also on 7/31/11, there was a payment of $[redacted]. What was that amount for?
A That's what I was just attempting to explain. That was... it had to be the relocation grossed up, because if you... that couldn't be right.
Q But it does appear that you not only received the sign-on bonus but also a relocation allowance, correct?
A It does appear that I did.
Q At the time you left KMMG, what was your salary?
A Base, I don't recall what my base was exactly, because there was a lump sum in there somewhere and it -- I don't recall exactly what my salary was. My base salary.
Q If you could retrieve Exhibit 20.
A Okay.
Q It's a letter dated April the 28th, 2010. Do you see that?
A Yes.
Q Okay. So it appears as of April 2010, your

base salary was $[redacted]7 its?
MS. CARTER: [redacted]
MR. MARTIN: [redacted]
BY MR. MARTIN:
Q Is that correct?
**A It does appear that that's correct.**
Q And then you received, that year, a $[redacted] bonus correct?
**A Correct.**
Q Which, again, in Ms. Carter's testament to my math skills, if one adds $[redacted] to $[redacted] that would appear to be $[redacted] Would you agree with my math?
**A I would.**
Q So your base salary at Goodyear was greater than the sum of your base salary at Kia plus your bonus for the year 2010, correct?
**A It was greater than the number that you just computed. However, it was not greater than the number that I was actually compensated from KMMG, because there was a car allowance for which I was -- it was taxed as income.**
Q So you got a car allowance at KMMG. Now, that takes us back to Toyota. Did you have a similar car allowance at Toyota?



**A No.**
Q So that's just another way that your compensation was more lucrative at Kia than it was at Toyota, correct?
MS. CARTER: Object to the form.
**A I considered it, yes, it was a form of compensation.**
Q I just recall you saying earlier that you received a pay cut when you went from Toyota to Kia. When you calculated your pay cut, did it include your car allowance?
**A It did not.**
Q Now, how long did you work at Goodyear?
**A A year and a half.**
**(Document marked for identification as Defendant's Exhibit 34.)**
BY MR. MARTIN:
Q I'd like to show you what's been marked as Defendant's Exhibit 34. It's a two-page document. You're familiar with this document, right?
**A Yes, I am.**
Q And it's the offer letter from Kone?
**A Kone.**
Q And Kone, that's K-O-N-E?
**A Yes.**



Q So in December of 2012, you were offered employment with Kone, with a base salary of $[redacted] correct?
**A Yes.**
Q And you also were eligible for an incentive for up to 25 percent of your base salary?
**A Yes.**
Q And you received a $[redacted]ign-on bonus?
**A Yes.**
Q And are you still employed by Kone?
**A Yes, I am.**
Q And in the year 2013, did you receive an incentive in addition to your base pay?
**A Not in 2013. I received an incentive for the year of 2013, paid out in April of 2014.**
Q And how much was your incentive for your performance in 2013 that was paid out in April of 2014?
**A It was approximately $[redacted]**
Q Has your base pay increased since your employment began on -- or, since your employment began with Kone?
**A Yes, it has.**
Q When did it go up?
**A It's gone up twice since then.**



Q Okay. When did it go up the first time?
**A It went up in April of 2014.**
Q And it went from $[redacted]to what number?
**A I don't recall the specific number. It was... approximately [redacted].**
Q So approximately $[redacted]
**A Yes.**
Q And then in April of 2015, did it go up again?
**A Yes, it did.**
Q And what's your current base salary with Kone?
**A It is... approximately [redacted]. Do you have that? Because I can't tell you the precise number.**
Q I'm not sure that I have that.
MS. CARTER: I think it's in the interrogatory.
BY MR. MARTIN:
Q So it's approximately $[redacted]?
**A I believe so.**
Q Did you receive an incentive bonus for your 2014 performance, which was paid out in April of 2015?
**A Yes.**
Q And how much was that?

A **I believe it was around [redacted]**
Q Did you have the use of a company vehicle at Goodyear?
A **No.**
Q Do you have the use of a company vehicle at Kone?
A **I can have. I currently am not using a company vehicle.**
Q At some point in time, did you use a company vehicle?
A **Yes, I did.**
Q And during what period of time did you use a company vehicle?
A **From January 2013 through June of 2015.**
Q Why did you discontinue the use of a company vehicle?
A **Because the program was changing, and I, instead, receive a lump sum amount as well as a gas and maintenance credit card to utilize my own vehicle. So the allowance, it shifted from a leased vehicle to an allowance program.**
Q And what is your allowance? What's your current allowance for the use of your own vehicle?
A **It's $[redacted] a year.**
Q Now, after the termination of your



employment with Kia and prior to the beginning of your employment with Goodyear, did you elect COBRA for your health insurance?
A **I did.**
Q Now, was your husband employed at that time?
A **He was self-employed.**
MS. CARTER: Object to the form.
BY MR. MARTIN:
Q Was your husband employed from January the 19th, 2011 until the beginning of your employment with Goodyear in June of 2011? A more specific question.
A **He was self-employed on a very part-time basis.**
**(Document marked for identification as Defendant's Exhibit 35.)**
BY MR. MARTIN:
Q I'd like to show you what's been marked as Defendant's Exhibit 35. And it shows a monthly COBRA premium of $747.38. Is that what you recall your COBRA payment being?
A **Yes.**
Q Miss Gogel, I'd like to go back to Exhibit 31, your interrogatory responses.
A **Yes, just a moment. I have a million**



**documents spread out here. Okay.**
Q In response to interrogatory number four, you identified a number of people who you contend are potential witnesses. I'd like to start with some of the names that we have not yet discussed here today, which begin on page nine.
Let's start with Diana Ledbetter. Since your -- since the end of your employment with Kia, have you had the occasion to have any conversations with Miss Ledbetter?
A **Yes.**
Q And how many conversations have you had with her?
A **I recall one.**
Q Do you recall when that was?
A **It was... it was shortly after the lawsuit was filed.**
Q Did you call her or did she call you?
A **I contacted her.**
Q And what did you discuss?
A **I told her that... that there had been a lawsuit filed and that I had seen a... that I was very concerned that based on the filing of a lawsuit that there may be -- there may be media coverage of that, and I wanted to tell her -- I just thought of another**



**conversation I had with her.**
**But I wanted to tell her that there may be media coverage, and I didn't have any reason to believe that she would personally be named in anything, but that I felt confident that I would if there was media coverage. And I didn't want her to be shocked or alarmed by it.**
**And there was another conversation that I had with her. She contacted me. It's been sometime since January of 2013, because she actually was looking for a job and asked if I would be willing to offer a reference if needed, because she needed a human resources reference.**
Q You also mentioned Milton Ross. What does Mr. Ross know?
A **Mr. Ross witnessed much of what occurred within the team relations department. And he was a team relations specialist, but he was also very... people naturally talked to Milton, frequently, and the folks in general affairs talked to him. And he was -- he was witness to many of the situations that occurred.**
**I recall a situation where Rayla Smoot and I were told, a little less than two weeks before a trip to Korea, that we needed to be prepared to -- to**

prepare 200 team members, get their passports, get them scheduled on a training trip to Korea and that it was all on my shoulders. Kevin Kim said it's all on my shoulders.

And we worked day and night to try and make that happen. And ultimately, we did make it happen. But in the midst of that, Mr. KS Kim talked to me in a very degrading way, and I left the conversation. And I believe that I was visibly upset.

And Milton said, I can't believe -- you're a strong woman, Red, is what those guys called me a lot of the time, was Red. Miss Andrea or Red. He said, You're a strong woman, Red. I can't believe he -- I can't believe he could make you cry.

Q All right. You say -- you identify Rayla Smoot. And you said she experienced gender discrimination.

A She did.

Q Okay. From whom?

A From Kevin Kim.

Q In what form?

A In his treatment of her. His treatment of her compared to other individuals who, although did not report to him, were of a male gender.

She complained -- I witnessed it and she



complained to Bob Tyler about it, and I told Bob Tyler what I witnessed, which was Kevin Kim absolutely yelling and screaming at her in front of 200 people in the parking lot, and completely degrading her.

And she had shared with me training content regarding gender differences that she was requested to utilize in some way, and it was very inappropriate. And I told her that -- I said, This is not appropriate for -- in the U.S.

Q What was the training content?

A It had -- it was two cartoon characters, one male, one female. And it had a bubble above their head showing what each one was thinking about. And with the man, it said he was thinking about sex, he was thinking about... uhmm, the -- some basic things. And then you saw the woman, and the thoughts that she was having were about her clothes and what she was going to wear.

And the male seemed to be thinking about sex and the... work-related, like, things, and the female was thinking about things that were... that were very shallow, stereotypical kinds of things. And it was completely inappropriate.

And I explained to Rayla that you cannot use that in training.



Q Who drafted those training materials?

A They were provided to her by Kevin Kim. And then there was another training person from Korea who had visited the U.S. and had provided those to her.

Q Was there ever any stereotyping of the Koreans by members of the, you know, U.S. management team?

A There were.

Q Okay. How did the U.S. management team stereotype the Koreans?

A The management team didn't stereotype the Koreans. I specifically remember a gentleman who... he was a salaried person. I don't recall his level. It was early on. It was in, sometime, I believe, in 2008.

And he made -- he made what I considered to be ugly and racist comments, and in search -- looking at his e-mail, he made ugly and racist comments not only about Koreans but about African-Americans. He ultimately was terminated from employment.

Q For those comments?

A Yes.

And it wasn't because he was just talking about Korean people, it was because the content was so inappropriate and I considered to be racist.



Q Do you ever recall any members of the, I guess, U.S. management team making discriminatory remarks about the Koreans?

A There's only one that I recall.

Q Okay. Who was that?

A That was Arthur Williams.

Q Okay. Do you ever recall an occasion where a member of the American management team said that certain Koreans need to go home?

A I don't recall that.

(Document marked for identification as Defendant's Exhibit 36.)

BY MR. MARTIN:

Q I'm showing you what's been marked as Defendant's Exhibit 36, a four-page document.

And it appears to be some correspondence between you and Bob Tyler, with some correspondence with Randy Jackson in the middle. Do you see that?

A Yes.

Q And I'd like to draw your attention to page three of four, at the top of the page, where Mr. Tyler says, He is another one like Mr. Seo, S-E-O, that needs to go back to Korea soon.

Do you see that?

A I do see that.

Q Now, you were copied on this e-mail. Did you investigate Mr. Tyler for his offensive remark?
MS. CARTER: Object to the form as it being offensive and not just an opinion.
BY MR. MARTIN:
Q Appears to be a little racist in his tone. Wouldn't you agree?
**A No.**
Q Okay. Let's go back to your list of people. You mentioned Andrea Mobley, M-O-B-L-E-Y. What knowledge does Miss Mobley have? I notice that the subject matter is blank.
**A Andrea Mobley, my concern about Andrea Mobley was that she may have been the victim of discrimination, although I... I never had substantial facts to back that up. But in addition to that --**
Q Where did she work?
**A She worked in the quality department as a... I believe she was a group leader.**
Q And who was the person who allegedly discriminated against her?
**A I am basing... I can't recall all of the specifics and the names. Chris Tarver, who was an assistant manager in the quality department, had fielded a complaint from, I believe, one of our Korean**



**counterparts that he worked with. And we did an investigation of Andrea Mobley and we couldn't substantiate the accusations.**
**And I don't recall what the exact accusations were. I just know that there were many accusations made. And then when we interviewed and did the investigation, there was nothing there.**
Q On page 10 of our interrogatory responses, you mentioned somebody by the name of Mandi Modling, at M-I-N-D-I, M-O-D-L-I-N-G, who you claim was the victim of discrimination.
**A She was.**
Q Tell me about that. Who was the alleged discriminator?
**A There was a gentleman named Richard Park, who was the legal senior manager.**
MS. CARTER: Is he Korean?
THE WITNESS: Yes, he's a Korean gentleman.
**A And he -- her name is Amanda. Mandy is what she goes by. And Mandy returned from maternity leave and was walking across the parking lot as Richard was walking across the parking lot. And he said, he told her she was a bad mom.**
Q Did you work for Mr. Park?



**A I did not. She reported that to me and I requested that she talk to Bob and/or Randy, because based on the level that Mr. Park was within the organization, I felt like that would be more appropriate.**
Q On page 11 of your responses, you identify a Nancy Miller. And what Miss Miller can offer is left blank.
What can Miss Miller offer as it relates to your claims?
**A Miss Miller was or is; I'm not sure her current position. She was the administrative personnel in the team relations department. And she was in that area all the time, so she witnessed the things that occurred.**
**And I know that based on the complaint or the response to the EEOC charge that I received, it's my understanding that Arthur Williams made statements that simply are not true. And there are many people who were in that department who can tell you those aren't true.**
Q Okay. What statements does she allege -- by "she," I mean Miss Miller -- does she allege that Mr. Williams made that you contend are untrue?
**A I haven't talked to Nancy Miller. I don't**



**know.**
Q Okay. Well, then how did it come to your attention that Miss Miller might know something?
**A Simply because she was present.**
Q How do you know she was present if you haven't talked to her?
**A Because she sat in that department every single day.**
Q Okay. So you're just speculating she might know something because she sat in that department?
**A Yes.**
Q Thank you.
MR. MARTIN: All right. Why don't we go off the record for a second.
(Deposition in recess, 7:34 p.m. to 7:42 p.m.)
MR. MARTIN: Back on the record.
**A So earlier when you asked me about people that I had talked to about this case, what I can tell you is that I have talked to people about this situation, not necessarily specifics to the case, with the exception of, I recall right after I was terminated, three of the people who had worked for me wanted to go out for dinner and drinks to wish me best of luck. And we did.**

**And I believe it was Carla Barry made something -- made a comment about... about the things that Arthur Williams had said. And... and I said I was very hurt, that I was shocked and hurt, that Arthur... usually had been in close communication with me, and he told me many things that were disturbing, but that I didn't even know if they were true, about Randy, about Kia. And so I simply said I was just very hurt and disturbed by it.**

**Then whenever, at some point in the last two years, I became aware of some of the specific things that Paul and Arthur had said, Paul Grimes and Arthur Williams had said about me, and I was -- again, I was shocked and I was hurt. I was shocked because they weren't true.**

**And... and that those guys have many faults, but I didn't think that they would outright lie. And I had talked to both Dama Smith and Milton Ross about how shocked I was that they would say the types of things that they did about me.**

Q Why do you think they'd lie about you?

MS. CARTER: Object to the form.

BY MR. MARTIN:

Q Do you have any idea why --

**A Why do I think Paul Grimes would lie about**



**me? I don't know that Paul Grimes would intentionally make up things, but I do believe that he would share opinions as though they were facts.**

**And Arthur Williams simply lies all the time. So it didn't surprise me that he would lie. It surprised me that he would lie about the things he lied about, about me.**

Q As we finish up, just as a matter of housekeeping, you're familiar with the KMMG policies, correct?

**A Yes, I'm familiar with many of them.**

**(Document marked for identification as Defendant's Exhibit 37.)**

BY MR. MARTIN:

Q I'm showing you what's been marked as Employer's Exhibit 37 for identification. Have you seen this policy before?

**A Yes, I have.**

Q Does this appear to be an accurate photocopy of the equal employment opportunity and harassment policies that were in existence when you left KMMG?

**A It appears to be similar, if not the same.**

Q Thank you. You had mentioned that one of the reasons for the delay in your job search by about six weeks was because of your emotional status at the



time.

Have you seen any mental health care treatment providers as a result of your termination?

MS. CARTER: Object to the form. I'm going to instruct you not to answer for psychiatric and patient privilege. That is not a matter that is relevant in this lawsuit, as we are only alleging garden variety emotional distress, of which any psychiatric care is not relevant and prohibited from discovery.

BY MR. MARTIN:

Q All right. Well, if your attorney is instructing you not to answer, have you gotten any other type of counseling, other than psychiatrist, psychoanalysts, and the individuals that your attorney is instructing you not to answer?

MS. CARTER: Again, objection. Relevance, as she is only alleging garden variety emotional distress damages that comes as a result of losing your employment and the effect that it has on a person, physically and emotionally, after losing their employment. She's not alleging intentional infliction of emotional distress damages.

MR. MARTIN: So just to make sure,



you're instructing her not answer?

MS. CARTER: Yes. If it has anything to do with any mental health counseling or treatments.

MR. MARTIN: I think with that, this concludes the deposition of Miss Gogel.

MS. CARTER: I have a couple of questions, though, just to clarify some things.

I'm Meredith Carter, representing Andrea Gogel in this matter.

EXAMINATION

BY MS. CARTER:

Q Miss Gogel, I know it's been a long day. I'm going to try to speed it up. I just had a couple of questions for you.

At the time of your employment at KMMG from 2008 through your termination in January 2011, were there any females in the role of head of department?

**A No.**

Q I'm sorry. You need to speak up for her.

**A No.**

Q At the time of your employment at KMMG from 2008 through January of 2011, were you aware of any African-Americans in a head of department role at KMMG?

**A No.**
Q Do you know why the KMMG -- you had mentioned earlier about keeping the organization charts so secretive. Do you know why that is, if you know? Don't guess.
**A I don't know why.**
Q Was it that way the whole time you were employed with KMMG, keeping the organization of the company secretive?
**A It was like that for the majority of that time. The only way that I could look at anything similar to an organizational chart was via phone lists of people that had designations of HOD on them.**
Q Did you ever receive -- and then one of our exhibits at the beginning, the Excel sheets of the organization charts. Did you ever receive something similar or to that effect during your employment?
**A Whenever Kevin Kim told me about team relations being a separate department, he quickly showed me an organizational chart, but then he folded it up.**
**After that, I don't recall... I did see, yes, at some point during 2009 -- 2010, I believe that I did see an organizational chart.**
Q But, so you did see one, but was it in your



possession? Were you allowed to have them in your possession, organizational charts?
**A At that point, yes, I believe I was. In 2010.**
Q Okay. Was that the first time?
**A That's the first time I recall being able to see an actual org chart.**
Q Earlier, Mr. Martin asked you, when we were looking at the org charts, he was asking you about males being promoted to HOD positions. And I'm not rehashing that testimony.
My question is, you -- and I want to clarify for the record. You said someone slid up and across, over you, but you didn't identify that person. Who was the person that you were referring to that slid up and across, over you? That was your words.
**A That was Bob Tyler.**
Q We might have to look back at the record, because you were -- I don't think you were talking about Bob Tyler. You were talking about another male who was, I thought, lower than you in position and then slid up and over you into another position. And I could be wrong.
MR. MARTIN: Yeah, I object. I mean, she answered your question.



BY MS. CARTER:
Q But upon -- you believe it's Bob Tyler?
**A I believe so.**
Q Okay. When Mr. Martin was showing you the e-mails pertaining to the photo discussion from 2008, about you asking to have females be represented in the photograph at KMMG. Do you recall those e-mails that he showed you earlier?
**A Yes.**
Q Was that the only time that there was a photo taken of management or anything to that effect?
**A Those were -- that's not referring to photographs of management.**
Q Oh.
**A There was... there were some photographs of new hourly team members, and all of the ones that they had picked out were men. And I didn't feel like it was an accurate representation of the hourly team members we were hiring. Because we did hire some women hourly people, particularly in the first wave of hiring.**
Q In 2010, when you were not promoted to head of department of team relations, what, if any, reason were you given for why you weren't promoted, and who gave the reason?



**A There were multiple. I was told --**
Q By who?
**A By Randy, at one point, that, oh, no, that's part of HR. It's just a section of HR. No, it wasn't.**
**And then I asked Bob again, and he said... he said, I don't -- it doesn't make sense to me. I don't know why.**
**And I asked Randy again, and he said, We'll take care of you in April.**
Q Well, I'm talking about 2010, not -- this conversation's from 2009?
**A I'm talking about 2010, too.**
Q Oh, same thing?
**A We'll take care of you in April.**
Q Okay. Sorry.
The time that you were employed with KMMG from 2008, March of 2008 through January 2011, did they also announce -- did the company also announce promotions of Koreans like they did Americans?
**A I believe that there... there were both. And the last time I recall asking Randy about the HOD designation was in June or July of 2010.**
Q Let me be more specific. We went over some documents where they announced organizational changes.

249

We saw a list of Americans that were being promoted.
Were Koreans that were in higher level management announced the same way or did they just show up in positions?
**A Both.**
Q Okay.
**A And there were other promotions that took place that were initiated from somewhere else, and I believe it was from Korea.**
Q For example, IB...
**A Jang.**
Q Jang was your...
**A I believe his title was senior manager.**
Q And then who was he replaced by?
**A He was replaced by Justin Yoo, who was a manager, as well as Kevin Kim, who was a senior manager.**
Q Were those -- were Kevin Kim and Justin Yoo's positions announced through the company?
**A I am not positive. I know there were promotions, but I don't know exactly how they were announced.**
Q In Exhibit 22, it's the e-mail between you and Bob and several others regarding examples that Mr. Jackson had requested from Bob.

250

**A Yes.**
Q In the first paragraph, Bob states, in the very first paragraph on the first page, I thought you should be given an opportunity to respond to Randy's request for real examples of why the blending of cultures and Kia way philosophy is not working here in reality at KMMG.
What was he referring to as "Kia way," in quotes?
**A (There was no response.)**
Q If you know.
**A There was a vision, for lack of a better term, around how the KMMG plant would operate, with a blending of cultures, with other tools that were utilized, quality and manufacturing processes. It was a total picture, and it was a visual of -- there was a visual of, of what the vision was for how that would work. And then there was some additional... some additional verbiage that described, that described that. And it was something that we taught during new-hire orientation.**
Q Were there any documents to reflect the Kia way?
**A Yes. I don't have those. But I know that those documents exist because they were utilized**

251

**frequently within KMMG.**
Q Do you remember what years they were utilized?
**A Well, I know they were used in 2009 and '10.**
Q Regarding the report of concerns from September 2010, did you see a second version from October 2010?
**A I saw, through this discovery process, I saw additional documentation around it.**
Q Okay.
**A Charlie Webb told me that -- there may have been two different versions. Charlie Webb told me that there was a portion of the original document that he felt was so sensitive in nature that it should be removed because it was in reference to the alleged relationship between Kisha and Mr. Ahn.**
Q Okay. Now, how many days -- all right. You filed your first charge in November 2010, and you were terminated in January of 2011.
How many days did you actually work at KMMG between the time you filed your charge and the time you were terminated?
**A From the time I filed the charge?**
Q From the time that they had notice of the charge.

252

**A From the time I understand when they received notice of the charge, I worked 17 days.**
Q And during that time, were you placed on administrative leave?
**A I actually worked 17 days. The other days were shutdown and administrative.**
Q Were you -- how many times were you placed on administrative leave?
**A I was placed on administrative leave twice.**
Q During that time frame?
**A Yes.**
Q What comment -- you were discussing... information about why you're alleging national origin and things like that.
What comment did Arthur Williams make about Koreans that you did not describe, but briefly referred to?
**A (There was no response.)**
Q If you recall.
**A He made comments about Koreans smelling bad. And he -- and I would -- I would tell him, Don't say things like that, and I don't think that Koreans smell bad.**
**And he would -- there was one incident where he insinuated that two of our Korean senior**

**management -- on the senior management team had employed a young woman from the training center as a prostitute. And it was -- it was completely ridiculous and inappropriate. And I told him to stop telling people that.**

**Because he was talking about it loudly in the team relations department. And I told him that not to, not to say that unless he knew it to be true.**

Q Do you recall about what time frame we're talking about?

**A I don't recall a specific time frame.**

Q You can't recall a year that he said this, these comments?

**A Probably 2009.**

Q But you're not sure?

**A I'm not sure.**

Q Did you write him up for it?

**A I did not write him up. I talked to him about it.**

**And the reason performance management was -- I rated myself as a needs improvement on my performance review was because Paul and Arthur, specifically, were very difficult to manage. Very, very difficult to manage.**

**And I was, you know, I had talked to Randy**



**about it early on, and I was strongly coached that I need to manage to their strengths, I think was the terminology that he used. Manage to their strengths. Manage to their strengths.**

**And I continued to coach as we went along. I did manage to their strengths and I did -- and they do have some great strengths. Some of the weaknesses are very extreme as well.**

**And with Arthur, it's around -- it was around misrepresenting information. And many times it was information that could paint our management team in a bad light, such as saying things about Randy, saying Randy finally found somebody dumb enough to keep paying him.**

Q Who said that?

**A Arthur.**

Q And what did you say in response?

**A I said, Oh, Arthur. He hired you, man.**

Q Okay. This was recently produced from KMMG as Bates stamp number 248. It's called -- the title is Report of Concerns Follow-up Response. And it's dated at the bottom November 28th, 2010.

Have you seen this?

**A November 28th, 2010.**

MR. MARTIN: Counsel, do you have a



copy for us to look at?

MS. CARTER: It's 248 in the recent production from the 21st, yesterday.

THE WITNESS: (Witness examining document.) I believe I --

MR. MARTIN: Hold on, counsel. Before you begin asking her questions, can we take a quick look at it?

MS. CARTER: Yeah. I wasn't going to ask her details about it. It was just a quick question.

MR. MARTIN: I'm just not familiar with the document.

BY MS. CARTER:

Q Have you seen it?

**A I read it in the documents that you sent.**

Q But before that, had you seen it?

**A I don't recall seeing it.**

Q Were you a part of, you know, this is signed by Mr. Tyler. Do you see that? On the last page.

**A Yes.**

Q Were you a part of the creation of this document, to your knowledge?

**A Meredith, I... I don't recall that I was. And I do recall when I, when I saw it in the documents**



**that were produced recently, I remember thinking that I had not seen it before.**

Q Okay. Miss Gogel, do you have any biases or any racist opinions about the Korean race?

**A No.**

Q And what was your main complaint about the interactions between the Koreans and the Americans?

**A (There was no response.)**

Q What were you most upset about?

**A Initially, with IB Jang and Eddie Jin, I did not -- I did not have concerns, because they were open and they would have dialogue about where we were going, what we were doing.**

Q Wait. When you say "open," what were they open to?

**A They were very sophisticated gentleman regarding different cultures, and they were students of American culture and had learned and wanted to learn more.**

Q What about the laws, American laws?

**A And they also wanted to learn about American laws. The problem that I had was that as we brought additional expatriates in, Kevin Kim would not allow us to do cultural... intercultural competency training to help people understand. The training that IB and I**

**had done to educate about American laws was cut and we were not allowed to continue to do it.**

**And so my biggest concern is, if I could put it in a nutshell, it was that I felt as though there stopped being an interest in understanding and following American laws.**

Q Well, were you trying to educate the higher Korean management on American laws, including Title VII?

**A I was. And I tried to educate Justin, and I shared information with him. And I would share information with him, and he would say, Why are you giving me this?**

**I would say, Because it's really important. It's a really important part of what we do, and, you know, anyone on our team here can help you learn more about it.**

**And so I would try to educate that way. As well as Kevin. And Kevin would become very angry with you if you tried to educate Kevin about American culture and laws. He did not want to talk about it.**

Q Can you describe the training that was cut?

**A It reviewed Title VII information.**

Q But was it training for employees? What do you mean?



**A It was training -- it was specifically for Korean expats, to help Korean expats understand the differences, the differences in the culture and in the laws.**

**And I felt as though Randy wasn't willing to have those tough conversations to teach, because immediately, right after I started, we were in Toledo and he's telling me how I have a responsibility.**

Q Who's he?

**A Randy was telling me that -- we were with Eddie Jin. Was telling me how I have a responsibility to help my Korean counterparts know how old people are from their resumes and, you know, because their culture, it was important that, you know, people not be older than the people reporting to them.**

Q Whose culture?

**A Or be older than the people reporting to them.**

**Pardon me?**

Q Whose culture?

**A According to the Korean culture.**

**And I did not -- I wasn't well educated around Korean culture at that time. I became more educated, and I made it a point to become more educated. And IB made it a point to help educate me.**



**And I felt like after IB was gone that there was no longer an interest or a desire in doing that kind of teaching and making sure that we were operating the way that was consistent with American laws.**

Q And before you started with KMMG, had you ever, in your previous -- with your previous employers, had you ever felt as if you were being discriminated against because of your gender?

**A No.**

Q Had you ever filed an EEOC complaint before your time at KMMG?

**A No.**

Q Had you ever felt that you were denied promotional opportunities because of your gender before KMMG?

**A No.**

Q Had you ever believed that you were denied promotional opportunities because you're working with a different culture, such as the Japanese?

**A No.**

Q To your knowledge, is Mr. Ahn still president of KMMG?

**A To my knowledge, he is not.**

Q And how do you know that?



**A Two ways. On the Internet there was a -- there were multiple stories about the fact that he was no longer president of KMMG. And I received a text message from Diana Ledbetter that said -- it was very simple. It said, I heard Kisha got fired now that Ahn is gone.**

Q So now Kisha Morris Tarver is now gone from the company? Do you know?

**A I don't know that for a fact.**

Q But that's what Diana Ledbetter texted you?

**A Yes.**

Q Did you ever get a response from Kevin Kim about Justin being designated as HOD of team relations on some of the documents that you saw?

**A No.**

Q Did you ever ask Mr. Jackson about that?

**A Yes.**

Q What was his response?

**A I don't remember the exact response.**

Q So you don't recall if he admitted it or denied that it was -- that that's the way it was, that he was HOD?

MR. MARTIN: I think she answered the question. She said she can't recall.

MS. CARTER: That wasn't my question,

though.
A Actually, it was... it was a runaround answer. It was a different excuse. One more different excuse.
Q But you don't recall specifics?
A Not off the top of my head. I can refer to my notes. Which that's here. (Witness examining document.)
Q Right before you were terminated, you had a meeting with Charlie Webb and Randy Jackson?
A Yes.
Q And what was said in that meeting?
A They said that I had been accused of collusion and... and at that time, I didn't fully understand the definition.
Q Of?
A Of that word. I would have been much more upset had I known the full definition.
And they asked me -- when I had talked to Diana Ledbetter, they said that -- something to the effect of that I had violated the December 6th, the agreement that I had made. Which was absolutely not true.
I asked them... I asked them what the, you know, what the outcome was going to be. I said, I was



concerned that you called me in here on my vacation day to send me back out. And Charlie looked at Randy, and they were --
The primary conversation was what was my relationship with Diana Ledbetter, what had my conversations been with Diana Ledbetter, when had I met with Diana Ledbetter, and I explained all of those. Because there was a specific meeting that they were talking about, and I knew exactly what they were talking about because I had notes from the meeting.
And the meeting was about... there were two things. It was cafeteria coverage during the shutdown and a holiday meal. And there was misunderstanding that Justin became upset with me and said -- asked me why I wouldn't let Koreans have lunch during shutdown. I said that -- that's not what I said. That's not what this is about at all. I wanted to ensure safety because there's construction in the cantina.
So I brought up maybe boxed lunches or some different options we might be able to use to maintain the safety of the individuals who were working during shutdown. And there were many more people than Korean people working during shutdown.
So I mean, there were topics that we talked about, and I actually had notes from that meeting.



Q So they were accusing you of discussing something that wasn't what you were actually discussing?
A Correct.
Q Okay.
A And through all of that conversation, I know that I adequately explained everything they were asking me about. And it was in no way inappropriate. And at the end of the meeting, they indicated that they were done, and Charlie said, Well, okay -- looked at Randy and said, What do you want to do? And Randy said, Well, just to be safe, why don't we go ahead as planned.
And the whole time, Gary Langswager, safety and security manager, was standing outside the door.
Q Was he present in the meeting?
A He was not present in the meeting. He was standing outside the door. I don't know --
Q Was the door open?
A No.
Q And go ahead. Sorry.
A And then -- so then they explained that yes, they were placing me on administrative leave until we could sort things out. And I asked how long it would be before I would get feedback from them, and Charlie



said he would be contacting me.
I don't think he did contact me. I think I waited and waited, and then I called you.
Q Well, did Gary have to escort you out, like, do you know what his --
A Yes.
Q So you were escorted out of the building?
A Yes.
Q And that was -- do you remember what date that was?
A Yes, that was January.
Q So we're in January now. January of '11?
A January of '11.
Q But at that time, did they tell you during the meeting you were terminated?
A No. No. They said they were investigating a... an allegation that I had been colluding with Diana Ledbetter.
Q Okay. Well, thank you very much.
MR. MARTIN: Nothing from us.
MS. CARTER: You got we're reading and signing, right?
THE REPORTER: Yes.
(Whereupon the above-entitled matter was concluded at 8:22 p.m.)

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of U.S. Legal Support. U.S. Legal Support was contacted to provide court reporting services for the deposition. U.S. Legal Support will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c).

U.S. Legal Support has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

U.S. Legal Support will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.



REPORTER'S CERTIFICATE

STATE OF GEORGIA:
FULTON COUNTY:

I hereby certify that the foregoing transcript was taken down as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true and correct transcript of the evidence given upon said hearing, and I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action.

Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia and OCGA 15-14-37 (a) and (b), written disclosure is attached herein.

This the 27th day of July, 2015.

______________________________
SHARI LYNNE SNOW, CCR-B-2258



DEPOSITION ERRATA SHEET

Deponent: ANDREA GOGEL
Deposition Date: July 22, 2015

I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated.

I have signed my name to the Errata Sheet and appropriate certificate and authorize you to attach both to the original transcript.

Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________



Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________
Page No.___ Line No.___ Change to:________________
Reason for Change:_______________________________

SIGNATURE:_______________________ DATE:__________
ANDREA GOGEL

Sworn to and subscribed before me this ____ day of______________, 20___.

________________________
Notary Public

**A**

[redacted]
**A-L-A-N** 18:19
**A-L-L-E-N** 18:19
**A-N-D** 68:1,2
**a.m** 1:13 6:7 53:18
**abilities** 33:8
**ability** 10:18,23 204:6,7
**able** 42:22 60:12 164:19 246:6 262:20
**above-entitled** 264:24
**absences** 66:13,13
**absolutely** 108:23 142:15 206:3 234:2 261:22
**abused** 169:8
**academic** 30:10
**acceptable** 8:24 10:12 102:20
**accepted** 81:6
**access** 159:11 164:16
**accomplish** 81:25
**accountable** 189:24
**accounting** 37:21
**accuracy** 144:10
**accurate** 20:24 54:24 77:16 81:18 106:23 107:4 108:25 109:3 114:3 125:11 126:6 134:16,22 144:2 161:21 217:6 242:19 247:18
**accurately** 143:22
**accusations** 238:3,5,6
**accused** 261:13
**accusing** 263:1
**accustom** 8:6
**achieve** 31:12 34:11
**achieved** 32:3,23
**acronym** 42:25
**act** 38:21 39:2,6 155:5 156:16
**acted** 187:4
**acting** 61:19
**action** 1:4 40:21 59:1 64:16,16,18,22 65:2 184:5,6 266:14
**actions** 190:6
**activities** 24:10,22 56:24 57:6,14 88:5
**actual** 246:7
**added** 75:11 93:22
**addition** 6:19 54:15 122:19 227:13 237:16
**additional** 104:19 250:18,19 251:9 256:23
**address** 6:12 7:4,10 7:11 15:7,24 16:10 17:8,11,13,19,21 77:12
**addressed** 63:6
**adds** 225:11
**adequately** 263:7
**adjustment** 4:4 188:6
**admin** 57:22
**administration** 6:24 30:3 37:1 96:22 103:5,19 140:21
**administrative** 14:17 53:3 57:14 58:6 67:18 70:22 97:23 142:7,25 199:4 207:1 216:4 239:12 252:4,6,8,9 263:23
**admitted** 260:20
**adult** 15:18 18:8 21:25 22:1
**adults** 22:4 169:16 170:3
**advance** 207:7
**advanced** 29:24
**advice** 105:16,20 120:11
**affair** 169:12,16
**affairs** 99:24 118:22 119:11,12 140:25 162:16 163:23 180:9,11 181:18 185:2 201:14,19 202:2,6,17 205:21 206:8 232:20
**affect** 10:18,23
**affiliated** 33:17
**affirmative** 5:11 49:7 50:4 53:16 65:16 152:14 206:20 210:2
**affirmatively** 10:8 37:13 223:9
**afraid** 163:25,25 213:7
**African-American** 162:10 175:18
**African-Americans** 235:19 244:24
**age** 14:3 39:5
**agency** 265:16
**ago** 43:1 53:23 114:24 141:20
**agree** 66:2 158:6 225:12 237:7
**agreed** 131:15 133:2
**agreement** 3:13 261:22
**Ah** 67:25 130:8
**ahead** 212:25 263:12 263:21
**Ahn** 120:2,7,22 121:11 122:17 158:8 167:16 168:24 169:7,12 170:15 200:15 251:16 259:22 260:5
**Ahn's** 168:21
**aid** 103:12
**aiding** 43:20
**airport** 20:7,11 164:23 165:9 166:25
**Alabama** 25:17
**Alan** 18:17
**alarmed** 232:7
**alcohol** 10:22
**alienage** 156:24 160:24 161:16,25 168:12 176:5,6
**aligned** 105:3
**allegation** 44:13 105:9,14 169:9 171:24 264:17
**allegations** 7:19 43:16 44:18,20 63:13 101:17,19 104:18
**allege** 239:22,23
**alleged** 238:13 251:15
**allegedly** 237:20
**alleging** 115:19 243:8 243:18,23 252:13
**allow** 24:6 256:23
**allowance** 219:11,18 219:24 220:3,10,13 223:14 224:12 225:21,23,25 226:11 229:20,21 229:22,23
**allowed** 118:24,24

158:20 246:1 257:2
**alternate** 27:22
**Amanda** 96:14 238:20
**ambiguity** 121:16,18
**America** 93:14 168:23
**American** 73:9 81:24 87:4 98:15 118:16 119:1 125:20 148:25 158:24 160:5 162:21 167:19,24 168:3 176:5 184:10 186:13 189:21 190:4,19 236:8 256:18,20,21 257:1 257:6,8,20 259:4
**Americans** 39:1 159:24 160:4 167:15 168:2 175:15 248:20 249:1 256:7
**amount** 45:24 71:5 75:5 80:11 99:19,22 99:24 100:13 144:12 222:18,25 223:5 224:6 229:18
**and/or** 239:2
**Andrea** 1:3,10 5:1,4 5:21,25 6:19 7:11 77:9 108:8 129:21 133:18 135:22 196:15 204:9 209:14 221:6,7,22 233:12 237:10,13 237:13 238:2 244:9 267:2 268:21
**Andy** 163:22
**Andy's** 163:22
**angry** 45:3 163:4 257:19
**announce** 248:19,19
**announced** 248:25 249:3,19,22
**announcement** 3:17 4:3 112:16 113:24 114:23 178:18,19 187:19
**announces** 178:21
**annual** 79:17
**answer** 5:17 8:20,23 9:3 30:16 48:14 105:25 116:12 127:2 130:5 141:25 157:18 166:3 195:23 212:17,20 214:5 243:5,13,16 244:1 261:3
**answered** 112:21 119:24 246:25 260:23
**answering** 36:21
**answers** 8:1,9 266:7
**anticipated** 61:10
**anybody** 13:11,20,24 18:14 71:25 83:15 96:9 114:13 128:4 147:23
**anymore** 70:21 216:8
**anyway** 25:10 82:6
**apart** 119:23
**apartment** 16:4
**apparent** 179:12 203:23
**apparently** 73:19
**appeal** 91:1
**appear** 106:23 107:4 133:10 134:21 136:1 224:10,13 225:6,12 242:19
**APPEARANCES** 2:1
**appeared** 179:17
**appears** 27:12 77:4,6 77:9 106:21 110:8 110:12 113:8,20 114:5 115:3 129:19 129:20 150:11 155:24 177:23 178:8 191:10,17 195:5 196:12 217:5 220:22 221:8 222:12,14,18 223:11,17 224:25 236:16 237:6 242:22
**applicable** 31:18
**application** 3:7 27:9 28:1,23 29:1,13 35:3 68:23 75:14,17 75:21 76:14
**applied** 218:7
**apply** 40:5
**appraisal** 3:18 71:15 129:8,11,12 130:9 130:10 134:16,22
**appraiser** 71:12 130:24 131:15,21 132:2,5,25 133:2,6 133:12
**appreciate** 202:12
**approached** 117:7 121:8 162:16 182:2 184:4
**appropriate** 51:8,15 61:18 62:3 88:8 102:20 105:18 172:18 184:6 189:22,25 190:1 234:8 239:5 267:11
**appropriately** 112:22 120:12
**approval** 64:8,14,24 64:24 65:6 71:21 100:13
**approvals** 64:22 99:18
**approved** 100:6
**approximate** 11:18 120:15 121:23
**approximately** 6:7 16:3 20:8 30:23 32:10 46:19 68:9 76:15 117:24 164:8 227:19 228:5,6,13 228:20
**April** 55:18 127:13 179:2,19 188:5 224:22,25 227:15 227:17 228:2,8,23 248:10,15
**area** 31:19 58:24 67:5 69:19 184:22 197:20 239:14
**areas** 98:16 116:3 126:3 128:22 132:21 133:3
169:21 177:12 199:4 202:12
**argument** 67:2
**Arnold** 126:15 139:17,19
**arose** 36:20
**arrive** 81:2
**arrived** 66:5 90:2 164:21
**Arthur** 83:11,20,22 84:10 90:20 96:7 124:1,13 175:17,21 185:10 198:24 201:4 202:7 205:22 216:1,2,5 236:6 239:18 241:3,5,12 241:12 242:4 252:15 253:22 254:9,16,18
**Article** 265:3 266:16
**arts** 29:23
**asked** 14:7 20:15,23 61:1 72:5 73:13 117:14 120:11,20 121:19 122:19 124:4 128:10 141:20 157:11 158:18 159:3 161:25 174:22 177:13 180:13 182:10 186:3 187:2 187:22 190:20,23 191:14,15,17 201:12 205:7 208:1 208:21 209:3 210:19 213:9 232:11 240:18 246:8 248:6,9 261:19,24,24 262:14 263:24
**asking** 7:18 13:10 20:19 96:24 112:7 132:1,2,3,4 147:1,2 147:11,21 175:5,20 176:9 193:7 220:1 223:20,22 246:9 247:6 248:22 255:7 263:8
**aspects** 57:18,20

142:7 144:14
**assembly** 90:20 94:10 99:2 125:24
**assessment** 190:2
**assigned** 87:16
**assignment** 67:12
**assist** 103:9
**assistance** 42:18 43:2 208:9,16,21
**assistant** 43:12,20,25 44:6 51:4 52:4,16 52:22 54:14,20 58:10,17 59:19,24 59:25 60:5 64:20 66:16 68:11,14 69:22 70:15 82:9 84:9,12 88:23 89:19 89:22 90:6,16 102:3 102:18 104:3,6,18 105:9 118:22 121:3 172:10 173:14 174:1,17 175:10,12 175:14 237:24
**assisted** 103:2
**assisting** 43:20
**associated** 19:17 118:17
**associations** 33:9
**assume** 10:6 75:18 86:5 116:15 212:3
**assumed** 20:19 86:9 98:12
**assuming** 146:20,21
**assumption** 86:12
**assure** 173:10
**Atlanta** 1:16 2:5 6:10 20:5 150:17
**attach** 267:12
**attached** 4:25 266:19
**attachment** 109:16 113:9
**attain** 34:7
**attained** 29:24
**attempt** 155:12
**attempting** 224:7
**attend** 19:18 29:14 45:25
**attendance** 44:23 59:9 63:4 101:7
173:4
**attended** 25:2,12 35:6
**attendees** 193:6
**attention** 33:7 63:24 68:22 74:4 75:20 110:3 113:3 114:16 120:9 130:19 135:19 152:18 194:15 210:23 218:1 221:16 236:20 240:3
**attitude** 122:24
**attitudes** 118:23
**attorney** 2:3,15 6:20 12:19 13:21 146:21 147:2,5,6,8,19,20 147:23 148:2 154:20 208:8,22,24 208:25,25 213:21 213:23 243:12,15 266:12,13
**attorney's** 209:1 211:25
**attorneys** 2:10 147:21 155:10
**attracted** 91:8
**audible** 8:9
[redacted] 15:16,17,18 16:12
**August** 180:23 184:18 198:4
**authored** 194:6
**authority** 189:23
**authorize** 267:11
**authorized** 5:5
**automatic** 127:1,1
**automatically** 125:9 127:23
**automotive** 75:3
**available** 40:3 73:20 80:17 199:14
**avenue** 71:23
**average** 30:6,9
**awarding** 162:18
**aware** 42:15 88:6 111:5 129:12 135:15 139:21 143:11 157:21
187:24 190:5 194:1 194:4 195:15 196:16 199:23,25 206:13 207:4,12 241:11 244:23
**awry** 88:18

**B**

**b** 266:19
**B-2258** 1:19
**bachelor's** 29:23
**back** 20:5 33:1 53:8 53:20,25 55:6,7,20 58:13,15 63:6 68:22 74:4 91:9 106:12 141:17 154:13 160:18 164:24 165:8,9 177:2 185:11 186:4,5 195:2 197:2 200:16 210:23 211:15 214:18 222:10 225:24 230:23 236:23 237:9,16 240:17 246:18 262:2
**background** 35:9 84:23 100:23 141:20,21,22 142:2 143:23
**Backing** 47:4
**bad** 17:21 124:3 139:23 163:6,6 182:5,12 238:24 252:20,23 254:12
**badly** 43:9 169:8 183:11
**baffled** 187:5
**bag** 20:7,16,21 213:4 213:6,14
**Bailey** 2:20 6:21
**ballpark** 33:2 63:16 94:12
**bankruptcy** 19:20
**banks** 199:14
**Baptist** 25:16
**bar** 49:13
**barriers** 48:24
**Barry** 241:1
**base** 76:7 78:23 79:2 79:3,4 80:7,14,21 81:6 224:16,16,19 225:1,15,16 227:2,6 227:13,20 228:11
**based** 33:25 38:24 56:14,16 57:1 62:22 72:10 75:11 80:5 81:5,5 84:23 90:4 92:6,17 105:7,18 124:19,23 129:12 136:12 138:9 156:24 158:1,23 161:15,16,16,23 167:10 173:12 184:6,24 202:19 231:23 239:3,16
**basement** 16:4
**bases** 123:23
**basic** 35:25 59:8 62:13 63:4 64:23 234:15
**basically** 165:16 215:16
**basing** 237:22
**basis** 26:24 34:13 145:14,15 230:14
**Bates** 110:6 114:17 130:20 194:22 222:14 254:20
**bears** 109:17 209:17 211:2
**becoming** 203:23
**began** 79:1 100:4 166:9 227:21,21
**beginning** 230:1,10 245:15
**begins** 218:3
**behalf** 2:2,8
**behaving** 43:9 175:6 213:11
**behavior** 44:24 45:2 65:3 87:24 102:20 172:25 184:1 185:9
**behaviors** 138:20
**belief** 119:7,22 123:21
**believe** 13:19,22 18:23 21:5 22:4,24

30:22 31:13 32:25 33:1,5,13 34:9 38:12 40:14 41:1 45:9 46:6 48:17 49:25 50:2,7 51:19 67:12 72:18 73:2,14 76:11 80:25 81:15 83:7 86:1 90:11 91:6 95:20 96:17,18 98:20,20,25 112:13 114:22 119:2,9 123:10,12,13,16 124:8 126:20,21 142:8 143:13 144:1 144:24 148:22 149:7 150:16 151:4 151:11 157:6,8 158:1 160:3 161:12 162:5 166:15 177:11 180:22 185:19 186:17 192:7 194:7,13 197:17,21 201:5,23 202:2 207:17 208:23 209:24 210:5 211:22 216:13 223:18 228:21 229:1 232:4 233:9,10,13,14 235:14 237:19,25 241:1 242:2 245:23 246:3 247:2,3 248:21 249:9,13 255:5
**believed** 81:20 155:10,10 259:18
**bell** 197:7
**beneath** 84:13
**benefits** 36:20 37:3 58:6
**best** 8:7,14,20 9:5 22:25 107:4 202:21 205:1 216:7 240:24
**better** 72:22 123:9 142:13,22 184:9 250:12
**beyond** 201:11
**bias** 126:19
**biases** 256:3
**bid** 162:24
**bidding** 162:18 163:18,21
**bids** 162:20
**bigger** 180:5
**biggest** 257:3
**bit** 93:14 95:5 106:14
**bizarre** 216:10
**black** 222:5
**blank** 12:6 90:10 237:12 239:8
**blanket** 151:23
**blending** 250:5,14
**block** 68:24 129:19
**blood** 21:22 22:2
**BlueCross** 4:20
**BlueShield** 4:20
**board** 37:2 63:17 265:4 266:17
**Bob** 3:20 69:4 72:1,3 73:2 85:4,20 95:23 97:6 111:21,23 113:21 114:6,9,14 115:5 116:7 122:10 126:13 133:6,23 136:6,14,16 140:8 140:10 141:9,20,24 142:8,13,17,23,24 143:25 144:21 147:3,12 149:3 157:17,24 172:8 178:21 180:3,13 185:22 187:17,22 190:13,14,18 191:11,14,15,21 194:5,13 195:6,15 196:13 205:23 234:1,1 236:17 239:2 246:17,20 247:2 248:6 249:24 249:25 250:2
**Bobby** 184:22
**body** 90:21 217:4
**Bolton** 177:21,25
**Bonkowski** 182:3,15 182:16 183:18
**bonus** 4:5 75:8 76:8 79:7,9 80:11,23 81:8,11,12 188:19 188:22 189:7 219:8 219:17 220:7 224:11 225:8,17 227:8 228:22
**bonuses** 74:21,25
**book** 33:25
**born** 15:2,3
**boss** 97:2,3 166:2
**bottle** 20:18
**bottom** 107:25 136:2 137:3,7 191:8 196:11 211:2 254:22
**bought** 166:25
**box** 33:10 78:1,3 112:4,10 137:6 167:1
**boxed** 262:19
**brand** 102:15,16
**break** 9:1,11,13,15 9:17,22 28:2 53:10 53:13,17,23 106:10 109:23 141:12 214:12,15,20
**breaks** 9:20
**Brenda** 34:2
**Brian** 196:13
**brief** 16:2 69:20 143:10 154:15
**briefly** 111:7 155:16 252:16
**bring** 84:18 174:3 180:1
**Bringing** 94:18
**broad** 103:4
**broader** 56:14,24 96:19
**broke** 106:15 141:19
**Brooks** 2:11
**brought** 120:9 159:4 163:1 179:23,25 180:2,2 186:19 189:21 201:5 256:22 262:19
**Bryan** 83:10 84:10 89:9 96:5
**bubble** 234:12
**budgeting** 37:22
**build** 45:22 202:8
**building** 35:25 42:7 45:20 46:4 82:2 94:2 133:19 190:10 264:7
**built** 93:22
**business** 108:18 109:4 149:2 169:11 169:15 170:2

## C

**C-H-O-N-G** 183:7
**C-O-L-E-M-O-N** 34:3
**C-O-M-B-S** 17:9
**C-O-R-B-E-T-T** 34:2
**C-O-U-R-T-N-E-Y** 196:13
**cafeteria** 262:12
**calculated** 226:10
**calendar** 12:2,3,4,6,8 12:12
**call** 26:13 39:24 61:24 62:1 63:6 107:9 145:25,25 146:3 231:18,18
**called** 20:2 33:22 37:23 46:25 73:2 87:1 98:24 107:11 135:6 151:4 186:16 216:1,5 233:11 254:20 262:1 264:3
**calling** 216:2
**calls** 146:2 196:19
**candidate** 40:5 202:15
**cantina** 262:18
**capabilities** 52:14,14
**caption** 115:2 266:6
**captioned** 178:19 267:6
**capture** 8:4
**car** 225:21,23,25 226:11
**card** 229:19
**care** 36:18,20 127:13 184:2 243:2,9 248:10,15
**career** 33:10 86:22 91:15 106:1

**careers** 208:11
**careful** 182:8
**Carla** 241:1
**Carolina** 20:12
**carried** 213:3,6,13
**Carter** 2:3 3:4 5:7,11 5:18 6:13,16,20 7:3 7:6 9:16 11:7 14:10 14:13,18 17:2 25:6 27:13,24 28:7 29:8 35:11 44:14 48:13 48:20 49:9 53:9,12 53:16 55:1 60:19,22 64:11 67:24 68:1 69:6 70:7,11 76:21 76:24 77:23 79:19 79:24 80:4 84:20 89:2 91:16 92:9 93:4,6 97:8 102:6 103:14,20 105:23 106:5,9,24 109:23 110:1,22 112:2,6,20 114:11 115:11,14 124:20 125:14 128:8,13 131:20 132:3,8,12 135:9 136:18,25 141:12 147:7,11 148:14 149:21 154:7 155:18 156:19 157:2,12 158:3 166:17 169:13,17 171:13 176:11,22 189:4 193:20 194:22 195:23 196:23 200:11,20 206:21 211:7,12,17 212:22,25 219:14 219:19,21,25 220:4 221:11,13,25 222:4 222:22 223:1,20 224:1 225:2 226:5 228:17 230:7 237:3 238:17 241:22 243:4,17 244:2,7,9 244:12 247:1 255:2 255:9,14 260:25 264:21
**Carter's** 220:9
225:10
**cartoon** 234:11
**case** 9:7,22 10:9 21:19 63:12 75:6 165:25 240:19,21 265:15,15,19
**cases** 174:3,8
**casual** 203:24
**categories** 138:5,8
**Caucasian** 160:20,22 161:24 164:11 165:7,24 176:3 184:10 186:24,25
**Caucasians** 160:1
**CCR** 1:19
**CCR-B-2258** 266:24
**cellphone** 25:19,21 25:23 26:1,2,9,18 26:19 27:21 146:3
**cellphones** 26:17,22 26:23 146:1
**center** 253:2
**certain** 9:8 28:24 31:17 32:7 75:5 99:13 198:20 236:9
**certificate** 266:1 267:11
**certification** 31:5,10 31:10,23 32:6,9,11 34:8,11,19,20,20
**certifications** 35:1
**certified** 33:20,22 34:17 214:25 265:7
**certify** 266:5,11
**chain** 43:11 64:6 71:24 96:20 140:13 140:15
**challenge** 91:2 92:12 92:19
**challenges** 48:11,18 49:13 92:7,13,21,23
**champions** 138:14
**chance** 193:23 217:23
**change** 46:20,21 90:23 94:15,17 138:14 155:25 187:20 203:6,8,10 203:11 267:13,14 267:15,16,17,18,19 267:20,21,22,23,24 268:1,2,3,4,5,6,7,8 268:9,10,11,12,13 268:14,15,16,17,18
**changed** 45:10 118:23 122:25
**changes** 248:25 267:8
**changing** 99:10 221:13 229:17
**chapter** 23:23 24:11 33:17
**characters** 234:11
**charge** 3:22 4:12,15 43:4,6 149:18 151:16 153:7,19 154:1,4 198:14,18 198:23 199:1,8,21 199:24,24 200:2,4 206:14 207:7,10,13 216:15,21 217:2,2,7 239:17 251:18,21 251:23,25 252:2 265:18
**charged** 19:23 21:16
**Charles** 195:6
**Charlie** 194:5,13 206:15 208:8 251:11,12 261:10 262:2 263:10,25
**chart** 3:15 84:14 110:9 111:7,9,25 245:12,20,24 246:7
**charts** 111:7 245:4,16 246:2,9
**check** 75:12 80:9,22 222:15
**child** 22:13,21
**children** 13:6,9,17 15:13 16:12,15,20 204:2
**children's** 26:22
**choking** 214:13
**Chong** 183:6,7,12,25
**chose** 126:20
**chosen** 208:24
**Chris** 22:10,11 23:4,7 126:14 139:16 237:23
**Christian** 25:13
**Christmas** 25:16 158:21 167:5
**church** 24:21 25:2,13 25:17
**churches** 24:24,25
**chute** 178:5
**circles** 38:16
**circumstance** 14:25
**circumstances** 20:3 105:7 120:12
**citation** 20:24 21:4
**citizen** 160:24 161:3 161:25 164:13 165:22 167:11 186:22
**citizens** 49:4 160:5 161:5
**City** 15:3 17:18 25:17 36:12
**civic** 23:10
**civil** 1:4 5:6 6:2,5 38:18,20,20
**claim** 156:23 161:13 161:22 165:24 167:8 168:5 238:10
**claiming** 165:18,21
**claims** 168:11 239:10
**clarification** 14:20 38:13 60:21 61:13 130:15
**clarify** 79:13,24 132:15 186:21 220:6 244:8 246:12
**classes** 30:13,17,17 30:19 35:5,7
**clean** 22:15
**clear** 12:4 97:21 98:5 98:8 116:12 118:5 179:20
**clearly** 101:17 107:7
**client** 5:8
**close** 91:6 163:4 215:10 241:5
**close-out** 63:10
**closed** 63:7 199:17
**closely** 57:24 62:11 153:10
**closer** 56:7,9 57:5,6
**clothes** 234:17

**club** 23:13 24:1,7,14 24:15
**clubs** 23:10 24:2
**co-op** 47:16
**co-worker** 16:4,5,7
**co-workers** 13:18
**coach** 33:20 254:5
**coached** 184:3 202:9 203:1 254:1
**coaching** 31:7 33:23 33:24 34:1,14
**COBRA** 230:2,19,21
**code** 3:14 108:18 109:3
**Colemon** 34:2
**collect** 155:11
**collected** 149:3
**college** 29:13,14,15 29:18 30:11,13,14 35:7
**colluding** 264:17
**collusion** 261:14
**color** 38:24
**column** 132:2,25
**columns** 130:23 132:6,10,16,18
**combination** 118:14 119:2
**combined** 39:10 119:21
**Combs** 17:9 77:12
**come** 39:23 55:19 62:1 69:10 72:20 86:24 130:12 160:18 172:22 205:17 207:24 240:2
**comes** 142:2,10,12 243:19
**comfortable** 163:11 210:9
**coming** 37:2 116:2 185:25 190:12 202:14 205:21,21 208:12
**command** 43:11 64:6 71:24 96:20
**comment** 19:12 118:2 120:18 142:16 185:12 241:2 252:12,15
**commenting** 183:14
**comments** 131:21 132:5 133:13 134:12 136:13 183:15 199:7 215:12 235:17,18 235:21 252:20 253:13
**Commission** 39:14 149:19,24 208:17
**commit** 8:11
**commitment** 167:22
**committed** 19:23
**common** 72:10,14 193:18 203:25
**communicate** 216:7
**communicated** 118:2 145:10 182:6 190:17 202:15
**communicating** 133:19
**communication** 8:6 47:24 48:21 62:3 145:23 202:11 241:5
**community** 82:1
**comp** 36:25
**companies** 162:21 218:6
**company** 10:11 16:7 48:8,19 49:6 66:20 118:21 153:6 158:21 162:22 170:5 198:7,9,17 202:20 219:17 229:2,5,8,9,13,15 245:9 248:19 249:19 260:8
**compared** 167:23 233:23
**comparing** 139:12,17 144:11
**compensated** 75:4 225:20
**compensation** 67:17 75:10,10 76:13 77:19 157:20 226:3 226:7
**competency** 256:24
**compilation** 194:7
**compiled** 194:11
**complain** 167:20 169:25 201:16
**complained** 44:25 119:13 120:13 201:11,13,15 202:18 233:25 234:1
**complaining** 164:1 205:18
**complaint** 103:16 115:7,14,16,21 237:25 239:16 256:6 259:11
**complaints** 118:25 169:4 200:14 203:15,16 205:17 205:20
**complete** 14:6 60:12 80:11 131:2 152:8 167:24
**completed** 34:15 61:11 80:6,24 94:5 94:7 130:12 137:23 151:9 152:9,11 222:3
**completely** 149:15 187:5,8 234:4,23 253:3
**completing** 153:7
**complex** 63:14
**compliance** 38:17
**comport** 195:12 217:12
**computed** 225:19
**concentrate** 8:9
**concept** 61:16 66:1
**concern** 162:17 163:3 164:1 169:20,21 170:1 181:21 184:16 185:24 201:5 237:13 257:3
**concerned** 162:19 163:24 170:4 180:5 180:16 182:21 204:5 213:10 231:23 262:1
**concerns** 4:7 42:21 148:23,24 149:5,6 174:4,15 176:13 180:6,7 181:16 184:12,13,21,23 186:8 187:2 189:10 189:12,21 190:12 190:16,20 191:2 192:5 193:15 198:3 198:6,11 199:25 202:24,24 203:13 208:20 251:5 254:21 256:11
**concluded** 64:3 264:25
**concludes** 244:6
**conclusion** 81:3 167:17 208:2
**conclusions** 138:9
**conditions** 10:18
**condolences** 36:24
**conduct** 3:14 43:10 61:6 62:18 71:11 100:24 101:2 104:17 108:18 109:4 120:10,20 121:10,20 122:20 123:18 171:10
**conducted** 9:9 44:3 102:1,8 130:3 172:9 173:16 182:9 198:11
**conducting** 46:6 59:1 201:12
**conference** 186:16 199:14,15,18,19 203:20 206:7,8,10
**confidence** 195:20
**confident** 203:5 232:5
**Confidentiality** 3:13
**confirmed** 181:15
**confront** 163:14
**confusing** 166:3
**connection** 123:10,12 123:13
**connotation** 72:15
**consensus** 65:20,21

65:23,25 66:2,4,5 66:15 67:2 85:14 86:6,10 172:6,19 173:1,3,23 174:16
**consenting** 169:16 170:3,9
**consider** 196:4
**consideration** 66:19
**considerations** 74:21
**considered** 34:16 47:1 66:7 71:24 72:2,22 92:12 97:3 100:6 178:5 226:6 235:16,25
**considering** 74:1 102:25 195:21
**consistency** 173:7
**consistent** 67:1 259:4
**consistently** 52:12 99:10
**Constangy** 2:11
**constructed** 51:13
**construction** 93:21 93:25 94:5 95:8,10 262:18
**consulted** 189:23
**contact** 20:18 145:13 145:18 150:2 151:1 264:2
**contacted** 73:12 147:6 214:2 215:11 231:19 232:9 265:9
**contacting** 264:1
**contend** 118:12 156:17 157:24 158:10,11 161:15 167:9 231:3 239:24
**contends** 158:6
**content** 13:13 144:13 149:5 234:5,10 235:24
**contention** 115:8 118:8 122:14 126:7 126:8,16 134:13 139:10 141:8 142:12 179:8
**contents** 13:16,25
**contested** 19:6
**context** 145:7 148:15 148:18,19 149:11 149:12 214:5
**continue** 186:9,9 204:10 213:2 257:2
**continued** 94:18,20 94:20 254:5
**continuing** 34:13 52:13
**continuum** 102:19
**contract** 95:20 181:2 265:12
**contract/agreement** 265:13
**contractor** 201:20
**contractors** 95:19
**contracts** 162:18
**contrary** 186:1 187:8
**contribute** 84:23 85:2 85:3,5 192:9
**contributed** 149:6 193:16,17 198:3
**controls** 61:16,20 62:14
**conversation** 8:17 73:17 117:23 122:7 123:1 147:4,14 148:10 163:2 172:3 176:17 180:3 186:6 186:15 187:5,10 199:16 203:21 216:10 232:1,8 233:8 262:4 263:6
**conversation's** 248:12
**conversations** 147:1 147:3,20 158:17 160:9,14,14,15 161:8,9 167:4 186:7 199:7 208:4,5 231:9 231:12 258:6 262:6
**coordinate** 65:15
**coordinator** 36:15 98:19,25
**copied** 109:15 237:1
**copy** 28:8 77:16 80:20 108:25 109:3 114:3 134:16,22,25 149:7 211:5,9,20 213:22 255:1
**Corbett** 34:2
**corporate** 93:9
**correct** 5:10,17 6:12 15:11 18:7 21:6 22:19 23:8 28:9 30:7 32:25 33:16 37:18 38:25 39:11 42:16 44:1 54:3,6 54:12 65:3,19 68:18 68:19 75:24 76:2,3 76:10 77:7 79:5 81:14,14 82:24 83:2 83:3 84:7,8,10,11 85:10 86:10,22,23 103:19,22,22,23 107:13,16 111:19 113:18,19 121:5,15 122:12 124:13 129:9,13,14 131:13 131:16 132:16,25 133:6,7 134:14 136:22 137:9,15,16 137:21,22 138:9,12 138:22,25 139:6 140:21,22 141:6,7 143:4 144:23 149:19,20 150:10 152:4,7,21 154:4 156:2,11 157:10 160:20,21,25 165:14,15 171:2 178:11 187:11 188:6,17,19,20 189:8,12 191:16 198:4 199:21 207:10,22 209:10 209:19 217:21 218:20,21 219:7,9 220:7,11 223:8 224:12 225:5,6,8,9 225:17 226:4 227:3 242:10 263:4 266:9
**corrected** 157:8
**Correction** 223:2
**corrections** 152:17 156:10,15
**corrective** 64:15,18 64:22 65:2 184:5
**correctly** 37:5 43:19 55:24 63:7 65:12 74:3 75:11 76:6 85:19 91:4 111:2 115:8 173:4 207:6 214:1 215:13
**corresponded** 13:20
**correspondence** 146:6 236:16,17
**couch** 167:20
**Council** 265:5 266:18
**counsel** 2:1 7:1 10:1 11:10 71:16 72:6 102:2 154:7,17 210:8,10 211:17 254:25 255:6 265:15 266:12,13
**counsel's** 134:11
**counseling** 65:14 243:14 244:3
**counter** 160:16
**counterpart** 98:15
**counterparts** 98:17 238:1 258:12
**Countess** 125:23
**country** 124:10,12
**County** 19:5 22:12 36:11,11,14 266:3
**couple** 36:4 55:11 244:7,14
**course** 7:17 11:19 31:5 34:12 36:6 65:3 72:21 96:14 183:9,10
**court** 1:1 5:19 6:17 7:24 8:3,13,15 21:7 22:14 28:7 265:4,7 265:9 266:17
**courtesy** 8:22 22:14
**Courtney** 196:13,17 196:17,22 197:5,6
**cousin** 22:6
**cover** 265:17
**coverage** 231:24 232:3,6 262:12
**create** 87:21 170:5
**created** 105:1 168:10
**creates** 138:24
**creating** 169:7
**creation** 255:22

**credit** 31:3 229:19
**credits** 30:15,17 32:8
**crime** 19:24
**crimes** 21:17
**criteria** 137:3
**critical** 11:13 99:7
**crux** 190:3
**cry** 233:14
**cubicles** 199:3,11,13 199:15
**cultural** 49:14 118:15 119:3 190:1 256:24
**culture** 87:25 88:17 118:16,17 203:4 204:13 256:18 257:21 258:3,14,16 258:20,21,23 259:20
**cultures** 250:6,14 256:17
**current** 14:3 15:24 16:24 17:1,13 25:23 62:4 174:8 228:11 229:23 239:12
**currently** 15:4 25:18 116:3,5 229:7
**Cursing** 45:3
**customary** 265:19
**cut** 74:3 81:1,3,21 226:9,10 257:1,22

**D**

**D-A-U-G-H-E-R-T...** 55:16
**Dama** 215:24 241:18
**damage** 208:11
**damages** 243:19,24
**data** 138:9 162:21 174:14
**date** 6:6 20:10 75:14 75:18 76:1 94:11 100:5,14 109:17 129:23 130:1,6 148:11 150:18,23 151:23 152:6 156:5 179:1,4,6 195:9 201:23 204:23 209:17,20 217:7 218:5 264:9 267:3 268:20
**date's** 113:11
**dated** 177:25 216:11 219:2 224:22 254:22
**dates** 11:13,14,15,17 11:17,18 12:2 151:25 155:21,22 185:19
**Daugherty** 55:14
**David** 177:21,25
**day** 50:15,16,19,19 73:2 92:3 134:12 152:13 210:12 215:11 216:3,4,5 218:13 233:5 240:8 244:13 262:2 266:21 268:23
**days** 62:17,21 63:7 123:4 216:13 251:17,20 252:2,5,5
**deal** 208:19 221:2
**dealt** 101:12 141:4
**Deb** 6:25 22:9 23:4,6 192:24
**debate** 66:3
**DEBORAH** 2:15
**Deborah.Walker@...** 2:17
**December** 188:23 189:8 204:23 205:10 206:18,19 209:17,24,25 210:4 227:1 261:21
**decide** 65:17
**decided** 208:15
**decision** 64:10 65:9 65:20,21,24,25 66:4 66:15 85:13,15 86:7 86:10,16 91:21 105:5 116:6,13 119:15 124:19,22 124:23 138:17 181:12 184:12,13 185:4 202:16
**decision-making** 86:13 189:23
**decisions** 65:23,23 66:24 134:6 172:6,7 173:8
**declare** 152:20
**deduction** 222:19,23
**deductions** 223:1,6
**defendant** 1:7 2:8 6:1 7:1 10:9
**Defendant's** 27:2,5 28:12,15 76:17,20 77:3 78:11,14 106:16,18 107:21 107:24 108:3,6,14 108:17 109:11,14 113:4,6 129:1,3 135:8,20 143:16,19 150:5,8 151:13,16 153:13,16 154:24 155:3 177:17,20 178:14,17 188:13 188:25 189:3 191:4 191:7,25 192:3 194:18 196:7,10 204:17,20 209:6,8 212:7,10 214:10,21 216:18,21 217:16 217:19 218:23 219:1 220:18,21 226:16,19 230:16 230:19 236:12,15 242:13
**define** 65:10 145:13
**defined** 142:4
**definitely** 73:16 178:10
**definition** 261:15,18
**definitive** 61:9
**degrading** 162:15 233:8 234:4
**degree** 29:22,23 36:7
**degrees** 29:24
**delay** 242:24
**demonstrated** 137:11 137:14,17,25 138:6
**demonstrates** 137:21 137:24 138:11,20
**denied** 259:14,18 260:21
**department** 37:10 55:22,24 58:25 61:9 64:20,25 66:16 83:5 85:6 87:18,20 94:16 97:19,20 100:21,23 102:1 103:1,8 108:22 109:9 110:18,21,25 111:23 112:11,24 114:24 115:4,9,20 116:7,11,20 117:12 122:10,11 123:9,17 124:25 125:3,5,8,9 125:13,18,21,25 126:1,2,5,17,24 127:8,22 128:2 151:25 173:6,15 174:16,18 182:4 183:5 187:24 188:1 197:12,16 232:17 237:18,24 239:13 239:20 240:7,10 244:18,24 245:19 247:23 253:7
**departments** 46:24 63:15 99:20 111:9 111:12 112:17 115:2,24 117:2,3 140:13,23 172:17
**depend** 64:15 106:4 145:12
**depended** 157:11
**depending** 104:13
**deponent** 6:19 267:2
**deposed** 7:15 19:13
**deposition** 1:9 5:1,4,7 5:9,25 6:7 7:17 11:3 12:16,20 13:1,11,14 13:17,21,25 14:1 19:14 28:5 53:18 141:15 176:25 214:16 240:15 244:6 265:10,11,17 267:1,3,6
**depositions** 9:9
**describe** 11:11 20:3 33:21 35:23 45:12 56:17 57:21 58:23 62:25 74:23 98:18 156:16 252:16 257:22
**described** 45:14

70:22 205:3 250:19 250:19
**describes** 143:23
**description** 3:11 106:21
**deserted** 164:25
**designate** 124:24
**designated** 111:14 117:9 122:11 125:2 125:5,9,21 126:11 179:18 185:3 187:14,17 260:13
**designating** 114:24
**designation** 31:21 32:3,18,24 33:3 60:1 68:11,14 82:9 98:18 110:13 111:4 117:9 119:8 122:9 122:15 125:17,17 125:22 126:23,24 143:3,9,12 144:17 144:18 157:8,10,14 157:23 179:13 186:1 187:3 211:3 248:23
**designations** 35:2 112:17,19 115:25 118:1 126:17 127:1 180:12 185:25 245:13
**designed** 90:1
**desire** 120:1,5 259:2
**desk** 181:4,20 186:17
**destroy** 122:23 213:4 213:7
**destroyed** 213:9
**detail** 73:7
**details** 144:12 255:10
**determine** 32:14 62:11 104:15
**determining** 52:17
**detriment** 169:23
**devastated** 218:16
**develop** 49:19,23 50:12,20 90:2 93:12
**developed** 49:25 50:20 66:11 87:23 87:24 99:6,8
**developing** 36:20 50:10 89:20 93:19
**development** 42:9 48:1 52:8,10,14 54:15,22 58:5 60:10 60:18 67:21 68:4,7 86:25 88:4 93:11 94:2
**devil's** 144:12
**dialogue** 256:12
**Diana** 181:7 198:25 199:20 200:6,8,13 201:4,4,7,11,13 202:3,11,23 203:1 203:16,17,24 206:13 208:1,18 210:24 212:16 231:7 260:4,10 261:20 262:5,6,7 264:18
**Diana's** 203:16
**difference** 19:9 93:21 170:10 177:9
**differences** 93:1,20 118:16 119:3 124:11 234:6 258:3 258:3
**different** 15:19 46:23 46:24 47:14,21 53:3 57:4,18,20 59:22 63:14,15 69:19 76:22 82:13 89:4 90:17,19 92:23 93:14,15 94:3,3 95:2,2 111:12,12 117:21 131:25 140:13 142:11 147:5,19 148:1 154:18 157:18,18 166:4 184:14 194:8 197:18 200:9 208:6 224:1 251:12 256:17 259:20 261:3,4 262:20
**differently** 124:11 170:18 185:23 186:13
**differing** 116:10
**difficult** 8:4 59:12 253:23,24
**difficulty** 42:15
**dilemma** 26:21
**dinner** 167:17,17 240:24
**direct** 47:10,13 75:20 82:10,15 83:4,14,25 84:3 121:8
**direction** 47:15 102:2 104:13 266:8
**directly** 64:9 68:20 80:16 83:7 87:7 101:23
**director** 4:9 6:22 96:21 103:2,5,18 116:9 140:17,20 199:11
**dirt** 93:24 95:7
**Disabilities** 39:2
**disagree** 9:20 134:19
**disagreements** 200:18
**disagrees** 134:6
**disapproval** 198:10
**Discharge** 4:14
**disciplinary** 30:10 40:21 58:25
**disciplined** 184:1
**disclosure** 265:1,6 266:19
**discontinue** 229:15
**discount** 265:20
**discovery** 6:3 11:19 114:21 139:4 211:16 243:10 251:8
**discriminated** 158:1 177:12 237:21 259:9
**discrimination** 3:22 4:15 38:24 39:5 43:17,22 44:12,17 44:20,25 101:17 103:3,10,13 118:10 118:12 149:18 152:1 156:17,24 157:7,25 158:11 161:15,23 167:9 168:6,8,11 199:21 208:3 233:17 237:15 238:11
**discriminator** 238:14
**discriminatory** 203:14 236:2
**discuss** 11:21 12:25 13:10,13,16 162:25 172:21 205:2,6 215:15,15 231:20
**discussed** 11:8 12:19 13:15 170:1 231:5
**discussing** 55:23 252:12 263:1,3
**discussion** 63:20 120:19 122:1 154:15 173:7 247:5
**discussions** 11:10 29:9 55:3 102:18 117:20 154:11 172:13,17 194:25 196:25 222:8
**dismissed** 21:5
**display** 24:6 61:21
**disposition** 102:13
**dispute** 136:16,21,23
**disrespectful** 183:13
**disrespectfully** 158:18
**dissatisfaction** 116:19,23 149:13 200:18
**distinct** 111:9
**distinction** 18:18 31:12 90:15 92:21 94:15 97:18 98:2,4 98:4,7
**distress** 243:9,19,24
**DISTRICT** 1:1,1
**district's** 28:3
**disturbed** 241:9
**disturbing** 241:6
**diversity** 56:21
**division** 1:2 40:11,23
**divorce** 19:1,4,7,14 19:17
**divorced** 19:3
**doc** 114:17 211:3
**document** 3:12 4:12 27:1,6,6,8,11,14,15 27:20 28:11,16,16

28:18,20 76:16,23 77:3 78:10,14,15,17 96:23 106:17,20 107:2,3,20,24 108:2 108:6,13,17 109:10 113:4,5,8 114:20 129:2,5,6 130:20 131:23 135:5,7,20 137:23 139:3 143:15,19,20 148:21,22 149:6,7,9 150:4,7,9 151:12,17 151:19 152:4,8,23 153:12 154:23 155:3,6,8,13,15,16 155:20 156:9 171:23 177:16 178:13 188:12,24 191:3,7,24 192:3,7 193:24 194:1,6,12 194:17 195:7 196:6 196:10 204:16,20 209:7,10,21,23 210:3,7,10,11,13,18 211:19 212:6,10,11 212:13 214:9,21,25 215:2 216:17,24 217:15,21 218:22 220:17,21 222:12 226:15,19,20 230:15 236:11,15 242:12 251:13 255:5,13,23 261:8
**documentation** 32:17 251:9
**documents** 12:15 14:14 29:2,4 36:1 107:18 135:16 146:10 148:13,20 154:3,16,20 187:15 211:3 231:1 248:25 250:22,25 255:16 255:25 260:14
**doing** 8:11 46:22 61:18 88:3 117:18 144:3 152:12 153:8 155:12 203:3 256:13 259:2
**dollar** 74:21,22
**Donuts** 167:1
**door** 263:15,18,19
**doors** 206:11
**double** 30:4
**doubled** 40:25 51:13
**doubt** 77:15 85:12 108:24 109:2,8 111:14 114:6,9 131:5 134:15 144:9
**Douglas** 126:14 139:16
**draft** 195:7
**drafted** 114:10,14 155:13 194:12 195:13 235:1
**dramatic** 170:10
**draw** 21:20 68:22 74:4 110:3 113:3 114:16 130:19 135:19 152:18 194:15 210:23 218:1 221:16 236:20
**draws** 138:8
**drew** 90:10
**drinks** 240:24
**drug-testing** 49:20 50:10
**dually** 113:2
**due** 122:15
**duly** 5:22
**dumb** 254:13
**Dunkin** 167:1
**duties** 35:23 40:17,18 40:22 44:22 45:16 45:17,19 46:3,8 47:21 51:6 52:22 54:10 94:17 131:13 179:14 203:1
**dye** 56:22

**E**

**e-mail** 4:2,6,8,9,22 109:14,15,16,21 113:9,14,15,20 114:1,3 146:6 191:10 195:5 196:12 198:9 235:18 237:1 249:23
**e-mailed** 146:13
**e-mails** 13:24 177:23 177:24 247:5,7
**E-N-O-C-H** 23:15
**EAP** 42:18 43:1
**ear** 9:19
**earlier** 19:12 41:3 52:20 77:13 93:2,7 93:13 100:22 117:24 134:11 157:8 167:2 177:11 217:1 226:8 240:18 245:3 246:8 247:8
**early** 93:17 98:10 235:14 254:1
**earned** 80:10
**easy** 8:18
**eat** 164:19
**EB's** 202:8
**Eddie** 86:1 96:16 256:10 258:11
**educate** 124:9 257:1 257:7,10,18,20 258:25
**educated** 258:22,24 258:25
**education** 141:9,23
**educational** 35:7
**EEO** 38:10,12,14 39:9 41:4,5 49:23 100:15 101:22 170:23
**EEOC** 3:21 4:12 11:22 12:14 39:16 99:22 150:14 151:1 151:16 153:7 154:3 154:17,21 155:4 198:14,18,23,25 199:8 206:14 207:7 207:9,13 216:15,21 217:11 239:17 259:11
**EEOC's** 150:16
**effect** 174:24 202:22 216:2,6 243:20 245:17 247:11 261:21
**effective** 179:1,5,7
**effort** 58:1
**efforts** 42:16
**eight** 23:2 82:13
**either** 13:24 17:22 21:22 29:2 73:3 98:9 154:19 177:8 194:5 206:6 208:14 221:11
**elect** 230:2
**elevate** 71:22,23
**elevated** 183:20
**eligible** 65:6 128:6 227:5
**embarrassed** 20:23 158:25
**embarrassing** 159:11
**emotional** 152:25 167:18 242:25 243:8,19,23
**emotionally** 218:16 243:21
**emphasize** 10:5
**EMPL** 221:8,22
**employed** 90:9 95:12 129:9 135:2,13,15 158:13 227:10 230:5,9 245:8 248:17 253:2
**employee** 41:22,24 42:14,17,24 43:2,3 43:9 45:15,20 46:4 47:4 52:21 53:4 57:15,21,24 70:25 75:2 87:1,3,6 88:9 88:20 97:25 107:10 129:13 143:1 144:8 144:13 174:19 220:25 221:1,2,3,5 266:11,13
**employees** 37:6 40:21 40:23 42:4,7 45:17 45:21,23 46:5,7 47:15 51:16,17 52:18 57:25,25 59:9 59:15 75:4 88:15,19 95:11 159:9 164:3,5 257:24
**employer** 82:24 218:4

**Employer's** 242:16
**employer-employee** 141:5
**employers** 259:8
**employment** 3:7,10 26:10 27:9,25 29:12 35:3 37:4 38:14 39:5,13 50:9 65:5 74:7 100:3 118:18 125:8 143:2,24 148:13 149:13,19 149:24 151:23 166:11 172:6,24 174:12 185:8 200:9 200:19 208:16 215:5 218:5,15,20 227:2,21,21 230:1,2 230:10 231:8 235:20 242:20 243:20,22 244:16 244:22 245:17
**encompass** 152:1
**enforced** 39:13 108:22
**English** 166:7
**enjoyed** 56:4 73:1
**Enoch** 23:13 24:1,18
**ensure** 61:17 262:17
**entered** 267:8
**entire** 15:25 78:2 151:6 152:1 158:12 159:10 267:5
**entirely** 56:8 97:21
**entitled** 9:21 33:25 135:21
**entity** 93:9
**enunciate** 8:14
**environment** 39:22 57:23 58:2 59:11 65:22 87:3,22,25 88:10,16 97:22 168:10 199:2
**equal** 38:14 39:13 50:8 100:3 149:18 149:23 208:16 242:20
**equals** 139:11
**equine** 24:9
**equine-related** 24:22
**Erlanger** 87:5
**Errata** 267:1,10
**escalated** 104:15
**escalation** 105:6
**escort** 264:4
**escorted** 264:7
**established** 33:14 185:15
**estimation** 23:1 138:5
**ethical** 3:14 108:18 109:3 162:20 170:19
**evaluated** 135:22
**evaluation** 71:12 139:8
**evaluator** 137:23 138:3
**Evansville** 30:21 31:4
**event** 201:6,7,9
**events** 4:1 10:19,24 80:13 121:1
**eventually** 90:5 218:19
**everybody** 5:3 114:7
**everyday** 8:7,17
**evidence** 124:18,22 266:10
**evolved** 90:24
**exact** 20:9 31:7 60:2 70:3 71:5 94:11 99:15 100:5,14 148:11 166:20 179:6 238:4 260:19
**exactly** 34:4 51:19 82:12 100:1 132:11 189:17 221:4 224:17,18 249:21 262:9
**exam** 31:23
**examination** 3:1,3,4 7:5,7 244:11
**examined** 5:22
**examining** 27:15 29:4 107:3 131:23 155:20 156:9 192:6 211:19 255:4 261:7
**example** 22:16 31:3 45:2 61:21 64:25 66:12 104:16 124:15 125:23 249:10
**examples** 4:6 59:6 162:1 180:4 191:12 191:14,16,21 249:24 250:5
**Excel** 109:17 245:15
**excellent** 202:15
**exception** 240:22
**exceptions** 156:14
**excessive** 9:20
**excited** 73:8 81:22,24 82:7 84:25
**excitement** 82:2
**excluded** 158:16 160:8,13 161:10 167:4 192:23 193:1 193:3,10
**excuse** 261:3,4
**Executive** 34:1
**executives** 181:5
**exempt** 75:4
**exhibit** 3:7,8,9,10,11 3:12,13,14,15,16,18 3:19,20,21,22,23 4:1,2,3,4,5,6,7,8,9 4:11,12,13,14,15,16 4:17,18,19,20,22,23 27:2,5 28:12,15 68:23 74:5 76:17,20 77:3 78:11,14 106:16,18 107:21 107:24 108:3,6,14 108:17 109:11,14 110:5 113:4,6 129:1 129:3 133:6 135:8 135:20 136:13 143:16,19 150:5,8 151:13,16 152:10 153:13,16,23 154:24 155:3 177:17,20 178:14 178:17 188:11,13 188:25 189:3 191:4 191:7,25 192:3 194:16,18,20 195:4 196:7,10 204:17,20 209:6,8 210:24 212:7,10,23,24 214:10,21 216:18 216:21 217:16,19 218:23 219:1 220:18,21 224:20 226:16,19 230:16 230:19,24 236:12 236:15 242:13,16 249:23
**exhibits** 3:6 4:25 245:15
**exist** 250:25
**existed** 94:18
**existence** 242:21
**expanded** 54:21 56:7
**expansion** 51:22 179:13
**expatriates** 48:25 49:3,14 168:17,20 256:23
**expats** 258:2,2
**expect** 85:14
**expected** 138:11,20
**experience** 31:17,18 31:25 67:16 93:19 141:9,23
**experienced** 233:16
**experiencing** 208:11
**expert** 136:25
**explain** 7:14 80:15 103:15 127:9 130:5 155:9 157:12 159:4 224:8
**explained** 73:5 128:3 159:5 163:2 187:13 210:8 234:24 262:7 263:7,22
**explaining** 62:13 116:25 159:3
**explanation** 102:14 127:12,16,19,20
**explanations** 185:24 186:1
**express** 116:18 120:5
**expressed** 124:2 182:20 184:20,23 202:24 203:24
**expunged** 21:6
**extend** 8:21
**extensive** 100:22

**external** 208:9
**extreme** 118:15 254:8

**F**

**face** 163:4
**faced** 92:22,23 163:3
**facilities** 88:14
**facility** 41:17 42:3 45:11 56:5,19,22,23 87:14,14 98:11 116:3 164:24 167:16 189:12
**facing** 103:3
**fact** 12:25 13:3,11,25 63:13 91:20 92:3 93:16 119:5 124:17 158:23 168:9 183:14 184:8 199:20 202:9 203:2 215:2 260:2,9
**factor** 92:1,2,3,4,5 122:19
**factors** 66:6,21 91:25 123:20
**facts** 63:15,22,22 105:19,21 172:15 172:22 174:14 175:7,22 184:14 237:16 242:3
**failure** 118:9 122:14 124:24,24
**fair** 104:2 137:14 138:5 147:23
**fall** 120:16 182:18 185:20 187:10 198:1 200:16
**falsification** 120:23
**falsified** 169:10
**familiar** 26:21 27:6 28:16 56:18 78:15 78:17 106:20 107:6 107:8,12 108:19 135:5 136:7 151:5 155:6,8 177:20 197:5,8 199:20 209:10 217:20 226:20 242:9,11 255:12
**family** 15:10 92:6
**far** 21:19 62:2 87:15 88:21 119:3 129:12 141:8,22 144:2 156:13 175:5 190:13
**Farm** 24:17
**Farmer** 16:6 215:23
**farming** 204:2
**fast** 63:5 122:5
**faster-paced** 39:21
**faults** 241:16
**fearful** 169:25
**February** 46:16 52:1 53:6 109:18 111:15 111:18,19,24 112:12,13,24 217:7 219:2
**fed** 123:21
**Federal** 5:5 6:2,5
**feedback** 263:25
**feel** 17:21 153:10 162:19 163:10 189:25 204:12 208:18 210:9 247:17
**feelings** 193:19
**fell** 12:3 58:3 102:19 197:22,22
**felt** 40:4 43:8,15 56:3 71:21 73:22 93:17 118:22 119:6 124:3 155:11 168:9 177:12 182:5,22 184:24 185:22,24 186:4 190:1 202:21 203:5 213:12 232:5 239:4 251:14 257:4 258:5 259:1,8,14
**female** 125:3,4 161:24 180:18,24 181:1 234:12,20
**females** 119:19 160:10 161:8 178:5 244:18 247:6
**Ferry** 17:9 77:12
**field** 31:22
**fielded** 237:25
**Fifth** 130:21
**figure** 215:21
**file** 1:4 134:17 199:23 200:1,3 207:13 216:15
**filed** 19:19 149:17 198:14 199:20 206:14 207:9,15,16 216:22 217:12 231:17,22 251:18 251:21,23 259:11
**files** 36:1
**filing** 199:24 207:7 231:23
**fill** 150:14,15
**fill-in-the-blank** 33:9
**filled** 75:9,17 76:14 113:1 150:12,16
**final** 74:17 222:3
**finally** 138:24 184:2 254:13
**Finance** 140:25
**financial** 265:20
**financially** 266:14
**find** 32:16 147:18 148:1 183:11,12
**finding** 51:11 63:14 92:16
**fine** 193:14
**finish** 8:20,22 9:6 25:6 242:8
**finished** 9:3,5
**firearm** 20:6 21:12
**fired** 260:5
**firm** 14:10 207:22
**first** 5:22 22:8,10 27:14 28:2 35:14 36:8,10 41:18 45:19 46:12 48:7 68:10,13 68:24 69:10 73:9 80:14 81:23 86:24 89:24 93:14 94:1,9 95:6,13,14 97:11 99:2 107:6 108:7 110:4 119:25 120:8 120:18,19 137:3 139:3 150:2 151:1,4 151:9 155:12 169:22 196:11 200:6,13 201:11 205:2 206:13 207:2 207:12 214:24 222:13 224:4 228:1 246:5,6 247:20 250:2,3,3 251:18
**five** 33:3,4 78:3 83:24 84:5 133:16
**five-page** 155:3
**flight** 20:25 21:1
**floor** 45:25 94:2
**FMLA** 42:19
**focus** 47:2 133:18 168:19 169:2
**focused** 31:2 58:25 82:23
**folded** 245:20
**folks** 13:14 34:15 37:9 83:21 95:18 171:1 183:4 232:20
**follow** 195:22
**follow-up** 142:1 254:21
**follow-ups** 34:14
**followed** 62:3 127:4,5 151:7 187:1
**following** 172:4 190:7 210:21 214:6 216:14 257:6 265:5 267:7
**follows** 5:23 126:18
**food** 159:11,12 164:16
**forced** 181:7
**Fordsville** 40:3
**forecast** 3:19 135:1,6 135:21 137:2
**foregoing** 266:5,8
**foreign** 48:7
**forgot** 20:6
**forgotten** 20:16 79:11 81:10
**form** 5:16 35:11 44:14 45:12 48:13 60:19 64:11 70:7 72:6 77:4,23 84:20 89:2 91:16 92:9 102:6 103:14,20 105:23 110:22 111:1,2 114:11 115:11 118:9

124:20 125:14 128:8 131:11 135:9 135:12 136:18 149:21 151:10 158:4,11 168:5 169:13,17 200:11 200:20 211:7 226:5 226:6 230:7 233:21 237:3 241:22 243:4
**formal** 171:22
**format** 108:23
**former** 55:11
**forward** 122:5 172:23
**forwarded** 171:17
**found** 20:13 254:13
**four** 17:16 27:18,18 33:7 38:9 39:19 59:22 69:7 74:6 75:15,21,21 83:24 84:5 85:15,17 86:4 86:11,12 137:9,20 150:18,18 231:2 236:21
**four-page** 27:5 150:7 236:15
**fourth** 85:25 130:20 178:3
**Foxhounds** 24:14
**frame** 70:3,24 72:1 112:25,25 120:17 122:6,8 166:20 252:10 253:9,11
**frankly** 79:10 142:24
**Freedom** 155:4
**frequent** 67:1 174:2,6
**frequently** 42:23 133:20 174:11 175:13 232:19 251:1
**Friday** 210:4
**friends** 203:25
**front** 27:16 42:10 63:20 68:15 102:23 158:25 181:3,20 234:3
**front-line** 43:7
**full** 7:10 17:24 87:16 94:25 95:20 261:18
**full-time** 47:15 95:19
**fully** 20:5 261:14
**FULTON** 266:3
**function** 57:13
**functional** 58:21 69:19
**functionally** 89:22,24 90:17,19
**functions** 35:25 42:2 57:16 58:7
**further** 102:14 166:10 266:10
**future** 115:25

**G**

**G-A-R-N-E-R** 140:3
**G-A-Y-N-O-R** 38:7
**game** 147:24
**garden** 243:8,18
**Garner** 126:13 139:15 140:3
**Gary** 40:1 126:13 139:14,22 181:15 191:15 214:2 263:14 264:4
**gas** 229:18
**gather** 63:22 122:22 190:18
**gathered** 190:14
**gathering** 122:20
**Gaynor** 38:5,6
**gender** 123:14,19 124:11,19,23 126:19 156:25 157:7,25 158:2,23 161:16,24 167:10 168:12 184:25 185:23 233:16,24 234:6 259:9,15
**general** 7:1 38:17 54:10 59:10 90:20 99:24 118:22 119:11,12 125:24 140:14,25 162:16 163:23 180:9,11 181:18 185:2 201:14,19 202:2,5 202:17 205:21 206:7 232:20
**generally** 8:6 14:24 39:8 105:13
**genesis** 189:15
**gentleman** 183:6 184:21 235:12 238:15,19 256:16
**Georgetown** 41:19,20 45:15 53:8 56:19,25 72:22 74:10 87:14 92:5
**Georgia** 1:1,6,16 2:5 2:12,16 6:10,23,25 7:2,12 10:10 15:5 21:21,23 22:2 23:12 24:17,20 25:1 73:6 121:4 190:2 265:5,7 266:2,18
**gestures** 8:5
**getting** 72:4 73:4
**girl** 183:14
**girls** 202:5
**give** 10:19,24 45:2 59:6 94:12 118:5 120:15 128:21 145:19 162:1,22 172:24 193:5
**given** 11:16 60:10 63:17 99:13,14 120:12 122:15 126:18 127:12,16 127:19 157:7,24 164:16 178:10 198:6 219:11 247:24 250:4 265:20 266:10
**giving** 8:9 149:15 180:4 257:13
**glass** 206:10
**glasses** 79:19
**go** 9:10,14,21 29:6 34:12,13 41:10 53:7 63:22 64:7,8,9,21 66:23 67:6,14 73:7 91:9,13 101:14 104:17 116:5 117:5 126:21 149:23 154:9 172:20 193:7 194:24 196:2,5,23 197:25 202:17
210:19 212:25 221:14 222:6 227:24 228:1,8 230:23 236:9,23 237:9 240:14,24 263:12,21
**goal** 67:14 89:19 170:15,16
**goals** 61:8
**goats** 204:2
**goes** 63:18 88:21 238:21
**Gogel** 1:3,10 3:8 5:1 5:4,21,25 6:20 7:9 7:11,13 10:14 14:3 14:22 15:12,16 17:25 22:9,11 23:4 25:18 27:4 28:14 29:12 53:22 76:19 77:9 106:14 108:8 114:17 129:21 130:21 135:22 141:19 154:19 177:4 193:23 195:4 195:15 196:15 197:25 209:14 211:2 214:20 217:18 221:6,7,22 230:23 244:6,10,13 256:3 267:2 268:21
**Gogel's** 22:20
**going** 9:9,19 20:14 21:15 65:18 73:9 81:1 99:17,25 118:15 126:21 141:13 147:16,17 147:18 148:1,4 158:3 165:10 171:3 174:4,5 186:19 190:14 195:19 199:23 200:1,3 202:17 207:13 208:15,20,25 209:3 209:4 234:18 243:5 244:14 255:9 256:13 261:25
**gonna** 147:14
**good** 5:3 53:9 56:4 80:12 91:15 93:18

137:17
**Goodyear** 4:17 218:20 219:1 220:22 225:15 226:13 229:3 230:2 230:11
**Gotcha** 37:16 52:9
**gotta** 202:5,8,8 223:22
**gotten** 145:9 208:24 243:13
**grade** 95:8
**grade-point** 30:6,9
**graduate** 29:17
**graduated** 29:20 36:6
**grandchild** 148:8
**Grange** 25:13
**great** 40:4 117:18 185:24 254:7
**greater** 225:15,18,19
**green** 62:6,7 63:18
**Greensboro** 20:12
**grew** 37:23 51:8,12 51:19
**Grimes** 83:10,20 96:3 205:22 241:12,25 242:1
**gross** 222:24 223:5 224:1
**grossed** 223:18 224:9
**group** 61:7 164:8,21 165:9,13,13,14,14 166:23 172:11 174:15 196:17 197:6 237:19
**groups** 25:1 46:24 164:6,20
**growth** 39:22
**guard** 180:25 181:1 181:13
**guess** 43:19 44:2 48:10 52:17 57:10 81:19 83:24 95:8 98:17 102:3,5 107:8 136:21 140:14 145:16 165:13 166:21 171:17 194:10 197:25 217:11 236:2 245:5
**guidance** 9:18
**Guide** 34:1
**guidelines** 88:1 153:4
**gun** 20:13,21 21:2,15
**guys** 90:15 124:6 233:11 241:16

**H**

**H-U-F-F-M-A-N** 40:6
**half** 45:7 226:14
**halfway** 68:24
**Hamilton** 24:17
**hand** 9:4
**handbook** 36:21 88:20 100:7
**handed** 76:21 153:9 214:20
**Handing** 76:23
**hands** 80:21
**handwriting** 27:11 27:17 69:2 76:4 108:7 136:8,10,14 136:17 150:9 204:21
**handwritten** 4:11,13 11:20 12:13 68:25 134:12,20,20 136:12 210:24
**happen** 21:22 48:6 72:24 121:24 179:23 195:19 206:2 233:6,6
**happened** 20:14 112:15 127:22 200:23
**happening** 180:15
**happens** 25:10
**harassment** 50:6,8 59:10,10,11 99:21 100:10,18 101:20 242:20
**hard** 203:6
**hate** 178:6
**he'll** 145:25
**head** 8:5,8 10:8 34:23 37:13 51:18 63:11 110:17,20,25 111:23 112:11,23 114:24 115:4,9,20 116:7,10,20 122:10 122:11 123:9,16 124:25 125:2,5,9,13 125:18,21 126:1,2,5 126:17 140:17 151:25 190:13 193:10 197:11,16 215:25 223:9 234:13 244:18,24 247:22 261:6
**headquarters** 35:21 87:4,8,11,15
**heads** 112:17
**health** 230:3 243:2 244:3
**hear** 205:20
**heard** 215:12 260:5
**hearing** 123:25 266:10
**hearings** 19:17
**heartfelt** 186:18
**held** 29:9 32:18 33:3 34:19 55:3 59:25 60:7 68:10,13 125:16 128:5 143:3 143:9,12 144:17,18 154:11 160:15 189:24 194:25 196:25 197:15 222:8
**help** 32:13,17 60:8 65:10 66:1 87:25 90:14 129:18 208:2 220:16 256:25 257:16 258:2,12,25
**helped** 50:12,20 194:14
**helping** 37:2 42:8 60:17 87:24 92:18
**Heritage** 40:10
**hidden** 180:25 181:4
**hide** 181:12 204:5
**high** 65:5
**higher** 78:4 104:20 104:25 116:4 125:20 126:3,10 138:12,21 181:5 249:2 257:7
**Hills** 40:10
**hire** 85:13 86:7,16 107:11,12,16 185:25 201:23 202:5 247:19
**hired** 82:25 83:1 97:11 119:12 180:9 181:2 185:2 201:14 201:19 254:18
**hiring** 51:7 92:16 94:19 97:24 99:1 119:10 178:6 247:19,21
**HISNA** 3:12
**historical** 173:8
**history** 66:8,8,9,17 66:20 67:15 81:5
**HO** 126:10
**hobbies** 33:8
**HOD** 110:13,15,17 111:10,10,14,17,22 112:18 115:24 116:5 117:10 119:8 126:11,11 127:2,24 136:4 157:8,9,17,20 157:23 166:10 179:13,18,20 180:10,14 185:3,25 187:2,15,16,18,21 245:13 246:10 248:22 260:13,22
**hodgepodge** 67:18
**HODs** 111:12
**hold** 9:4 34:20 35:1 36:13 50:22 52:2 60:4 69:24 72:15 98:18 125:17 255:6
**holiday** 262:13
**home** 20:5 26:16,17 27:21,23 146:4 148:9 167:20 210:19 236:9
**honest** 152:24
**hope** 82:2 205:16 215:17
**hospital** 36:11,12,14 37:7 38:8 39:18,20 40:12,19 41:4
**Hostile** 59:11

**hot** 166:16
**hotel** 159:9 165:5,7,8
**hour** 141:13
**hourly** 89:21 159:9 164:3 247:16,18,20
**hours** 75:5
**house** 144:7
**housekeeping** 242:9
**Houses** 204:1
**HR** 4:9 35:25 37:9 43:20,25 44:6 45:8 48:2 55:25 57:2,8 57:19,21 59:19 67:19 69:19 70:22 88:13 103:2,5 110:9 110:12 111:10 115:23 144:19 248:4,4
**HR-related** 30:19
**Huffman** 40:2,6,8
**human** 6:21,24 23:20 30:3 31:11,19 32:2 32:19 33:14 35:9,13 35:14 36:7,8,10,15 36:16,21 38:16 39:4 39:8 40:2,16 42:2 43:12 48:2 52:4 53:4 54:20 58:10,17 60:1,5 68:11 92:22 95:18,21 96:18,21 97:14,16,19,24,25 98:13 103:18 114:25 115:5 117:1 139:19,19 140:1,6,9 140:11,12,14,17,18 140:20,24 141:6,21 142:2,4,8 144:7 178:11,22,23 187:6 187:25 188:3 232:13
**hundred** 37:8 95:16 95:17
**hurt** 241:4,4,9,14
**husband** 13:4,5,9,15 15:12 17:23 21:24 23:4,11 24:3,25 230:5,9
**husband's** 22:6
**Hyundai** 159:9

**I**

**IB** 85:20,21,23 96:15 98:10 249:10 256:10,25 258:25 259:1
**ID** 220:25 221:1,3,3,5
**idea** 30:9 32:16 33:2 198:17 213:12 241:24
**identification** 27:1 28:11 76:16 78:10 106:17 107:20 108:2,13 109:10 113:5 129:2 135:7 143:15 150:4 151:12 153:12 154:23 177:16 178:13 188:12,24 191:3,24 194:17 196:6 204:16 209:7 212:6 214:9 216:17 217:15 218:22 220:17 226:15 230:15 236:11 242:12,16
**identified** 46:3 231:3
**identify** 233:15 239:6 246:14
**identifying** 46:5 52:20
**ignorance** 24:7
**II** 2:9
**image** 51:14
**imagine** 50:17
**immediately** 116:24 117:4 120:9 123:6 132:24 258:7
**impact** 82:1 204:6,7 204:13
**implement** 67:14
**implies** 30:16 206:1
**impolite** 14:24
**important** 8:13,15 111:11 144:15 203:3 257:14,15 258:14
**impression** 138:25
**improper** 118:20
**improve** 52:13,15 172:25
**improvement** 128:6 128:18,23 131:6,9 131:12 132:22 133:3 253:21
**inaccurate** 217:3
**inappropriate** 44:24 45:1 119:13,20 169:5 181:17,18 185:9 202:10 234:7 234:23 235:25 253:4 263:8
**inappropriately** 43:10 175:7
**incentive** 227:5,13,14 227:16 228:22
**incident** 21:10,15 252:24
**include** 40:17 43:16 44:11 51:6 54:21 138:8 157:20 226:10
**included** 40:18,20 42:7 45:16 51:7 54:14 88:3 101:19 101:22 102:17 113:15 119:3 158:17 161:8 172:7 190:15 192:20
**includes** 110:9
**including** 43:21 257:8
**income** 78:2 79:15 225:22
**incomplete** 156:13
**Incorporated** 10:10
**incorrect** 29:3 32:24 103:24 151:20,22 152:23 155:17,22
**increase** 157:21
**increased** 227:20
**increases** 80:6
**INDEX** 3:1,6
**Indiana** 15:3 17:18 18:13 19:5 22:1 30:21 35:6,21 36:12 45:11 46:15,17 47:9 49:16 51:1,20,24 53:25 56:2,12,13 57:4,7 69:14,17 70:18 87:14 91:1,11 91:12,18 93:8,8,21 97:23 143:14 144:5
**indicate** 9:4 32:23 34:23 120:22
**indicated** 5:8 40:2 41:3 120:22 184:15 263:9 267:9
**indicates** 30:2 31:9 31:16,17 74:7 131:11 214:24
**indicating** 79:18
**individual** 34:14 66:19 71:20 120:13 171:6 205:18
**individuals** 86:6 139:18 233:23 243:15 262:21
**infer** 19:12
**infliction** 243:23
**influence** 10:22 91:21
**influenced** 91:3
**Influences** 138:17
**influx** 89:21
**information** 11:9,16 14:8,9 29:2 42:19 80:16,24 122:21,23 122:23 149:3 153:9 155:5 156:10 160:19 172:14,21 173:12,13,19 175:8 189:16 190:18,21 190:23 191:1 192:5 193:16 194:8,11 213:9 218:3 252:13 254:10,11 257:11 257:12,23
**infractions** 184:7
**initial** 99:1
**initially** 37:17,20 46:22 61:10 73:14 89:16 97:21 115:22 126:20 146:16 162:25 166:7 202:13 210:6 213:21 215:18 256:10
**initials** 85:21

**initiated** 118:19 249:8
**ink** 155:25
**input** 99:19,23,24 189:11
**insinuated** 252:25
**instance** 167:7 171:5 176:19
**instances** 119:18 201:10
**institutions** 31:1
**instruct** 243:5
**instructed** 216:6
**instructing** 243:13,16 244:1
**instructions** 151:7
**insulting** 168:1,2
**insults** 168:9
**insurance** 230:3
**Intake** 3:21
**intended** 207:17
**intense** 94:22
**intensive** 94:23
**intent** 190:9
**intentional** 243:23
**intentionally** 242:1
**intentions** 213:8,11
**interactions** 256:7
**intercultural** 256:24
**interest** 73:13 216:7 257:5 259:2
**interested** 266:14
**interesting** 75:3 81:20
**interests** 33:8
**intern** 47:16
**internal** 59:2
**internally** 208:3,19
**International** 35:17 35:20,24 40:1,11,13
**interned** 39:25
**Internet** 260:1
**internship** 35:15,16 36:3
**interpretation** 58:3
**interrogatories** 4:16 11:6 12:11 217:20
**interrogatory** 218:2 218:9 228:18
230:24 231:2 238:8
**interview** 153:8
**interviewed** 55:18 85:16,17 86:5 201:25 202:1 238:6
**interviewing** 45:17 86:12 94:19 152:12
**intimate** 169:6
**introduce** 46:1
**investigate** 44:17 59:2,3 64:1 101:15 118:25 120:1,6,23 122:16 168:25 170:15 237:2
**investigated** 44:20 59:7
**investigating** 64:19 88:19 103:13 104:24 171:8 264:16
**investigation** 4:8 43:10,14 55:22 61:24,25,25 62:2,18 62:22,23 63:1,2,17 64:3,7 101:5,25 102:8 104:17 105:11,18 118:20 118:24 120:10,21 121:10,20 122:3,20 122:22 123:18 158:7 169:3 171:11 171:23 172:9 173:12,17 180:17 180:19 182:3,7,9,19 183:9,10 185:10,10 198:10 201:13 238:2,7
**investigations** 42:10 43:5,5,8 44:3,21,23 46:6 53:1 55:23 58:24 59:2,20 60:6 60:15 61:1,4,7,22 61:24 66:7 68:8 100:23,24 101:1,8 101:10 102:19,22 119:18 171:1
**investigative** 67:5 102:9
**investigator** 64:9,13 65:14
**investigators** 64:1
**invited** 158:15,16,21 159:16,18,23,24 160:2 167:3,5 192:10,10,11,12
**involve** 102:16
**involved** 23:11,24 24:4,12,12,25 63:14 66:4 102:5,12 104:14,14 105:11 105:14,14 170:8 171:8,10 177:13
**involvement** 104:20
**involving** 66:21
**irrelevant** 186:5
**IRS** 77:4
**Isaac** 15:18,21,22 16:13 18:8,11
**issue** 42:17 59:9 63:4 66:9 71:22 101:7 117:13,15 126:22 127:6,10,15 128:1 134:21 163:21 180:5 185:1
**issues** 42:8,8,12 46:5 49:14 52:18,20 59:11 88:19 95:5 101:13 119:3,10 174:4,8 189:24 204:1 205:3,6,7,11 215:15
**item** 15:1 79:6 193:17
**items** 11:7,12

**J**

**J** 2:3,20
**J-A-N-G** 85:24
**J-A-S-P-E-R** 35:22
**J-I-N** 86:2,3
**J.D** 2:20
**Jackson** 2:20 6:23 73:21,21 85:4,8,9 85:20 86:20,21,24 96:15,21 97:1,3 103:6,9,12,25 104:11 105:17 106:2 116:8,15,24 117:7 119:14 120:19 121:8 140:18,23 142:17 161:2 171:18 172:2 177:5 181:15,22 184:17 189:15 191:11 195:6 198:22 214:22 236:18 249:25 260:16 261:10
**James** 126:14 139:16 215:23
**Jang** 85:20,24 96:15 98:10 249:11,12 256:10
**January** 22:3 46:15 46:16 75:15 76:2 129:15,23 130:11 130:17 156:1 187:22 206:17 216:11 218:13 229:14 230:9 232:10 244:17,23 248:18 251:19 264:11,12,12,13
**Japanese** 48:25 49:4 49:13 259:20
**Japanese-based** 48:11,19
**Jasper** 35:21
**Jin** 86:1 96:16 256:10 258:11
**JMartin@Constan...** 2:13
**JMurray@Consta...** 2:13
**job** 3:11 36:9,10,22 40:19 42:11 43:20 45:5,8 46:12 55:19 58:9,10 60:11 66:7 72:19 73:2,4,5,15 91:4,22 106:21 117:18 131:12 139:19 145:9 195:21 196:3,4 203:1 218:18 232:11 242:24
**Joe** 6:20
**joined** 68:16,17 84:19 166:6

**joint** 87:13
**joke** 202:7
**JONATHAN** 2:9
**Joseph** 2:10 17:25
**jotted** 11:13
**jotting** 11:14
**JR** 2:10
**judge** 5:14 9:7,8
**Judicial** 265:5 266:18
**Judith** 34:2
**July** 1:12 5:2 6:6 248:23 266:21 267:3
**June** 148:19 229:14 230:11 248:23
**jury** 21:20,20
**Justin** 163:1,1 165:3 165:8,12,16 166:9 172:8 187:14,17,20 249:15,19 257:10 260:13 262:14
**Justin's** 166:1

**K**

**K** 2:20
**K-I** 34:3
**K-I-M-B-A-L-L** 35:19
**K-I-N-E-B-R-E-W** 34:6
**K-O-N-E** 226:24
**keep** 203:6,10 254:14
**keeping** 245:3,8
**Kentucky** 17:7,15 18:4,6 29:13,14,15 29:17 30:11,22 31:6 33:18 35:6 40:4 41:19,21 46:23 47:5 53:8,24 54:1 55:7 56:1,15,25 58:9,13 74:10,11 87:5
**kept** 21:1 175:20 176:9
**Kerr** 1:15 2:4 6:8
**Kevin** 98:12 111:6 115:22 120:20 121:19 122:19,21 162:14 163:1 167:6 172:8 180:20 182:2 183:24 184:2,17 213:4 233:3,20 234:2 235:2 245:18 249:16,18 256:23 257:19,19,20 260:12
**Kevin's** 213:8
**Key** 4:1
**Kia** 1:6 2:16 3:7 4:2 6:22,24 7:1 10:9,11 16:8 26:10,12,14 27:10 68:16,17 70:6 72:20 73:5,10,14,17 73:18 78:19 79:2 81:2,24 82:10,16,20 82:21,25,25 84:19 85:10 87:18 90:9 91:8 92:22 93:5,7 93:13,23 94:4 101:8 106:22 107:9 121:3 129:9 142:5 143:2 143:24 144:18 146:11 148:13 149:13 156:18 159:9 168:22 225:16 226:3,9 230:1 231:8 241:8 250:6,8,22
**Kim** 98:12 111:6 115:22 120:20 121:19,24 122:7,19 122:21 123:1 159:1 160:16 161:13,18 162:1,3,6,9,14 163:1,13 167:6 172:8,8 180:20 182:2 183:24 184:2 184:17 192:14 195:7 213:4 233:3,7 233:20 234:2 235:2 245:18 249:16,18 256:23 260:12
**Kimball** 35:17,18,20 35:23 39:25 40:11 40:13,24 41:5,8,12
**kind** 43:5 47:23 215:17 259:3
**kinds** 124:15 234:22
**Kinebrew** 34:3,5
**Kisha** 118:21 120:2 120:21,23 169:6,8 169:11 192:14,15 192:15 200:14 205:8 213:5 251:16 260:5,7
**Kisha-Ahn** 201:15
**KMMG** 10:11 28:23 109:4 113:14,15,23 116:19 125:8 128:19 130:21 135:3,13,15 158:13 166:6 168:22 171:14 174:11 185:8 186:9 195:19 213:17,18,19,20 214:3,3,4 224:14 225:20,23 242:9,21 244:16,22,25 245:2 245:8 247:7 248:17 250:7,13 251:1,20 254:19 259:6,12,16 259:23 260:3
**KMMG-Gogel** 110:5
**knew** 80:10,23 81:4 86:21 128:10 153:4 166:6 208:6,8 253:8 262:9
**know** 7:20 8:8 9:11 9:13 10:3,6,6 18:20 19:9 22:9,16 26:4 38:1 39:9 42:22 44:3,12 46:2 55:17 56:8 63:18 64:2 66:22 69:10 72:9 80:12,14 86:15 88:19 91:17 93:25 95:11 101:5,9 104:25 106:1 109:7 112:21 114:13,15 116:6,8,13,14,16,17 117:15 119:1,5 122:18 124:10,12 125:16 127:2,4 128:4,11,12,15 133:25 134:1,8,24 135:1,4,11,14 136:9 136:13,15,19,24 141:23 142:17,19 142:23,23 143:8,12 143:21,22,25 146:2 147:17 149:12 154:21,22 157:22 159:12 160:10,12 161:7,14,18 162:12 163:9,9,13,17,19 164:15 165:20 166:4 173:8 175:3 175:21 176:12,13 176:15 177:4 179:5 179:6 181:14 182:10 183:25 192:19 193:11 194:6,14 195:24,25 196:1,4,21 197:11 199:12 200:1 202:13,14,19,20 203:5,25 204:9,11 205:10,12 207:19 207:20 211:2,24 212:3 213:7,13,14 215:18 220:13 221:2 232:15 235:6 238:5 239:16 240:1 240:3,5,10 241:7 242:1 244:13 245:2 245:4,5,6 248:8 249:20,21 250:11 250:24 251:4 253:25 255:19 257:16 258:12,13 258:14 259:25 260:8,9 261:25 263:6,18 264:5
**knowing** 81:8
**knowledge** 31:18,18 112:23 121:21 127:25 161:2,4 186:22 194:12 200:17 237:11 255:23 259:22,24
**known** 9:2 143:25 186:19 261:18
**Kone** 4:19 226:22,23 226:24 227:2,10,22 228:12 229:6
**Korea** 159:8 164:2,5 164:21 166:13,14

167:6 181:5 232:25 233:2 235:3 236:23 249:9
**Korean** 98:15 118:16 119:20 133:20 161:19 162:7,22 168:17,19 182:25 183:2,5,23 184:9 190:5 235:24 237:25 238:17,18 252:25 256:4 257:8 258:2,2,12,21,23 262:22
**Koreans** 124:6 163:5 163:7 235:6,10,12 235:19 236:3,9 248:20 249:2 252:16,20,22 256:7 262:15
**KS** 159:1 160:16 161:13 162:1,3 167:5 172:8 176:12 195:6 233:7

**L**

**L** 1:19 77:9 221:22
[redacted] 22:23
**L-A-N-G-S-W-A-...** 139:24
**La** 25:13
**labeled** 33:10 132:18 132:25 133:15
**lack** 72:22 123:8 167:23 250:12
**lady** 152:11 182:3
[redacted] 22:22,25
**Lang** 139:22
**Langswager** 126:13 139:15,23 181:15 214:2 263:14
**language** 48:23,24 49:13,13
**lapsed** 32:6,11,14
**large** 20:18 21:20 42:3 101:13
**larger** 41:14 56:19
**late** 94:13 98:9 99:3 120:8,14 166:9 181:10,25 210:16
**Latesa** 2:20 6:21
**laugh** 119:16
**law** 2:3,10,15 6:21 38:23 39:12 207:22
**laws** 38:18,20 39:10 118:18 124:9 204:13 256:20,20 256:22 257:1,6,8,21 258:4 259:5
**lawsuit** 7:19 115:17 139:4 146:13,15,17 161:22 231:16,22 231:23 243:7
**lawyer** 207:25
**lead** 101:4
**leader** 237:19
**leaders** 88:14
**leadership** 52:13 133:20 137:24
**leading** 172:15 186:7
**Leads** 138:14
**lean** 31:6
**learn** 41:15 45:25 81:25 256:19,21 257:16
**learned** 256:18
**learning** 24:8 93:19
**leased** 229:20
**leave** 21:2 39:20 40:12 42:20 94:9 98:10 163:10 205:7 207:1 216:4 238:21 252:4,8,9 263:23
**led** 87:5,5 119:7,21
**Ledbetter** 181:7 198:25 199:20 200:7,8,13 205:23 206:14 207:21 210:25 212:5,16 231:7,10 260:4,10 261:20 262:5,6,7 264:18
**left** 41:2 50:25 52:3 53:6 54:23 82:6,8 82:11,12 83:7,15 99:2 100:16,19 121:2 144:3 159:9 164:3,17 165:4,4,16 167:7 176:17
186:16 224:14 233:8 239:7 242:21
**legal** 8:19 99:23 101:23 102:2 109:6 109:9,24 170:18,21 197:22 210:8,10 238:16 265:8,9,10 265:13,18
**Lenora** 7:11
**lens** 20:18
**less-than-pretty** 181:13
**let's** 12:22 26:13 53:17 78:3 91:9 119:23 148:19 154:9 155:24 159:22 194:20,24 204:15 222:6 231:7 237:9
**letter** 4:4,5,14 78:18 85:9 86:20 146:20 147:5 215:11 216:11,14 218:12 219:1 224:22 226:22
**level** 31:17 43:7 56:13 64:15,17,21 65:4,6,13 71:22 104:14,15,20,25 105:12,12 116:4 120:12 125:20 126:10 138:12,21 181:5 184:6 199:11 235:13 239:3 249:2
**levels** 65:1 126:4 170:10 183:8 208:7
**Lexington** 30:21 31:5 56:15
**licensed** 20:6
**lie** 241:17,21,25 242:5,6
**lied** 242:7
**lies** 242:4
**life** 8:7
**light** 254:12
**liked** 56:6,11,15
**limit** 34:21
**limited** 159:12
**limiting** 9:17
**line** 42:10 58:21 94:10 95:4,4 99:3 196:14 221:14 267:13,15,17,19,21 267:23 268:1,3,5,7 268:9,11,13,15,17
**linear** 104:12 105:6
**list** 27:22 30:6 99:15 100:2 193:6 237:9 249:1
**listed** 35:2 45:19 218:6
**listen** 208:19 223:22
**lists** 245:12
**litigation** 148:16,18 265:21
**little** 61:11 95:5 106:14 141:19 166:6 232:24 237:6
**live** 15:13 17:5,12,14 18:12 22:11
**lived** 15:25 17:7,11 17:18 23:11
**lives** 18:11,13 21:25 22:12
**living** 25:1 148:9
**LLC** 2:4 6:9
**LLP** 2:11
**local** 28:3
**located** 6:9
**location** 24:12 31:8 36:19 56:18 92:5
**Locke** 184:23
**logistics** 151:6
**long** 15:7 17:14 18:1 18:21 26:7 32:17 33:2 36:2 38:8 39:18 41:8 45:5 46:17 50:22 51:24 60:4 63:16 67:4,10 68:6,8 70:1 71:3 94:4 148:22,22 167:21 180:3 204:9 207:20 211:23 215:21 226:13 244:13 263:24
**longer** 63:2,9 94:24 98:11 259:2 260:3
**look** 12:2 27:14 28:25

52:12 62:11 63:22 68:23 74:5 78:3 96:23 106:24 108:21 115:2 129:18 133:5 155:15 191:8 196:11,14 222:13 222:21 223:10 245:11 246:18 255:1,8
**looked** 12:8,10 14:15 80:7,9,10 124:11 262:2 263:10
**looking** 27:13,15 61:23 73:15 111:25 195:16,21 196:1,4,5 217:4 221:5 223:19 232:11 235:17 246:9
**looks** 78:18 144:1 156:11,11
**losing** 243:20,22
**lost** 195:20
**lot** 45:16 59:16 73:7 93:9 95:8 156:9 173:6 174:14 203:15,17,25 233:11 234:4 238:22,23
**loud** 198:23 199:1
**loudly** 253:6
**loved** 56:1
**low** 65:13
**lower** 246:21
**lowest** 64:17
**loyalty** 167:22,23
**luck** 240:25
**lucrative** 226:3
**lump** 224:17 229:18
**lump-sum** 188:15
**lunch** 106:10 262:15
**lunches** 262:19
**lunchtime** 210:17
**LYNNE** 266:24

**M**

**M** 2:10,15
**M-A-E-N-H-O-U-...** 140:5
**M-A-R-Z-A-N** 197:9
**M-A-S-O-N** 55:18
**M-I-N-D-I** 238:10
**M-O-B-L-E-Y** 237:10
**M-O-D-L-I-N-G** 238:10
**ma'am** 16:1 55:9
**Macon** 2:12
**Madame** 5:19
**Maenhoudt** 126:14 139:15 140:5
**magistrate** 9:7
**Mail** 215:1
**main** 256:6
**maintain** 32:8 88:9 262:20
**maintained** 31:14
**maintaining** 37:3
**maintenance** 229:19
**major** 30:4
**majority** 66:4 144:4 144:6 245:10
**majors** 30:2
**maker** 64:10 65:9,24 222:5
**makers** 65:25
**makeup** 183:14
**making** 37:4 102:12 102:24 105:5 129:13 138:17 163:5 236:2 259:3
**male** 125:25 151:24 158:19 159:4 160:16,17 175:11 184:9 233:24 234:12,19 246:20
**males** 126:11 246:10
**man** 124:17 125:2,12 125:16,19 162:4 163:14 180:8 186:25 234:14 254:18
**manage** 148:24 253:23,24 254:2,3,4 254:6
**managed** 61:7
**management** 23:21 31:19 32:19 33:15 57:25 98:15 105:15 131:10 134:5 148:25 172:11 182:25 183:2,5 189:22 190:4,5,19 195:20 235:6,9,11 236:2,8 247:11,13 249:3 253:1,1,20 254:11 257:8
**manager** 3:11 37:24 38:2,4 39:25 40:3 40:16 43:12,21,25 44:6 51:4 52:4,16 52:22 54:14,20,20 57:2 58:11,18 59:20 60:1,5 64:20,25 65:15,17 66:16 68:11,14 69:22,24 70:15,16,25 82:5,9 82:10,18 83:2 84:6 90:13 97:12,13,14 97:15,16 104:7,19 104:19 105:9,12 106:22 117:3 118:22 121:3,5 125:8,13,17,19,24 125:25 143:3,5 144:19 151:24 166:5 172:10 173:14 174:1,18 175:11 178:10,22 178:23 179:10,15 179:17 180:9,18 182:4,20 184:11,22 185:2 188:3 197:15 197:21 237:24 238:16 249:13,16 249:17 263:15
**managers** 42:10 55:11 57:8 59:24 70:23 84:9,12 88:24 89:19,23 90:6,17 102:3,18 104:3,6 116:5 125:24 175:12,14 177:14 183:4 192:10,12,20 192:22
**Mandi** 238:9
**Mandy** 238:20,21
**manner** 61:19 208:5
**manufacturer** 48:12
**manufacturing** 1:6 6:22,25 7:2 10:10 31:6 39:22 41:11,13 41:16 42:3,6 45:17 56:23 57:5,6 59:5 69:13,17 70:18 73:10 88:14 92:19 94:14,22,25 100:4,8 100:11 121:4 250:15
**March** 95:6 113:11 113:17 115:4,20 116:20 118:9 121:2 122:9 123:17 124:25 126:17 128:23 156:4 157:23 218:14 248:18
**mark** 30:8 55:13 181:14 222:4
**marked** 27:1,5 28:11 28:15 76:16,20 77:2 78:10,13 106:16,17 107:20,23 108:2,5 108:13,16 109:10 109:13 110:5 113:4 113:5 128:25 129:2 135:7 137:6,24 143:15,18 150:4,8 151:12,15 153:12 153:15 154:23 155:2 177:16,19 178:13,16 188:8,12 188:24 189:2 191:3 191:6,24 192:2 194:16,17 196:6,9 204:16,19 209:5,7 212:6,9 214:9 216:17,20 217:15 217:19 218:22,25 220:17,20 226:15 226:18 230:15,18 236:11,14 242:12 242:15
**marriage** 21:22 22:2
**married** 15:11 18:1,3 18:9,14,22

**marry** 18:6
**Martin** 2:9 3:3 5:3,13 5:19,24 6:15,17 7:8 9:23,25 14:12,16,19 14:21 17:4 25:9 27:3,24 28:9,13 29:6,11 35:12 44:16 48:15 49:11 53:11 53:14,17,20,21 55:2 55:5 60:20,24 64:12 67:25 68:2,3 69:7,9 70:8,13 76:18,23 77:1,24 78:12 79:22 84:21 89:3 92:10 97:10 102:7 103:21 105:24 106:7,12,13 106:19 107:1,22 108:4,15 109:12,25 110:2,23 112:8 113:7 114:12 115:12,16,18 124:21 125:15 128:10,14 129:4 132:6,11,14 135:11 135:18 136:20 137:1 141:14,17,18 143:17 147:10,13 148:17 149:22 150:6 151:14 153:14 154:9,13,14 155:1 156:21,22 157:3 158:6,9 166:19 169:18 171:15,16 176:24 177:2,3,18 178:15 189:1,5,6 191:5 192:1 193:22 194:24 195:2,3 196:8 197:2,4 200:12,21 204:18 206:22 209:9 211:8 211:14,18 212:8 213:1 214:11,14,18 214:19 216:19 217:17 218:24 219:16,20,23 220:2 220:5,19 221:12,15 221:18,20 222:1,6 222:10,11,24 223:2 223:4 224:3 225:3,4 226:17 228:19 230:8,17 236:13 237:5 240:13,17 241:23 242:14 243:11,25 244:5 246:8,24 247:4 254:25 255:6,12 260:23 264:20
**Marzan** 197:9
**Mason** 55:18
**materials** 235:1
**maternity** 238:21
**math** 81:13,14 225:11,13
**matter** 10:2 113:23 118:3 151:2 237:12 242:8 243:7 244:10 264:25 267:6
**matters** 7:4 38:10,12 41:4,5 64:2
**Mays** 1:15 2:4 6:8
**meal** 262:13
**mean** 9:18 12:21 13:23 36:17 42:13 45:1 51:10 52:11 53:24 56:16,17 57:21 59:25 61:15 71:19 74:14,15,18 74:23 81:19 89:23 90:16 96:25 98:14 99:11,25 119:17 121:17 124:23 135:10 152:18 160:4 164:25 175:12 182:11 190:14 194:10 201:18 206:23 222:4 239:23 246:24 257:25 262:24
**means** 33:21 42:14 52:12 71:20 74:24 110:25 136:21 137:14 145:23
**meant** 36:18,19 79:24 124:5 127:9,17 128:1
**mechanisms** 62:4
111:3
**media** 231:24 232:3,6
**medical** 42:20 98:10
**medications** 10:23
**meet** 7:13 24:16,19 86:24 200:13,22 201:4 205:5,11,24 208:25
**meeting** 62:8 159:17 172:4 173:11 174:22 175:22,24 177:6,7,8 186:3 190:8 192:11 193:1 193:4,10 200:6 261:10,12 262:8,10 262:11,25 263:9,16 263:17 264:15
**meetings** 46:1 158:15 158:19,20 159:23 159:24 160:2,9,11 167:4 174:2,3,6,25 175:1,2,3 177:7,8 203:16,17,19 206:4
**member** 23:25 45:10 45:12 46:9 47:2,9 47:17 54:3,9 66:9 98:15 105:15 108:11 144:14 172:15,16 236:8
**member's** 65:15
**members** 25:4 103:3 120:24 165:10 189:21 233:1 235:6 236:1 247:16,19
**Memorial** 36:12
**memory** 140:24 193:8 209:25
**men** 83:12,13 126:18 163:17 168:13 186:12,13,13 192:25 193:3,9 247:17
**mental** 10:17 243:2 244:3
**mention** 93:18 105:2
**mentioned** 5:24 18:11 21:24,25 23:3 42:25 43:3 67:20 73:20 85:8 90:25
120:1 138:4 141:3 157:6 164:2 167:2 195:18 196:20,21 205:6 232:14 237:10 238:9 242:23 245:3
**Meredith** 2:3 6:20 11:7,16 14:8 244:9 255:24
**Meredith@Maysa...** 2:6
**Merit** 4:4
**message** 260:4
**messages** 13:24
**messed** 155:21
**met** 69:11 86:25 144:21 185:21 200:8 205:2 206:6 206:16 213:21 214:1 262:7
**Method** 33:23
**Methodist** 25:2
**methodology** 33:23
**methods** 41:16
**metric** 63:1,3
**metrics** 61:19 62:17 62:21
**Michael** 171:6
**midday** 210:16
**middle** 18:17 236:18
**Midland** 24:14
**midst** 95:10 233:7
**Miller** 126:15 139:16 239:7,7,9,11,23,25 240:3
**million** 230:25
**Milton** 232:14,19 233:10 241:18
**mind** 60:11 93:16 176:19
**mine** 26:20 27:12 126:9 132:8,13 158:20 197:20 204:22
**minimum** 81:4
**Ministries** 23:13 24:2 24:18
**minutes** 9:10,15,21 42:25 53:23 114:24

**mirror** 51:14
**Mischaracterizes** 158:4
**misconduct** 59:17
**misrepresenting** 254:10
**missed** 21:1
**mistreatment** 103:17
**misunderstanding** 262:13
**mixed** 190:10
**Mobley** 237:10,11,13 237:14 238:2
**mode** 94:25 95:1
**Modling** 96:14 238:9
**mom** 56:7 238:24
**moment** 14:4 230:25
**Monday** 210:1,21
**money** 74:2 75:13 81:17
**month** 17:3 67:17 118:5 120:15 121:23 145:3 219:21,22 220:1
**monthly** 145:15 230:19
**months** 16:3 36:4 60:13 67:13 68:9 71:6,7 80:14 123:8 145:5
**morning** 5:3 210:16
**Morris** 118:21 120:2 120:6,23 121:11 122:17 169:7,22 170:8 192:15 200:14 205:8 213:5 260:7
**Morris's** 120:21
**mortgage** 16:24 17:1
**mother** 13:6,10,17 56:1,9
**motives** 213:8
**Motor** 41:11,13 70:18
**Motors** 1:6 6:22,25 7:1 10:9 16:8 69:13 69:16 78:19 121:4 168:22
**Mountain** 7:12 15:5 17:6 24:20 25:3
**move** 41:12 50:19 55:7 56:4 81:21 91:15 94:1 172:23 194:20
**moved** 17:5 56:2 58:8 58:13 94:8 220:14
**movement** 50:15,21 70:19
**moving** 47:17 93:24 95:7
**Mulberry** 2:11
**multi-shift** 50:18
**multiple** 55:10 60:22 65:1 66:6 91:25 117:20 119:6,8,17 119:18 123:20 184:21 190:14 200:8 215:14 248:1 260:2
**multitasking** 131:7
**multitude** 104:21
**Murray** 2:10 6:21

**N**

**name** 7:10 15:19 17:24 18:17 22:8,9 22:10,15 25:14 38:5 40:1,7 55:15 59:12 68:25 69:4 85:23 111:21 112:1 135:21 163:22 171:6 181:1,4 183:7 196:13,20,21 197:8 209:1,14 220:22 221:6,7 238:9,20 267:10
**named** 177:21 180:8 180:10 182:3 183:6 232:4 238:15
**names** 30:25 45:25 193:13 231:5 237:23
**Nancy** 239:7,25
**narrow** 32:17 60:11
**national** 23:25 38:24 48:7 156:24 158:2 160:5 162:7 252:13
**nationals** 161:19
**naturally** 232:19
**nature** 99:8 119:20 148:7 169:6 251:14
**NE** 1:15 2:4 6:10
**near** 206:25
**necessarily** 44:24 78:2 130:4 139:14 144:15 145:14 158:23 179:12 240:21
**necessary** 62:22
**need** 9:13 53:12 63:21 64:24 79:20 117:16,17 163:10 176:16 192:6 202:20 214:12 221:18 236:9 244:20 254:2
**needed** 9:22 42:18 48:4,5 59:1 62:10 66:18 71:22 89:18 99:6,19 128:22 131:6,9,12 132:22 133:3 155:11 160:19 184:1 199:16 218:17 232:12,12,25
**needs** 52:13 202:12 236:23 253:21
**negative** 130:10 140:4 206:21
**net** 223:17
**never** 104:23 143:3 144:17,18 153:1,1 200:3 220:13,14 237:15
**new** 40:21 56:6 67:14 73:4,5 88:15 94:18 102:15,16 105:2 107:10,11,12,15 131:24 145:9 185:25 247:16
**new-hire** 250:21
**NEWNAN** 1:2
**night** 50:16,16 92:4 233:5
**nine** 60:12 80:14 193:17 231:6
**nodded** 34:23
**nodding** 8:8
**nods** 8:4 10:8 37:13 223:9
**non-Caucasians** 168:15
**non-credit** 35:5
**non-denominational** 25:12
**non-exempt** 75:2
**non-work-related** 204:1
**nonverbal** 8:5
**North** 2:5 6:10 20:12 73:9 81:24 87:4 93:14
**northern** 1:1 28:3
**Notary** 268:25
**notation** 134:20
**note** 27:25
**noted** 9:24 223:3
**notes** 4:11,13 11:4,5 11:20,22,25 12:5,9 12:13 32:23 210:24 211:6,9 212:4,14,15 212:16,21 213:3,4 261:7 262:10,25
**notice** 3:23 6:1 27:20 29:12 109:15 153:16,19,25 224:4 237:11 251:24 252:2
**noticed** 187:13
**notified** 215:4,6,7,9
**November** 122:6 123:3 150:3,24 152:6 167:16 195:9 198:12,15,19,21 199:7 207:14 251:18 254:22,24
**number** 25:23 26:5,7 26:12,14,14,16 27:21,22,23 28:1,4 32:7 51:16,17 56:20 60:2 62:21 74:22 78:4 115:3 137:2 138:4 145:20 153:20,22 192:7,17 192:18 194:23 218:2,6 220:25

221:1,3,8,8,9,22 225:18,19 228:3,4 228:15 231:2,3 254:20
**numbers** 26:15,18,19 221:3 222:2
**nutshell** 257:4

**O**

**O'Brien** 55:17
**O-B-R-I-E-N** 55:17
**O.C.G.A** 265:12
**Oakland** 17:18
**oath** 10:3
**object** 9:16 35:11 44:14 48:13 60:19 64:11 70:7 77:23 84:20 89:2 91:16 92:9 102:6 103:14 103:20 105:23 110:22 114:11 115:11 124:20 125:14 128:8 135:9 136:18 149:21 158:3 169:13,17 200:11,20 211:7 226:5 230:7 237:3 241:22 243:4 246:24
**objected** 71:16 72:6
**objecting** 70:11
**objection** 9:23 48:20 105:25 134:10,11 211:13 219:19 243:17
**objections** 5:15
**objectives** 33:10
**observed** 162:13
**obtain** 36:8
**obtained** 155:4
**obvious** 22:16
**obviously** 8:3,13 9:12 10:3 20:16 21:19 90:12 99:12,21 156:12 213:15
**occasion** 7:13 70:4,10 72:16,17,18 163:14 178:9 201:1,3 205:24 231:9 236:7
**occasions** 201:2
**occur** 56:24 59:1,4,14 90:8 148:10 166:14 181:9 182:17 185:4
**occurred** 11:18 50:21 181:10,23 182:18 185:13,16 208:6 232:16,22 239:15
**occurring** 12:21,22 13:3 123:24 124:16
**OCGA** 266:18
**October** 120:17 121:7 122:6 123:3 180:4 185:21 251:7
**OD** 52:5,9 67:16,24
**oddly** 213:11
**ODN** 67:20,23
**off-the-record** 154:15
**offended** 167:15 168:4,4
**offensive** 237:2,4
**offer** 3:10 4:17,19 78:18 85:9 86:20 193:12 226:22 232:12 239:7,9
**offered** 82:5 93:9 209:20,23 210:3,12 219:5 227:1
**offering** 88:7
**office** 79:25 87:15 150:17 151:7,8 199:1,4,17
**offices** 6:8 199:3,10
**officially** 215:6
**oh** 14:12 19:15 32:5 117:17 159:7 187:6 200:8 205:14 220:4 247:14 248:3,14 254:18
**okay** 5:13 10:7 11:9 14:11,12,16,19 16:2 25:10 28:6 34:5 41:20,24 44:2 45:5 46:21 48:18,22 49:8 49:23 50:1 53:17 54:13 56:10 57:7,17 58:8,20 60:4 63:16 63:25 68:2 70:14 72:13 73:24 74:2,20 76:4 78:3 79:12 80:4,8 81:16 82:4 82:22 84:5 86:14,19 86:21 87:17 89:4,10 89:13,15 91:7,18 93:1,6 94:14 95:11 96:20 97:2 98:3,7 99:12 100:15 102:3 103:12,24 104:2 105:16 106:3,9 110:1,17 112:11 113:17 114:16 121:7,19 125:7,12 126:12,16,21 127:14,25 129:23 130:3,5,8,14,22 131:5,9 134:4 135:25 136:4,16 137:17 138:3 140:12 142:9 147:9 149:9 150:12 151:8 153:25 155:22 156:6,8 159:14 160:1 161:13 163:20 164:7 165:16,18 170:7,25 171:12,20,24 173:1 173:16,19,25 174:20 175:19,21 175:24 176:3,5,8 181:24 182:1,14 185:6 189:18 190:25 192:22,25 194:21 198:2 199:5 201:1 205:15 206:19 207:5 209:25 210:6 212:19 214:12 215:7,17,20 216:9 220:16 222:24 223:5,13 224:21,25 228:1 231:1 233:19 235:9 236:5,7 237:9 239:22 240:2,9 246:5 247:4 248:16 249:6 251:10,17 254:19 256:3 263:5 263:10 264:19
**old** 14:22 15:1,17,21 16:17 22:25 258:12
**older** 258:15,17
**oldest** 16:16
**onboarding** 107:9
**Once** 94:14
**one's** 128:24
**one-page** 28:15 77:3 107:24
**one-time** 220:2,7,10
**ones** 92:15,20 94:1 99:21 141:2,2 161:10 215:24 247:16
**ongoing** 4:8 58:1 86:25 99:5,11
**online** 12:8,12
**open** 102:18 110:14 110:15 111:17,18 111:20 112:4,10,12 112:24 113:1 172:21 199:1 256:11,14,15 263:19
**operate** 60:14 250:13
**operating** 60:13 259:4
**operation** 50:17,18
**operations** 90:21
**opinion** 128:5,17 175:22 237:4
**opinions** 242:3 256:4
**opportunities** 59:16 73:17 82:3 88:7 186:11,14 259:15 259:19
**opportunity** 4:10 38:14 39:13,23 41:14,15 50:9 56:13 81:7,23 82:7 85:1 100:3 149:19,24 172:24 179:14 208:16 210:10 242:20 250:4
**opposite** 167:24
**options** 262:20
**order** 32:8 65:2 99:16
**org** 84:13 111:7,7,8 111:25 246:7,9

**organization** 10:12 24:8 37:2 41:15 52:15 88:4 99:9 104:21 105:3 111:3 128:5 138:12,21 171:1 208:7 239:4 245:3,8,16
**organizational** 3:15 3:16 4:3 52:8,10 54:15,22 57:1 67:20 68:4,7 90:23 110:9 113:24 178:18 245:12,20,24 246:2 248:25
**organizationally** 127:20
**organizations** 23:10 24:3
**orientation** 107:10,11 107:12,16 250:21
**origin** 38:24 156:25 158:2 160:6 252:13
**original** 4:25,25 28:5 51:14,21,23 251:13 267:12
**originals** 211:11 213:23,25
**OT** 74:22
**outcome** 261:25
**outcomes** 102:21
**outright** 241:17
**outside** 101:14 208:21 263:15,18
**outstanding** 85:6
**overall** 52:14 87:21 104:13
**overheard** 199:6
**overtime** 49:20 50:11 75:1 76:8 80:10,23 81:8

**P**

**P-E-R-R-Y** 36:11
**p.m** 53:19 106:11,11 141:15,16 176:25 177:1 214:16,17 240:15,16 264:25
**packets** 36:1
**page** 3:2 27:14,16,18 33:7 69:6,7 74:5,6 75:14,20 78:20 105:3 107:6,7,25 108:7,10 109:21 110:4,4,5 112:5 114:17 129:19 130:20,21 131:18 132:7,16 133:5,15 133:15 136:1,2,13 137:3,7 150:18 155:23,24,25 156:3 191:9 192:17 193:20,21 196:11 214:24 218:1,2,3 221:16,21 222:14 222:14 223:21,21 224:4 231:6 236:20 236:21 238:8 239:6 250:3 255:20 267:13,15,17,19,21 267:23 268:1,3,5,7 268:9,11,13,15,17
**pages** 106:25 148:22 222:21 223:10 266:9
**paid** 36:10 37:4 79:1 223:18,25 227:15 227:17 228:23
**paint** 42:5 90:21 254:11
**panel** 65:7
**paperwork** 21:9
**paragraph** 115:3 250:2,3
**parameters** 88:16
**Pardon** 222:24 258:19
**Park** 238:15,25 239:3
**parking** 234:4 238:22 238:23
**Parkway** 2:16
**part** 14:10 19:14 21:20 28:22 42:2,11 44:8,22 52:18 61:3 65:25 81:23 86:25 91:1,3 103:24 122:15 123:18,19 131:24 132:1,5 135:25 154:4 167:3 170:5 187:6,25 190:11 248:4 255:19,22 257:15
**part-time** 230:13
**partially** 103:23
**participate** 185:9
**particular** 23:23 24:11 42:2 63:19 66:9 72:1 74:24 173:11 175:11,16 176:19 196:22
**particularly** 36:19 247:20
**particulars** 217:5
**parties** 14:14 64:14 265:19 266:12
**partner** 6:21
**party** 158:21 166:21 167:5 265:14,20
**pass** 19:1 31:23
**passed** 123:9,16
**passports** 233:1
**patience** 134:5
**patient** 117:19 203:9 203:9,10 243:6
**Paul** 55:17 83:10,20 83:25 84:9 90:21 96:3 126:14 139:15 140:5 191:15 202:3 205:22 241:12,12 241:25 242:1 253:22
**pay** 26:19 74:3 81:1,3 81:21 226:9,10 227:13,20
**paying** 254:14
**payment** 16:25 188:15 222:15 223:11 224:5 230:21
**payroll** 4:18 36:23 37:22 58:6 220:23 222:13
**Peachtree** 1:15 2:4 6:9
**peers** 65:7,7
**pen** 155:25
**penalty** 152:20
**people** 17:12 24:9,23 46:2,24 47:5 50:15 50:18 51:8,11 56:6 56:11,12,20,20 59:20,25 61:7 66:2 66:3 83:18 85:15,17 86:4,11,18,18 87:25 88:4 92:16,17,18 94:19,21,24 95:4 101:13,16 102:15 103:25 104:23 112:18 116:4 126:8 139:11 158:25 160:5 165:1 170:17 174:11,15 178:6 183:11 186:12 190:14 191:17,18 191:18 199:6 203:13 208:14,19 215:10,14,22 231:3 232:19 234:3 235:24 237:9 239:19 240:18,20 240:23 245:13 247:20 253:5 256:25 258:12,14 258:15,17 262:22 262:23
**people's** 45:25
**percent** 227:6
**perfect** 62:15 106:7 128:24
**perform** 42:23
**performance** 3:18 71:11,14 80:13 129:8 131:9 139:7 227:17 228:23 253:20,22
**performed** 190:2
**period** 16:2 31:23 40:25 46:13 49:5 61:9 63:10 69:20 70:17,21 71:13 99:9 143:10 152:2 158:12 164:22 166:8 197:23 216:3 229:12
**periodic** 34:14
**perjury** 152:20
**permanent** 220:14

**permitted** 6:4
**Perry** 36:11,11,13
**person** 14:7 37:21,23 37:25 38:3 39:24 43:8 64:8 66:20 103:17 125:1,22 135:22 153:8 163:6 163:20 172:4,12,24 194:11 197:8,14 235:3,13 237:20 243:21 246:14,15
**person's** 138:5 163:2
**personal** 33:8 42:17 56:3 148:7,9 211:21 214:2
**personally** 61:6 154:19 180:10 232:4
**personnel** 35:25 37:24 38:4 51:15 57:14 97:23 134:17 239:13
**persons** 6:18
**perspective** 56:3,20 170:4,19,21,22,23
**perspectives** 102:25
**pertaining** 247:5
**Petersburg** 18:13
**phase** 93:21 94:5
**Phenix** 25:17
**philosophies** 41:16
**philosophy** 250:6
**phone** 26:3,5,11,12 26:14,15,16 27:21 27:22,22,23 146:4 245:12
**photo** 4:2 192:14 247:5,11
**photocopy** 242:19
**photograph** 177:13 192:16 247:7
**photographs** 159:16 247:13,15
**phrase** 123:9 127:15 127:16,25
**physical** 10:17
**physically** 243:21
**pick** 95:5 106:14
**picked** 52:5 247:17
**picture** 250:16
**piece** 115:21 167:21
**Pike** 19:5
**Pine** 7:12 15:5 17:5 24:20 25:3
**place** 24:17 50:2,3,7 50:9 62:4 74:6 100:4 106:6 109:4 117:4 196:5 202:21 206:5 214:6 249:8
**placed** 20:15 127:23 157:17 206:25 216:4 252:3,7,9
**places** 63:21 75:22 196:2
**placing** 263:23
**Plaintiff** 1:4 2:2
**plan** 180:13,14
**planned** 263:13
**planning** 201:7
**plans** 94:2 187:24
**plant** 42:3,6 49:16 51:1,8,12,14,22,23 51:25 56:13,25 57:4 57:8 59:5,14,25 66:10,11 73:10 90:19,22 92:12,14 93:22,23,23 94:5,7 98:11 215:10 250:13
**plant-wide** 47:3,24 48:3
**plants** 57:11
**play** 9:19 130:12
**please** 5:20 7:9,20 9:3 9:13 10:6 20:3 35:18 37:19 43:23 58:23 65:11 79:14 79:16 86:8 103:15 112:22 130:5 161:20 169:14 213:2
**plus** 74:22 76:7,8 225:16
**point** 2:16 9:12 12:7 20:22 53:10 65:8 73:6,19 93:2,15 102:16 106:1 115:25 116:18 127:21 149:17,24 172:18 174:9 176:23 201:20,22 204:12 205:8 207:10 209:2 220:10 221:4 229:9 241:10 245:23 246:3 248:3 258:24 258:25
**pointed** 86:14 111:10
**pointing** 212:22
**points** 47:14 59:22 82:14
**policies** 49:19 50:9,12 87:23 89:20 97:25 99:4,6,8,10,13,14 99:16,25 100:2 153:5 242:9,21
**policy** 4:23 47:25 49:20,21,23,25 50:5 50:11,11,13,14,20 58:2 59:13 93:10 99:22,23 100:4,5,10 100:15,18 101:4,14 108:19,21,25 109:6 109:9 159:6 184:7 202:25 203:14 242:17
**Pony** 23:13 24:1,7,14
**pool** 21:20
**poor** 137:11,25
**Poplar** 24:17
**population** 101:13
**portion** 72:12 192:8 251:13
**portrayed** 208:5
**position** 35:14 38:2 40:3,9 44:19 46:18 46:19,20 50:23 52:2 52:23,24 53:2 54:17 55:13 60:5,7 73:20 73:22,24 83:1 96:22 104:24 117:4 127:24 144:2,3,4,6 166:1 168:21 169:9 179:17 192:16 195:16 197:15 202:1,2 219:5 239:12 246:21,22
**positions** 36:13 57:2 57:5 116:5 151:24 246:10 249:4,19
**positive** 58:2 87:2,2,6 87:22,24 88:9,9,11 93:16 133:19 138:24 249:20
**positively** 204:12
**possess** 29:22,23
**possession** 211:21,25 212:21 213:18,21 246:1,2
**possibilities** 170:13
**possibility** 55:23
**Possibly** 145:6
**post-college** 35:7
**posting** 196:3
**postings** 36:22
**potential** 3:19 63:21 73:17 81:23 101:4 103:9,13 135:2,6,21 137:2 231:4
**power** 55:24,25 56:22
**practice** 66:10
**practices** 149:2 163:18 203:14
**precedents** 66:18
**precise** 228:15
**pregnancy** 204:7
**pregnant** 201:7,8 203:23 204:3 205:7
**preliminary** 7:3 10:1
**premium** 230:20
**preparation** 90:11
**prepare** 11:2 12:16 28:20 218:17,18 233:1
**prepared** 232:25
**preparing** 36:1 89:20
**prerequisite** 179:18
**present** 2:19 6:18 7:24 74:9 126:4 172:14,20 181:19 218:5 240:4,5 263:16,17
**presentations** 48:1
**presented** 174:14
**presenting** 175:7
**president** 6:24 48:2

118:21 168:22 169:7 259:23 260:3
**presumably** 72:7 164:18 218:13
**pretty** 32:2 103:4 119:11 173:5 181:6 181:8,19 202:4,5 207:18
**previous** 74:7 147:8 259:7,7
**previously** 66:18 180:11 186:2
**Primarily** 11:6
**primary** 92:20 123:21,22 145:23 262:4
**Princeton** 144:5
**print** 12:10 109:24 209:15
**printed** 108:11 209:14
**prior** 40:19 66:22 70:9 72:16 93:19 134:12 143:2,24 144:17 175:8 199:24 214:20 230:1
**prioritized** 99:6
**priority** 99:13,14,15 100:2
**private** 199:10,16
**privilege** 243:6
**privileged** 11:11 147:21
**probably** 9:14 64:18 105:11 145:15,22 165:25 171:19 179:22,22 193:17 253:14
**problem** 62:10 256:22
**problems** 30:11 43:21 44:23 62:12 103:2,10,13 105:1
**Procedure** 5:6 6:2,5
**procedures** 99:4
**proceed** 7:14 8:23
**proceeded** 163:3
**process** 28:23 34:13 63:8,13 67:15 93:3 93:8 94:1 99:5,11 99:18 107:9,10 129:11 135:16 151:5,6 251:8
**Process-Driven** 34:1
**processes** 40:20 42:9 42:20 47:25 60:9,9 62:2 92:19 250:15
**produced** 12:13,14 14:14 114:20 135:17 194:23 211:15 212:5 254:19 256:1
**product** 157:25
**production** 57:24,25 141:1 255:3
**products** 56:21
**professional** 31:11 39:22 56:3 92:22 181:19
**professionals** 39:9 88:13
**program** 34:4 43:2 229:17,21
**programs** 25:16 48:5
**progressed** 66:11 117:22
**prohibited** 243:10 265:12
**prohibits** 38:23
**project** 47:1,12,18 50:23 54:2,5
**projects** 47:3,23 54:11 87:13,13 190:11
**prominent** 159:16 192:16
**promotable** 72:23
**promote** 24:23,23 116:6 124:24
**promoted** 37:23 51:2 51:3,4 54:17 116:20 118:9 178:22 179:9 188:2 204:6,8 246:10 247:22,24 249:1
**promotes** 24:8
**promoting** 87:2,6
**promotion** 42:9 47:19,20 67:15 73:24 82:5 127:2 128:7 157:9,10,15 157:16 178:10 179:1,4,6,14
**promotional** 178:17 259:15,19
**promotions** 248:20 249:7,21
**prompted** 39:20 41:12 55:6
**pronoun** 182:14
**properly** 105:4
**property** 213:19 214:3,4
**Prophete** 2:11
**proposed** 169:3
**prostitute** 253:3
**protect** 208:13,13,15
**protected** 183:22
**protocol** 66:23
**provide** 42:18 52:15 105:16,19,21,22 154:20 189:11 191:20 212:2 265:9 265:14
**provided** 26:11 93:10 104:13 139:4 146:10 148:12,20 148:21 149:10 154:3,16,17 162:22 186:2 190:20 192:5 235:2,4
**provider** 25:21 26:2
**providers** 243:3
**providing** 88:19 149:5 181:3
**psychiatric** 243:6,9
**psychiatrist** 243:14
**psychoanalysts** 243:15
**Public** 268:25
**published** 5:14
**pull** 192:15
**purely** 37:22 117:15 117:18,19,19 127:6
**purpose** 87:20,21 169:2
**purposes** 5:5 6:3,4 49:5
**purse** 79:25
**pursuant** 6:1 265:3 266:16
**put** 30:8 46:25 52:20 60:8 62:4 75:18 104:23 117:21 133:23 169:19 171:20 257:3
**putting** 63:23 170:16

## Q

**qualifications** 143:23
**qualified** 73:23 92:17 142:3,13
**quality** 237:18,24 250:15
**question** 5:16 7:22 8:21,22 9:6 10:5,7 14:7 25:7 30:8 32:20 38:1 44:2 48:16 72:7 81:20 82:23 86:15 90:13 91:13 112:21 115:13 119:24 123:15 126:25 127:5 128:22 141:22 142:1 145:17 152:22 154:18 156:20 162:3 178:4 195:24 211:13 212:18,20 217:1 219:15 230:12 246:12,25 255:11 260:24,25
**questionnaire** 3:21 152:9
**questions** 7:18,20,25 8:10 10:14,19,24 36:20,22,23 60:23 106:15 147:22 172:21 173:7 175:20 176:10 244:8,15 255:7 266:7
**quick** 53:12 190:2 196:24 214:14 255:8,10

**quickly** 42:15 245:19
**quit** 91:21,23
**Quite** 79:10
**quote** 127:10 142:17
**quotes** 250:9

**R**

**race** 38:24 157:2,4 158:2 160:20 161:17,24 167:10 168:12 256:4
**racist** 235:17,18,25 237:6 256:4
**raise** 80:12
**raised** 174:15
**raising** 173:11 175:6
**Randy** 2:20 6:23 73:21,21 85:4,8,8 85:19 86:20,21,25 96:15,20 97:1,3 103:6,9,12,25 104:10,13 105:17 106:2 116:8,15,24 117:7,24 119:14 120:10,19,25 121:8 122:1 126:20 128:3 140:18,23 141:2 142:16 160:16 161:2 170:2,20 171:18 172:2,7 173:2,23 174:20,22 176:12,18 177:4 180:4 181:16,21 183:25 184:17 185:21 186:3,16 187:1 189:15 190:18,22 191:10 191:14 195:5 198:22,25 201:12 203:8 206:15 214:22 236:18 239:2 241:8 248:3,9 248:22 253:25 254:12,13 258:5,10 261:10 262:2 263:11,11
**Randy's** 121:20 149:4 160:22 250:4
**range** 56:24
**rated** 253:21
**rates** 265:19
**Rathert** 83:10 89:9 96:5
**Rayla** 232:23 233:15 234:24
**reach** 172:19 173:1 173:23
**reached** 173:3 208:1 215:14
**read** 5:9 20:24 79:17 129:20 131:20,21 132:8 155:18 255:16 267:5,7
**reading** 10:2 264:21
**reads** 133:18 134:4 178:4
**ready** 73:4
**real** 4:6 191:11 196:24 250:5
**reality** 250:7
**realize** 193:7
**really** 49:15 73:14 80:12 104:14 175:4 175:8 176:13 257:14,15
**reason** 9:1 77:15 85:12 108:24 109:2 109:8 111:13 114:6 114:9 117:21 123:19 131:5 134:15 144:9 167:3 169:24 232:3 247:23,25 253:20 267:14,16,18,20,22 267:24 268:2,4,6,8 268:10,12,14,16,18
**reasons** 55:10 104:21 104:22 158:5 200:10 242:24 267:8
**recall** 7:16 10:19,24 11:25 12:15,17 13:6 13:12 17:8,19,21 19:13,16 20:9 22:8 25:14 30:8,24 31:7 31:24 32:10,12 33:19 40:7 41:4 44:19 46:13 49:21 60:2 70:3 71:3,5,9 71:10,14 73:10,12 82:12 87:9 88:22 91:4 94:11 96:16 99:15 100:5,14 101:8 107:7 108:20 114:1,4 117:23 134:11,22 145:2 146:9,14 149:14,15 154:5 159:19,21 162:3,6,8,9,12 163:22 171:4,5 173:4 176:20,20,21 177:10,22 187:19 193:9,25 196:18 197:13,20 201:10 203:21 206:4,24 207:4,5 210:15 211:22 216:12 220:12,15 224:16 224:18 226:8 228:4 230:20 231:14,15 232:23 235:13 236:1,4,7,10 237:22 238:4 240:22 245:22 246:6 247:7 248:22 252:19 253:9,11,12 255:18 255:24,25 260:20 260:24 261:5
**receipt** 216:14
**receive** 66:13 75:7 79:7,9 126:24 160:19 179:15 196:19 215:2 223:13 227:12 228:22 229:18 245:14,16
**received** 14:8 39:24 74:25 78:19 116:10 125:22 146:19 147:4 169:4 179:16 188:5,15,18,21,23 189:7 198:18 211:4 215:11 216:12,13 217:11 218:12 219:8 220:7,9,12,13 220:22 224:11 225:7 226:9 227:8 227:14 239:17 252:2 260:3
**receiving** 114:1,4 166:21 218:19
**receptionist** 181:8,20
**recess** 53:18 141:15 176:25 214:16 240:15
**recipients** 113:14
**recognize** 78:1 133:8
**recognized** 203:4
**recollect** 197:24
**recollection** 96:25 107:5 195:12 205:1 217:12
**recommendation** 64:14,19 102:13 104:7 105:22 106:2 172:16,22
**recommendations** 43:13 44:8,11 64:4 64:7 104:3,10
**recommended** 64:16 64:17 72:19 172:5 174:9
**recommending** 65:4
**record** 7:9 8:2 21:6 22:15 27:25 28:10 29:6,10 34:5,22 38:13 53:20 55:2,4 55:6 58:12 85:23 106:12 107:2 118:5 132:15 141:17 154:9,12,13 177:2 186:21 194:24 195:1,2 196:23 197:1,3 214:18 222:7,9,10 240:14 240:17 246:13,18 267:8
**records** 32:13 37:3
**recovering** 214:2
**recruit** 55:19
**recruited** 40:9 55:11 55:12
**recruiter** 201:21
**recruiters** 95:20 196:19
**recruiting** 40:20

45:16 58:5 97:24
**red** 62:6,9 63:18 163:3 233:11,12,12 233:13
**redact** 28:4 221:18 221:25 222:2
**reduced** 266:7
**refer** 10:11 261:6
**reference** 12:3,6 196:16 232:12,13 251:15
**referral** 265:16
**referred** 12:2,12 39:16 68:24 98:21 114:23 252:17
**referring** 11:22 12:1 14:13 58:12 115:15 196:15 197:19 246:15 247:12 250:8
**reflect** 78:2 250:22
**refused** 210:6,18
**regard** 93:15 151:2 200:18
**regarding** 7:18 112:16 134:5 149:4 162:17 163:18 171:18 186:8 189:11 190:15 192:5 199:7 200:14 201:6 210:24 218:4 234:6 249:24 251:5 256:17
**Regina** 16:6 215:23
**register** 4:18 222:13
**registry** 220:23
**regular** 12:6 26:24 214:25
**Regulations** 265:4 266:17
**rehashing** 246:11
**reiterated** 204:8
**reiteration** 203:7
**related** 21:9 31:6 37:1,3 44:23 48:3 50:21 73:8 122:23 123:17 149:16 173:7 197:22 203:18 213:4
**relates** 154:1 239:9
**relating** 146:11 148:13
**relations** 3:11 4:23 41:22,24 42:24 43:4 45:10,13,15,20 46:4 46:9 47:2,5,9,17 52:21 53:5 54:3,9 57:15,21,24 70:25 82:16,18 83:1,5 84:7,15,17 85:6 87:1,3,6,17,22 88:9 88:10,12 89:19 90:12 94:16 95:18 95:22 97:15,19,25 98:13 100:21 102:17 103:1,8 104:7,17 106:22 108:22 110:10,14 111:10,15,18 112:6 112:7,9,12,24 114:25 115:6,23 116:11 117:1,11 122:10 126:23 127:7,21 128:2 140:9,10,11,25 141:6 142:10,13,18 142:23 143:1,1,4,5 144:8,13,14 157:17 166:10 172:16 173:2 174:2,5,17 178:23 187:3,6,15 187:23 188:3 201:14,17,25 202:4 202:14,17 203:21 205:9 232:17,18 239:13 245:19 247:23 253:7 260:13
**relationship** 118:20 120:2,6 121:10 122:16 141:5 169:5 169:6,19,23 170:3 190:4 201:15 251:16 262:5
**relationships** 42:7 45:21,22 46:5 133:19 190:13,15 190:16 191:2
**relative** 23:3 69:17 141:20 166:1 266:11,13
**relatively** 60:11
**relatives** 21:21 22:1
**relayed** 173:19
**Relevance** 243:18
**relevant** 243:7,10
**religious** 24:25
**relocation** 219:11,17 219:24 220:3,10,12 223:14 224:8,11
**rely** 160:17
**remain** 41:8 50:25
**remark** 237:2
**remarks** 236:3
**remember** 21:7 26:12 30:25 38:3 50:10,11 51:18 55:24 63:7 74:3 75:11 85:19 111:1 148:11 196:22 214:1 215:13 235:12 251:2 256:1 260:19 264:9
**remembered** 20:22
**remind** 181:24
**reminder** 64:23 66:14
**remittance** 4:21
**remove** 20:6
**removed** 201:8 251:15
**rent** 16:21
**rental** 16:24
**repeat** 7:21 43:23 82:22 156:19 161:20 219:14
**rephrase** 7:21
**replaced** 249:14,15
**report** 4:7 44:5,9 70:17 71:2,17,18 96:25 121:9 148:23 171:17 190:11 192:4 193:15 198:3 198:6,11 233:24 251:5 254:21
**reported** 43:8,24 70:23 71:4 72:1 83:16 104:1 140:23 141:2 157:16 173:13 181:14 198:24 208:14 239:1
**reporter** 5:19 6:18 7:24 8:4,14,15 22:14 264:23 265:7 265:15
**reporter's** 28:8 266:1
**reporting** 70:20 83:18,21 111:3 140:13,14 170:12 258:15,17 265:4,10 265:14,16 266:17
**reports** 47:10,13 82:10,15 83:4,15,22 84:1,3 171:20
**represent** 150:24 266:9
**representation** 247:18
**representative** 265:8
**represented** 247:6
**representing** 76:12 207:22 244:9
**represents** 137:11
**request** 4:22 13:7 122:16 123:18 149:4 162:20 180:21,22 189:15 218:3 250:5 267:7
**requested** 118:19 120:10 122:21 159:15 180:17,19 190:18 201:8 205:9 234:6 239:2 249:25
**requests** 211:16
**required** 10:4 51:14 64:22 65:5 66:15
**requirements** 34:10
**rescheduled** 20:25
**reserved** 5:15
**reside** 15:4,9 17:17 21:22 22:2
**resided** 15:23 16:9 22:3
**residence** 16:22 220:14

**resigned** 82:6
**resolution** 21:3 105:18
**resolve** 42:8
**resolving** 43:21 103:2 103:9
**resource** 23:21 40:3 60:5
**resources** 6:22,24 30:3 31:11,19 32:2 32:19 33:14 35:10 35:13,14 36:7,9,10 36:15,17 38:16 39:4 39:8 40:16 42:2 43:12 48:2 52:4 53:4 54:20 58:10,17 60:1 63:23 68:11 92:22 95:18,21 96:18,21 97:14,16 97:19,24 98:1,13 103:18 114:25 115:5 117:2 139:19 139:20 140:1,6,9,11 140:12,14,17,18,20 140:24 141:6,21 142:2,4,8 144:7 178:11,22,23 187:7 187:25 188:3 232:13
**resources-related** 36:21
**respect** 8:3
**respond** 10:7 44:12 176:15 250:4
**responded** 66:22 121:13 180:14
**response** 13:2 14:23 19:8 52:19 67:22 71:8 76:9 84:24 87:19 88:25 109:19 117:17 127:6 128:20 129:17 133:24 134:18 140:16 168:7 185:14 188:7 210:14 211:10,16 212:1 218:9 222:17 231:2 239:17 250:10 252:18 254:17,21 256:8 260:12,18,19
**responses** 4:16 10:20 10:25 217:20 230:24 238:8 239:6
**responsibilities** 42:12 52:5 89:5,6 98:12
**responsibility** 24:9 42:1,5 48:6 52:17 57:13 86:13 96:19 98:14 124:9 170:6 258:8,11
**responsible** 96:17,18 103:17
**responsiveness** 5:16
**rest** 136:10
**result** 63:1,9 243:3,19
**resulted** 70:20
**results** 43:13 44:5 102:10 190:6
**resume** 3:8,20 28:19 28:19,25 30:2 31:9 33:6 35:2 144:10 218:17
**resumes** 258:13
**retaliated** 163:25
**retaliation** 158:22
**retrieve** 224:20
**return** 213:25 214:3
**returned** 213:20,23 214:4 238:21
**revealed** 204:2
**review** 11:5 43:13 65:6 100:13 175:1,2 192:6 193:23 194:19 210:11 217:23 253:22
**reviewed** 11:4,12 12:15 102:9 130:13 153:10 257:23
**reviewing** 217:1
**reviews** 99:18
**Richard** 16:16 18:8 18:12,17 238:15,22
**Rick** 126:14 139:16
**ridiculous** 253:4
**right** 3:23 6:17 17:23 20:13 21:12 22:8 32:4 33:15 34:4,24 38:18 39:2,3,6,10 42:11 43:25 44:3 45:4 46:11 47:8 49:6,12 50:5,8 51:12 52:9 53:6,15 53:22,25 54:8,16,19 54:25 55:2 58:17 59:6,19 62:7 67:4 67:10 75:7,22 76:12 78:24 79:6 82:8 83:12 88:22 91:5,11 95:9,24 97:6 102:23 103:1,6 104:4,8 105:20 111:13,21 112:1,2,4 113:21 115:10 116:13 119:23 120:3 121:11,17 123:6,11 123:15,25 124:7 129:6 130:16 132:24 136:12 137:12,18 139:5 140:18,19 144:16 146:5 147:13 152:3 152:6,8,13,19 153:16,19,25 154:6 156:25 159:21 160:20 163:23 164:2,18 172:19 173:17,20,23 179:21 188:22 191:20,23 195:4 201:18 210:1,7 213:22 219:6 221:6 221:12 224:9 226:20 233:15 240:13,22 243:12 251:17 258:7 261:9 264:22
**right-to-sue** 146:19 147:5
**rights** 38:18,20,20
**ringing** 197:7
**risk** 62:8 170:4,7,17
**Road** 7:12 15:5 17:9
**Robert** 191:15 197:9 197:20
**role** 38:2 41:20 44:22 53:3,24,24 54:21 60:16 68:7,8 69:16 69:17 70:2 73:25 139:18 244:18,24
**roles** 56:7 89:11,12 89:14,15,23
**room** 6:19 86:11 128:6,18 159:5 163:10 167:15 168:13,15,18 172:20 186:16 199:18 203:20 206:7,8
**rooms** 199:14,15,19 206:10
**Ross** 232:14,15,16 241:18
**routine** 131:12
**rule** 6:1 9:1 66:5 202:5
**rules** 5:5,14 6:2,5 9:8 9:10 28:4 88:1,17 153:3 265:3 266:16
**rumor** 163:15
**rumors** 163:7,18
**runaround** 261:2
**running** 55:23

**S**

**S-A-B-E-L-H-A-U-S** 15:20
**S-E-O** 236:22
**S-H-R-M** 23:18
**Sabelhaus** 15:19 16:16 18:17,21 19:1
**safe** 213:15 263:12
**safety** 140:25 141:6 262:17,21 263:14
**salaried** 235:13
**salary** 36:22 74:13 76:7 78:23 79:2,3,4 80:6,7,22 81:6,7 188:6 219:6 224:15 224:19,19 225:1,15 225:16 227:2,6 228:11
**sat** 240:7,10
**satisfy** 34:10
**saw** 98:1,1 123:24 164:23 165:7,12,13

208:10,12 234:16 249:1 251:8,8 255:25 260:14
**saying** 25:11 99:11 111:23 117:14 124:12 163:9,12 167:19 182:4 223:16 226:8 254:12,13
**says** 9:18 68:24 74:13 79:6 108:7 111:20 112:4,10 131:8 132:2,5 133:21 152:19 156:4,7 196:14 236:22
**scale** 137:6,9
**scheduled** 233:2
**school** 31:8 36:5
**scope** 60:10
**scopes** 162:20
**screamed** 163:4
**screaming** 234:3
**screening** 92:17
**search** 218:18 235:17 242:24
**second** 29:7 33:9 55:1 58:15 89:25 93:23 107:7 123:15 135:25 136:1 154:10 177:24 185:12 191:8 207:2 207:3 240:14 251:6
**secondary** 123:23
**secret** 111:8 120:25 122:2 142:24
**secretive** 245:4,9
**section** 42:6 248:4
**sections** 192:4 193:15
**security** 20:7,14 21:16 28:1,4 180:25 181:1,3,13 221:9 222:2 263:15
**see** 7:24 29:5 33:10 56:12 68:25 74:7,11 74:18 75:15 77:4,10 77:13,19 78:4,6 79:7 80:9 109:18 110:6,10,15 113:9 113:11,13,24 114:18 129:24 130:24 132:12 133:13,14,16 134:6 135:23 136:2 137:4 137:7,25 138:6,14 150:19 151:4 153:17,20 155:16 159:12,13 177:24 178:1,18,24 179:2 187:17 191:12 195:10 204:24 209:18 210:25 214:22 217:8 218:7 219:2 220:23 221:9 221:23,24 222:16 222:19,22 224:23 236:18,24,25 245:22,24,25 246:7 251:6 255:20
**seeing** 93:25 134:12 187:19 190:6 211:23 255:18
**seek** 208:15,21
**seeking** 168:25 218:15
**seen** 109:7 129:5 135:10 136:9,10 139:3,7 143:20 212:11 231:22 242:17 243:2 254:23 255:15,17 256:2
**seldom** 137:14 138:6
**selecting** 46:7
**selection** 40:20 42:9
**self-appraisal** 130:7 130:17
**self-assessment** 129:13,15
**self-employed** 230:6 230:13
**self-evaluation** 130:24 131:3,6,16 132:19
**semester** 36:5
**send** 262:2
**senior** 6:23 31:11 125:23 144:18 178:10,22 179:10 179:15,17 184:22 188:3 238:16 249:13,16 252:25 253:1
**sense** 62:15 63:25 187:18 248:7
**sensitive** 213:16 251:14
**sent** 13:23 113:20 114:7 159:8 196:3 198:9 214:25 217:24 218:13 255:16
**sentence** 178:3,4
**Seo** 236:22
**separate** 115:24 117:2 141:1,1 187:24,25 245:19
**separation** 117:1
**September** 15:8 46:14 120:16 121:7 149:8 178:1 185:5 195:16 198:7 223:12 251:6
**sequence** 121:1
**series** 7:18 177:23,24
**serious** 174:10 218:18
**seriously** 174:13
**server** 201:6,8 205:7
**serves** 209:25
**service** 181:2
**services** 265:10,14
**sessions** 87:6
**set** 47:21 48:5 66:18 84:18 85:5 87:24 213:13
**sets** 93:18 202:20
**seven** 23:2 59:23 95:21,23 115:3
**seven-page** 113:8 129:5 196:10 204:20
**severity** 64:21 104:14
**sex** 234:14,19
**sexual** 50:6 59:10
**shallow** 234:22
**share** 160:5 242:2 257:11
**shared** 13:7 234:5 257:11
**Shari** 1:19 6:18 266:24
**she'll** 7:25
**Sheet** 267:1,10
**sheets** 245:15
**Sheila** 38:5
**Sherpa** 33:20,22 34:1 34:7,15,19
**shift** 50:15,16,16,16 50:17,19,20 70:24 89:24,25 90:6,18 92:3,4
**shift-movement** 50:13,14
**shifted** 229:20
**shifts** 90:5,7,22
**shit** 142:17
**shocked** 192:9 232:7 241:4,14,14,19
**shop** 45:25 172:11
**short** 67:12 185:8
**shorter** 63:1
**shortly** 112:14,15 120:18 231:16
**shoulders** 233:3,4
**shouted** 162:15 167:19
**shouting** 192:14
**show** 78:13 106:15 107:23 108:5,16 111:16 128:25 134:4 143:18 177:19 178:16 188:8 189:2 191:6 192:2 204:19 216:20 218:25 226:18 230:18 249:4
**showed** 80:22 111:6,8 111:9 245:20 247:8
**showing** 27:4 28:14 76:19 77:2 109:13 150:7 151:15 153:15 155:2 196:9 209:5 212:9 217:18 220:20 234:13 236:14 242:15

247:4
**shows** 111:17 230:19
**SHRM** 23:17,23 24:2 31:4 33:13,17
**shutdown** 252:6 262:12,15,22,23
**sick** 148:8
**side** 53:4 58:4 67:19 70:22,23 97:24,25 142:25 143:1 144:7 144:8
**sign** 5:9 20:24 74:21 74:22 107:18 152:22 210:6,18
**sign-on** 79:7,9 81:11 81:12 219:8 220:7 220:13 223:13 224:11 227:8
**signature** 27:18 75:24,25 76:1 78:20 107:25 108:10 129:19,20,21 133:8 133:10 136:4,5,6,9 136:11 150:19,21 151:17 152:3,19 187:15 209:12 216:24 217:10 268:20
**signatures** 130:11 136:1
**signed** 4:12 20:25 75:21 78:19 85:9 100:6 130:1,13 153:11 210:21 255:19 267:10
**significance** 110:20 115:23 116:25
**significant** 92:4 208:11
**significantly** 77:21
**signing** 10:2 166:9 210:9 264:22
**similar** 40:18 45:14 46:22 88:5 89:14,23 97:22 98:22 101:12 126:9 170:25 173:9 193:19 197:20 225:24 242:22 245:12,17
**similarly** 125:6 139:12 141:10,24
**simple** 63:8 260:5
**simplistic** 61:22
**simply** 12:10 56:13 119:7 134:24 176:21 180:6 203:15 206:24 220:15 239:19 240:4 241:8 242:4
**single** 240:8
**sir** 11:24 14:2 16:11 18:5 21:8,14 23:19 25:20 68:12 80:19 170:24
**sit** 181:7
**sitting** 153:6 167:20
**situated** 125:6 139:12 141:10,24
**situation** 42:1,16 45:18 63:12 89:17 92:6 98:22 105:7 117:22 125:1,4,6 155:11 159:6 162:14 169:7 170:12 173:4 175:12,17 180:24 181:17 196:22 232:23 240:21
**situations** 11:18 66:21,22 126:9 173:9 175:8 197:19 232:21
**six** 67:13 68:9 71:6,6 95:21,23 242:25
**size** 59:14
**skill** 84:18 93:18 202:20
**skills** 137:24 138:11 141:9 225:11
**slid** 117:4 246:13,15 246:22
**slightly** 14:25 45:10 57:3 78:4 94:17 154:18
**slip** 4:21
**slotted** 112:18
**slow** 203:9,10
**small** 36:11,18 44:21
**smell** 252:22
**smelling** 252:20
**Smith** 2:11 215:24 241:18
**Smoot** 232:23 233:16
**Snow** 1:19 6:18 266:24
**social** 28:1,4 221:9 222:2
**Society** 23:20 32:19 33:14
**sociology** 30:3 36:7
**soldiers** 167:24
**solely** 58:25
**solicited** 189:11
**solution** 20:18
**somebody** 14:16 43:15 45:3 105:12 138:11 162:7 177:21 196:12,19 199:10 238:9 254:13
**someplace** 150:15
**somewhat** 67:18
**son** 15:18 16:16 148:8
**sons** 18:8 21:25
**soon** 236:23
**sophisticated** 256:16
**sorry** 17:20 25:8 37:17 79:17 82:22 130:21 132:4 152:25 156:19 186:18 212:25 215:12,16 221:10 222:22 244:20 248:16 263:21
**sort** 45:23 65:13 88:12 110:8 173:9 263:24
**sought** 218:4
**source** 208:9
**sources** 194:8
**sourcing** 51:7,9
**South** 7:12 15:4
**southern** 56:2
**space** 199:17
**speak** 93:10 158:19 158:20 167:8
171:25 172:1 174:21,25 176:14 177:5 244:20
**speaking** 24:24 105:13 144:21 175:5 185:12 189:10 199:19
**special** 48:1
**specialist** 41:23,25 42:24 43:4 45:11,13 45:15,20 46:4,9 47:1,2,5,9,12,18,18 50:23 52:21 54:2,3 54:5,10 64:20 66:16 84:16,17 87:2 104:17 105:10 162:17 163:23 172:9,10,14 173:14 173:16,22 174:1,17 175:10 176:2 183:7 183:8,19,21 201:19 202:1 232:18
**specialists** 94:23 102:4,17 104:2
**specific** 11:17 31:22 50:12 61:8 80:13 84:18 89:6 117:25 120:14 128:21 145:16,19 148:15 171:3 180:4 183:2 190:23 191:14,15 191:20 201:10 228:4 230:11 241:11 248:24 253:11 262:8
**specifically** 13:23 15:11 87:12 106:4 108:20 117:14 185:23 193:11 235:12 253:23 258:1
**specificity** 11:11
**specifics** 237:23 240:21 261:5
**speculating** 240:9
**speculation** 128:9,11
**speech** 167:18,18,22 168:2,8
**speed** 244:14

**spell** 22:17 23:14 35:18 38:6 55:15
**spelling** 40:7
**spend** 45:24
**SPHR** 31:9,10,16 34:18
**split** 57:12,18 90:5,8 90:19,22,22 127:7
**spoke** 5:7 10:1 175:13,14
**spoken** 175:12
**spot** 126:11
**spread** 163:18 231:1
**spreading** 163:15
**spreadsheet** 109:17 109:20,24 110:4 111:17
**spring** 118:7
**stable** 202:8
**staff** 14:17 51:8 60:10 60:17 119:20 148:25 167:19 182:25 183:3,5 190:4,5
**staffing** 51:5,15 52:6 54:15,21 58:5 67:7 67:11,14 68:7
**stamp** 110:6 194:22 217:11 254:20
**stamped** 114:17 130:20 222:14
**stamping** 56:23 182:4 182:20 183:5 184:10,11
**stand** 43:1 110:17
**standard** 62:7,9,10 62:16 66:12,23 118:17
**standardization** 60:17
**standardize** 60:9
**standards** 66:10 87:23
**standing** 263:15,18
**stands** 23:20 38:14
**start** 12:22 35:13 63:23 73:4 83:22 89:20,20 91:22 123:7 155:24 190:2 200:6 204:15 231:4 231:7
**started** 39:3,4 41:2 41:19 46:14 54:19 55:22 73:4 83:6 93:2 94:14 95:6,13 95:14 100:7,11 121:3 122:20 129:11 155:9 166:9 187:14 203:23 213:11 258:7 259:6
**starting** 51:23 74:13 92:12,13 93:15 156:4 219:6
**startup** 45:18 48:4 49:17 51:21,21,22 81:24 89:16 91:2,3 91:14,18,21 92:2,7 93:20
**state** 7:10 266:2
**stated** 161:21 266:6
**statement** 103:4 126:5 151:24 152:19
**statements** 4:23 239:18,22
**states** 1:1 23:13 49:4 149:18,23 161:25 167:11 250:2
**stating** 173:12
**status** 62:5 167:10 242:25
**stay** 82:6 204:10,11
**stayed** 145:13 165:2
**staying** 164:24
**step** 146:21
**steps** 62:2
**stereotype** 235:10,11
**stereotypical** 234:22
**stereotyping** 235:5
**Steve** 126:13 139:15 140:3 180:8,13 182:20 184:20 185:1,7 186:21
**sticks** 176:19
**stipulations** 7:4
**stop** 14:4,6 55:1 95:4 106:8 122:22 123:7 253:4
**stopped** 257:5
**stopping** 53:9 106:5 176:22
**stories** 116:10 260:2
**story** 142:11
**straightforward** 59:8 63:8 173:5
**streamline** 111:2
**Street** 1:15 2:4,11 6:9
**strengths** 254:2,3,4,6 254:7
**strides** 203:4
**strife** 148:25
**Strike** 218:2
**string** 177:24 191:19
**strong** 142:25 143:1 233:11,13
**strongly** 174:25 175:5,13 185:12 254:1
**structure** 56:14,14,17 57:1,3 81:8 90:3,23 119:4 126:4 197:18 197:18
**struggles** 48:18
**Stuart** 125:23 126:2
**stub** 75:12 80:9
**stubs** 80:22
**students** 256:17
**subject** 66:3 105:25 113:23 191:11 237:12
**submit** 28:22 32:7
**submitted** 106:2 130:7,16 193:24 194:2
**subordinate** 159:5
**subordinates** 158:19 160:17 161:5
**subscribed** 268:23
**substantial** 75:7 237:15
**substantiate** 238:3
**successfully** 34:16
**suddenly** 94:24
**sue** 3:23 153:17,19,25
**suffer** 79:22
**suggested** 121:9
**suggestion** 121:13,24
**Suite** 2:5,11 6:10,13
**sum** 224:17 225:16 229:18
**summary** 149:5
**summer** 166:15,17 181:10,25 203:22
**Sunday** 165:8
**superior** 137:20,24
**superiors** 138:18
**supervisor** 69:20,21 70:5,9,12,16 71:17 72:2,6,7,10,15 116:9 166:12
**supervisor-subordi...** 70:2
**supplier** 85:6 88:14 89:7
**suppliers** 88:6,8
**support** 85:7 87:22 89:7 90:7 93:9 265:8,9,11,13,18
**supported** 172:10
**supporting** 42:16 88:5
**suppose** 86:17 105:19
**supposed** 179:24 185:3
**supposedly** 113:1 208:4
**sure** 12:17 14:5 20:2 21:11 32:21 37:4 43:24 46:10 58:1 59:15 63:9 65:12 66:8 73:15 79:10 82:23,25 86:9 88:21 102:24 103:5,16 105:2,8,20 112:23 117:15 118:4 119:24 128:24 130:2 131:4 141:14 159:20 169:15 170:16 171:5 174:13 176:20,24 183:21 185:15 190:9 193:7 194:10 195:19 197:24 207:18 228:16 239:11 243:25 253:15,16 259:3

**surprise** 242:5
**surprised** 242:6
**suspect** 60:2 165:23
**swapped** 70:25
**swear** 5:20
**sworn** 5:22 268:23
**systems** 47:25 61:17 88:7

**T**

**T-R-O-U-P** 22:18
**take** 9:11,13,14,15,17 18:3 30:18 48:25 53:12,17 55:20 61:8 81:21 119:23 127:13 134:21 141:12 155:15,18 159:22 162:21 186:4,5 192:13 214:5,14 215:21 248:10,15 255:7
**taken** 5:4,25 6:3,8 12:5 19:14 30:13,16 66:19 81:13 106:10 156:17 184:2 247:11 266:6 267:6
**takes** 225:24
**talk** 8:16,18 42:23 56:16 117:16,17 145:7,14 146:18,21 146:22,23 147:7 148:6 172:18 174:7 174:23 239:2 257:21
**talked** 73:11 102:20 145:1 146:15,16 147:8 159:1 167:22 170:19 174:4 201:4 203:13 204:1 232:19,20 233:7 239:25 240:6,19,20 241:18 253:18,25 261:19 262:24
**talking** 39:10 49:3 62:18 75:9 97:8 112:2 132:9 148:15 149:11 152:25 157:12 170:22 171:13 182:15 198:22,23,25 215:19 235:23 246:19,20 248:11 248:13 253:6,10 262:9,10
**tangent** 81:1
**tardiness** 63:4 101:7
**Tarver** 237:23 260:7
**taught** 153:5 250:20
**taxed** 225:22
**taxes** 37:22
**teach** 204:13 258:6
**teaching** 42:19 88:15 259:3
**team** 3:11 4:23 45:10 45:12 46:9 47:1,9 47:17 54:2,9 55:25 65:15 66:9 82:16,18 83:1,5 84:6,15,17 85:6 87:17,22 88:9 88:11 89:19 90:12 94:15 95:18,21 97:15,19 98:13 100:21 102:17,17 102:25 103:1,3,8 104:7,16 106:22 108:11,22 110:9,14 111:10,15,18 112:6 112:7,9,11,24 114:25 115:6,23 116:11 117:1,11 120:24 122:10 126:23 127:7,21 128:1 140:9,10,11 140:24 141:5 142:10,13,17,23 143:1,3,5 144:13 157:17 165:10 166:10 172:15,16 173:1 174:2,5,17 178:23 187:3,6,15 187:23 188:3 190:9 190:19 201:14,17 201:25 202:3,14,17 203:20 205:9 232:17,18 233:1 235:7,9,11 236:2,8 239:13 245:18 247:16,18,23 253:1 253:7 254:11 257:16 260:13
**teams** 190:10
**Ted** 96:12 126:15 139:16,19
**tell** 15:3 29:1 31:16 32:22 35:9 36:12 48:18 66:14 91:7 100:1 101:10,11 108:9 120:25 144:5 147:25 148:3 160:18 162:22 172:3 192:4 196:20 204:14 207:6,15 228:14 231:25 232:2 238:13 239:20 240:19 252:21 264:14
**telling** 53:23 121:14 123:7 126:22 163:7 253:5 258:8,10,11
**templates** 93:10
**ten** 60:12
**tenure** 185:8
**term** 21:6 39:9 72:23 250:13
**terminated** 174:12 185:7 213:17 215:5 215:13 235:20 240:23 251:19,22 261:9 264:15
**termination** 65:4 146:11 172:5,23 174:10 214:7 218:5 218:12 229:25 243:3 244:17
**terminology** 38:17 254:3
**terms** 200:19
**Terren** 182:3,21 183:9,10,11,17 184:23
**Terry** 171:6,9,18
**testament** 225:10
**testified** 5:23 77:13 100:22
**testimony** 10:4 60:25 76:6 91:4 125:7 139:2 158:4 207:5 246:11
**text** 13:24 260:3
**texted** 260:10
**thank** 8:12 12:11 14:19 16:21 19:19 33:6 34:7,18 37:6 49:12 50:22 54:25 61:12 68:6 69:8 72:13 76:24 80:2 118:8 130:14 188:10 189:5 196:14 197:2 240:12 242:23 264:19
**theft** 59:9,9 63:12,12 63:13 101:8
**theme** 193:18
**therapy** 24:23
**thereto** 266:7
**they'd** 241:21
**thing** 75:3 79:23 85:4 102:4 119:25 172:19 173:9 174:10 208:12 215:17 248:14
**things** 45:23 48:4 59:3,7 61:2,21 66:23 88:18 89:17 90:21 93:11 116:2 118:15 119:6,8,21 119:25 123:24,25 124:15 144:14 163:5,12 166:10 167:9 180:15 190:12 202:25 203:2,6,8,18 204:13 234:15,20,21,22 239:15 241:2,6,11 241:20 242:2,6 244:8 252:14,22 254:12 262:12 263:24
**think** 9:19 19:23 24:2 24:5 33:1 46:8,11 63:11,22 69:11 92:20 95:16 96:9 97:14 118:14 141:1 145:4 154:7 167:8 176:16 178:6

179:16 192:25 193:14 195:18 200:5 204:10 205:9 207:8 210:16 215:23,24 228:17 241:17,21,25 244:5 246:19 252:22 254:2 260:23 264:2 264:2
**thinking** 63:20 234:13,14,15,19,21 256:1
**third** 107:7 114:17 178:3 196:14 222:21 223:10
**Thomas** 15:12 17:23 17:25
**Thompson** 7:12 15:5 180:8,14 185:1
**thought** 81:1 84:22 85:1,3,4 91:15 99:2 99:7 105:17 119:4 132:3,4 148:5 153:1 153:2 163:14 167:2 186:4 187:16 193:12 202:13 219:23,25 231:25 246:21 250:3
**thoughts** 155:12 234:16
**threatened** 182:5
**three** 33:4 61:22,23 61:25 63:7 66:13 74:5 79:6 83:6,8,9 83:14 84:9,12 88:23 89:1 121:25 132:21 133:3 137:17 141:4 205:24 207:24 217:5 221:17,17,21 221:21 222:21 223:10,21 236:21 240:23
**three-page** 107:1 143:19 222:12
**threefold** 168:12
**throw** 39:9
**Tim** 175:24 176:1,2
**time** 5:8 6:7 8:18 9:2 9:2 12:18 13:8 15:25 16:2 20:16 31:23 34:21 39:4 40:25 41:18 42:4 43:7 44:22 45:19,24 46:20,25 49:5 52:2 54:22 55:21 57:23 58:15 61:9 67:1 68:13 69:18,20 70:3 70:5,17,19,21,24 71:1,5,13,15,21 72:1,12 80:18,19,21 82:12 87:1,16 92:6 92:16 95:5,12,20 97:7 98:4 99:9 100:1,15,18 102:23 106:8 111:8 112:25 112:25 115:9 116:9 116:18 117:8,12,25 118:1,2,6 120:8,17 120:23 122:6,8 124:1,16 127:21,23 139:3 143:10 144:4 144:6,12,25 147:6 148:12 149:17,25 151:9 155:18 158:12 166:8,20 169:10 171:22 172:7 176:21 179:9 180:12 181:23 188:18 189:10 193:12 197:23 199:12 203:8 204:8 205:2,8 206:25 207:2,2,3,20 208:23 209:2 210:12 211:23 216:3 219:25 224:14 228:1 229:9,12 230:5 233:12 239:14 242:5 243:1 244:16,22 245:7,11 246:5,6 247:10 248:17,22 251:21 251:21,23,24 252:1 252:3,10 253:9,11 258:23 259:12 261:14 263:14 264:14
**timeline** 4:1 11:21 12:14 117:13
**timely** 61:19
**times** 44:4 50:18 65:5 65:24 66:17 87:5 99:16 145:17 157:15,19 166:4 176:18 184:21 200:9 201:12 202:23 205:5,11,16 205:17,20 252:7 254:10
**timing** 80:6 117:10 117:15,19,19 118:3 126:22,22 127:6,10 127:15 128:1 180:6
**Tina** 181:1,4
**tips** 77:18
**title** 40:15 41:22 45:10 54:7,8 58:9 58:10,18 69:24 74:1 82:19 84:13 97:7 143:5 157:20 166:5 170:22 179:15 249:13 254:20 257:8,23
**titled** 108:18
**titles** 88:24
**TMMI** 69:12,13 70:5 143:13 144:22
**TMMK** 55:11,13 56:15
**today** 7:14 21:13 222:5 231:5
**today's** 6:6 11:2 12:20 13:21
**told** 20:17 21:2 40:1 73:3 115:22 117:10 119:11,14 122:22 123:6 156:10,15 157:14,16 159:2 167:8 171:25,25 174:20 177:5 180:10,11 182:7,12 185:22 187:9 198:24 200:3,22 202:3,19 203:8 207:17,18 208:18 209:1,4 231:21 232:24 234:1,8 238:23 241:6 245:18 248:1 251:11,12 253:4,7
**Toledo** 258:7
**tone** 237:6
**tools** 52:15 250:14
**top** 51:18 63:11 74:6 130:23 132:7,10,16 155:25 156:4 193:9 204:23 208:7 215:25 220:23 221:17,21 236:21 261:6
**topic** 31:2 213:16
**topics** 262:24
**total** 75:13 115:21 250:16
**tough** 258:6
**Tower** 2:5 6:10
**Toyota** 41:11,13,15 41:17 43:4 45:6,9 45:11,15 46:12 48:7 53:25 57:23 61:17 68:20 69:13,16 70:18 72:21 73:25 74:10 75:6 76:13 79:4,15 81:2,5,17 82:5,8,11,14 86:22 87:15 91:1,9,12,18 92:8,15,24 98:22,24 101:12 121:2 143:13 186:4,5 225:24,25 226:4,9
**track** 62:1,7
**tracking** 60:9,17 61:14 64:3
**traffic** 19:22
**train** 55:25,25 56:22
**training** 36:1 52:5,7 53:4 54:14,22 58:5 67:16,23 68:5 88:3 88:7,12,13,21 94:25 95:3 98:13 102:24 141:23 164:22 165:11 233:2 234:5 234:10,25 235:1,3 253:2 256:24,25 257:22,24 258:1
**transaction** 214:6

**transcript** 4:25 8:19 10:2 28:6 266:6,9 267:5,12
**transcript's** 222:3
**transfer** 205:9
**transferred** 46:15 53:25 91:23,24 201:17
**traveling** 20:4
**treated** 124:4 149:1 158:18 159:13 169:8,25 170:17,18 182:22,24 184:9,24 185:22 186:13
**treating** 43:9 101:6 163:11 183:11
**treatment** 101:5,16 102:9 119:19 120:24 233:22,22 243:3
**treatments** 244:4
**tremendous** 45:24 99:19,22,24 100:12
**tremendously** 94:3 184:14
**trial** 5:15 6:4
**trick** 90:13
**tried** 257:10,20
**trip** 159:8 164:2 166:13,14 167:6 232:24 233:2
**Troup** 22:12,16,18
**true** 77:16 108:25 134:16 152:21 163:12 239:19,21 241:7,15 253:8 261:23 266:9
**trust** 208:19
**truthful** 10:3,20,25 218:10
**try** 233:5 244:14 257:18
**trying** 32:25 60:20 80:15 90:14 111:2 155:9 162:25 204:4 257:7
**turn** 33:7 131:18 208:8
**turned** 11:20,21
**twice** 227:25 252:9
**twisted** 208:5
**two** 16:3 18:8 21:25 22:4 23:6 33:3,7 37:25 41:9 46:19 47:14 50:17 57:9,12 57:18,20 61:25 63:7 63:23 67:17 69:6,7 70:23 75:21 78:20 78:21 83:17,18 84:12 85:21 89:10 89:22,25 90:5,15,16 90:20 104:21 108:10 110:4 111:9 111:11,12 115:23 117:2 121:25 123:11,13,22 130:23 132:6,10,16 136:3,13 137:14 142:1 144:11 145:5 155:23 156:3 164:6 164:20 169:16,21 170:3 183:8 192:17 193:21 216:13 217:5 218:13 232:24 234:11 241:10 251:12 252:25 260:1 262:11
**two-page** 78:14 108:6 135:20 191:7 214:21 226:19
**two-week** 34:12
**Tyler** 3:20 69:4,10 70:2 72:1,3,19 85:4 85:20 95:24 97:6 111:23 113:21 114:7,10,14 115:5 116:7 122:10 126:13 133:6,23 139:11,13,14 140:8 140:10 141:9,24 142:14 143:8,25 144:21 145:1,8 147:3,23,25 148:3 148:12 157:18,24 172:8 178:9,21 180:13 187:17,22 191:11,21 194:5,13 195:6,15 196:13 205:23 207:9,21 234:1,1 236:17,21 237:2 246:17,20 247:2 255:20
**Tyler's** 69:16 111:21 124:17 136:6,7,14 136:17 139:7 141:21 143:23
**type** 40:22 49:19 62:23 63:19 101:1 102:4 107:15 118:12 170:7 173:23 188:19 243:14
**typed** 153:9 156:1
**types** 57:14 59:3,7,11 63:15 171:20 241:19
**typewriting** 266:8
**typewritten** 133:12
**typically** 57:5 159:17 172:13 203:20

**U**

**U.S** 24:1,7 160:24 161:2,5 164:13 165:22 176:6 186:22 215:1 234:9 235:4,6,9 236:2 265:8,9,10,13,18
**ugly** 235:17,18
**Uh-huh** 5:11 49:7 50:4 53:16 65:16 152:14 206:20 210:2
**Uh-uh** 130:10 140:4 206:21
**uhmm** 53:11 130:4 215:13 234:15
**ultimately** 103:17 172:22 176:10 185:7 233:6 235:20
**umbrella** 197:23
**unclear** 220:6
**uncomfortable** 43:16 168:10 170:11 184:8
**uncommon** 192:11 196:18
**uncontested** 19:6,10
**underneath** 74:20 111:16
**understand** 7:19,21 7:22 9:23 10:5,7,13 10:19,24 34:22 43:19 48:16 57:7 58:8,16 59:15 65:10 66:1 72:4 74:14,15 74:17 76:6 88:1 90:14 92:18 105:8 111:11,22 115:7,13 117:8 124:5 127:14 130:14 134:19 139:2 159:2,7 161:22 162:2 175:4 175:9 182:10 187:4 187:16 205:16 211:12 252:1 256:25 258:2 261:15
**understanding** 39:12 42:8,12 65:18 72:11 72:14 90:1,4 98:3 110:25 116:25 134:5 149:4 166:5 189:14,18 190:22 194:9 239:18 257:5
**understood** 23:9 60:25 61:5,12 62:15 65:12 66:1,8 70:14 71:1 72:25 134:10 144:16 146:5 166:19 215:22 223:2
**undertake** 122:2
**unexcused** 66:13
**unfamiliar** 31:15 36:16
**Unfortunately** 215:8
**unhappy** 200:23
**uniform** 99:23
**unique** 14:25 48:10 89:11,12
**United** 1:1 23:13 25:2 49:4 149:18,23 161:25 167:11
**university** 30:14

**unofficially** 215:7,9
**unpaid** 35:15 36:2
**unquote** 127:10,15 142:18
**untrue** 239:24
**upcoming** 81:6
**updating** 99:10
**upgraded** 151:24
**upset** 20:23 152:24 162:19 202:25 233:9 256:9 261:18 262:14
**upsetting** 163:8
**upstairs** 206:7
**use** 6:3 10:10 51:9 61:20 71:16,18 88:11 160:4 182:14 211:3 229:2,5,9,12 229:15,23 234:24 262:20
**USI** 31:4
**usual** 265:18
**usually** 137:20 196:20 241:5
**utilization** 93:18
**utilize** 26:1 65:2 221:3 229:19 234:7
**utilized** 16:4 250:15 250:25 251:3
**utilizing** 169:22

**V**

**vacation** 13:8,10 71:21 262:1
**vague** 44:15 72:8 128:13
**values** 138:20
**variety** 243:8,18
**various** 38:18
**vary** 62:22
**vehicle** 94:9 99:2 165:3 229:2,5,8,10 229:13,16,19,20,23
**verbatim** 7:25
**verbiage** 250:19
**Verizon** 25:22 26:7 26:13 27:21
**version** 251:6
**versions** 251:12
**versus** 31:3 53:4 57:22 63:2 185:25 201:14
**veterans** 167:25 168:3,3
**vice** 6:23 48:2
**victim** 156:23 157:6 161:23 237:14 238:11
**VII** 170:22 257:9,23
**Vineyard** 9:8
**Vineyard's** 5:14
**violated** 261:21
**violation** 19:22 101:4
**violations** 59:13 202:25 203:14
**Virginia** 20:5
**visibly** 233:9
**vision** 250:12,17
**visit** 181:5
**visited** 235:4
**visual** 60:8 61:14,16 61:20 62:14 64:2 250:16,17
**voice** 116:23 173:11 175:6,21,24 181:21 184:12,16 189:25
**voiced** 116:24 184:13
**voicing** 198:10
**volume** 92:17,18
**vs** 1:5

**W**

**W** 2:9
**W-2** 3:9 77:4,16 78:2 80:20,21
**wage** 36:22
**wages** 77:18
**wagon** 166:22
**wait** 8:20 9:5 218:14 219:14 256:14
**waited** 264:3,3
**waiting** 8:22 72:23
**Walker** 2:15 6:25
**walking** 238:22,23
**want** 10:4 11:9 14:6 19:10 50:19 53:15 61:25 75:20 104:19 109:16 141:12 143:18 176:10,13 185:11 194:19 232:6 246:12 257:21 263:11
**wanted** 19:11 39:21 60:8,13 72:9 80:1 88:17 104:23 121:9 174:13,22 186:11 186:14 192:13 231:25 232:2 240:24 256:18,21 262:17
**wants** 9:10
**wasn't** 19:14 20:20 38:2 47:20 60:11 82:18 97:21 117:9,9 119:7 127:5 140:10 158:22 170:9 173:11 195:19 235:23 248:5 255:9 258:5,22 260:25 263:2
**watching** 61:18 182:8 182:8,13,13
**Watson** 126:14 139:16 215:23
**wave** 247:20
**way** 61:23 62:13 65:4 67:3 80:6 93:16 101:6 124:3,6 139:22 142:4 149:1 154:18 159:13 162:17 163:11 169:25 170:17 180:16 182:6,21 184:4,23 190:17 198:10,23 199:1,13 205:14 226:2 233:8 234:7 245:7,11 249:3 250:6,8,23 257:18 259:4 260:21 263:8
**ways** 260:1
**we'll** 9:13,14 11:20 248:9,15
**we're** 8:6 9:19 49:3 65:17,18 154:13 221:21 253:9 264:12,21
**we've** 7:13 19:23 21:24,24 25:2,5,12 76:19 139:23 141:13 191:6 194:16
**weaknesses** 254:7
**wear** 234:18
**Webb** 194:5,13 195:6 208:8 251:11,12 261:10
**Wednesday** 177:25
**week** 36:23 75:5 165:10
**weekend** 49:20 159:10 164:4 165:2 165:4,7 167:7
**weekly** 145:14
**weeks** 63:23 121:25 123:5,7 232:24 242:25
**welcome** 166:22
**welcomed** 165:9
**went** 20:7 29:13 51:16,20 53:8 54:10 54:13 60:16 64:23 65:3 67:7 68:20 71:21 82:9 88:18 91:12 107:15 119:9 119:16 120:9 124:14 151:7,8 164:5,19,21,22,24 165:4,8 167:21 181:16 183:24,24 226:9 228:2,3 248:24 254:5
**weren't** 158:4 170:16 174:11 241:15 247:24
**Wesleyan** 29:15,17 30:11
**West** 2:16 73:6
**Western** 29:13,14
**wife's** 22:9
**Wilbanks** 176:2
**William** 16:16
**Williams** 83:11,20 96:12 124:1 175:17 185:10 198:24 201:4 202:7 205:22

216:1,2 236:6 239:18,24 241:3,13 242:4 252:15
**willing** 232:11 258:5
**willingness** 186:8
**Winchester** 17:7,14 18:6 27:23
**wings** 57:10
**wish** 27:24 240:24
**wishes** 5:9
**witness** 5:20 10:8 14:11 17:3 25:8 27:15 29:4 37:13 48:14 49:10 79:21 80:2 93:5 107:3 131:23 132:9 135:14 147:9 155:20 156:9 192:6 193:21 211:19 212:24 223:9,19,24 232:21 238:18 255:4,4 261:7
**witnessed** 232:16 233:25 234:2 239:14
**witnesses** 231:4
**woman** 119:1,5 124:18 164:9 165:6 165:7,19 182:5,12 182:23 184:10 233:11,13 234:16 253:2
**women** 83:12 119:4 119:10,12 164:15 164:18,20 178:6 181:19 192:19,22 208:10 247:20
**word** 10:11 51:9 61:14 68:14 70:11 71:2,16,17,18 72:7 72:11,15 88:11 105:21 108:11 110:14 157:9 160:4 261:17
**words** 159:6 192:8 203:12 246:16
**wore** 183:14
**work** 13:8 26:1,3,5 26:14 31:22 36:25 38:8,10 39:18 41:14 41:17 42:22,23 46:23 47:23 51:24 56:21 58:2 59:11 70:1 73:1,3 82:14 87:3,7,10 88:16 89:24 94:4 139:19 149:16 162:18 180:6 183:16,17,18 194:9 200:24 203:18 226:13 237:17 238:25 250:18 251:20
**work-related** 234:20
**worked** 36:23 37:21 37:21,24 47:24,25 48:1,8 49:1 54:2 57:24 61:1 69:18 87:4,12 88:24 97:22 101:23 104:1 110:24 124:1 125:25 144:22 153:6 156:18 159:1 174:19 190:10 205:19 213:19 233:5 237:18 238:1 240:23 252:2,5
**workforce** 89:21
**working** 20:4 40:8,10 47:6,7 48:11,19 49:5 54:1,11 56:4 59:21 69:11 70:20 72:21 73:13 74:10 79:2 82:16 92:4 94:21 113:17 121:3 128:19 144:18 186:9 203:6,11 250:6 259:19 262:21,23
**workplace** 88:2
**worldwide** 87:8,10
**wouldn't** 105:10 130:11 145:14 160:19 186:18 202:3 237:7 262:15
**wound** 218:19
**write** 134:2 178:7 253:17,18
**writing** 171:21
**written** 64:23 65:14 66:14 99:3,17 266:19
**written-in** 131:24 132:1
**wrong** 91:7 156:5 223:21 246:23
**wrote** 134:8

**X**

**Y**

**y'all** 62:16 146:18
**Y-I** 183:8
**yeah** 14:12 132:12 156:21 191:1 202:8 211:18 219:25 246:24 255:9
**year** 32:8,22 33:3 45:7 46:12 50:24 60:7,15 61:1,10,11 67:5 74:24 75:8,12 77:6 80:12,15,23 81:6,16 94:6 97:8 118:5 121:23 145:11,18 146:7 180:12 225:7,17 226:14 227:12,15 229:24 253:12
**years** 15:1 17:16 18:2 18:23 26:8 29:14 31:24 33:3,3,4 37:25 38:9 39:19 41:9 46:20 69:12 241:11 251:2
**yelled** 159:2 161:13 161:14,18 162:2,7 162:10,15
**yelling** 162:4 167:5,6 234:3
**yellow** 62:6,8 63:18
**Yep** 28:7
**yesterday** 255:3
**Yi** 183:6,7,8,12,16,17 183:18,25
**Yi's** 184:6
**Yoo** 163:1 165:3 166:22 172:8 182:8 182:13 187:14,17 249:15
**Yoo's** 249:19
**young** 24:9,23 119:10 119:11 181:18 183:13 202:4,5 253:2
**Youngblood** 182:20 184:20

**Z**

**0**

[redacted]

[redacted]

[redacted]

EXHIBIT
1
7-22-15

| KIA MOTORS MANUFACTURING GEORGIA | GENERAL EMPLOYMENT APPLICATION | KR-GA-HR-EMP-F-00001 |
|---|---|---|
| Revision Date: 01-May-07 | Owner: Assistant Manager, Employment | Revision Level: 00 |

# Employment Application

Name: Andrea L. Gogel

Position Desired: EMPLOYEE RELATIONS MGR.

Application Date: 1-25-08

Applicant Notice

Kia Motors Manufacturing Georgia, Inc. ("KMMG") fully complies with the spirit and intent of laws regarding non-discrimination for employment because of sex, race, color, religion, national origin, age, disability, veteran status or any other lawfully protected classification.

The questions on this form are designed to assist you in your proper placement. Please be accurate in filling out this application. KMMG verifies work history, compensation, criminal background information, and educational information.

## KIA Motors Manufacturing Georgia, Inc

| KIA MOTORS MANUFACTURING GEORGIA | GENERAL EMPLOYMENT APPLICATION | KR-GA-HR-EMP-F-00001 |
|---|---|---|
| Revision Date: 01-May-07 | Owner: Assistant Manager, Employment | Revision Level: 00 |

## PERSONAL

LAST NAME: Gogel FIRST NAME: Andrea MIDDLE NAME: Lenora

CURRENT ADDRESS (Number and Street): [redacted]

CITY: Winchester STATE: KY ZIP: 40391

HOME PHONE: [redacted] ALTERNATE PHONE NUMBER: [redacted] SOCIAL SECURITY NUMBER: [redacted] DRIVER'S LICENSE NO/EXP DATE/STATE: [redacted]

NOTIFY IN EMERGENCY: NAME: Tom Gogel ADDRESS: [redacted] Winchester, KY PHONE: [redacted]

ARE YOU UNDER 18 YEARS OF AGE? ☐ YES ☒ NO

WHAT CAUSED YOU TO SEEK EMPLOYMENT AT KMMG? ☐ ADVERTISEMENT ☒ REFERRAL ☐ OTHER (Specify):
REFERRED BY: Bob Tyler

GIVE THE NAMES AND RELATIONSHIPS OF ANY RELATIVES WHO ARE WORKING OR APPLYING FOR WORK WITH KMMG (information used for proper placement)

HAVE YOU EVER BEEN CONVICTED OF A FELONY? ☒ NO ☐ YES IF "YES", PLEASE EXPLAIN:
(A conviction may not necessarily disqualify you from the job applied for)

DO YOU KNOW OF ANY REASON WHY YOU WOULD NOT BE ABLE TO PERFORM THE VARIOUS FUNCTIONS OF THE JOB YOU ARE SEEKING? ☒ NO ☐ YES IF "YES", EXPLAIN:

IF APPLICABLE, WHAT SOFTWARE PACKAGES ARE YOU PROFICIENT IN? Word, Excel, Powerpoint, Visio, Lotus Notes

CAN YOU TYPE? ☐ NO ☒ YES ______ WPM

## CAREER OBJECTIVES

POSITION DESIRED 1st CHOICE: EMPLOYEE REL. MGR. 2nd CHOICE:

OTHER POSITIONS FOR WHICH YOU ARE QUALIFIED: HUMAN RESOURCES RELATED

HAVE YOU WORKED FOR OUR COMPANY BEFORE? ☐ YES (If "Yes", state date left): ______ ☒ NO

ABILITIES, INTERESTS, HOBBIES, OR PERSONAL ASSOCIATIONS THAT WHICH YOU BELIEVE WILL ASSIST US IN EVALUATING YOUR APPLICATION (OPTIONAL)
Cert. Sherpa Coach
SHRM

## EDUCATION

| CIRCLE HIGHEST GRADE COMPLETED IN EACH SCHOOL GRADE CATEGORY | SCHOOL | LOCATION | MAJOR/DEGREE | DID YOU GRADUATE? | GRADE PT. AVE. |
|---|---|---|---|---|---|
| HIGH SCHOOL 9 10 11 (12) | PERRY CENTRAL H.S. | LEOPOLD, INDIANA | ACADEMIC | YES | 3 |
| COLLEGE 1 2 3 (4) | Ky WESLEYAN COLLEGE | OWENSBORO, KY | BA- HR ADM. SOCIOLOGY | YES | 2.8 |
| GRADUATE SCHOOL 1 2 3 4 | | | | | |
| APPRENTICE, BUSINESS OR VOCATIONAL SCHOOL NO. OF YEARS 1 2 3 4 | | | | | |
| OTHER TRAINING OR SKILLS (Special Courses, Military Training, if appropriate) | | | | | |

| KIA MOTORS MANUFACTURING GEORGIA | GENERAL EMPLOYMENT APPLICATION | KR-GA-HR-EMP-F-00001 |
|---|---|---|
| Revision Date: 01-May-07 | Owner: Assistant Manager, Employment | Revision Level: 00 |

## PREVIOUS EMPLOYMENT

LIST ALL JOBS AND ACTIVITIES (INCLUDING FULL-TIME, PART-TIME EMPLOYMENT WHILE IN SCHOOL, AND SELF-EMPLOYMENT). BEGIN WITH MOST RECENT.
DO NOT REFERENCE A RESUME.
PLEASE LIST ALL PERIODS OF UNEMPLOYMENT IN SPACE AT BOTTOM OF PAGE
MAY WE CONTACT YOUR PRESENT EMPLOYER? ☐ YES ☒ NO

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| 9-97 | present | TOYOTA | 502-868-2000 | |
| | | STREET ADDRESS: 1001 Cherry Blossom Way | | |
| BASE RATE OF PAY* START: 44K | FINAL: 93K | CITY: Georgetown | STATE: KY ZIP: 42340 | |
| | | YOUR TITLE AND JOB DUTIES: HR ASSISTANT MGR | | |
| OTHER CONSIDERATIONS: $19 - bonus $10+ OT | | NAME AND TITLE OF SUPERVISOR: Craig Gruzza, Gen. Mgr HR | | |

[redacted]

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| 10-91 | 8-95 | PERRY County Mem. Hosp. | 812-547-0150 | Better opportunity - desire to be in Manufacturing |
| | | STREET ADDRESS | | |
| BASE RATE OF PAY* START: [redacted] | FINAL: [redacted] | CITY: Tell City | STATE: IN ZIP: 47586 | |
| | | YOUR TITLE AND JOB DUTIES: HR COORDINATOR | | |
| OTHER CONSIDERATIONS | | NAME AND TITLE OF SUPERVISOR: SHEILA BAYNOR, HR DIRECTOR | | |

[redacted]

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| | | STREET ADDRESS | | |
| BASE RATE OF PAY* START | FINAL | CITY | STATE ZIP | |
| | | YOUR TITLE AND JOB DUTIES | | |
| OTHER CONSIDERATIONS | | NAME AND TITLE OF SUPERVISOR | | |

PERIODS OF UNEMPLOYMENT: None after 10-91 - when grad. from college

*BASE PAY IS YOUR BASIC RATE OF PAY EXCLUDING OVERTIME PREMIUMS, SPECIAL BONUSES OR ALLOWANCES. IF SIGNIFICANT, PLEASE LIST UNDER "OTHER CONSIDERATIONS."
IF YOUR NUMBER OF PREVIOUS EMPLOYMENT LISTINGS IS MORE THAN FIVE, PLEASE ADD SUPPLEMENTAL PAGES AS NEEDED.

## PROFESSIONAL REFERENCES



CONFIDENTIAL 

| KIA MOTORS MANUFACTURING GEORGIA | GENERAL EMPLOYMENT APPLICATION | KR-GA-HR-EMP-F-00001 |
|---|---|---|
| Revision Date: 01-May-07 | Owner: Assistant Manager, Employment | Revision Level: 00 |

PLEASE LIST FORMER SUPERVISORS AND/OR ASSOCIATES WHO ARE ACQUAINTED WITH YOUR PROFESSIONAL QUALIFICATIONS AND WHO MAY BE CONTACTED FOR REFERENCES.

| NAME | ORGANIZATION | TITLE |
|---|---|---|
| Tony Dillon | Toyota Motor Mfg. Ind. | HR Manager |
| HOME PHONE: ( ) | BUSINESS PHONE: (812) 387-2000 | PROFESSIONAL RELATIONSHIP: Prev. Mgr. |
| [redacted] | | |
| NAME | ORGANIZATION | TITLE |
| Sheila Gaynor | Perry County Mem. Hosp. | HR Director |
| HOME PHONE: ( ) | BUSINESS PHONE: (812) 547-0150 | PROFESSIONAL RELATIONSHIP: Prev. Mgr. |

## PROFESSIONAL/TECHNICAL LICENSES, REGISTRATIONS AND/OR CERTIFICATIONS

| TYPE | STATE ISSUED | DATE | NUMBER |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

## OPERATING A COMPANY OWNED VEHICLE

Consistent with KMMG's objective of promoting safety and safeguarding its company assets, employees who lease and/or operate any Company-owned or provided vehicle (hereinafter "Vehicle"), including, but not limited to, those who are required to operate a Vehicle to perform their job functions, must meet, maintain, and follow all requirements, including driving eligibility requirements, in KMMG's Vehicle Services Policies and Procedures Manual and Kia Motors America's ("KMA") relevant policy manual. KMMG will periodically review the driving record of any employee who operates a Vehicle. If it is shown that an employee's driving record contains accidents and/or violations that exceed applicable standards, the employee will not be permitted to drive a Vehicle.

Your driving record will be reviewed through the appropriate state agency. If your job requires you to drive a Vehicle, and you meet all other job-related requirements of the position, any job offer made to you will be contingent on the fact that your driving record conforms to applicable standards.

You agree to pay any lease charge by payroll deduction. Any money owed KMMG or KMA, due to damage to a Vehicle or unpaid lease payments, may be deducted from your paycheck.

[signature] 1-25-08

Signature of Applicant Date

## CERTIFICATION

I hereby certify that the entries on this form and any other statements made by me to Kia Motors Manufacturing Georgia, Inc are, in connection with my application for employment, true and correct. Any material omissions or misstatements are grounds for non-selection or termination.

I understand that if an offer of employment is made, it is contingent upon my submitting documentation of my legal right to work in the United States.

I agree to submit to a physical examination and drug screen. I also authorize KMMG to request from my former employers, and any other source, any information that KMMG may lawfully seek in considering my application for employment, and I hereby release KMMG, and such other employers or sources from any liability whatsoever for requesting and/or providing such information. I UNDERSTAND THAT I WILL BE SUBJECT TO DISMISSAL IF ANYTHING IN THIS APPLICATION IS FOUND TO BE FALSE.

In consideration of any employment, I agree to conform to the rules and regulations of KMMG. I UNDERSTAND THAT MY EMPLOYMENT AND COMPENSATION IS AT WILL, AND CAN BE TERMINATED WITHOUT CAUSE OR NOTICE AT ANY TIME AT THE OPTION OF MYSELF OR KMMG. I understand that no employee or representative of KMMG, other than the President, has any authority to authorize an agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.

[signature] 1-25-08

Signature of Applicant Date

Kia Motors Manufacturing Georgia, 1302 Orchard Hill Rd. LaGrange, GA 30240

EXHIBIT
2


# Andrea L. Gogel, SPHR

[redacted]
Winchester, Kentucky 40391

Phone: [redacted]
Email: [redacted]


## OBJECTIVE

Manager level role in the field of Human Resources where I can utilize and build upon my skills and experience in the automotive industry. I seek to have a positive influence on employee relations and hence a positive impact on the bottom line.

## WORK HISTORY

***TOYOTA MOTOR MANUFACTURING***

***Assistant Human Resources Manager, TMMK 2004-present***

*Body Operations HR Team 2005-present*

Manage HR functions within the 1500 employee Body Shop across three shifts, which includes employee relations, development, with a special emphasis on development of the skilled work force. 4 direct reports.

*Investigations Team 2004-2005*

Manage a five person team, which was responsible for all investigations of policy violations across the site.

***Assistant Human Resources Manager, TMMI 2001-2004***

Staffing and Training and Development in location with 4800 employees. 8 direct reports. Area encompassed hiring, both production and salaried; internal promotion and transfer systems; workforce planning; training, development and succession; performance management; and diversity initiatives.

***Team Member Relations Specialist, TMMI 1999-2000***

Involved in all facets of Employee Relations, including team member issues, FMLA, ADA and Corrective Action. Project work included coordination of TMMI's first Opinion Survey and Quarterly Business Review Communication.

***Employee Relations Specialist, TMMK 1997-1999***

Maintained positive employee relations and was specifically assigned to second shift for six month period to train and develop new Group Leaders and Assistant Managers.

***HUMAN RESOURCES MANAGER, National Office Furniture 1995-1997***

Responsible for all aspects of HR Management within a 250 employee manufacturing facility. Implemented training program for ISO 9000 certification. Implemented applicant screening program to support a 60% increase in workforce.

***HUMAN RESOURCES COORDINATOR, Perry County Memorial Hospital 1991-1995***

Generalist duties, including Payroll, Benefits Administration, and Worker's Compensation.

## EDUCATION

**B.A., Kentucky Wesleyan College**

Majors: Human Resources Administration
Sociology

CONFIDENTIAL

EXHIBIT
4

KIA Motors Manufacturing Georgia, Inc.
1302 Orchard Hill Road, LaGrange, Georgia 30240
TEL: 706-298-4800 FAX: 706-298-4986

February 13, 2008

Confidential

Andrea Gogel
[redacted]
Winchester, KY 40391

Dear Andrea:

On behalf of Kia Motors Manufacturing Georgia, Inc. (KMMG) it is my pleasure to extend an offer of employment to you for the position of Manager, Team Relations; reporting to the Director, Human Resources.

The terms and conditions of this offer are as follows:

1. Your beginning base salary will be $115,000 annually.
2. You will be eligible for company benefit plans, including group Health Insurance. I have attached a benefit summary for your review. Your group Health insurance will go into effect on the first day of employment.
3. You will receive a $20,000 sign-on bonus (after 90 days of service and in accordance with the payroll processing schedule).
4. You will be eligible for 8 Paid Time Off (PTO) days which must be used by the end of the calendar year.
5. You are also eligible for all remaining paid holidays for the rest of this year.
6. This offer is contingent upon verification of both the information listed on your employment application and the results of your drug screen. To verify your current salary, KMMG requires recent pay stubs and/or W-2 forms.
7. This offer of employment is made with the understanding that you will complete the "Employment Eligibility Verification" Form (I-9) and provide proof of appropriate identification documents on your first day of employment.

Please note that no individual has the authority to make any contrary agreement or representation. While KMMG has every hope that the employment relationship will be mutually beneficial and rewarding, team members and the Company retain the right to terminate the employment relationship at will, at any time, with or without cause. Accordingly, this constitutes a final and fully binding, integrated agreement with respect to the at-will nature of the employment relationship.

KIA Motors Manufacturing Georgia, Inc.
1302 Orchard Hill Road, LaGrange, Georgia 30240
TEL: 706-298-4800 FAX: 706-298-4986

This offer will remain open until February 20, 2008. If you decide to accept our offer, as we hope you will, please acknowledge your understanding and acceptance of the offer by signing the original of this letter in the space indicated below and returning it to Human Resources along with verification of your current salary. Submissions may be made either in person or via mail, fax, or (scanned) email.

If you have any questions or need clarification of any of these terms or conditions, please do not hesitate to contact Mandi Modling at (706) 298-4823 or amanda.modling@kmmgusa.com.

On behalf of Kia Motors Manufacturing Georgia we look forward to working with you.

Sincerely,

**J. Randy Jackson, J.D.**
**Director, Human Resources**

OFFER ACCEPTED:

Andrea Gogel 2-13-08
Date

3-17-08
Availability Date

EXHIBIT
5

# Kia Motors Manufacturing Georgia
## Job Description

| | |
|---|---|
| **Job Title/Dept.:** | Manager, Team Relations |
| **Job Classification:** | Manager |
| **FLSA Status:** | Exempt |
| **Reports to:** | Sr. Manager |
| **Division:** | HR |
| **Dept./Section:** | Team Relations |
| **Cost Center:** | K3500 |

| HR Only | |
|---|---|
| Control # | KMMG-JD-HR-TR-MGR-S-003 |
| Owner | Compensation |
| Revision Level | 01 |
| Revision Date | 8-May-10 |

**General Summary:**
Responsible for leading and directing the Team Member Relations and Supplier Support programs and functions. Plans and implements key activities to promote high team member morale and prevent unwelcomed activity within both KMMG and KMMG Suppliers.

**ESSENTIAL DUTIES and RESPONSIBILITIES** (including but not limited to accountabilities below):

- Pro-actively monitor and assess outcomes of investigations, working conditions, corrective actions, and team member concerns, and make recommendations for policy and procedure enhancements to address such concerns
- Supervise and provide daily direction to a staff of human resource professionals
- Develop plan/strategy and timelines on how to resolve Team Relations issues and keep all appropriate parties informed of status
- Build and maintain cross organizational relationships to foster collection of information from various departments, as well as providing management coaching opportunities
- Ensure effective plant-wide communication practices
- Supervise and provide direction to staff engaged in developing and administering policies and procedures, as well as ensuring consistency and fairness for all team members
- Develop HR key performance indicator system and manage for continuous improvement
- Educate management on union avoidance best practices and techniques, and fair and equitable employment practices within the industry and region
- Maintain most up to date knowledge and information base regarding on-going changes and conditions which impact Team relations within the automotive industry

The above typical duties are characteristic of this job and demonstrate a level of difficulty and are not intended to list or limit the duties that may be required or assigned to a team member in this classification.

**QUALIFICATIONS and JOB REQUIREMENTS** (Education and Experience):

- Bachelor Degree in Human Resources Management or a related field, along with eight (8) years of progressive employee relations and/or human resource management experience in a manufacturing setting (preferably automotive OEM or supplier), or an equivalent combination of education and experience
- Professional certification or designation (i.e., SPHR, GPHR) reflecting advanced working knowledge and continuing education in the Human Resources profession is preferred
- Three (3) to five (5) years of experience in a related area in a leadership or supervisory role
- Must possess considerable knowledge and experience with Team Relations and union avoidance strategies within the automotive industry
- Must be able to research information and analyze data to arrive at valid conclusions, recommendations, and plans of action
- Must be able to assemble comprehensive reports and represent ideas clearly and concisely, both orally and in writing
- Must have the ability to exercise considerable judgment and discretion in establishing and maintaining good working relationships
- Must have working knowledge of federal and state labor laws (NLRA, FLSA, ADA, FMLA,TITLE VII)



CONFIDENTIAL

Reasonable accommodations may be made to those who are able to perform the essential duties of the job.

COMPETENCY REQUIREMENTS:

| | |
|---|---|
| **KMMG Leadership Competencies** | |
| ***Interpersonal Skills***-Effectively solves problems and conflicts with his or her peers. Demonstrated they have built effective relationships with supervisors and reporting staff. | ***Mentoring/Coaching/Developing***-Developing subordinates' skills and competencies by planning effective development activities related to current and future jobs. |
| ***Leads Change***-Creating a desired future state through helping others see, and emotionally feel, how things can be different (and better). Using appropriate interpersonal styles and methods to inspire and guide individuals (subordinates, peers, and superiors) toward goal achievement; modifying behavior to accommodate tasks, situations, and individuals involved. | ***Decision Making***-Committing to an action after developing alternative courses of action that are based on logical assumptions and factual information and that take into consideration resources, constraints, and organizational values. |
| ***Selecting "A" Players***-What the individual does to ensure they hire the best candidates for their department | ***Performance Management***-Removing of non-performers. |
| **KMMG Core Competencies** | |
| ***Tenacity / Work Standards***-Staying with a position or plan of action until the desired objective is obtained or is no longer reasonably attainable. Setting high standards of performance for self and others; assuming responsibility and accountability for successfully completing assignments or tasks; self-imposing standards of excellence rather than having standards imposed. | ***Cooperation***-Effectively integrates one's contribution with that of others throughout the organization to complete work and improve business processes. Places common team and/or organizational results above individual results. Committed to team and organizational objectives. Carries own share of work and helps others. Makes internal customers and their needs a primary focus of one's actions: develops and sustains productive customer relationships. |
| ***Create the New and Different (Innovation)***-Generating innovative solutions in work situations; trying different and novel ways to deal with work problems and opportunities. | ***Multi-Tasking***-Organizing one's own work activities and using personal time management techniques to meet deadlines. Achieving work objectives in a systematic, efficient, and timely manner. Keeping one's work area orderly and organized. Selecting and organizing the appropriate resources needed to achieve work objectives. |
| ***Problem Solving***-Takes a broad ("big picture") approach when making decisions and solving problems. Makes connections between current actions and future consequences. | ***Adaptability/Flexibility***-Maintaining effectiveness when experiencing major changes in work tasks or the work environment; adjusting effectively to work within new work structures, processes, requirements, or cultures. |
| ***Integrity, Trust, & Respect***-Meets commitments, deadlines, and promises. Actions are aligned with company values, principles and ethics. Understands the impact of own behavior on others. Treats others fairly and equitably. Establishes a reputation for honesty, reliability and unwavering passion to be trustworthy. Articulates personal and company values in both words and actions. Treats others with dignity, respect and compassion. Maintains an expectation that others are trustworthy. | |
| **KMMG Job Competencies** | |
| ***Inter-personal Skill***-Considerately understanding other people's perspectives by showing interest in their motivations, emotions, situations, etc. | ***Service Orientation***-Thinking in a perspective manner to satisfy and optimize the values of service recipients; to show proactive willingness for improving service quality and application timing. |



CONFIDENTIAL

*Compliance*-With a foundation of strong and visible corporate ethics, avoiding immoral methods and self benefiting advantages; clear and direct task executions based on corporate regulations and procedures.

*Routine Job Duties*-Carries out the standard duties and responsibilities for the position, displays and uses technical or functional expertise to get the work done, maintains expected quality and quantity standards, minimizes mistakes, reliable, maintains company standards for attendance, and seeks out new work challenges and improvements.

*Communication*-Clearly understanding fellow associates and efficiently conveying one's thoughts using adequate communication channels and methods.

SPECIALIZED SKILLS AND KNOWLEDGE REQUIRED

- Experience working with word processor, spreadsheet, database, desktop publishing, and presentation applications and/or software

Acknowledgement:

Team Member Date Supervisor Date

❖ **KMMG reserves the right to revise this Job Description, as it deems necessary.**



CONFIDENTIAL

EXHIBIT
10

Tyler, Bob KMMG/HR

| | |
|---|---|
| From: | Tyler, Bob KMMG/HR |
| Sent: | Wednesday, March 11, 2009 7:13 AM |
| To: | KMMG ALL |
| Subject: | KMMG Organizational Announcement |
| Attachments: | KMMG Organizational Announcement 3-11-09.pdf; KMMG Organizational Announcement Q&A.pdf |

In order to strengthen KMMG's teamwork and cooperation in support of the Kia Way, we are taking additional steps in creating an organization in preparation for a successful start of operations. Attached is a summary of the organizational changes effective March 2, 2009. A Q&A is also attached.

Please support these very important changes during our company's growth. Your continued support and assistance to members of our leadership team, particularly those who have been assigned expanded roles and responsibilities, is appreciated.

Bob Tyler, SPHR
HR Manager
Kia Motors Manufacturing Georgia (KMMG)
706-298-4821 (Tel)
706-350-3126 (Cell)
706-298-4986 (Fax)

This electronic mail (including any attachments) may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any dissemination or use of this electronic email or its contents (including any attachments) by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please notify me immediately by reply email so that I may correct my internal records. Please then delete the original message (including any attachments) in its entirety. Thank you.



CONFIDENTIAL

# Organizational Announcement

KMMG Company-Wide Organizational Structure

In our continuing efforts to strengthen teamwork and cooperation in support of the Kia Way, KMMG's organizational foundation has been confirmed by our President & CEO, Mr. B. M. Ahn. As a result, we are pleased to announce KMMG's company-wide organizational structure, effective March 2, 2009. This structure reflects the KMMG organization which is designed to ensure a successful start of operations.

KMMG will be made up of six (6) Sub-Divisions, horizontally and vertically aligned to support both cross-functional collaboration and cooperation and quick decision making. KMMG Departments and Sections have also been further defined to clarify functional roles and responsibilities and communications.

To balance organizational harmony, and to establish clear leadership responsibilities and effective working relationships both intra- and inter-department, the roles of chief of sub-division (CSD), head of department (HOD), and head of section (HOS) have been assigned to members of KMMG leadership. These assignments are not considered organizational promotions, but increases in role and responsibility to assist with organizational alignment, internal two-way communications, and accomplishment of business objectives during KMMG's start-up period. Some of these assignments may be short-term or long-term depending upon KMMG's evolving operating needs and conditions, leadership and team performance, and our ability to fill key management positions with internal/external talent. The KMMG Organization will be reevaluated at a later date for both functional and personnel changes (including organizational promotions and re-assignments).

Please support the functional changes and personnel assignments listed below:

**Division**

1. The Division will be led by COO Jack Yoon, Executive Vice President, in support of the KMC Production Corporation concept and our need for a strong production-oriented direction during the start of operations period.
2. Four (4) Sub-divisions and three (3) Departments will report directly through COO



CONFIDENTIAL

Sub-Divisions

1. Six (6) Sub-Divisions
2. Three (3) Sub-Divisions redefined including HR & Administration, Legal & Sales, and Construction & Maintenance

3. *Chief of Sub-Division Assignments*:
   - Brian Kang, Senior Director - Finance
   - J. Randy Jackson, Director - HR & Administration
   - Eddie Jin, Senior Director – Legal & Sales
   - Jaehoo Jeong, Senior Director – Construction & Maintenance
   - *Open* - Chief of Sub-division for Production (Mr. Yoon will continue to lead the Production Sub-division)
   - Tony Son, Director - Procurement

**Departments (21)**

1. Human Resources reclassified into two departments, Human Resources(HR) and Team Relations
2. Training renamed Training and Organizational Development (OD)
3. Safety, Medical, & Security separated from General Affairs, with both departments reporting directly to Chief of Sub-Division, HR & Administration
4. Public Relations separated from Legal, and reports directly Chief of Sub-Division, HR & Administration
5. Construction department renamed Construction and Facility Maintenance
6. Maintenance department reports directly to Chief of Sub-Division, Construction & Maintenance
7. *Head of Department Assignments* (new/changing):
   - Bob Tyler, Manager – Employment to HOD for Human Resources (HR) and Team Relations
   - Gary Langswager, Manager – Safety/Medical/Security to HOD Safety, Medical, & Security
   - Steve Garner, Manager – Construction to HOD Construction & Facility Maintenance
   - Paul Maenhoudt, Manager – Maintenance Technical Support to HOD Maintenance
   - James Watson, Manager – Welding to HOD Welding
   - Rick Douglas, Manager – Paint to HOD Paint
   - Chris Miller, Manager – PC Material Handling to HOD Production Control (PC)
   - Ted Arnold, Manager – Quality Control to HOD Quality Control (QC)



CONFIDENTIAL

Sections (55)

1. *Department Sections* (New/Redefined):
   - Finance: Treasury and Cost Accounting & Budget
   - Team Relations: Team Relations and Support Services
   - General Affairs: General Affairs and Team Member Services
   - Safety & Medical: General Safety (General Assembly), General Safety (Stamping, Body, Paint), Medical, and Security & Plant Protection
   - Construction & Facility Maintenance: Facility Maintenance and Environmental

2. *Head of Section Assignments* (New/Changing):

   **Note: Section name is shown before Department name below**
   - Ken Miles, A/M – Tax, Finance
   - Jaiwon Jung, A/M – Cost Accounting & Budget, Finance
   - Rayla Smoot, A/M – Training & OD, Training & Organizational Development
   - Kisha Morris, A/M – General Affairs, General Affairs
   - George Smith, A/M – General Safety (General Assembly), Safety, Medical, & Security
   - Victor Gipson, A/M – General Safety (Stamping, Body, Paint), Safety, Medical, & Security
   - Joanne Mabrey, A/M – Public Relations, Public Relations
   - Della Sanderson, A/M – Environmental, Construction & Facility Maintenance
   - Ricky Carter, A/M – Stamping, Maintenance
   - Don Gillahan, A/M – Welding, Maintenance
   - Scott Zellen, A/M – Paint, Maintenance
   - John Nozell, A/M – General Assembly, Maintenance
   - Stephen Lane, A/M – Production Engineering, Welding
   - Gary Parker, A/M – Production Engineering, Paint
   - Kelly Pitman, A/M – Production Engineering, General Assembly
   - Percy Hurtado, A/M – Process Control, Production Control
   - George Carr, A/M – Specification Control, Production Control
   - Mike Resha, A/M – Welding & Paint QC, Quality Control
   - Chris Tarver, A/M – Vehicle QC, Quality Control



CONFIDENTIAL

# KMMG Organizational Announcement
# Q&A

1. **Why is the KMMG Organization being communicated now?**

   KMMG's organizational chart (effective 3/2/09) is our first published company-wide organizational chart. KMMG's organizational structure was designed to promote harmony, teamwork, and quick decision making in preparation for a successful start of operations in December 2009. Communicating KMMG's organizational structure now is of vital importance so that all KMMG team members can clearly understand KMMG's functional and leadership roles and responsibilities in support of clear, consistent communication and collaboration.

2. **What are the roles and responsibilities of the Chief of Sub-Division, Head of Department, and Head of Section?**

   <u>Chief of Sub-Division/Division</u>
   Drive and be accountable for the achievement of financial returns through the identification of the organization's and sub-division/division business vision/mission and strategy in the short, medium and long term. Lead and be accountable for the development of integrated and aligned operational business plans. Lead and be accountable for promoting the institutionalization of the organization's core values. Set the direction and is accountable for setting the way in which the sub-division/division should leverage and optimize the use of resources.

   *Strategy*

   - Is accountable for supporting and assisting in the formulation of organization's business mission and vision with the intent of optimizing financial returns
   - Leads and is accountable for the design, development and implementation of corporate and sub-division/division projects that promote the institutionalization of corporate values, culture and governance throughout the organization
   - Drives the optimal utilization of resources

   *Operations*

   - Drives and is accountable for the formulation and achievement of the sub-division/division operational business plans for the short/medium/long term through a combination of a 'top-down' and 'bottom-up' approach
   - Leads and is accountable for the rationalization and integration of operations to ensure continuous and long-term relevance



CONFIDENTIAL

*People*

- Leads and is accountable for the institutionalization of cross-functional collaboration and cooperation with the organization's divisions, sub-divisions, and departments
- Leads and is accountable for the management of effective relations and communication with sub-division/division team members
- Leads / manages / coaches / inspires direct reports to ensure effectiveness and efficiency in the achievement of business strategies and results
- Leads the development of leaders

Head of Department (HOD)
Supports organizational, division, and sub-division strategies and operational objectives and aligns with department business plan. Provides strategic leadership and direction for a function at the department level. In cooperation with their Korean Coordinator, shares full responsibility and authority for leading departmental initiatives and activities and making important decisions to ensure organizational and department goals and objectives are met. Prior to making decisions or actions that impact the Department, the HOD must take steps to advise, consult, and reach agreement with the HOD Coordinator. This joint communication and collaboration supports steps for both critical decision making and proper authorization.

Head of Section (HOS)
Supports departmental strategy and business plans as directed by HOD and independently translates strategy into tactical activities. Provides leadership and direction to ensure a section's tactical projects and objectives are achieved. Proactively develops, applies, and shares professional competencies to ensure the section's ongoing responsibilities, assignments, and tasks are completed among the staff. Nurtures the performances of section staff members and strengthens the overall competency skills of the section. Works closely with HOS Coordinator to ensure proper alignment and agreement on Section's responsibilities, activities, and decision making (i.e.., Advise, Consult, & Agree Before Action).

3. **What is the role and responsibilities of the Korean Coordinator?**
The Department or Section Coordinator serves as advisor, coach, and trainer for the HOS and/or HOD in a peer working relationship. They act as partners with the HOS and/or HOD in the spirit of cooperation and collaboration to fulfill section/departmental responsibilities. They serve a vital role by ensuring open, two-way communication and reporting between KMC and KMMC staff in their functional area of responsibility. Their primary purpose is to ensure that KMC's global standards of operation are properly implemented in collaboration with their HOS and/or HOD. Coordinators are also jointly responsible and accountable with their respective HOS/HOD for performance and decision making within the



CONFIDENTIAL

section/department.

4. **Are the new assignments to Head of Department and Head of Section permanent in nature?**
These assignments may be short-term or long-term depending upon KMMG's evolving operating needs and conditions, leadership and team performance, and our ability to fill key management positions with internal/external talent. Individual performance in these new roles including ability to lead a department's or section's activities toward a successful SOP will be key in determining the length of the assignment.

5. **Are the new assignments to Head of Department and Head of Section considered promotions?**
These assignments are increases in role and responsibility to assist with organizational alignment, internal two-way communications, and accomplishment of business objectives during KMMG's start-up period and thereafter. These assignments are considered a "role" that needs to be performed vs. a job classification (i.e., Assistant Manager, Manager, etc.). Changes in job classification level only (i.e., Assistant Manager to Manager, etc.) would be considered a promotion.

6. **What are organizational promotions and when are they conducted?**
Organizational promotions are changes in job classification level (A/M and above) that represent increases in job scope and responsibility. Organizational promotions can occur as a result of replacing leadership positions left vacant due to attrition, filling of newly approved leadership positions, through job re-evaluation whereby a job has increased in scope and responsibility, or via changes to organizational structure. Standard timing for changes to organizational structure with accompanying organizational promotions occurs in January of each year. Some organizational promotions may occur throughout the year based on organizational need, job changes, and promotions from within to fill leadership opportunities due to attrition or newly created positions.

7. **Will there be any adjustments to base salary for those team members who are assigned to Head of Department or Head of Section roles?**
Adjustments or increases to base salary will only occur as a result of organizational promotion or based on merit for individual performance and will take into account business and market conditions. Merit based increases occur in July of each year based on individual performance during the 12-month measurement period (i.e., July 1st of prior year through June 30th of current year).



CONFIDENTIAL

EXHIBIT
11

KIA MOTORS
The Power to Surprise

# Performance Appraisal and Competency Assessment

| | | |
|---|---|---|
| Team Member Name | Andrea Lenora Gogel | |
| Team Member ID | 100178 | |
| Job | Team Relations | |
| Title | Manager | |
| Department (or Sub-division or Division) | Team Relations | |
| Period covered | 01/01/2009 ~ 12/31/2009 | |
| Appraiser | First Reviewer | Second Reviewer |
| Robert D Tyler | Hyung Suk Yoo | James Randall Jackson |

1

CONFIDENTIAL

# Performance Appraisal

| | | | | | | |
|---|---|---|---|---|---|---|
| Objective 1 | Priority (%) | 20 | Self Evaluation | Meets expectation | Appraiser | Meets expectation |

Maintain a flexible TR organization to rapidly respond to changing business conditions.

**Success Measures 1**

Rapid response to TM concerns.

**Self Comments 1**

There have been few un issues which have not been effectively managed and followed up on. Feedback from Departments is that they receive a high level of customer service from TR, and we are a valued part of the team.

**Appraiser Comments 1**

Andrea has developed good working relationships with both office and production team members that enables her to capture the pulse of the organization and its team members. She has systems in place to ensure quick response and action to team member concerns and issues.

| | | | | | | |
|---|---|---|---|---|---|---|
| Objective 2 | Priority (%) | 25 | Self Evaluation | Meets expectation | Appraiser | Meets expectation |

Develop and gain approval on all core policies

**Success Measures 2**

100% approved by year end 2009

**Self Comments 2**

Current approval is 97% on core policies. Although there were multiple obstacles encountered, we continued to push for completion.

**Appraiser Comments 2**

Despite the obstacles and barriers to timely approval and implementation of core policies, Andrea stayed the course and found ways to get to consensus of agreement on core policies.

| | | | | | | |
|---|---|---|---|---|---|---|
| Objective 3 | Priority (%) | 20 | Self Evaluation | Meets expectation | Appraiser | Meets expectation |

Build Supplier Support Systems

**Success Measures 3**

Mechanism for Supplier Training established

Consistent tracking and communication methods established

**Self Comments 3**

A Supplier Support Conference schedule was developed and maintained. Overall feedback for the programs has been extremely high. Communication systems are in place and utilized effectively. An issue tracking database has been established and utilized.

**Appraiser Comments 3**

Andrea provided consistent leadership and direction to the area of supplier support and system development.



CONFIDENTIAL

KMMG-Gogel_0062

| Objective 4 | Priority (%) | 15 | Self-Evaluation | Meets expectation | Appraiser | Meets expectation |
|---|---|---|---|---|---|---|

Create systems for consistent application of policies and processes

**Success Measures 4**

Appropriate tracking mechanisms in place for Corrective Action, Performance Appraisal and trends

Standardize processes

**Self Comments 4**

Standardized work has been written for all critical processes. Investigation filing system has been created and is in place. Logs have been created which track all Corrective Action as well as Performance Appraisal completion. Daily logs have also been created to track all TR activities on a daily basis from which the TR Topics report is created

**Appraiser Comments 4**

The development of standardized work and reporting mechanisms has assisted Team Relations in maintaining good visual management and control of all policies, practices, and processes.

| Objective 5 | Priority (%) | 10 | Self-Evaluation | Meets expectation | Appraiser | Meets expectation |
|---|---|---|---|---|---|---|

Establish Key Performance Indicators for Team Relations

**Success Measures 5**

KPI template created and consistent measurements established

**Self Comments 5**

KPI template was created and although it has continued to evolve from it's original state in February of '09, as of the end of 2009, it was in a very good format.

**Appraiser Comments 5**

Andrea was instrumental in guiding the development of the KPI foundation. Additional work will need to be done in this area to make the KPI report a true measurement tool for managing and controlling trends and identifying countermeasures.

| Objective 6 | Priority (%) | 10 | Self-Evaluation | Exceeds expectation | Appraiser | Exceeds expectation |
|---|---|---|---|---|---|---|

ERP System Implementation

**Success Measures 6**

Efficient and timely implementation of the ERP system (in relation to Team Relations-related functions).

**Self Comments 6**

All TR related pieces of ERP system were outlined and approved ahead of schedule. It was one of the most seamless pieces of the ERP implementation, partially because TR had established processes in place and simply had to modify to fit within the parameters of ERP.

**Appraiser Comments 6**

Team Relations' advanced planning and readiness ensured timely implementation and allowed focus to other critical areas of ERP system implementation.

| Object 7 | Priority (%) | Self Evaluation | Appraiser |
|---|---|---|---|
| Success Measures 7 | | | |
| Self Comments 7 | | | |
| Appraiser Comments 7 | | | |

| Object 8 | Priority (%) | Self Evaluation | Appraiser |
|---|---|---|---|
| Success Measures 8 | | | |
| Self Comments 8 | | | |
| Appraiser Comments 8 | | | |

| Overall Comments on Performance Appraisal | |
|---|---|
| 1st Reviewer | |
| 2nd Reviewer | I agree with this rating |

| Annual score and grade for Performance Appraisal | 3.10 | B |
|---|---|---|



CONFIDENTIAL

## Competency Assessment

| Category | Competencies | Priority(%) | Self Evaluation | Appraiser |
|---|---|---|---|---|
| Core Competencies | Adaptability/Flexibility | 30 | Meets expectation | Meets expectation |
| | Create the New and Different(Innovation) | | Exceeds expectation | Exceeds expectation |
| | Integrity, Trust, & Respect | | Exceeds expectation | Exceeds expectation |
| | Multi-Tasking | | Needs improvement | Needs improvement |
| | Problem Solving | | Meets expectation | Meets expectation |
| | Cooperation | | Meets expectation | Meets expectation |
| | Tenacity / Work Standards | | Meets expectation | Meets expectation |
| Leadership Competencies | Interpersonal Skills | 40 | Meets expectation | Meets expectation |
| | Mentoring/Coaching/Developing | | Meets expectation | Meets expectation |
| | Leads Change | | Exceeds expectation | Exceeds expectation |
| | Decision Making | | Meets expectation | Meets expectation |
| | Selecting "A" Players | | Exceeds expectation | Exceeds expectation |
| | Performance Management | | Needs improvement | Needs improvement |
| Job Competencies | Communication | 30 | Meets expectation | Meets expectation |
| | Compliance | | Meets expectation | Meets expectation |
| | Inter-personal Skill | | Meets expectation | Meets expectation |
| | Service Orientation | | Exceeds expectation | Exceeds expectation |
| | Routine Job Duties | | Needs improvement | Needs improvement |
| Final Score | 3.11 | Final Grade | | B |

**Additional Self Comment**

I feel I have made great improvements in 2009 in recognizing and understanding our unique culture. Given that, we have made significant strides in accomplishing our goals. I have excelled at building good relationships within the organization. I have both strong relationships within my work group, and shown strong leadership in their development. I have a great team which adds value to the organization, and feel that my efforts have contributed to that strength.

**Appraiser Comment**

Andrea takes great pride in her job and is a strong advocate for team members. She is a valuable member of the leadership team and her leadership is essential to building positive team relations. Andrea should focus on building positive working relationships and communicating more frequently with Korean leadership. She should show more patience and understanding regarding management decisions she disagrees with. Her vast experience/knowledge and strong opinions are critical to maintaining balance, but she should not lose sight of the big picture. Andrea always takes the necessary steps and initiative to keep projects and important decisions moving to completion and approval.

**1st Reviewer Comment**

**2nd Reviewer Comment**

I agree with this rating



CONFIDENTIAL KMMG-Gogel_0065

## Integrated Evaluation

| Performance Appraisal | | Competency Assessment | | Integrated Evaluation |
|---|---|---|---|---|
| Final Score | Portion (%) | Final Score | Portion (%) | Score |
| 3.10 | 70 | 3.11 | 30 | 3.10 |

* Comments : Integrated evaluation score = [SUM (Final score for performance Priority(%) x Rating score)]

| Integrated evaluation score | More than 4.5 to 5 | More than 3.5 to 4.5 | More than 2.5 to 3.5 | More than 1.5 to 2.5 | More than 1 to 1.5 |
|---|---|---|---|---|---|
| Integrated evaluation grade | S | A | B | C | D |
| Performance Appraisal Ratings<br>Overall Performance Ratings (Integrated Evaluation Grade) | S = Outstanding | A = Exceeds Expectations | B = Fully Meets Expectations | C = Needs Improvement | D = Unsatisfactory |
| | Performance consistently exceeds expectations. Performance results in extraordinary and exceptional accomplishments with significant contributions to the goals of the department and/or the company. | Performance fully meets and exceeds (exceeds more often than meets) expectations. Individual has extensive knowledge of the position and is able to initiate and perform most work with minimal direction. | Performance consistently meets standards and routinely delivers expected results. Individual displays consistently high quality and quantity of work; sound judgement; and demonstrates knowledge and mastery of position responsibilities. Overall composite is solid performance. | Needs immediate improvement, although certain components of performance may be acceptable or improving. Individual demonstrated inability to meet overall requirements on a consistent basis. Produced less than needed results. May require constant direction and regular follow-up. | Performance consistently does not meet the established standards. Failed to achieve minimal expectations. |
| Competency Assessment Ratings | S = Outstanding | A = Exceeds Expectations | B = Fully Meets Expectations | C = Needs Improvement | D = Unsatisfactory |
| | Always demonstrates the exact definition of competency by applying all the behavioral attributes and, furthermore, becomes a role model to fellow team members. | Shows profound insight and understanding in the definition of competency as well as behavioral attributes. Consistently demonstrates the definition of competency by applying most of the behavioral attributes. | Shows overall understanding of the definition of competency. Usually demonstrates the definition of competency by applying most of the behavioral attributes. | Shows some understanding and demonstrates the definition of competency by following some of behavioral attributes. Small improvements are necessary. | Shows little understanding or effort to satisfy; seldom demonstrates the definition of competency by following behavioral attributes. Much improvement needed. |

| Integrated Evaluation Grade | |
|---|---|
| Integrated Evaluation Grade | Overall Comments |
| B | |

| | Appraisee | Appraiser | 1st Reviewer | 2nd Reviewer | HR Team |
|---|---|---|---|---|---|
| Signatures | Andrea Lenora Gogel | Robert D Tyler | Hyung Suk Yoo | James Randall Jackson | |
| Date | 01/29/2010 | 02/01/2010 | 02/11/2010 | 02/12/2010 | |



CONFIDENTIAL

EXHIBIT
13

# Bob Tyler

[redacted] Murfreesboro, TN 37127
Phone: [redacted]
E-mail: [redacted]

## Qualifications

1 Generalist with over 18 years of human resource manufacturing, assembly, and distribution experience
2 Over fourteen years of automotive manufacturing experience
3 Over thirteen years of human resource supervisory or management experience within single-site, multi-site, and corporate manufacturing organizations
4 Experience emphasizes strategic planning skills; communication and interpersonal skills; analytical abilities; project management; policy and program development and implementation; and an in-depth understanding and application of human resource concepts, practices, and procedures in both union and non-union environments

## Professional Experience

### CALSONIC KANSEI NORTH AMERICA

**2002 – Present**

Tier 1 Automotive Supplier of Electronic, Exhaust, HVAC, and Plastic Components – 3000 employees

*Senior HR Manager* – Lewisburg & Shelbyville, TN (Multi-Plant Sites & Corporate HQ)

Direct and manage the human resource function and employee relations activities for over 2,000 regular, contract labor, and temporary employees in four (4) automotive supplier plants including two modular assembly operations inside Nissan auto assembly plants. Provide various human resources support to North American corporate manufacturing headquarters and three research and development sites. HR organization consists of five HR Managers and four HR representatives.

1 Coordinated and supported redeployment of Electronics, Exhaust, and Plastics Manufacturing Operations into "centers of excellence" across U.S. Activities affect seven (7) plants and impact over 400 employees.
2 Coordinated contract labor transitions at two modular assembly operations inside Nissan auto assembly plants.
3 Developed and redesigned team member handbook and common HR policies and practices throughout CKNA's U.S. facilities.
4 Implemented employee relations initiatives designed to improve and maintain stable employee relations including team building, peer input, peer review, roundtable conversations, and legal compliance hotline.
5 Developed and implemented variable workforce strategies at automotive supplier plants and lead manager for coordinating two company-wide transitions to single source temporary staffing vendor.
1 Developed integrated approach to income stability and paid time off programs for CKNA U.S. team members.
6 Lead contributor to design and implementation of voluntary benefit and discount programs throughout CKNA U.S. facilities.
7 Designed, implemented, and administered hourly production worker incentive/bonus pay programs at Tier 1 automotive supplier plants.
8 Lead administrator for implementation of online Talent Resource Planning system designed to assess talent, rate performance in both results and behaviors, provide a framework for development and succession planning.
9 Member of Corporate Benefits Committee that redesigned health & welfare plans and retirement plans for improved cost containment while maintaining competitive benefit package.
10 Developed and implemented numerous kaizens to skilled and semi-skilled hourly pay programs at automotive supplier plants.

CONFIDENTIAL

## TOYOTA MOTOR MANUFACTURING

1993 – 2002

Automotive Manufacturing & Assembly – Sedans, SUVs, and Trucks – 23,000 employees

*HR Manager, Team Member Relations* – Princeton, IN (Plant Site)

Directed and managed human resource and team member relations activities at a 2,700-employee truck and SUV assembly plant. Supervised and led a large HR professional staff in wide range of human resource support activities: team member relations; policy administration and legal compliance; business planning and measurement systems; internal communications; team member services and activities; union avoidance and supplier support; and compensation, benefits, and HRIS; workforce staffing and recruitment; organizational development and succession planning; and education, training, and development. HR organization consisted of six (6) Assistant Managers and 29 HR representatives.

1. Initiated continuous improvement activities for progressive employee relations and communications programs and practices.
2. Implemented and administered hourly production worker incentive/bonus pay programs.
3. Administered of hourly and salaried pay programs.

*HR Manager, Team Member Relations* - Erlanger, KY (North American Mfg. Headquarters)

Provided HR generalist support to ten (10) North American Manufacturing Companies to ensure effective employee and labor relations management among employee population in excess of 20,000. Supervised eight (8) HR professionals and provided advice and counsel to Plant Site HR Management. Areas of emphasis included strategic planning, staffing administration, policy development, measurement systems, supplier support, positive employee relations, and good management practices.

4. Served as the lead person responsible for establishing a multi-site workforce staffing authorization and reporting strategy for North American manufacturing affiliates consisting of over 20,000 employees.
5. Coordinated salaried and indirect staffing benchmarking study amorⁿ Toyota, Honda, and Nissan.
6. Developed corporate inter-company transfer policy among U.S. basc [illegible]nufacturing facilities.
7. Developed, implemented, and administered HR key performance indicator system designed to measure morale and lead to workforce stability.
8. Managed special project initiated to develop best practices and common HR policies and practices among North American manufacturing facilities.

*Human Resources Specialist* - Georgetown, KY (Plant Site)

Supervised four HR staff members and managed salaried recruiting and staffing programs for auto assembly plant of 6000 employees.

1. Facilitated Organizational management reporting function including staffing and labor analysis.
2. Developed workforce staffing control and administration policy for direct labor positions.
3. Administered assistant manager promotion process.
4. Served as facility EEO/AA coordinator.
5. Supported HRIS activity for Personnel function.
6. Managed professional employment activities and coordinated skilled employment program.
7. Led critical recruiting initiatives resulting in hiring of 20 Information Technology Professionals and over 50 Skilled Maintenance journeymen

*Human Resources Specialist* - Georgetown, KY (Plant Site)

Provided support to production supervision in daily human resource matters in 6000 employee auto assembly plant. Managed the HR function in assigned areas consisting of 300-500 employees. Areas of responsibility included policy interpretation, development and administration of various human resource programs, and identifying and resolving team member problems.

1. Coordinated Employee Relations project activity including FMLA implementation and Hourly Performance Evaluation process.

## EATON CORPORATION

CONFIDENTIAL

**1991-1993**

Hydraulics Division - Transmissions Manufacturer for Lawn & Garden Market – 300 employees

*Human Resources Manager* - Spencer, IA

Led six-member department in managing, directing, and administering all Human Resources functions and associated activities at 300-employee Hydraulics Plant. HR organization consisted of HR representative, Nurse, Administrator, and three Security representatives.

2 Redesigned Hourly Job Analysis & Job Revaluation Process.
3 Modified Attendance Control System resulting in reduced hourly absenteeism.
4 Implemented internal policies and practices to ensure compliance with ADA, Civil Rights Act of 1991, and Bloodborne Pathogens Standard.
5 Developed provisions of hourly layoff process following seasonal slowdown.

**CHEVRON CHEMICAL COMPANY**

**1986-1991**

Consumer Products Division – Manufacturer of Lawn Fertilizers, Pest Control Chemicals, & Fuel Additives – 100 employees *(needed more challenge)*

*Supervisor, Human Resources, Safety, & Training* - Fort Madison, IA

Responsible for entire range of Human Resource activities including labor relations and grievance administration, information systems, performance management, policy administration, employee involvement and recognition programs, employment and EEO, training and development, health and safety, and compensation and benefits. HR staff consisted of one HR Assistant. Other positions included two year assignments in Wyoming as hourly process operator and one year temporary domestic assignment in California and Washington as a human resources representative.

1 Ensured successful start-up following labor transition.
2 Contributed to employee-led union decertification.
3 Developed and implemented standard HR, Safety, and Training policies and programs at start-up facility.
4 Developed Plant Instruction and Operator Training Manuals for Fertilizer Manufacturing Plant.

**G.R. HERBERGER'S, INC.**

**1983-1986**

Retail Department Store – 100 employees

*Divisional Manager* - Billings, MT & Rock Springs, WY

Supervised 10-20 employees in assigned areas of retail department stores including Boy's, Children's, Domestics, Gifts, Juniors, Lingerie, Men's, Receiving, Women's, etc. Managed merchandising, sales and promotion, staffing, purchasing and inventory control functions.

5 Sustained and increased performance efforts and results leading to two merit-based promotions.

## Education and Development

**BS, Business Administration, Human Resources Management**, Eastern Montana College (MSU-Billings), Billings, MT, 1982

1 Finished four year program in three years

SPHR, Recertification – 3rd (HRCI, 2006)
SHRM Member since 1990

CONFIDENTIAL

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

**1. Personal Information**

Last Name: Gogel First Name: Andrea MI: L.

Street or Mailing Address: [redacted] Apt or Unit #:

City: Pine Mountain County: Troup State: GA Zip: 31822

Phone Numbers: Home: [redacted] Work: [redacted]

Cell: [redacted] Email Address: [redacted]

Date of Birth: [redacted] Sex: ☐ Male ☑ Female Do You Have a Disability? ☐ Yes ☑ No

**Please answer each of the next three questions.** i. Are you Hispanic or Latino? ☐ Yes ☑ No

ii. What is your Race? Please choose all that apply. ☐ American Indian or Alaskan Native ☐ Asian ☑ White ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? United States of America

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: Tom Gogel Relationship: husband

Address: [redacted] City: Pine Mountain State: GA Zip Code: 31822

Home Phone: [redacted] Other Phone: [redacted]

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☑ Employer ☐ Union ☐ Employment Agency ☐ Other (Please Specify)

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

**Organization Name:** Kia Motors Manufacturing Georgia

Address: 7777 Kia Parkway County: Troup

City: West Point State: GA Zip: 31833 Phone: (706) 902-7777

Type of Business: auto manufacturer Job Location if different from Org. Address:

Human Resources Director or Owner Name: Randy Jackson Phone: (706) 902-7507

**Number of Employees in the Organization at All Locations:** Please Check (✓) One

☐ Fewer Than 15 ☐ 15 – 100 ☐ 101 – 200 ☐ 201 – 500 ☑ More than 500

**3. Your Employment Data** (Complete as many items as you are able.) **Are you a federal employee?** ☐ Yes ☑ No

Date Hired: 3-17-2008 Job Title At Hire: Team Relations Manager

Pay Rate When Hired: 115,000/yr Last or Current Pay Rate: [redacted]

Job Title at Time of Alleged Discrimination: Team Relations Mgr. Date Quit/Discharged:

Name and Title of Immediate Supervisor: Bob Tyler

**If Job Applicant,** Date You Applied for Job Job Title Applied For

EXHIBIT 14

CONFIDENTIAL

4. What is the reason (basis) for your claim of employment discrimination?

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to* Race. *If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to* Retaliation.

~~☑ Race~~ ☑ Sex ☐ Age ☐ Disability ☑ National Origin ☐ Religion ☐ Retaliation ☐ Pregnancy ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing ii. family medical history iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: ______

If you checked genetic information, how did the employer obtain the genetic information? ______

______

Other reason (basis) for discrimination (Explain): ______

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. **Please attach additional pages if needed.** *(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

**A. Date:** 11-1-2010 **Action:** Denial of expenses for pre-approved travel.

**Name and Title of Person(s) Responsible:** Randy Jackson

**B. Date:** ______ **Action:** Failure to promote to Head of Department.

**Name and Title of Person(s) Responsible** K.S. Kim, Kevin Kim, Randy Jackson

**6. Why do you believe these actions were discriminatory? Please attach additional pages if needed.**

A. This was harassment based on my participation in a complaint.

B. Because men in similar situations were promoted, and my superiors told me they were sorry.

**7. What reason(s) were given to you for the acts you consider discriminatory? By whom? His or Her Job Title?**

A. It was a mistake

B. Multiple: Timing, organizational structure. None performance related.

**8. Describe who was in the same or similar situation as you and how they were treated. For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.**

**Of the persons in the same or similar situation as you, who was treated *better* than you?**

| | Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|---|
| A. | Chris Miller | White male | Snr. Mgr | No concerns or |
| | ~~Spencer Oh~~ | ~~Korean male~~ | ~~Snr. Mgr.~~ | |
| | Eric Han | Korean male | Mgr. | issues with their trip |
| B. | | | | |

CONFIDENTIAL

Of the persons in the same or similar situation as you, who was treated *worse* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A. ______________________________

B. ______________________________

Of the persons in the same or similar situation as you, who was treated the *same* as you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A. ______________________________

B. ______________________________

**Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

**9. Please check all that apply:**
- ☐ Yes, I have a disability
- ☐ I do not have a disability now but I did have one
- ☐ No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

______________________________

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
☐ Yes ☐ No

If "Yes," what medication, medical equipment or other assistance do you use?

______________________________

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
☐ Yes ☐ No

If "Yes," when did you ask? ____________ How did you ask (verbally or in writing)? ____________

Who did you ask? (Provide full name and job title of person)

______________________________

Describe the changes or assistance that you asked for: ______________________________

How did your employer respond to your request? ______________________________

CONFIDENTIAL

13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|
| A. | | | |
| B. | | | |

14. Have you filed a charge previously on this matter with the EEOC or another agency? ☐ Yes ☑ No

15. If you filed a complaint with another agency, provide the name of agency and the date of filing: ____________

16. Have you sought help about this situation from a union, an attorney, or any other source? ☐ Yes ☑ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.**

BOX 1 ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time.**

BOX 2 ☐ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

[signature] 11-10-10

**Signature** **Today's Date**

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974; Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08). 2) AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)
3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

[ ] FEPA

[X] EEOC 410-2011-00549

State or local Agency, if any and EEOC

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mrs. Andrea Gogel | [redacted] | [redacted] |

| Street Address | City, State and ZIP Code |
|---|---|
| [redacted] | Pine Mountain, GA 31822 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| KIA MOTORS MANUFACTURING GEORGIA | Unknown | (706) 902-7507 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7777 Kia Parkway, | West Point, GA 31833 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [X] NATIONAL ORIGIN

[ ] RETALIATION [ ] AGE [ ] DISABILITY [ ] GENETIC INFORMATION

[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 07-23-2009 Latest: 06-30-2010

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began employment with Kia Motors Manufacturing on March 17, 2010, as a Team Relations Manager. During the period of July 23, 2009, and June 30, 2010, my position was not upgraded to a Head of Department position. All male manager positions were upgraded to Head of Department.

I was informed by Randy Jackson, HR Director, that my position was not upgraded because of timing and technicalities.

I believe that I have been discriminated against based on my sex (female) and National Origin (American), in violation of Title VII of the Civil Rights Act of 1964, as amended.

EXHIBIT 15

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

Nov 10, 2010 [signature]

*Date* *Charging Party Signature*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

RECEIVED NOV 10 2010 EEOC-ATDO

CONFIDENTIAL

From: Bolton, David S.
To: Gogel Andrea L KMMG/HR
CC: Fraser, Heathere L.
Sent: 9/17/2008 10:26:04 AM
Subject: RE: kia photo

EXHIBIT 18

Thank you for getting this in motion so quickly. I'm in complete agreement concerning the addition of a female for use in these photo. Let's plan on having one participate in the photo session. I look forward to hearing back from Paul or Rayla to set our schedule. >d<

**From:** Gogel Andrea L KMMG/HR [mailto:andrea.gogel@KMMGUSA.COM]
**Sent:** Wednesday, September 17, 2008 10:11 AM
**To:** Bolton, David S.
**Subject:** RE: kia photo

I have forwarded this to Mr. Paul Grimes and Rayla Smoot. I am sure they can take care of this for you. One other question, have you considered having any females in this shoot? I would hate for people to think that we are not hiring women. There are several currently in training at the Training Center who I am sure would have no problem being photographed.

Thank you. Andrea Gogel

**From:** Bolton, David S. [mailto:dbolton@georgiaquickstart.org]
**Sent:** Wednesday, September 17, 2008 10:03 AM
**To:** Gogel Andrea L KMMG/HR
**Cc:** Flannigan, Beth
**Subject:** FW: kia photo

Attached is the photo that our Art Director has used to select her preferred team members. If possible we are open to shooting as early as tomorrow.
Please let me know your schedule and the days and times that work best for you and your team members. >d<

**From:** Fraser, Heathere L.
**Sent:** Wednesday, September 17, 2008 9:52 AM
**To:** Bolton, David S.
**Subject:** kia photo

Heathere Fraser
*Strategic Media Art Director | Georgia Quick Start, TCSG*

404.253.2793 office | 404.253.2821 fax
75 Fifth St. NW, Suite 400 | Atlanta, GA 30308

From: Bolton, David S.
To: Gogel Andrea L KMMG/HR
CC: Fraser, Heathere L.
Sent: 9/17/2008 10:26:04 AM
Subject: RE: kia photo

Thank you for getting this in motion so quickly. I'm in complete agreement concerning the addition of a female for use in these photo. Let's plan on having one participate in the photo session. I look forward to hearing back from Paul or Rayla to set our schedule >d<

**From:** Gogel Andrea L KMMG/HR [mailto:andrea.gogel@KMMGUSA.COM]
**Sent:** Wednesday, September 17, 2008 10:11 AM
**To:** Bolton, David S.
**Subject:** RE: kia photo

I have forwarded this to Mr. Paul Grimes and Rayla Smoot. I am sure they can take care of this for you. One other question, have you considered having any females in this shoot? I would hate for people to think that we are not hiring women. There are several currently in training at the Training Center who I am sure would have no problem being photographed.

Thank you, Andrea Gogel

---

**From:** Bolton, David S. [mailto:dbolton@georgiaquickstart.org]
**Sent:** Wednesday, September 17, 2008 10:03 AM
**To:** Gogel Andrea L KMMG/HR
**Cc:** Flannigan, Beth
**Subject:** FW: kia photo

Attached is the photo that our Art Director has used to select her preferred team members. If possible we are open to shooting as early as tomorrow.
Please let me know your schedule and the days and times that work best for you and your team members. >d<

**From:** Fraser, Heathere L.
**Sent:** Wednesday, September 17, 2008 9:52 AM
**To:** Bolton, David S.
**Subject:** kia photo

Heathere Fraser
*Strategic Media Art Director | Georgia Quick Start, TCSG*

404.253.2793 office | 404.253.2821 fax
75 Fifth St. NW, Suite 400 | Atlanta, GA 30308

1480

EXHIBIT
19

# Organizational Announcement

KMMG Organizational Changes and Promotions

The scope and complexity of our operations continue to grow day by day as we prepare for 2nd shift SOP and introduction of a 2nd vehicle later this fall. At this critical time in our history, we must continue our efforts to improve teamwork and cooperation in support of the Kia Way. In addition, we must improve our organization and strengthen our leadership and its capabilities in support of the challenges that lie ahead. As a result, we are pleased to announce organizational changes including promotions and assignments, effective April 12, 2010.

Please support the functional changes, organizational promotions, and personnel assignments listed below:

Organizational Promotions

- **Rick Douglas**, Manager, Paint to **Senior Manager, Paint**
- **Chris Miller**, Manager, Production Control to **Senior Manager, Production Control**
- **Bob Tyler**, Manager, Human Resources to **Senior Manager, Human Resources and Team Relations**
- **James Watson**, Manager, Welding to **Senior Manager, Welding**
- **George Carr**, Assistant Manager, PC Specification Control to **Manager, PC Specification Control**
- **John Englehardt**, Assistant Manager, QC Supplier Quality to **Manager, QC Vehicle Quality**
- **Ken Miles**, Assistant Manager, Finance Tax to **Manager, Finance Tax**
- **Kisha Morris**, Assistant Manager, General Affairs to **Manager, General Affairs**
- **Gary Parker**, Assistant Manager, Paint Production Engineering to **Manager, Paint Production Engineering**
- **Kelly Pitman**, Assistant Manager, General Assembly Production Engineering to **Manager, General Assembly Production Engineering**
- **Mike Resha**, Assistant Manager, QC Body &Paint to **Manager, QC Body & Paint**
- **Scott Zellen**, Assistant Manager, Paint Maintenance to **Manager, Paint Maintenance**
- **Tim Pigott**, Specialist, QC Supplier Quality to **Assistant Manager, QC Supplier Quality - Interior**
- **Otis Roberts**, Specialist, PC Specification Control to **Assistant Manager, PC Specification Control**
- **Dama Smith**, Specialist, Team Relations to **Assistant Manager, HR Compensation, Benefits, Payroll & HRIS (Acting HOS)**

EXHIBIT
20

KIA MOTORS
The Power to Surprise®

*Confidential*

April 28, 2010

Andrea Gogel:

Thank you for your efforts during our start-up and continuing growth period. Your contributions and performance have been important to the start of operations and continued success of KMMG. This letter is to confirm adjustments to your compensation as well as other information about compensation at KMMG.

It is important to note that adjustments to your compensation are based on your prorated length of service during the 2009 measurement period. Based on your hire date of 3/17/2008, you were credited with 12 months of service during the measurement period.

Your current base salary is $[redacted]7. Based on company results, your individual contributions and being above the midpoint in your position's pay range, your merit adjustment will be paid as a lump sum rather than as an increase in your base salary. Your lump sum payment will be paid on May 18, 2010.

Lump Sum Payment: $4,138.65

Please remember that your salary and other compensation information are *Confidential*, and should not be discussed with anyone else. If you have any questions, or would like to talk about any of this information, please feel free to come to me anytime.

As we move closer to start of 2nd shift operations and introduction of a 2nd vehicle, I look forward to your continuing contributions. We appreciate your ongoing dedication to the continuing development and growth of our company.

Sincerely,

J. Randy Jackson, J.D.
Director, Human Resources

EXHIBIT
21

KIA MOTORS
The Power to Surprise®

*Confidential*

December 23, 2010

To: Andrea Gogel
Department: Team Relations

During the year of 2010, Kia has continued to surprise the industry with outstanding sales, growth, market share, quality, safety and productivity achievements.

In addition, we have received New Industry Awards and continued to get positive recognition of the Kia brand. The Sorento has continued to be the leading vehicle in sales and customer satisfaction for the entire year of 2010. KMMG has continued to hit or exceed every target because of your continued hard work and dedication every day.

I want to thank all team members for your extra efforts and commitment during the 2010 year. Your contributions and performance have been excellent toward making KMMG successful.

In support of recognizing the results all team members have achieved as "One Team, One System," I am proud to announce a *Success Sharing Award* to all team members actively employed with KMMG through December 28, 2010.

To be eligible for the full payout, team members must have twelve (12) months or more of company service. Team members with less than 12 months of service, will be prorated at 1/12 amount for each month. In addition, leave of absence time, excluding Military Leave, greater than 12 weeks will be deducted from the total length of service for the purposes of calculating the payout amount.

The payment will be reflected on the December 28, 2010 pay check. Below, please find the approved amount for your position and months of service.

$12,000.00

Again, thank you for all of your efforts. Have a safe and happy holiday shutdown! We look forward to a successful 2011 year.

Sincerely,

Byung Mo Ahn
Group President & CEO
Kia Motors America and Kia Motors Manufacturing Georgia

EXHIBIT 22

| | |
|---|---|
| From: | Tyler, Bob KMMG/HR |
| To: | Garner, Robert S KMMG/Facilities; Langswager, Gary W KMMG/Safety; Marzan, Robert KMMG/Sales; Gogel, Andrea L KMMG/TR; Maenhoudt, Paul KMMG/Maintenance |
| BCC: | Tyler, Bob KMMG/HR; bdtyler@msn.com |
| Sent: | 9/23/2010 12:46:51 PM |
| Subject: | FW: Real examples |

In fairness to each of you who attended the Management Workshop on 9/1, I thought you should be given an opportunity to respond to Randy's request for real examples of why the blending of cultures and "Kia Way" philosophy is not working here in reality at KMMG. More specifically, Randy is looking for real examples that support the statement I made at the feedback meeting yesterday. It is shown in my email below. I truly believe that the vast majority of the American staff have this same perception of how we are treated and expected to act at KMMG in order to survive. I appreciate any examples you can send to me.

Bob Tyler, SPHR

Senior Manager, HR and Team Relations

Kia Motors Manufacturing Georgia (KMMG)

706-902-7516 (Tel)

706-350-3126 (Cell)

706-902-9999 (Fax)

This electronic mail (including any attachments) may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any dissemination or use of this electronic email or its contents (including any attachments) by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please notify me immediately by reply email so that I may correct my internal records. Please then delete the original message (including any attachments) in its entirety. Thank you.

From: Tyler, Bob KMMG/HR
Sent: Thursday, September 23, 2010 9:12 AM
To: Wintrich Andrew S KMMG/Procurement; Miller, Chris E KMMG/PC; Countess, Stuart C KMMG/Quality S-Div; Douglas, Rick G KMMG/Paint; Webb, Charles KMMG/Legal; Watson, James L KMMG/Welding; Locke, Bobby D KMMG/Assembly
Subject: FW: Real examples

My first thought regarding Randy's request below is to be cautious about giving any examples. Retaliation is a word that the Korean expats don't quite understand yet. However, we can't move forward and make real improvements without a willingness to share where things are wrong. With that said, please provide me some real examples I can share with Randy that relate to my "show up, shut up, do what we're told, and act like everything is wonderful" statement yesterday.

Bob Tyler, SPHR

Senior Manager, HR and Team Relations

Kia Motors Manufacturing Georgia (KMMG)

[illegible] (Tel)

[illegible] (Cell)

[illegible] (Fax)

This electronic mail (including any attachments) may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any dissemination or use of this electronic email or its contents (including any attachments) by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please notify me immediately by reply email so that I may correct my internal records. Please then delete the original message (including any attachments) in its entirety. Thank you.

From: Jackson, Randy KMMG/HR & Administration
Sent: Thursday, September 2[illegible], 2010 [illegible] AM
To: Tyler, Bob KMMG/HR
Subject: Real examples

Please give me these real examples so I have something to work with as it relates to you comments yesterday in Sr. Manager meeting.

EXHIBIT 23

# Report of Concerns

*(Submitted by, and on behalf of, members of KMMG American Management)*

## A. 9/2/10 Management Workshop Feedback

1. We didn't really understand the invitation list. Some Managers were there, some were not. I'm sure it made the "not's" feel de-valued. The Korean Coordinators were there physically, but not mentally or emotionally. In fact, many slept through the presentations or just got up and left. One got there extremely late, then left and returned for dinner only.

2. The presentations by specific departments' American HODs were good but you hear something once in a workshop and then go back to a busy workplace; not much sticks.

3. We devoted most of our time together presenting information that the majority of the attendees see on a daily basis in various production meetings. There was nothing about those presentations that was a "workshop". It was simply repeating information most already knew. The whole purpose of our management workshop was intended to be the beginning of the process to address the relationship between Korean and American leadership. Randy Jackson was the only one to speak at all about this issue. Even the egg drop recovery project was unproductive since there was praise for all participants but no lesson learned about communication or cooperation. The real message, the real lesson learned, was clear to all who attended, our Korean partners are not interested in change.

4. The presentations by executive management were terrible. We all kept waiting for the "meat," and it didn't arrive until dinner. The realities of our situation were completely glossed over, and we would assume that was a continuation of one of our primary themes – If we pretend the bad stuff isn't there, it will just go away. Instead, it perpetuates the feeling that we are a company which values only surfaces and appearances, and not truth or honesty or real quality. The Kia Way is a travesty, something that does not really exist here. It is a joke all over the plant floor. It is actually the Korean Way here, their way or the highway, and we all know it. Bob Tyler is ashamed to say that he was involved in the design and development of the Kia Way document. He had the expectation as others did in this organization that when we joined we would actually do what we say we will do. The Kia Way document is nothing more than a piece of paper with a bunch of words and concepts stolen from Toyota. Until the Korean expats accept the Kia Way through their credible actions and behaviors, we need to stop pushing this concept in front of the Americans.

5. The Quickstart exercise was interesting in that it portrayed in a one hour timeframe what we as Americans live with every day – we are expected to show up, shut up, do what we're told, and then pretend like everything is wonderful. It's not wonderful – it is pathetic. The Americans were not included, not listened



CONFIDENTIAL

to, and basically ignored while the Koreans proceeded to; Break the rules (cheat), rudely grab everything, take individual action without team consensus, pretend like they either don't speak English or we were not talking, and then appear to be happy about what they had accomplished.

6. Quickstart did a good job of designing the program, but then did a TERRIBLE job of following through with their responsibilities as facilitators. They should be ashamed to call themselves trainers. It immediately became obvious that their goal was not to help KMMG become better as an organization and facilitate "ah-ha" moments with the staff, but to have a major photo opportunity in which we were the insignificant actors. Their performance did nothing but drive a further wedge between the American and Korean staff. Their declaration of victory at the end just proved to us that they are not allowed to tell the truth either. As Jackie Rohosky told many of us very clearly three years ago, "we love Kia, you know we will do whatever you want us to do". And they have, by lying and turning a blind eye to the ignorance, ineffective management, and unethical actions and behaviors. Like us, they have become conditioned to tell the Koreans whatever they want to hear in order to survive and preserve their own job security.

7. The only value that Andrea Gogel added to the workshop appeared to come at the end when they wanted to make sure that she was very visible in the photo. They specifically asked for her and the one African American woman (Kisha Morris) to be very visible in the photo – by name, and did that with no one else. Andrea intentionally "hid" behind someone, and it was pointed out to her by Kevin Kim when he received the photos back. Obviously, Andrea and Kisha were the "tokens." That is not only embarrassing, but incredibly insulting. At least Andrea finally knew why she was invited, and it is obvious since she is not asked to "come to the table" regarding other very important issues that she has a need to be involved in.

8. The meal was wonderful and the gift was nice. Have you ever heard the term, "Like putting lipstick on a pig?" The lipstick in this particular case was top of the line.

9. Bottom line, we walked in to the workshop with the hope that we could come away better somehow. Unfortunately, we walked away embarrassed, disappointed, and with a confirmation that this is not an American company. Not only is it NOT an American company, the Koreans have no intention of utilizing any American talent. It really just validated what we already believed about how dysfunctional and un-American this organization is.

10. For the record, during the management feedback meeting on 9/22, we listened to K.S.'s comments in response to one American Senior Manager's points in the first 3 minutes of discussion. Our general opinion was that we were wasting our time… We might as well have been trying to build a fire with ice cubes… so at least one Senior Manager sat there and just listened. It was pointless. KS never



CONFIDENTIAL

listens, only listens to respond, and never really lets anyone finish talking before he butts in.

B. <u>Examples that support the Americans' staff view that Korean expats expect Americans to "show up, shut up, do what we're told, and pretend everything is wonderful":</u>

1. One example that comes to mind is the time the American Senior Procurement Manager was invited to the Korean management meeting several months ago. This meeting usually takes place every week, and it is a forum for Mr. Min and Mr. Oh to give updates on various items, and give direction. During this meeting, Mr. Min started out using English and within about 3 minutes, all of the Korean group leaders started to chime-in in Korean. He spoke up and told everyone that unless they started to speak in English, he was leaving the meeting. After his comment, Mr. Min said something in Korean, then he told him that the rest of the meeting will be in English. Needless to say, that was the last meeting he was invited to.

2. In regards to sharing information with the Procurement Team, the American Senior Manager has been repeatedly asking Mr. Oh to conduct a weekly meeting with both the Korean and American staff. The last time he brought this topic up (two weeks ago), he wanted to have meetings with only the Korean group leaders (which he is already doing). The American Senior Manager told him that unless he invites the Assistant Managers and the meetings were in English then he was not coming and that it would be a waste of his time. After several weeks, he is still "thinking about it" in regards to having weekly Procurement Team meetings. Since his arrival several months ago, they have not had any such meetings.

3. A few weeks ago Procurement was performing a study related to a new vehicle being proposed for KMMG. This request came from Headquarters and the American Senior Manager found out later that several of the Korean bilingual Specialists received information pertaining to cost, strategy, volumes, etc. This information was only shared amongst the Koreans and bilinguals so that they could get capacity and cost info from the suppliers related to this model. The American Senior Manager explained to Mr. Min that this information should flow from top down instead of bottom up. To this day, none of this vital info has been shared with him.

4. After direction was decided amongst several internal departments to countermeasure a particular issue, the American Senior Manager was approached by various team members from those departments asking him why Procurement changed the direction without notifying the plant. Upon conducting a meeting, he found out that the Korean staff in Procurement created documents (in Korean) that were agreed to by his Korean management without any communication with the local American staff, or with the other departments. He become extremely angry with both the bilingual Specialist and group leader, and repeatedly asked to get a copy of the document so he could discuss this issue with Mr. Min. The Specialist made excuses for not wanting to give it to him such



CONFIDENTIAL

as "it is somewhere on my desk" or "I will give it to you later." He waited and told him that he needed it at that instant, because Mr. Min was waiting for him. Upon receiving the document, he explained to Mr. Min that all documents created at KMMG for KMMG needed to be in English, and that he needed to sign off so that he could understand what is going on. Since that time, he has let a few documents "slide" that were in Korean, but the next one that he sees will be kicked back and he will not sign unless it is in English.

5. The examples given at the feedback meeting on 9/22 of CMA involvement or lack of are still occurring. On Thursday, 9/23 a large Korean only meeting was again held in the Pine Mtn. room literally under the noses of the American QC Director and American PC Senior Manager. No updates from that meeting have yet been given, if at all.

6. Another less recent example would the 2010 Business Plan development and roll-out. ZERO input from the American Mgmt. Team.

7. One good example was the unwillingness to listen to American General Assembly management as it related to incorporating the temporary workers into the line as opposed to segregating them as is done in Korea. Hence, the segregation continues to cause them huge turnover and quality issues at final 3.

8. Another example is the unwillingness to listen to us as it relates to the addition of a third shift and how the shifts will operate. They want to do it their way without any regard to the opinions and advice from experienced American management who know the pitfalls and dangers of their plan from both a team member morale and operational perspective.

9. One American Senior Manager has occasionally been the victim of the intra-Korean politics. For example, Mr. Jeong forbade his reports from talking to Legal because of his problems with KS Kim, which led to Environmental not getting any support on their permit issues until the 11th hour. It also made them very uncomfortable as Mr. Jeong went back to Korea and they were then assigned to report to KS Kim. But it wasn't that he was told he couldn't do his job (give advice), it's that someone basically told his would-be client they couldn't seek advice.

10. Manpower: No American staff, specifically HODs, are typically involved or consulted regarding the allocation of manpower. No apparent I.E. studies of work content, quality expectations, or current conditions. It appeared that numbers were based solely on what another facility was doing, then reduced. For the CMA launch, the American Senior Managers for Production departments are typically handed a paper with the allocation described and told that this is all they are allocated to have for 2 shifts, which was a reduction to the original conditions. American Senior Managers are generally given the latitude, to a degree, to move people within that specified allocation as long as they got the approval of the Korean staff. If it differed greatly to what they had ALREADY reported to their superiors, they had to change it.



CONFIDENTIAL

11. Salaried Staffing: The Korean staff apparently made proposals and got approvals on the salaried staffing for the 2nd shift before discussing with the American staff. When it was realized that they had made errors in their proposal and didn't consider all the needs, there was no option to go back and revisit the errors... but to adjust staffing to align with the original proposal. That placed some in a condition to decide whether to pull resources from the shop floor or reduce our "Administrative" staff. Some ended up reducing PRODUCTION Managers or Assistant Managers and Specialist level positions.

12. Working Hours: Some American Senior Managers constantly wrestle between Korean Managers about reducing overtime and getting things done. They get daily requests directly from the Korean staff to do various types of assignments and reports that cause them to work hours outside their normal scope. They are expected to be on the shop floor, yet they are requested to complete 2-3 hours of reporting work after the shift. When the overtime reports are generated, they get told that their staff is not managing overtime effectively enough.

13. Accountability or Not?: This is some American Senior Managers' biggest concern. They are asked to operate a pre-determined system, with pre-determined resources, with pre-determined results expected... most of which were pre-determined without their involvement or input. If/When these areas don't align with the expectations, then they are told that the "responsibility is on their shoulders"..... and in many cases, are expected to report inaccurate data to reflect the pre-determined results, which hides the underlying issues well enough that they don't get adequately addressed.

14. We feel tolerated by the Korean leadership as a necessary function to do business ~~in the US. We do not feel that we are valued contributors. Most efforts to share~~ what we know to be best practice (or just our personal experiences) are met with ambivalence at best, or with arguments and demands for written proof of statutory requirements.

15. Regarding safety and environmental, we see our Korean leadership's behavior as defining the Kia Way to be the least expensive option for minimal compliance to the literal interpretation of written standards, without regard even for common practice, and if there is any part of the written standard that is the least bit subjective, then the Kia Way is to ignore it all together.

16. With respect to daily or weekly reports, we are not permitted to report true problems and issues. Korean expats up through VP level have forbidden us from doing this because they fear the truth will be reported to our President or back to KMC. On a regular basis, Korean expats "doctor" the reports that are submitted to the President and KMC. Data, statistics, and critical issues/concerns regarding production, quality, human resources, team relations, legal, etc. are falsified or include errors and omissions on a repeated basis. When we are allowed to report a problem, we repeatedly get admonished for not bringing recommended solutions to the problem. However, the fact of the matter is that when the problems are reported, they don't believe the problem and don't hear the



CONFIDENTIAL

recommended solution that is in fact given. They tune out after the problem is reported and will only blame the stupid American for the problem having occurred in the first place.

17. The repeated mistreatment and disrespect of American staff is a common concern. Some examples include:

- Directives to "hide" any female security officers during visits of VIPs.
- Female salaried exempt employees being required to serve food to executives and wash their dishes.
- A Korean Senior Manager engaging in a verbal and hostile attack on a female Training & OD Assistant Manager regarding errors made by another member of management during the scheduling of team members for Korea basic skills training. (Never properly investigated or addressed because we were not allowed to perform our legal and company obligation in this regard.)
- A Korean Senior Manager engaging in a verbal and hostile attack on a female HR Specialist for an error committed by a different HR Specialist. (Never properly investigated or addressed because we were not allowed to perform our legal and company obligation in this regard.)
- A Korean Senior Manager verbally telling an American female HR Specialist that she was a "bad mother" because she works at KMMG and is not home with her new baby.
- Senior Korean leadership telling individual members of American management on many occasions that they make too much money.
- A Korean Senior Manager verbally telling the HR and Team Relations HOD that the Koreans believe that he recommends and gives HR and Team Relations candidates higher job offer salaries than other candidates.
- the list goes on.

18. The COO, Korean QC Senior Manager, and other Korean Expats have requested that team members be "punished" and "embarrassed" for any vehicle defects or quality concerns they cause/create. The COO stated in the daily production meeting on Thursday, September 23 that if a team member makes a mistake, they should be "disadvantaged". This request and statement was further clarified by a request made to the American QC Director to "post" the team member names and hire dates for all team members that cause vehicle/quality defects including the number and type of defects. This is not "hearsay" or a misunderstanding in communication or translation. These actions and behaviors support the Korean's blatant disregard for the Kia Way and our philosophy of corrective action (to correct and improve, not punish).



CONFIDENTIAL

19. Korean leadership effectively lied to prospective salaried professionals during the recruitment process by failing to live up to their commitment to provide a discretionary bonus program as part of the total compensation package. This commitment was made verbally and in writing via recruitment documents and KMMG's website. They did this through unwitting American members of management who were not wise to their plan to deceive. Many salaried professionals gave up good, higher paying jobs to come to KMMG for the promise of future promotions and compensation growth. In three years, KMMG has failed to live up to any of those promises and commitments despite the recent production and sales successes that continue to set records throughout KMC globally.

C. **General Comments:**

There is a larger systemic issue that prevents some necessary local rationale from being utilized, apparently.... Because it's just not the way Korea does it. We have HUGE silos of information, activity, and overlapping responsibilities that, if eliminated, could generate our effectiveness to an exponential level.... But this goes beyond Korean/American. It's Facility to Facility, Shop to Shop, and Department to Department. Our approval process is simply absurd. How much authority is required to buy production supplies for your shop? Why does it take four (4) levels of approvals or more to get your basic necessities bought for the facility? How much HPV can we reduce by eliminating all of the redundant and unnecessary activities for the most basic tasks?

There are probably hundreds of specific cases that could be brought forth. However, we realize all too well that any case would be pushed aside or fall on deaf ears as it ~~always has in the past. We know that Randy Jackson wants this to work and he~~ focuses his efforts to achieve that end. After three years of dealing with the Koreans on a daily basis, we no longer believe there is any possibility of change on their part. We do not believe in them or trust them any longer in the business world. We have repeatedly given in and acquiesced to their sometimes inane, unethical, and illegal decisions. We have never humbled ourselves to anyone as much as we have these people. We will continue to do our job as best as humanly possible and continue to allow them to proceed and fall as they have so many times before. We will help them back up and follow along behind and be ready to catch them again as we have done in the past, at least for now.

Socially, they are absolutely wonderful. We truly enjoy their fellowship.

We have always prided ourselves on learning new things and doing things new ways. We love to help those that do not understand and want to learn. The Koreans know everything and want to learn nothing. The definition of insanity comes to mind almost every day here. "Do the same thing, the exact same way, over and over again, and expect a different result". We are tired of trying to get a different result. This particular effort is just not worth it to us any more.



CONFIDENTIAL

If we are to grow as a company, then we need to realize and appreciate the experience that we have gathered from all over the auto industry, and put real time and energy into finding ways to build trust and respect between Korean and American leadership. We do understand that you don't start building trust by attacking your partner. But the partner needs to demonstrate that they are also willing to begin the process.

We will continue to attend on a daily basis and contribute what we can to our company because we want it to succeed, but we are very disappointed at the lack of professional relationships with our Korean colleagues. Our potential is so much greater if we could engage our partners in a trusting relationship of shared responsibility. Here, we feel we are just employees doing a job, putting our time in, and doing what we are told. We do not feel like the American management team is a participating member of an International Leadership Team, fully engaged and working towards a shared corporate culture that transcends the personalities of individuals to achieve "the best and most innovative automotive company in the world". It's too bad.

D. **Legal and Unethical Concerns:**

There are a multitude of issues which are of an illegal or unethical nature which have been witnessed by many. There is an extreme culture of retaliation and retribution which many times inhibits the exposure of such issues. However, we will first only talk about those which have been carried out with full knowledge by the company that they are illegal or unethical in nature:

1. Hiring undocumented aliens to work in the facility to perform work more quickly, ~~and attempting to hide it by not informing American management that they were~~ coming. When questioned about these types of practices, a Senior Manager replied that it was like Chinese workers in Korea - they were a necessity.

2. Alleged inappropriate relationship between the President/CEO and a female African American subordinate. This issue has been brought to the attention of many, but has continuously been ignored, to the detriment of others. Team members within the General Affairs department have repeatedly complained about the relationship, but there has never been a full investigation into the matter.

3. The President/CEO's request to have KMMG executives notify local vendors (hotels, restaurants, etc.) and officials to ban or bar anyone affiliated with the UAW or union organizing from services. This is in direct violation of the spirit and intent of the NLRA and regulations governing public accommodations. American management staff did not feel they could inform the President/CEO that taking these actions are illegal for fear of retaliation.

4. Political and state officials (including law enforcement and judiciary) given political favors and financial benefits. This includes the awarding employment to relatives (e.g., requirement to hire GA Transportation Commissioner's close



CONFIDENTIAL

relative as a KMMG PC Specialist to clear the way for state transportation permits and interstate highway access to the KMMG plant) and providing favorable treatment to Koreans who violate the law (e.g., DUI, Traffic Citations, and resisting arrest cases).

5. American Specialist positions in Procurement do not meet or satisfy the "duties" test under the FLSA's Administrative Exemption requirement. Both HR and Legal have ensured that the job descriptions are in compliance with FLSA in order to classify these positions as "Administrative Exempt" and thus not subject to the overtime provisions. However, Korean Procurement management do not permit team members in these positions to perform the necessary duties and essential job functions to maintain FLSA "exempt" status. Duties actually performed and expected of these Specialists are primarily "clerical" in nature and do not involve the exercise of independent judgment and discretion about matters of significance as required to maintain "exempt" status classification. Our due diligence in this matter has also revealed that American Assistant Manager positions fail to meet the FLSA's Executive exemption because the team members in these positions don't regularly supervise two or more other employees, have management as the primary duty of the position, and have some genuine input into the job status of other employees (such as hiring, firing, promotions, or assignments). Some evidence of this relates to the fact that Korean Procurement leadership have unauthorized organizational charts that reflect that Specialists do not report to Assistant Managers, but to Korean expats instead. In addition, American Assistant Managers do not assign work to Specialists, nor are they permitted to manage their time and attendance (e.g., PTO, OT).

6. The disposal of hazardous materials into the drains is another example of violations of environmental law and regulations.

7. Deliberately ignoring OSHA guidelines in order to more quickly achieve work. There are a couple of examples documented in cases where there were citations resulting from the direction and behaviors an American Manager was trying to change. We are reluctant to provide those details. Once they are "out there" there is no way to take them back. We don't trust that those who will receive the message can understand the example without getting defensive or retaliatory. We do trust that Randy Jackson will use these examples with discretion to achieve the desired goal of a real partnership with our Korean colleagues, so here are some general examples:

   - phone calls to direct that we allow safety exceptions for certain contractors because we were in a hurry to make preparations for a VIP visit;
   - requests from other departments' Korean Coordinators asking for "special consideration" because one of our own senior leaders had given orders with very short lead time to complete the task;



CONFIDENTIAL

- requests to ignore the orientation or drug test requirements for certain favored contractors;
- request that the American Safety & Medical Manager occupy the safety staff elsewhere to keep them away from certain construction activities so as not to slow down the work;
- re-assign one of the safety TMs in preference for a different safety TM because the first one is "inflexible" (code word for insists upon OSHA compliance);
- "don't ask questions if you can't manage the answer" in reference to certain contractors' employees' I-9 status;
- make provisions for contract employees whose employer had failed to properly train or equip;
- solicit specifications and quotes from American suppliers then give Korean suppliers a "target" to beat to win our business;
- provide extra training, safety equipment, and attention to selected Korean contractors when qualified American contractors were denied the work;
- the list goes on. And, the most difficult situations between the American Safety & Medical Manager's coordinator and him is when he would receive direction that was directly contrary to what he knew to be required for compliance, then he would have to stand against him, rather than the two of them being allowed to function as one, to ensure KMMG did the correct thing.

8. Directives from Korean expats to exclude females, older workers, and candidates with a unionized work history from employment opportunities.

- Repeated instances of Korean expats asking illegal, non-job related questions during and after pre-employment interviews and the selection/recruitment process (including questions regarding age, marital status, etc.).
- Attempts made by senior Korean leadership to deny recommendations for employment for female salaried professionals based on their gender.
- Requests made to exclude the hiring of production team members in the 50+ age category.
- Requests made to reduce the number of African-Americans that are being hired due to the high level of minority vs. non-minority representation.



CONFIDENTIAL

- Denials of employment, and requests made to American HR management to deny employment, for salaried and hourly candidates with unionized work history.

- The aforementioned behaviors and actions have been witnessed by many members of management, and have been brought to the attention of the executive team. However, the directives have continued. There has been a systematic approach to discredit and harass these KMMG team members. This is such a wide-spread problem with the Korean staff that it is common knowledge not only within the American management team, but even in the community.

9. There are employees who have been witness to, and been asked to participate in, unauthorized utilization of materials created by other companies. For example, requesting a design and quote from one company, and then providing that company's engineering drawings to another company. In all of these instances, material and quotes were obtained and then ultimately provided to a Korean company. The business was then awarded to a Korean company, although that company did not originally submit a quote.

10. Immediate family members of KMMG executives given preferential treatment and awarded jobs and/or business opportunities for their respective companies in violation of KMMG's conflict of interest and code of ethical business conduct policy and practices. One example would be the President/CEO's son working for the company which oversees, and provides consulting services to, KMMG's 401K plan. Another would be HR Director Randy Jackson's son being the executive over the KMMG JC Malone account. Not only did we do much of our salaried professional recruiting through that agency, which would have had a dramatic financial impact on the Director's son, but we also now hire all of our production temporaries through the same agency.

11. The Korean SVP, KS Kim, recently placed undue pressure on both the American Safety & Health Manager and American Legal Senior Manager to violate the provisions of HIPAA by requesting the release to him of the PMI (Protected Medical Information) of team members who required emergency medical treatment and/or transport to a local hospital by ambulance. In addition, he attempted to deny a production team member's request for religious accommodation pursuant to Title VII. Ultimately, after repeated objections from KMMG's Legal, Safety & Medical, and HR professionals, we were successful in ensuring that KMMG maintained legal compliance in both matters. However, KS Kim has continued to chastise and admonish the members of KMMG management who prevented him from doing what he wanted to do. These members of management believe that he will continue to retaliate against them in tangible or intangible ways because they did not allow him to violate the law.

12. Korean expats interfered in the employment process of a General Affairs Specialist who received a job offer from another Korean company owned by Kia and who KMMG does business with.



CONFIDENTIAL

13. There are at least two incidents of females (one Specialist and one Manager) resigning from KMMG largely as a result of the general mistreatment of females and gender-based discrimination that is prevalent at KMMG on the part of Korean expats. Prior to the two females resigning from KMMG employment, the issues and concerns were brought to the attention of Korean leadership, but Team Relations was not permitted to conduct prompt, thorough investigations due to the interference and veiled threats from Korean expats. Recommendations were brought forward from Team Relations, but simply ignored.

14. There are additional incidents which are very concerning, but it is not known if KMMG American Management was aware of, or could have controlled either of the situations:

- Unfair credit practices which benefit only people of Korean descent. (?)
- There have been two occasions where the Vice Chairman assaulted others during visits to our facility. Both times these assaults were witnessed and reported by others. Ultimately, this Vice Chairman was reported to have been terminated due to quality issues. It is appalling that a Vice Chairman would go unscathed for physically assaulting an employee, but would be terminated for quality problems.

**E. Closing Comments**

1. We all came here with the necessary knowledge and experience to start-up this company and make it successful. However, on a daily basis we are disrespected and not trusted to the jobs we know how to do. They don't think we are smart, and that is a serious mistake on their part. Our actual intelligence continues to pull them out of the fire on a daily basis, and will also be their undoing when their illegal and unethical practices come to light.

2. The Korean expats have no intention of ever following the Kia Way and thus trust and respect people, particularly American people. Many conversations have been overheard where they openly disrespect the American staff, including saying we are not needed or are not as intelligent as them. There are also legitimate reports where Korean expats have warned American members of management about discussing their issues or concerns with KMMG Human Resources/Team Relations.

3. On a daily basis, rather than listening to the real problems and causes, they resort to blaming American staff or being very critical of them for not fixing the problems that are largely outside of their control. This is all the while they are ignoring the problems with our Suppliers, our true Achilles heel. Instead we need to focus on identifying root causes, conducting 5-why analysis, and focusing on problems and improvement (not trying to determine what American we can blame as the Koreans do). Most here have come to recognize and accept, like HMMA team members have, is that the culture will never change, that they will



CONFIDENTIAL

never listen, and that they will always look first to throw an American under the bus. This is why many are leaving and continue to search for other jobs; in fact, the vast majority of salaried team members.

4. All members of KMMG American management are very frustrated and embarrassed by what is really going on here at KMMG. We did not sign up for this. As a member of leadership and an agent of the company, we have a responsibility to bring serious issues forward (particularly when we have a legal obligation to act) and recommend solutions. The American management team continues to hear from Randy Jackson and the Korean staff that we need to bring solutions forward, not just problems. The fact is that we do, but nobody is listening. You should know that many American members of management throughout KMMG have had to resort to documenting these issues to provide some sense of protection in the event an American gets thrown under the bus for a Korean's failure to follow our company policies or obey our U.S. laws and regulations. We know that soon they will have to listen, we just don't know where it will come from.

5. Lastly, the behavior and actions of senior Korean leadership, is not only embarrassing but illegal in most cases. Many of the American staff know about these situations, where laws are broken, and are waiting for the day they need to use it to their advantage, their sort of vengeance. There is a day of reckoning coming for the Koreans for their repeated racial/gender discrimination, hostile work environment, unethical practices, and other legal/legislative violations. Therefore, there are many Americans in this organization who are taking steps to protect their career, future, and financial security accordingly. We dread this day, because we know it is coming. It will swallow all of us up if we don't act quickly. Each of us has the necessary professional ethics and integrity to not allow anyone to knowingly break the law, even if requested to do so by the Koreans (which occurs regularly but is often cloaked in smoke, mirrors, deceptive tactics, so-called Korean English, or claims of miscommunication because of the language barrier). We will not take the fall or go to jail for anyone, and certainly not for the SVP, COO, President/CEO, etc. Someone around here needs to wake up and smell the coffee because word on the street is that the class action lawsuit is coming. It is just a matter of time and there are so many opportunities out there where illegal actions will bring this company to its knees. Let's not become like HMMA (e.g., $6M dollar case) or Mitsubishi. Should they receive this document, our only hope is that the Koreans are smart enough to know that they should never attempt to retaliate. It always proves more costly than the legal violation(s) themselves.

6. We know there are many concerns among the American KMMG team members about retaliation and the loss of future financial or promotional opportunities. Some of us already feel we may have missed some of those things because of bringing forward or raising concerns. But "for evil to triumph, it is enough only that good men do nothing." Enough time and suffering has passed for the Americans to finally wake up and stand up to the wrongdoing by Korean expats.



CONFIDENTIAL

We can no longer tolerate the illegal practices and unethical behavior including the mistreatment of, and disrespect toward, American KMMG team members and thus must report these concerns.

7. It is a sincere belief held by members of American management that the only reasonable and acceptable resolution to the concerns reported in this document is for the following actions to be taken:

   - Engage a full scale independent investigation of all the allegations of illegal or unethical business and employment practices on the part of Korean expats
   - Implement immediate remediation of all the factual and substantiated inappropriate behavior and actions on the part of Korean expats in violation of KMMG policy and the Kia Way to the full satisfaction of American management staff .
   - Require signed statements from all Korean expats that include admissions of wrongdoing and acceptance of responsibility and accountability for their inappropriate, illegal, and unethical actions and behaviors
   - Immediate termination and/or return of all Korean expats who have committed these inappropriate, illegal, and unethical actions and behaviors

8. The above recommended resolutions are considered reasonable from the perspective that the Koreans have repeatedly shown a pattern of intentionally refusing to respect, honor, and obey U.S. laws and regulations, KMMG policy, and other generally accepted customs and practices. It's a situation which is no longer tolerable, and we believe if it goes unchanged, it will ultimately end up being addressed by the UAW, EEOC, DOL, OSHA, EPA, etc.

Should the information contained in this document result in retaliatory actions, including tangible or intangible employment actions against any member of the KMMG American management staff, each party involved in the production of this report has no control over the potential release (by other members of the American management staff or their legal counsel) of this document and other information reflecting wrongdoings on the part of the Koreans, to media sources; federal, state, and local officials including regulatory bodies; or other interested parties.

The above information is respectfully submitted at the request of HR Director, Randy Jackson, and in compliance with Legal policy LG201, Duty to Report Concerns.



CONFIDENTIAL