## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

ANDREA GOGEL,

       Plaintiff,

v.

KIA MOTORS MANUFACTURING
GEORGIA, INC.,

       Defendant.

CIVIL ACTION NO.

3:14-cv-00153-TCB-RGV

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff Andrea Gogel ("Gogel") brings this action against defendant Kia Motors Manufacturing Georgia, Inc. ("KMMG"), alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981").  See [Doc. 19].[1] KMMG has filed a motion for summary judgment, [Doc. 83], which Gogel opposes, [Doc. 101].  Gogel has filed a motion for partial summary judgment on the prima facie case of her retaliation claims under Title VII and § 1981 and certain defenses offered by KMMG, [Doc. 93], which KMMG opposes, [Doc. 99].  For the reasons that follow, it is **RECOMMENDED** that KMMG's motion for summary judgment, [Doc.

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, except that citations to deposition transcripts are also cited according to the transcript page number.

83], be **GRANTED** and that Gogel's motion for partial summary judgment, [Doc. 93], be **DENIED**.

## I.  FACTUAL BACKGROUND

### A.    Preliminary Procedural Issues

"In this District, the process for separating disputed from undisputed material facts is governed by Local Rule 56.1(B)." Brandon v. Lockheed Martin Aeronautical Sys., 393 F. Supp. 2d 1341, 1347 (N.D. Ga. 2005), adopted at 1346.  In compliance with Local Rule 56.1B, both parties have submitted statements of undisputed material facts, [Doc. 83-2; Doc. 93-2], and responses thereto [Doc. 102; Doc. 100]. Gogel also has submitted a statement of disputed material facts, [Doc. 103], to which KMMG has responded, [Doc. 111].  The Court accepts as undisputed those facts which Gogel admits or has failed to properly dispute or deny, see [Doc. 102, admitting of failing to properly dispute ¶¶ 1-3, 5, 7, 9-11, part of 12, 13-18, part of 19, 20, 22-23, part of 24, 28, part of 29, 30-31, 34, 36-48, part of 49, 50-62, 64-65, 67-70, 72, 76-77, 79-81, 83-94, 96, part of 97, 98, part of 99, 100-07, 110-12, part of 114, 116-23, 125, part of 126, 127-29, part of 131, 132-34, 138-42, 146-50, part of 152, 153-56, 158-64, part of 165, 166-70, and 173 of KMMG's statement, Doc. 83-2], as well as those facts which KMMG admits or has failed to properly dispute or deny, see [Doc. 100, admitting or failing to properly dispute ¶¶ 1-18, 20, part of 21, 25, part of 26, 28-34, part of 36, 37, part of 38, 39-40, 47, part of 49, part of 53, 54, part of 57, 59, 63, 65, 67-

69, 73, 91, 93-94, 103, 124-25, 127-28, 130-31, 136, 151-52, 155-56, 163, part of 164, 165-67, part of 168-69, 171-74, 177, 179, part of 181, 183-85, 188-90, 192-94, 196, 198, 200-01, 204, 207, 209, 215-16, 218, 221, 226, 229-30, and 232 of Gogel's statement, Doc. 93-2]; see also [Doc. 111, admitting or failing to properly dispute ¶¶ 1-2, 4-13, part of 14, 15-16, part of 18,  20-22, 27, part of 28, 32, 35-38, 41-43, 48, part of 49, part of 50, 51, 58, part of 60, part of 68, 69, part of 74, 75-76, part of 77, 81, 83, 93, 95, 97-99, 103-06, 111, 130, 132, 140, 153, 185-86, 188-90, 199, 201-02, 207, 224-26, 231-32, 242, part of 245, 246, 248, part of 249, part of 250, 252, 254-56, 262, 265, 271-72, 274, 277, 282, 284, part of 285, part of 286, 288-90, 293-95, 297-99, 301, 319, 321, 334, 337-38, and 340 of Gogel's statement, Doc. 103].[2]  However, the Court has disregarded those facts

---

[2] KMMG objects that Paragraph 159 of Gogel's statement of disputed facts and the portion of her declaration used to support the aforementioned paragraph are contradicted by Gogel's own testimony and thus should be stricken from the record. See [Doc. 111 at 46 ¶ 159]; see also [Doc. 103 at 35 ¶ 159; Doc. 101-1 (Pl.'s Decl.) at 14 ¶ 48].  "An affidavit may be considered a 'sham' affidavit 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"   White v. Crystal Mover Servs., Inc., Civil Action No. 1:13–CV–1452–WSD–JSA, 2014 WL 4662371, at *19 (N.D. Ga. June 24, 2014), adopted as modified by 2014 WL 4662379, at *10 (N.D. Ga. Sept. 18, 2014) (alterations in original) (citation omitted) (quoting Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986)).  The Eleventh Circuit has cautioned that the sham affidavit rule "should be used sparingly, and the affidavit and deposition must contain inherent inconsistencies before the affidavit can be disregarded." Wolk v. Seminole Cty., 276 F. App'x 898, 900 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted). Additionally, "an affidavit may only be disregarded as a sham when a party has given clear answers to unambiguous questions which negate the existence of any

that are not material, are supported by citation to a pleading rather than to evidence, or are stated as issues or legal conclusions.  See LR 56.1B(1)-(2), NDGa.

_____

genuine issue of material fact." nVision Global Tech. Solutions, Inc. v. Cardinal Health 5, LLC, 887 F. Supp. 2d 1240, 1259 (N.D. Ga. 2012) (citations and internal marks omitted).  "A court presented with such an inconsistency in a party's testimony may disregard the later 'sham affidavit' in favor of the earlier deposition testimony." White, 2014 WL 4662371, at *19 (citations omitted) (citing Van T. Junkins & Assocs. v. U.S. Indus., Inc., 736 F.2d 656, 658 (11th Cir. 1984)).  However, a "court must be careful to distinguish between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." nVision Global Tech. Solutions, Inc., 887 F. Supp. 2d at 1260 (citation and internal marks omitted).  "In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition." See Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980) (citations omitted).  Indeed, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence," and "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." Tippens, 805 F.2d at 954 (citations omitted).  Here, Gogel testified that she told Diana Ledbetter ("Ledbetter") that she "didn't feel like [she] could trust the people internally to listen to or deal with any concerns that [she] had and that [she] was going to seek outside assistance.  And [Ledbetter] asked [her] if [she] had an attorney.  And [she] [] believe[d] at that time, [she] didn't . . . but [she] had chosen an attorney, and was going to meet with that attorney.  And [she] told [Ledbetter] that attorney's name." [Doc. 117 (Pl.'s Dep. Vol. I) at 52-53 pp. 208-09].  In her affidavit, Gogel states, "I did not solicit others to further my own agenda, and deny I had an agenda except to protect myself from further discrimination at KMMG." [Doc. 101-1 at 14 ¶ 48].  The Court finds that Gogel's affidavit is not inconsistent and does not directly contradict her deposition testimony.  See Phillips v. Tacala, LLC, 883 F. Supp. 2d 1138, 1145 (N.D. Ala. 2012) (finding deposition and declaration testimony were not inconsistent).  Therefore, the Court **OVERRULES** KMMG's objection to the challenged portion of Gogel's affidavit as a "sham."

4

Furthermore, the facts will be construed in the light most favorable to the non-moving party, as required on a motion for summary judgment, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (citation omitted), and "the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist," <u>Glenn v. Brumby</u>, 724 F. Supp. 2d 1284, 1295 (N.D. Ga. 2010).  "Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" <u>Id.</u> (alteration in original) (quoting <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004)); <u>see also</u> <u>Adega v. State Farm Fire & Cas. Ins. Co.</u>, No. 07-20696-CIV, 2009 WL 3387689, at *3 (S.D. Fla. Oct. 16, 2009) (citation omitted) ("When evaluating cross-motions for summary judgment, the Court analyzes each individual motion on its own merits and thus views the facts on each motion in the light most favorable to the respective nonmovant.").  Thus, "the denial of one does not require the grant of another."  <u>Perez-Santiago v. Volusia Cty.</u>, No. 6:08-cv-1868-Orl-28KRS, 2010 WL 917872, at *2 (M.D. Fla. Mar. 11, 2010) (citation and internal marks omitted).  "Even where the parties file cross motions pursuant to Rule 56, summary judgment is

inappropriate if disputes remain as to material facts."  Id. (citations and internal

marks omitted).[3]

## B.    Factual and Procedural Background

After graduating with a Bachelor of Arts in 1991, Gogel's first paid human

resources position was as the human resources coordinator at a small hospital in

Indiana.  [Doc. 117 at 8 p. 29, 9 p. 36, 110].  Thereafter, she held the job titles of

human resources manager, employee relations specialist, team member relations

specialist, and assistant human resources manager at various companies between

1995 and 2004, before being employed as an assistant human resources manager at

Toyota Motors Manufacturing Indiana ("Toyota") in 2004.  [Id. at 110].  In 2004, she

also obtained a Senior Professional in Human Resources ("SPHR") certification,

which she held "between three and five years."[4]  [Id. at 8 p. 31, 9 p. 33].  At the time

Gogel left Toyota, she had four employees who directly reported to her.[5]  [Id. at 110].

---

[3] Accordingly, what follows is a summary of the undisputed material facts,
and the Court will note those occasions in which Gogel or KMMG offer additional
or conflicting factual statements that are supported by the evidence of record.  J.D.P.
v. Cherokee Cty., Ga. Sch. Dist., 735 F. Supp. 2d 1348, 1350 (N.D. Ga. 2010).  Finally,
the Court has taken additional facts from the pleadings and supporting exhibits in
order to fully describe Gogel's allegations.

[4] Gogel points out that the SPHR designation is "preferred, but [] not
required[.]"  [Doc. 120 (Jackson Dep.) at 27 p. 104].

[5] Gogel submits that "[f]our people would have been the least number of
people [she] ha[d] supervised since 2001."  [Doc. 101-1 at 4 ¶ 13].

Before beginning her employment at KMMG, Gogel had never held the titles of senior human resources manager or manager of team relations.  [Id. at 36 pp. 143-44].

In July of 2007, KMMG hired Randy Jackson ("Jackson") as its Director of Human Resources.[6]  [Doc. 85 (Jackson Decl.) at 2 ¶ 3; Doc. 120 at 19-20 pp. 72-73].  As part of KMMG's organizational structure, Korean coordinators, who were hired by Kia Motors Corporation ("KMC") in South Korea, would be temporarily assigned to work at KMMG for three to four years.  [Doc. 115 (Bailey Dep.) at 22 pp. 81-84].  The coordinators partnered with the senior manager, assisting with the senior manager's responsibilities and communications between KMMG and KMC.[7]  [Id. at 23-24 pp. 88-89].  Tyler had previously worked with Gogel at Toyota and referred Gogel to KMMG.[8]  [Doc. 117 at 17-18 pp. 68-72, 25 p. 97, 107, 110; Doc. 121 at 14 pp.

---

[6] Jackson was the highest ranking American at KMMG during Gogel's employment.  [Doc. 93-3 (Pl.'s Decl.) at 7 ¶ 23].

[7] Gogel points to the testimony of Bob Tyler ("Tyler"), who at the time was KMMG's Manager of Human Resources, that the senior manager could not make decisions without the coordinator, as the "ultimate decision was with the coordinator."  [Doc. 122 (Tyler Dep.) at 16 p. 60].  KMMG maintains that, with respect to the decisions at issue in this case, Jackson made the decisions and was the sole decision-maker.  [Doc. 120 at 36 p. 139, 48 p. 188, 70 p. 273, 71 p. 279].

[8] Tyler graduated in 1983 with a bachelor's degree with a concentration in human resources.  [Doc. 121 (Tyler Dep.) at 6 pp. 23-24].  After graduating, Tyler started as a divisional manager at a retail department store where he supervised and led retail employees.  [Id. at 7 pp. 26-27, 8 p. 29, 65].  In 1986, Tyler began his

54-55, 15 p. 57].  Gogel applied for employment at KMMG on January 25, 2008, [Doc. 117 at 106-09], and the following month, Jackson, whom she also knew from her employment at Toyota, hired her to be KMMG's Manager of Team Relations, [Doc. 115 at 25 p. 95; Doc. 117 at 21 p. 83, 22 pp. 85-87, 111-12; Doc. 120 at 49 p. 190], and she officially started at KMMG on March 17, 2008, [Doc. 115 at 60 p. 235; Doc. 117 at 17 p. 68, 24 p. 95]; see also [Doc. 117 at 111-12].[9]  At the time she was hired, Gogel reported directly to Jackson.  [Doc. 117 at 25 p. 97].

According to Gogel, the overall purpose of Team Relations was "to create and support an environment of positive team relations," to develop standards and policies, and "to help people understand [] the rules and guidelines of the

---

employment with Chevron Chemical Company, and during his tenure there, he began as a process operator and was promoted to supervisor of human resources safety and training.  [Id. at 8 pp. 30-32, 65].  From 1991 until 1993, he was employed with Eaton Corporation as a human resources manager.  [Id. at 10 pp. 37-38, 64-65].  In 1993, Tyler began his employment at Toyota as a human resources specialist in the team member relations section.  [Id. at 10 p. 40, 11 p. 41, 64].  In 1997, Tyler obtained his SPHR certification and still holds this designation.  [Id. at 6-7 pp. 24-25].  He was promoted to assistant manager of human resources, team member relations in 1997 and human resources manager, team member relations in 1999.  [Id. at 11 p. 44, 12 p. 46, 64].  While at Toyota, six assistant managers directly reported to Tyler and twenty-nine human resources representatives reported to him indirectly through the assistant managers.  [Id. at 13 p. 49, 64].  In 2002, Tyler joined Calsonic Kansei North America as the manager of human resources, and in 2004, he was promoted to the senior manager of human resources.  [Id. at 13 pp. 49-51, 63].

[9] Gogel testified that when she joined KMMG, it was the first time that she held a position as a "manager without the word assistant in front of it."  [Doc. 117 at 17 p. 68].

workplace[,]" which "included doing training and development as people came into the organization, as well as supporting similar activities with [KMMG's] suppliers" through "training opportunities and systems that were appropriate for [KMMG's] suppliers to also maintain positive employee relations, positive team relations within their environment." [Id. at 22 pp. 87-88].  As Manager of Team Relations, Gogel's "primary job duty was to resolve employment conflicts[ or] any type of disputes[ and] to try to resolve them before they got out to an outside party, such as an attorney or the [United States Equal Employment Opportunity Commission ('EEOC')]." [Doc. 115 at 26 p. 98; Doc. 121 at 7 pp. 27-28].  In fact, "she was hired to investigate complaints, resolve conflicts, [and] to be an advocate for the team member in the best interest of [KMMG]."[10]  [Doc. 115 at 12 p. 44].  The Team Relations Department's investigations included policy violations, treatment of individuals by others, attendance and tardiness issues, and investigations into

---

[10] Gogel acknowledges that she was responsible for resolving team relations issues, but maintains that this was not her primary duty. [Doc. 101-1 at 1-2 ¶ 2; Doc. 101-9 at 2].  Gogel submits that her position included additional duties beyond investigating and resolving complaints, [Doc. 101-9 at 2], and that she was not hired to investigate all complaints, as the Legal Department handled and investigated EEOC charges, [Doc. 115 at 40 p. 156].  She claims that she was "responsible for creating process, policies and systems to maintain high morale at KMMG . . . . [which] included hiring and guiding Team Relations personnel," and that she was also responsible for knowing "federal and state labor laws" in order to "advise employees accordingly within the guidelines of the[] laws." [Doc. 101-1 at 2 ¶ 3]. KMMG disputes that Gogel's duties included advising non-management employees within the guidelines of federal and state laws.  [Doc. 101-9].

allegations of discrimination and harassment. [Doc. 117 at 26 p. 101]. Investigations of EEO ("Equal Employment Opportunity") matters were conducted by Team Relations under the direction of KMMG's Legal Department.[11] [Id. at 25-26 pp. 100-02]; see also [id. at 10 p. 38; Doc. 119 (Grimes Dep.) at 18 p. 65]. Team Relations assisted Jackson in resolving potential discrimination problems. [Doc. 117 at 26 p. 103]. As Manger of Team Relations, Gogel reviewed the investigative results and was involved in providing the facts to Jackson and making recommendations as to the disposition of the investigation.[12] [Id. at 26-27 pp. 102-06; Doc. 119 at 39 p. 150]. A summary of the results of the investigation would then be provided to Jackson and the Legal Department. [Doc. 123 (Williams Dep.) at 42 pp. 162-63]. When investigating management, Jackson provided the overall direction, depending on the level and severity involved, and determined the level to which the investigation escalated, [Doc. 117 at 26 p. 104], and Gogel generally was involved and provided

---

[11] Gogel admits that Team Relations investigated internal complaints regarding discrimination and harassment, but she maintains that the majority of the investigations "included attendance problems, falsification of documents, and leaves of absences" and that if the investigation "had the slightest appearance that it could have legal implications, it was done under the direction of [the] Legal [Department]," [Doc. 101-1 at 3 ¶ 7], and that any EEOC charges were handled in the Legal Department, [Doc. 115 at 40 p. 156].

[12] Gogel adds that the recommendations were made in conjunction with her team, [Doc. 117 at 26 p. 102], and she contends that she did not always provide recommendations to Jackson, [id. at 26-27 pp. 104-06].

the facts discovered, advice, and recommendations to Jackson, [id. at 27 pp. 105-06]. However, for non-management employees, members of Team Relations conducted the investigation, then made recommendations to Gogel, who would then provide a recommendation to Jackson.  [Id. at 26 pp. 103-04].

Gogel also was "responsible for team-member morale."[13]  [Doc. 115 at 12 p. 44].  Her position as Manager of Team Relations put Gogel "in a position of trust and confidence[.]"  [Id. at 12 p. 44].  According to a 2010 job description, the Manager of Team Relations was "[r]esponsible for leading and directing the Team Member Relations and Supplier Support programs and functions" and "[p]lan[ning] and implement[ing] key activities to promote high team member morale and prevent unwelcomed activity within both KMMG and KMMG Suppliers."[14]  [Doc. 117 at 113]; see also [id. at 27 pp. 106-07].  The essential duties and responsibilities of a Manager of Team Relations, as listed in the 2010 job description, included:

- Pro-actively monitor and assess outcomes of investigations, working conditions, corrective actions, and team members concerns, and make recommendations for policy and procedure enhancements to address such concerns[; and]

---

[13] Gogel asserts that others were also responsible for team-member morale. [Doc. 101-1 at 2 ¶ 4].

[14] Gogel asserts that "unwelcomed activity" was "a term that was used for union organizing activity, not EEO and legal activity."  [Doc. 101-1 at 2 ¶ 5].  KMMG disputes that anyone at KMMG, including Jackson, understood "unwelcomed activity" to mean what Gogel avers.  [Doc. 111 at 6 ¶ 19].

- Develop plan/strategy and timelines on how to resolve Team Relations issues and keep all appropriate parties informed of status[.]

[Id. at 113].  As Manger of Team Relations, Gogel had three "direct reports"– Paul Grimes ("Grimes"),[15] Bryan Rathert ("Rathert"), and Arthur Williams ("Williams"), who at the time were all Assistant Managers of Team Relations.[16]  [Id. at 21 pp. 83-84]; see also [Doc. 119 at 15 p. 52; Doc. 123 at 20 p. 76].  Williams testified that his role in Team Relations was to " hope [sic] team members stay out of legal situations and try to resolve problems prior to them getting bad," while protecting both the team member and KMMG.[17]  [Doc. 123 at 34-35 pp. 132-33].

In the fall of 2008, Gogel received complaints pertaining to B.M. Ahn, KMMG's President during the relevant time period, and Kisha Tarver ("Tarver"),[18] who worked in KMMG's General Affairs Department, and Gogel was concerned

---

[15] Grimes had applied for Manager of Team Relations, but Jackson selected Gogel for the position.  [Doc. 119 at 14 pp. 51-52].

[16] Gogel also had "multiple [team relations] specialists indirectly reporting to [her] at KMMG."  [Doc. 101-1 at 3 ¶ 8]; see also [Doc. 117 at 21 pp. 83-84].

[17] Gogel contends that Team Relations did not handle legal situations, which were reserved for KMMG's Legal Department, [Doc. 101-1 at 2 ¶ 2], and that "[i]f a team member fe[lt] that their complaint's not being addressed by [KMMG], then it[ was] up to the team member to find other options," [Doc. 123 at 35 p. 133].

[18] Tarver's last name, at the time Gogel worked at KMMG, was Morris.  [Doc. 123 at 59 p. 231].

that they "were engaged in a quid pro quo relationship that was affecting others at KMMG," so she asked Jackson if she could investigate the relationship.[19] [Doc. 101-1 at 4 ¶ 14]; see also [Doc. 117 at 30 p. 120, 42-43 pp. 168-70, 50 p. 200; Doc. 119 at 22 pp. 82-83; Doc. 120 at 116]. Jackson told Gogel that she could not investigate the matter. [Doc. 117 at 31 p. 121]. Within two to three weeks, Kevin Kim, the Korean Coordinator for Human Resources and Team Relations, asked Gogel to investigate Tarver, but not to inform Jackson of her investigation. [Id. at 30-31 pp. 120-22]; see also [Doc. 101-1 at 5 ¶ 15; Doc. 122 at 17 p. 61]. After Gogel started the investigation, Kevin Kim asked her to "stop the investigation, [] not to gather any more information, and destroy all information related to [the investigation]." [Doc. 117 at 31 p. 122].

In March of 2009, KMMG released an organizational announcement with new titles and designations, including Head of Department ("HOD") designations.[20] [Id.

___

[19] KMMG's harassment policy "prohibit[ed] romantic or sexual relationships between any KMMG member of management and any subordinate Team Member." [Doc. 93-11 at 4; Doc. 101-7 at 4].

[20] "In cooperation with their Korean Coordinator, [the HOD] shares full responsibility and authority for leading departmental initiatives and activities and making important decisions to ensure organizational and department goals and objectives are met." [Doc. 117 at 121]. "Prior to making decisions or actions that impact the [d]epartment, the HOD must take steps to advise, consult, and reach agreement with the [Korean] Coordinator." [Id.]. Senior Manager is a recognized level in KMMG's organization, and the HOD designation deals more with roles and responsibilities (i.e., work content). [Doc. 114 (Arnold Dep.) at 21 p. 77; Doc. 117 at

at 29 pp. 113-14, 116-22].  Two separate departments at KMMG–Human Resources and Team Relations–handled personnel matters.  [Doc. 115 at 34 p. 131; Doc. 117 at 28 p. 111].  Due to his significant responsibilities regarding construction of KMMG, Jackson wished to reduce the number of managers that reported directly to him, so he decided to designate one individual as the HOD for two departments–Human Resources and Team Relations.  [Doc. 85 at 2-3 ¶¶ 7-8].  Thus, in March of 2009, Jackson designated Tyler as the first HOD of Team Relations and Human Resources.[21]  [Id. at 2 ¶ 6; Doc. 115 at 34 p. 132; Doc. 117 at 25 p. 97, 25 p. 110, 29 p.

_____

117].

   [21] Jackson testified that he alone made the decision to promote Tyler to HOD of both Team Relations and Human Resources.  [Doc. 120 at 48 p. 188, 71 p. 279]. Gogel denies that Jackson was the sole decisionmaker, pointing to Jackson's testimony that he and K.S. Kim, KMMG's Senior President of Human Resources and Administration, would have discussed making Tyler HOD for Team Relations and Human Resources, [id. at 36 pp. 139-40; Doc. 115 at 22 p. 82], and Tyler's testimony that Jackson "in conjunction with the Korean coordinators for [Human Resources] and [T]eam [R]elations" made the decision to designate him as HOD, [Doc. 122 at 43 pp. 165-66].  While Tyler was designated as HOD of Team Relations and Human Resources in 2009, along with other managers' HOD designations as part of an organizational structure, these "were designations, not promotions," and these designations did not include a raise in pay.  [Doc. 115 at 46 p. 179]; see also [Doc. 117 at 117-22].  No one has since been designated as HOD of Team Relations and Human Resources.  [Doc. 115 at 32 p. 123; Doc. 120 at 49 p. 189].  Gogel submits that she was the only American manager that did not have a higher level American manager above them who was not designated as HOD for her particular department, [Doc. 93-3 at 7 ¶ 24; Doc. 101-1 at 5 ¶ 16, 6 ¶ 21; Doc. 117 at 32 pp. 125-26], and that only American males were designated as HODs in 2009, [Doc. 117 at 32 pp. 125-26].  However, Jackson testified that "[n]ot all Managers received the HOD designation," including Robert Marzan.  [Doc. 85 at 2 ¶ 5].  Gogel maintains

115, 116-18; Doc. 119 at 18 p. 66; Doc. 120 at 116-18].  Jackson based his decision on

Tyler's many years of experience and on his being at KMMG "from the beginning."

[Doc. 120 at 36 p. 140].   Gogel understood the HOD designation as an attempt "to

streamline the reporting mechanisms within the organization."  [Doc. 117 at 28 p.

111].  Gogel began reporting directly to Tyler at this time.  [Id. at 29 p. 115]; see also

[Doc. 19 at 3-4 ¶ 10].  Gogel asserts that she should have been designated as the

HOD of Team Relations and that she "immediately voiced [her dissatisfaction] to []

Jackson," but he responded that it was a timing issue,[22] and she further contends

that she brought it up again in October 2009, expressing her concern that "there was

---

that his position in KMMG's organizational structure was different than hers. [Doc.
117 at 50 p. 197].

   [22] In particular, Gogel explained to Jackson that she understood that the
significance of the separation of Team Relations and Human Resources was that
they were two separate departments and that the manager in place "immediately
slid up into [the HOD] position."  [Doc. 117 at 29-30 pp. 116-17].  Gogel states that
Jackson informed her that she was not designated as HOD for Team Relations
because Human Resources and Team Relations had just been separated into two
separate departments and that the HOD designations had been automatic.  [Id. at
29-30 pp. 116-17, 32 pp. 126-28]; see also [Doc. 122 at 96].  Jackson described it as a
timing issue and told her it was not because of anything else and explained he
would take care of Gogel in April.  [Doc. 117 at 30 p. 117, 32 pp. 126-27]; see also
[Doc. 122 at 91].  KMMG points out that Gogel understood that not all managers
were automatically designated as HODs, [Doc. 117 at 32 pp. 125-26]; see also [Doc.
85 at 2 ¶ 5], and that Jackson testified that he never told Gogel he would promote
her later or "take care of her" in April, [Doc. 120 at 41 pp. 157-58].

a bigger issue at work than simply timing[.]"[23]  [Doc. 117 at 29-30 pp. 115-18, 45 pp.

179-80; Doc. 120 at 41 p. 157].

_____

[23] Gogel testified that she was concerned that it was more than just a timing issue because Steve Thompson, hired as the Manager of General Affairs, told her that he was going to be named HOD of General Affairs, despite the fact that she had been told that such designations were made only one time each year.  [Doc. 117 at 45 p. 180, 47 pp. 185-86]; see also [Doc. 122 at 96].  Gogel maintains that "multiple factors" went into to her not being designated HOD in 2009, including her request to conduct an investigation regarding KMMG's President, [Doc. 117 at 31 p. 123], cultural differences and her being female,  [id. at 30 pp. 118-19, 47 p. 185]; see also [Doc. 101-1 at 6 ¶ 20], and the fact that "the Korean [c]oordinators did not want to work closely with [her]," [Doc. 101-1 at 5 ¶ 17]; see also [Doc. 117 at 30 pp. 118-20]. Gogel submits that Williams told her that he felt bad for her because the Koreans did not treat her right, [Doc. 101-1 at 15 ¶ 52; Doc. 117 at 31 pp. 123-24]; however, Williams denies ever saying this to Gogel, [Doc. 123 at 54 pp. 210-11].  Gogel claims that when she expressed her concerns to Jackson in October 2009, she told him that there was a "gender issue" at KMMG, pointing to the "requirement to 'hide' female security officers when Korean expatriates visited" as an example, and that she felt her performance was "looked at very differently than [her] male counterparts." [Doc. 101-1 at 6 ¶ 20].  Gogel asserts that after she expressed her concerns, Jackson asked her if Toyota would take her back and said that he "wouldn't have brought [her] [to KMMG] if [he] had known what it was going to be like."  [Doc. 117 at 47 p. 186]; see also [Doc. 101-1 at 6-7 ¶ 21].  However, Jackson denies ever saying this to Gogel.  [Doc. 120 at 41 p. 158].  When Gogel again followed up with Jackson sometime in the fall of 2009 regarding her concerns about the HOD designation, she maintains that Jackson stated that Team Relations was a part of Human Relations, which Gogel submits is contrary to the timing reason that Jackson had expressed to her earlier.  [Doc. 117 at 47 p. 187]; see also [Doc. 122 at 91].  Based on Jackson's explanation, Gogel testified that she asked Tyler and he informed her that Team Relations was a separate department.  [Doc. 117 at 47 pp. 187-88]; see also [Doc. 122 at 97].  Gogel also testified that at the end of 2008, Kevin Kim briefly showed her an organizational chart depicting that Team Relations and Human Resources were "two distinct departments" with "two different HODs" and he told her that in the future there would be HODs made for each department and that the current managers "would go into those HOD positions."  [Doc. 117 at 28 p. 111, 29 pp. 115-16].

In June of 2009, Gogel asked Tyler if she could attend a Society for Human Resources Management ("SHRM") meeting, but Tyler informed her that Jackson wanted to send an assistant manager to the meeting.  [Doc. 117 at 6 p. 23; Doc. 120 at 42 pp. 163-64, 124; Doc. 122 at 27-28 p. 104].   At some point during "the late summer of 2009," Gogel went to Jackson about her concern regarding an incident in which a female security guard who was "not pretty" was "hidden during a visit of [KMMG's] higher level executives from Korea," while Ledbetter was made to sit up front because "she's pretty."  [Doc. 117 at 45-46 pp. 180-81].[24]

On August 14, 2009, Jackson sent an email requesting information from KMMG's managers in order to develop a training session to bring American managers and Korean coordinators closer together in working relationships.  [Doc. 120 at 121-22]; see also [id. at 41-42 pp. 160-61].   In particular, Jackson asked for information regarding problems that American managers were having in their working relationships with the Koreans.  [Id. at 41-42 pp. 160-61].  Gogel submitted the requested information to Bonnie Colley, Jackson's administrative assistant.  [Id. at 42 p. 161].

---

[24] At some point in 2009, Gogel traveled to Korea with approximately 400 employees.  [Doc. 117 at 41-42 pp. 164-66].  Gogel claims that she was abandoned during this trip because she was left at the hotel for the weekend with "very limited food" and was "the only Caucasian woman" left at the hotel.  [Id. at 40 p. 159, 42 p. 165].

In the fall of 2009, Kevin Kim requested that Gogel investigate Terren Bonkowski ("Bonkowski"), a Manager of KMMG's Stamping Department, whom Kevin Kim described as a "very bad woman."[25]   [Doc. 117 at 46 pp. 181-82].   Gogel informed Jackson of Kevin Kim's request. [Doc. 93-3 at 7 ¶ 22; Doc. 101-1 at 15 ¶ 53]. During her investigation, two male managers in the Stamping Department

---

[25] Sometime "after the fall of 2009," Gogel submits that following a meeting regarding an employee's termination where both Korean and American management were present, Jackson asked that she not speak so strongly in review meetings and sometimes other meetings.  [Doc. 117 at 43-44 pp. 171-75, 47 pp. 185-86].  Gogel asked Jackson if it was okay for two of her subordinates, Williams and Tim Wilbanks, to voice opinions and facts in those meetings, and she maintains that Jackson responded in the affirmative.  [Id. at 44 pp. 175-76]. Gogel further maintains that Jackson informed her that "KS [Kim] ha[d] concerns" and that Jackson "really [didn't] want [her] to speak at all."  [Id. at 44 p. 176].  Gogel did not recall if Jackson ever told anyone else not to speak during a meeting, and she did not recall how many times Jackson asked her not to speak and could only remember this "particular instance."  [Id. at 45 p. 177].  Jackson stated that he "may have told [Gogel] not to 'speak so strongly,'" but that his "point in talking to her was to encourage her not to interrupt the presenters with continued questions about their investigations, which she had a tendency to do," and "to let her know that all issues about the termination decision or the manner in which the investigation was conducted should be done before the meeting started" as the "termination meetings included executives who expected everything to have been fully vetted before the meeting, not during the meeting," [Doc. 85 at 5 ¶ 15], and that other female Team Relations members attended and presented at these meetings, [id. at 4 ¶ 11, 5 ¶¶ 14, 16].  Gogel maintains that she did not continually interrupt presentations, but that she offered her opinions at the conclusion of the presentations.  [Doc. 101-1 at 4 ¶ 10].

expressed their concerns to Gogel regarding the way Bonkowski was treated and their thoughts that it was based on her gender.[26]   [Doc. 117 at 46 pp. 182-84].

In January 2010, Tyler completed a Performance Appraisal and Competency Assessment of Gogel for the 2009 calendar year.   [Doc. 117 at 123-29]; see also [id. at 33 p. 129; Doc. 121 at 68-74].   As part of the self-assessment portion of the performance appraisal, Gogel indicated that she needed improvement in the areas of multi-tasking, performance management, and routine job duties.   [Doc. 117 at 33 pp. 130-31, 127].   Tyler  agreed with Gogel's self-evaluation.[27]   [Doc. 121 at 72]; see

---

[26] Gogel testified that Kevin Kim also screamed at her and told her she was a bad person who was telling rumors about Koreans, [Doc. 117 at 41 pp. 162-63], and that K.S. Kim yelled at her and told her that "he didn't understand what [she] was explaining to him" and "asked for someone else to explain it to him," [id. at 40 pp. 158-59].   She further testified that once she brought her male subordinate in to explain it to him, he would then understand.   [Id.].   However, Gogel testified that she also believed K.S. Kim yelled at male employees.   [Id. at 41 pp. 161-62].   Gogel complained to Jackson regarding K.S. Kim's behavior.   [Doc. 101-1 at 13 ¶ 41]; see also [Doc. 93-3 at 4 ¶ 12].   Gogel also complained that she was excluded from meetings and that she was excluded from conversations on many occasions with Williams, Grimes, Jackson, Justin Yoo, a Korean coordinator, and K.S. Kim, and that she relied on Williams and Grimes to relay the information to her.   [Doc. 101-1 at 11 ¶ 35]; see also [Doc. 117 at 40 p. 160].

[27] Although the appraisal indicated that Tyler agreed with Gogel's self-evaluation, Tyler testified that he was "asked [by Jackson] to change the final result" because her "score was too high," but he could not remember whether he agreed or disagreed with Gogel's self-evaluation on his first draft.   [Doc. 121 at 24-25 pp. 96-100].   Tyler further testified that he understood why "there was a needs improvement" under performance management as "she was asked to better manage her two assistant managers who essentially were unmanageable."   [Id. at 25 pp. 97-98].

also [id. at 24-25 pp. 95-98].  On March 3, 2010, Jackson sent Gogel an email telling her she did a "good job" in a meeting that took place the previous day and that he would "keep working with KS [Kim] as we go forward."  [Doc. 93-4 at 2].  Also in March of 2010, Tyler completed a Forecast of Potential on Gogel, the purpose of which was "to help guide KMMG Leadership in the succession, planning, promotion, and development."  [Doc. 122 at 101-04]; see also [id. at 37 p. 143].  Tyler indicated that Gogel's likely next position was Senior Manager, but that such a promotion would not occur for 24 months, explaining that Gogel "needs more time in current Manager role to display leadership skills and readiness for Senior [Manager] position."[28]  [Id. at 102, 104].

Tyler was promoted to Senior Manager of Human Resources and Team Relations effective April 12, 2010, and he received a raise at this time in conjunction with his promotion.[29]  [Doc. 120 at 39 p. 150, 119-20; Doc. 122 at 19 pp. 70-71, 49 p.

---

[28] Tyler testified that Jackson told him to give Gogel a different rating than the one he had given her and that the statement on the form that Gogel needed to wait two years until being promoted "didn't come from [him]," but he could not remember if Jackson specifically told him to say that.  [Doc. 122 at 37-38 pp. 144-46]; see also [Doc. 121 at 22 p. 87].  Tyler also testified that although these forms were completed, they were "never evaluated" as he was "given the promotional list prior to the full review of these documents," [Doc. 121 at 22 p. 88], and that while "this document [] was intended to be reviewed to make those decisions[, it] in fact, [was] not reviewed," [id. at 23 p. 89]; see also [Doc. 122 at 37 p. 143].

[29] Gogel submits that Tyler was also promoted to HOD at this time.  [Doc. 122 at 20 p. 74]; see also [Doc. 93-2 at 13 ¶¶ 55-56].  KMMG disputes this contention and

190]; see also [Doc. 117 at 45 pp. 178-79, 140].  He was the only one promoted to

Senior Manager of two departments in 2010.  [Doc. 122 at 20 p. 74].  At this time, two

females were also promoted into lower management positions.  [Doc. 93-3 at 5 ¶ 14;

Doc. 101-1 at 13 ¶ 43]; see also [Doc. 117 at 140 (listing Tarver as being promoted to

Manger of General Affairs and Dama Smith ("Smith") as promoted to Assistant

Manager of Human Resources)].[30]  Jackson explained that Gogel was not promoted

in 2010 to HOD of Team Relations because there was no opening as Tyler was HOD

of both departments.  [Doc. 120 at 47 p. 184]; see also [Doc. 119 at 50 p. 196].  Gogel

maintains that the position of Senior Manager was the same as HOD and that the

---

maintains that Tyler had already received this designation in 2009.  [Doc. 117 at 29
p. 115, 118].  Gogel asserts that she "was the only American [m]anager that was not
promoted to HOD of [her] particular department in 2010," [Doc. 101-1 at 5 ¶ 18], and
that all of those promoted in 2010 to HOD were male, [Doc. 122 at 20 p. 74, 90; Doc.
117 at 140].  KMMG contends that HOD was a designation not a promotion, but
admits that no women were designated HOD or promoted to Senior Manager in
April 2010.  [Doc. 117 at 140].  When Gogel was not promoted to HOD of Team
Relations in 2010, she submits that Jackson's reason was that Team Relations was
part of Human Resources and that he repeated his statement that he would take care
of her in April.  [Doc. 117 at 62 pp. 247-48].  She again submits that contrary to
Jackson's reason, Team Relations and Human Resources were separate departments.
[Doc. 115 at 34 p. 131; Doc. 117 at 62 p. 245; Doc. 122 at 85].  Jackson, however,
testified that he never told Gogel that he would take care of her in April.  [Doc. 120
at 41 p. 158].

[30] According to Gogel, she informed Jackson and Tyler that she "believed the
only reason [Smith] was promoted was based on the fact she was of the Korean
race."  [Doc. 101-1 at 13 ¶ 43].  Tarver, who was also promoted at the same time as
Smith, is African-American.  [Id.].

title was sometimes referred to as Senior Manager/HOD.  [Doc. 122 at 19 p. 71].

However, Gogel believed that being designated as HOD was a prerequisite to

receiving the title of Senior Manager.  [Doc. 117 at 45 p. 179].  Thus, Gogel testified

that she was "[n]ot necessarily" contending that she should have received the

promotion of Senior Manager.[31]  [Id.].  At this time, it became clear to her that she

would not be designated HOD of Team Relations in 2010.[32]  [Id.].  On April 28, 2010,

Gogel received a merit adjustment, which was paid as a lump sum in the amount of

$4,138.65.[33]  [Doc. 117 at 47 p. 188, 141].

---

[31] Gogel submits that she "was confused and misunderstood how the promotions were being announced at KMMG during that time," and that she "fully expected to be promoted."  [Doc. 101-1 at 6 ¶ 19].  She points to a promotion received by Regina Farmer ("Farmer"), in which Gogel contends Farmer was promoted to Senior Manager without first receiving the designation of HOD.  [Doc. 123 at 129].  However, KMMG asserts that HOD designations are not necessarily reflected on the organizational announcements when a Manager is promoted to Senior Manager.  [Doc. 117 at 140 (listing Tyler as being promoted to Senior Manager of Human Resources and Team Relations but not listing his prior designation of HOD)].

[32] Gogel disputes that it was clear she would not be promoted in 2010, as a new hire had been designated HOD in September 2009, even though the organizational announcements had already been made earlier in the year.  [Doc. 117 at 47 pp. 185-86].

[33] Amanda Modling ("Modling") resigned on May 20, 2010, explaining that the "environment [she] faced when returning from [maternity] leave gave [her] the perception of a company culture stating if you are a woman you will only climb so far in the organization, and if you are a woman with children your place is at home."  [Doc. 93-6 at 2; Doc. 101-6 at 2].  Gogel informed Jackson about Modling's resignation and her reasons for resigning.  [Doc. 93-3 at 4 ¶ 13; Doc. 101-1 at 13 ¶ 42].

Williams testified that he and Grimes arranged to have lunch with Jackson away from KMMG in mid-2010 to express concerns regarding Gogel and the Team Relations Department, but Jackson did not believe them.[34]  [Doc. 123 at 79 p. 310]; see also [id. (Williams Decl.) at 151 ¶ 27; Doc. 119 at 39 pp. 151-52].  On June 23, 2010, Jackson responded to an email from Tyler, explaining that Team Relations reports to Human Resources and that "mud slinging [was] not the answer[.]"  [Doc. 122 at 91].  Tyler forwarded the aforementioned email to Gogel, stating he did not know that Team Relations reported to Human Resources and that "reporting policy violations and potential hostile work environment situations involving members of management was considered 'mudslinging.'"  [Id.].  Gogel responded to the email, expressing her frustration that she was not designated HOD and reiterating the reasons given to her by Jackson.  [Id.].  On August 11, 2010, Gogel sent an email to Jackson telling him that she believed she has "no say in decisions" that are made, that she is not supposed to speak at all during meetings, that she does not believe the Koreans listen to what she had to say, and that she feels ignored, disrespected, undermined, and degraded.  [Doc. 93-5 at 2-3; Doc. 101-5 at 2-3].  Jackson testified

---

Jackson did not look into complaints made during exit interviews by females in management, including Modling and Bonkowski, regarding treatment by Koreans. [Doc. 120 at 44-45 pp. 172-73]; see also [Doc. 115 at 118-24].

[34] Gogel contests that this occurred in mid-2010, pointing to Grimes' testimony that the lunch may not have been that early.  [Doc. 119 at 39 p. 152].

that he received Gogel's email, but he did not feel that he should step in and try to resolve it.  [Doc. 120 at 49-50 pp. 192-94].

Gogel was invited to the September 2010 Management Workshop.  [Doc. 101-1 at 11-12 ¶ 36].  During the taking of a photograph at the workshop, K.S. Kim asked her and Tarver, the other female manager present, to make sure they were clearly shown in the photograph.  [Id.].  Instead, Gogel testified that she "purposely hid behind another person when the photo was taken," and that Kevin Kim "chastised [her] for not being visible in the photo" several weeks later.  [Id. at 12 ¶ 37].  Gogel testified that she believes she was selected for this photo because she is a woman. [Id. at 11-12 ¶¶ 36-38; Doc. 117 at 40 p. 159].

In September of 2010, Gogel contributed to a document entitled "Report of Concerns," which was compiled by Tyler with input from American managers, detailing KMMG's allegedly discriminatory and unethical business practices.[35]  [Doc.

---

[35] Gogel testified that Jackson had requested that Tyler gather concerns from American management, and when asked by Tyler, Gogel provided him with her concerns.  [Doc. 117 at 37-38 pp. 148-49, 48 pp. 190-91, 50 p. 198]; see also [id. at 143]. In particular, Gogel points to the following portions of the Report of Concerns that she contributed:

    a)    Page 2, paragraph 7.  Entire paragraph based on an invitation to a workshop.

    b)    Page 6, first bullet under item 17.  Gary Langswager (safety & security) both made that complaint.

    c)    Page 7, Paragraph 19.

    d)    Page 11, item 9.  [She] was one of several who complained about

117 at 48-49 pp. 190-93]; <u>see also</u> [<u>id.</u> at 143-58; Doc. 101-1 at 8 ¶ 24].  In fact, it

referenced the Koreans' alleged unlawful and unethical acts 29 times.  [Doc. 117 at

145-58].  The Report of Concerns was given to KMMG at the end of September of

2010.  [<u>Id.</u> at 50 p. 198].  On October 1, 2010, Tyler sent an email to Jackson

---

        unethical bid processes.

    e)       Page 12, item 13.  That was all [her] complaint regarding females leaving based on treatment.

    f)       Page 13, items 4 & 5.  [She] was one of several with that complaint.

[Doc. 93-3 at 3-4 ¶ 8; Doc. 101-1 at 7 ¶ 22]; <u>see also</u> [Doc. 117 at 48-49 pp. 191-93, 145-58].  KMMG contends that Gogel's testimony indicates that she contributed only to Paragraph 7 on Page 2.  [Doc. 117 at 48 p. 192].  A portion in the Report of Concerns stated:

> There is a day of reckoning coming for the Koreans for their repeated racial/gender discrimination, hostile work environment, unethical practices, and other legal/legislative violations.  Therefore, there are many Americans in this organization who are taking steps to protect their career, future, and financial security accordingly.  We dread this day, because we know it is coming.  It will swallow all of us up if we don't act quickly.  Each of us has the necessary professional ethics and integrity to not allow anyone to knowingly break the law, even if requested to do so by the Koreans (which occurs regularly but is often cloaked in smoke, mirrors, deceptive tactics, so-called Korean English, or claims of miscommunication because of the language barrier).

[Doc. 117 at 157].  Gogel maintains that she did not contribute to this portion of the Report of Concerns, but that she did "share that Korean Management had repeatedly engaged in racial/gender discrimination and hostile work environments and unethical business practices."  [Doc. 101-1 at 7-8 ¶ 23].  Jackson testified that after he read the Report of Concerns it was "pretty" obvious who some of the contributors were.  [Doc. 120 at 53 p. 208].

explaining that Team Relations had difficulties completing tasks when Kevin Kim
and Justin Yoo do not communicate with Gogel.[36]   [Doc. 122 at 94].   During an
investigation into the Report of Concerns, Jackson, Charlie Webb ("Webb"),
KMMG's counsel, and Tyler interviewed Gogel on October 14, 2010, regarding her
contributions to the report.[37]   [Doc. 118 at 1; Doc. 120 at 125]; see also [Doc. 101-1 at

---

[36] Jackson testified that he remembered talking to Kevin Kim with regard to
Gogel and he "asked him one day why he wasn't talking to [her], and he said that
every time he talked to her, he made her cry.   And he didn't want to make her cry,
and it made him feel bad.   And that he was going to start asking her to start talking
to Justin [Yoo] in the future."   [Doc. 120 at 45 pp. 175-76].

[37] When Jackson had contacted Gogel prior to October 14, 2010, to set up a
meeting, Gogel claims she told Jackson that, since she had already told him her
concerns earlier, she would "feel more comfortable talking to an independent or
outside investigator/counsel."   [Doc. 118 (Pl.'s Dep. Vol. II) at 1].   Also prior to the
October 14, 2010, meeting, Gogel submits that Webb told her that she did not have
a claim and that her "insistence on bringing up not being promoted might make the
powers that be believe that [she] was only complaining to get something for
[her]self."   [Doc. 93-3 at 1-2 ¶ 2; Doc. 101-1 at 8 ¶ 26].   Gogel submits that the
purpose of the meeting was for her to reiterate her concerns that she had expressed
in 2009 and 2010.   [Doc. 93-3 at 2 ¶ 3; Doc. 101 at 8-9 ¶ 27].   However, Gogel sent
Jackson, Tyler, and Webb an email on the morning of the October 14 meeting,
explaining that she would like to meet with them "to discuss recent requests for
[her] participation in an investigation."   [Doc. 120 at 125].   Gogel maintains that she
reiterated her concerns during the interview, which included "a quid pro quo
relationship" between KMMG's president and Tarver, her failure to be promoted
when similarly situated men were promoted, Caucasian men and women's bad
treatment by KMMG's Korean management, and the poor treatment of other
American females.   [Doc. 93-3 at 2-3 ¶¶ 3-6; Doc. 101-1 at 9-10 ¶¶ 28-31].   In
particular, Gogel pointed to a female manager in training that she claims Kevin Kim
treated badly and another female receptionist let go because she was "unattractive."
[Doc. 93-3 at 3 ¶ 6; Doc. 101-1 at 10 ¶ 31].   Gogel also stated that she was worried
about retaliation and wanted an independent investigator to look into her concerns.

10 ¶ 30].  Following the meeting, on November 3, 2010, Gogel sent an email to

Jackson, Webb, and Tyler and copied K.S. Kim, in which she affirmed her

contributions to the Report of Concerns, reiterated parts of the conversation that

took place in the meeting on October 14, 2010, and expressed her disappointment

that the investigation into the concerns raised had been closed.  [Doc. 118 at 1]; see

also [Doc. 101-1 at 8 ¶ 24; Doc. 117 at 49 p. 195, 50 p. 198].  In fact, the investigation

concluded that "there were no . . . legal violations."[38]  [Doc. 115 at 37 p. 141].

---

[Doc. 93-3 at 4 ¶ 9; Doc. 101-1 at 10 ¶ 30].  The Report of Concerns was also
discussed at this meeting.  [Doc. 93-3 at 3 ¶ 7].  Jackson ended the meeting after
approximately 45 minutes, as he had another meeting to attend, but Gogel claims
she had not finished discussing her concerns.  [Id. at 4 ¶ 10; Doc. 101-1 at 10-11 ¶ 33;
Doc. 117 at 59 pp. 233-34].  Jackson testified that the meeting lasted one hour and
that he did not follow-up with Gogel again as he and Webb did not get any direct
answers or facts from Gogel with which Jackson could work.  [Doc. 120 at 46 pp.
177-80].  On October 29, 2010, Tyler replied to Jackson in an email, stating that
"Kevin [Kim] and KS [Kim] still don't listen to [Gogel]" and that he thought it was
because she was believed to be "too emotional" and "ha[d] a bad mindset for a
Manager."  [Id. at 128 (internal marks omitted)]; see also [id. at 50 pp. 194-95].

[38] Gogel submits that "Jackson's typical response to [her] complaints about
discrimination at KMMG was to give [her] a lecture about blending the two cultures,
and that change was slow."  [Doc. 93-3 at 5 ¶ 15; Doc. 101-1 at 13-14 ¶ 44].  KMMG
admits that Jackson counseled American managers about the importance and time
required to forge good working relationships between colleagues from two different
cultures.  [Doc. 120 at 41-42 pp. 159-61, 50-51 pp. 196-97].  Jackson testified that
Gogel "didn't come to [him] directly too much about her concerns."  [Doc. 120 at 66
p. 260].

On November 10, 2010, Gogel filed a charge of discrimination with the EEOC against KMMG, alleging discrimination based on her sex and national origin.[39] [Doc. 117 at 137]; see also [id. at 38 pp. 149-51].  In particular, she claimed that she "ha[d] been discriminated against based on [her] sex (female) and [n]ational [o]rigin (American), in violation of Title VII" because her position "was not upgraded to a [HOD] position" between July 23, 2009, and June 30, 2010.  [Id. at 137]; see also [id. at 38 pp. 151-52].  On November 19, 2010, Tyler filed a charge of discrimination with the EEOC, alleging discrimination based on national origin and retaliation.  [Doc. 120 at 132-33]; see also [Doc. 117 at 52 p. 207].[40]

---

[39] Gogel maintains that she filed her EEOC charge because she "had witnessed several women throughout KMMG experiencing significant damage to their careers because of discrimination at KMMG, and saw the same damage coming for [her]self, and realized [she] couldn't protect them and couldn't protect [her]self, and the people [she] reported to wouldn't protect [her] either."  [Doc. 101-1 at 14 ¶ 45]; see also [Doc. 93-3 at 5 ¶ 16; Doc. 117 at 52 p. 208].  Gogel also maintains that during a management dinner held at KMMG in November of 2010, President Ahn chastised American management for complaining and questioned their loyalty.  [Doc. 117 at 167-68]; see also [Doc. 122 at 35 p. 134].

[40] KMMG's harassment policy and EEO policy prohibited retaliation and discrimination, specifically stating that it was against KMMG policy "to harass or retaliate against any Team Member due to the Team Member filing a complaint of discrimination / harassment or due to the Team Member's cooperation in [KMMG's] investigation of a complaint" and instructed employees to report violations of the policies, including discrimination, harassment, and retaliation, to their immediate supervisor or "Team Relations Manager or any other member of KMMG management . . . with whom he/she feels comfortable."  [Doc. 123 at 123-28]; see also [id. at 36 pp. 137-38, 37 p. 142; Doc. 93-9 at 2-3; Doc. 101-8 at 2-3; Doc. 119 at 37 p. 142].  Gogel, Tyler, and Jackson signed the harassment policy, which was

KMMG received Gogel's EEOC charge on November 22, 2010.[41] [Doc. 120 at

127]; see also [Doc. 117 at 50 p. 198; Doc. 120 at 47 pp. 181-82]. On December 3, 2010,

Gogel was asked to sign an agreement that provided:

A. I will not discuss my EEOC charge or similar claims against
[KMMG] with Team Members and will not use my position to
solicit or influence Team Members to make claims against
KMMG;

B. I will not put any Team Members, including my reports, in any
conflict of interest by seeking their assistance in any fact finding
or any information gathering related to my claim against
KMMG;

C. I will not make any written or verbal statements to Team
Members that malign the company; and

D. I will not seek access to any files or documents that relate in any
way to the merits of my claim or similar claims against KMMG.

[Doc. 118 at 9]; see also [Doc. 93-7 at 2; Doc. 117 at 53 pp. 209-10; Doc. 120 at 131].

However, Gogel refused to sign it, and she was thereafter placed on administrative

---

adopted on October 27, 2008. [Doc. 123 at 36 pp. 137-38, 123].

[41] Gogel testified that after KMMG received her EEOC charge, Williams and
Ledbetter reported to her that Jackson was talking about her charge "in a very loud
way in the open office environment." [Doc. 117 at 50 pp . 198-99]. Jackson denied
making an announcement after receiving Gogel's charge or mentioning it to any of
her co-workers. [Doc. 120 at 51 p. 199]. Latesa Bailey ("Bailey"), a KMMG employee
designated to testify under Rule 30(b)(6) of the Federal Rules of Civil Procedure,
testified that she was unsure who specifically was interviewed regarding Gogel's
November 2010 EEOC charge as the Legal Department handled her charge. [Doc.
115 at 41 p. 158].

leave.[42]  [Doc. 117 at 53 pp. 209-10]; <u>see also</u> [Doc. 115 at 39 p. 151].  On the same day,

Tyler also was asked to sign the agreement, and he did so that day.  [Doc. 122 at 35

p. 136]; <u>see also</u> [Doc. 115 at 42 p. 161].  Gogel signed the aforementioned agreement

on December 6, 2010, and returned to work the same day.[43]  [Doc. 117 at 53 pp. 209-

10; Doc. 118 at 9].

On December 16, 2010, Gogel requested four days off, January 4-7, 2011,

following KMMG's semi-annual plant shut down, which Jackson approved.  [Doc.

85 at 6 ¶ 19, 11]; <u>see also</u> [Doc. 120 at 67 p. 263].  Jackson provided Gogel with a

$12,000 discretionary bonus during a meeting held on December 22, 2010, at which

Jackson informed Gogel that she was doing a good job.  [Doc. 117 at 47-48 pp. 188-

89, 142; Doc. 120 at 59 p. 229].  On December 22, 2010, Stuart Countess ("Countess"),

who at the time was KMMG's Director of Quality, held a Christmas party, to which

he invited production employees and senior management.  [Doc. 116 (Countess

Dep.) at 3 p. 8, 31 pp. 119-20].  Gogel, Tyler, and Kevin Kim were not invited to the

---

[42] Gogel testified that she refused to sign as she "did not feel comfortable signing the document until [her] legal counsel had an opportunity to review the document."  [Doc. 117 at 53 p. 210].

[43] Gogel submits that Jackson would have fired her had she not agreed to sign the agreement.  [Doc. 120 at 58 p. 227].  KMMG disputes this assertion and claims Jackson testified that it would have been his decision whether to fire Gogel if she refused to sign the agreement, if such a decision needed to be made.  [<u>Id.</u>].

Christmas party.[44]  [Id. at 31 p. 119; Doc. 117 at 40 p. 158; Doc. 121 at 36 pp. 143-44].

At the time of the party, Countess was not aware that Gogel had filed an EEOC

charge against KMMG.  [Doc. 116 at 16 p. 60].

On December 23, 2010, Jackson received Ledbetter's December 10, 2010, EEOC

Charge.  [Doc. 120 at 59-60 pp. 232-33, 62 pp. 241-42, 134-36].  The EEOC charge

showed that it had been faxed from the law firm of Barrett & Farahany.  [Id. at 134-

35]; see also [id. at 60 p. 233].  Jackson thereafter emailed K.S. Kim to inform him of

Ledbetter's EEOC charge.  [Id. at 63 pp. 246-47, 136].  In the email, Jackson stated

that he was trying to call President Ahn to let him know about Ledbetter's charge

and that "[i]t look[ed] like [Tyler] and [Gogel] [were] recruiting others."  [Id. at 136].

Ledbetter, Tyler, and Gogel were all initially represented by the same firm–Barrett

& Farahany, [Doc. 117 at 52 p. 207; Doc. 120 at 60 p. 233], and this concerned Jackson

because as he testified Gogel was "paid to prevent lawsuits" and he did not "want

[his] manager of [his] team relations group out soliciting and encouraging other

people to file lawsuits," [Doc. 120 at 66 pp. 258-59].[45]  On or about December 23,

_____

[44] Gogel claims that other employees outside of production and senior
management were invited and that Tyler and Kevin Kim were, in fact, invited. [Doc.
101-10 at 2].

[45] Gogel maintains that she "did not have the power to prevent any team
members from filing a lawsuit against [KMMG], as [her] duties included problem
solving, but not preventing lawsuits."  [Doc. 101-1 at 2 ¶ 2]; see also [Doc. 101-9 at
2-4].  She further maintains that she did not solicit others to file charges or lawsuits

2010, KMMG shut down until January 4, 2011.[46]  [Doc. 115 at 39 pp. 151-52, 52 p. 203;

Doc. 120 at 58-59 pp. 228-29, 63 p. 248].

On January 4, 2011, Williams met with Jackson to report his concerns about

Gogel and Tyler.  [Doc. 85 at 6 ¶ 20; Doc. 120 at 63-65 pp. 248-53, 72 p. 283, 137; Doc.

123 at 50 pp. 193-94].  In particular, Williams relayed that they had "repeated

meetings" with Ledbetter and they had stated that they "'hate' the Koreans."[47]  [Doc.

_____

against KMMG, [Doc. 101-1 at 14-15 ¶¶ 48-50], that she "did not know whether
[Ledbetter] was going to file a charge [with the EEOC]," [Doc. 117 at 50 pp. 199-200];
see also [Doc. 101-2 (Ledbetter Decl.) at 4 ¶ 11 ("I didn't tell [Gogel] I was filing a
[c]harge before I filed one.")], and that she "first found out [Ledbetter] filed an
EEOC [c]harge when [] Williams told [her] around December 2010," [Doc. 101-1 at
15-16 ¶ 54].  KMMG submits that Gogel had external knowledge about Ledbetter's
EEOC charge and knew that she was going to file it.  [Doc. 115 at 51 pp. 198-200]; see
also [Doc. 123 at 34 pp. 131-32].  Ledbetter testified that Gogel "did not solicit [her]
to do anything against KMMG," that Gogel "did not encourage [her] nor solicit [her]
to get an attorney and sue [KMMG] or file an EEOC [c]harge," and that she "decided
for [her]self to . . . file a [c]harge with the EEOC."  [Doc. 101-2 at 3-4 ¶¶ 8-9].
Ledbetter never filed a lawsuit against KMMG.  [Doc. 115 at 13 p. 45].

[46] Gogel submits that KMMG did not shut down until the close of business on
December 23, 2010.  [Doc. 120 at 58 pp. 227-28].

[47] Williams testified that Gogel said on more than one occasion that she did
not like the Koreans, that she did not like Kevin Kim or K.S. Kim because they were
Korean, and that he believed she was racist towards Koreans.  [Doc. 123 at 78 pp.
306-07].  Grimes likewise testified that he believed Gogel and Tyler hated Koreans
based on comments that were made.  [Doc. 119 at 56 pp. 219-20].  Gogel denies that
she said she hates Koreans or that she ever heard Tyler say that he hates Koreans,
[Doc. 101-1 at 17 ¶¶  59-60]; see also [Doc. 101-2 at 7 ¶ 18], and Tyler testified that
he had never heard Gogel say that she hates Koreans, [Doc. 122 at 29 p. 108].  Rather,
Gogel testified that she was concerned that "there stopped being an interest in
understanding and following American laws."  [Doc. 117 at 64-65 pp. 256-57].  In

85 at 6 ¶ 20]; see also [Doc. 120 at 63-65 pp. 248-53, 137].  Prompted by Williams'

concerns, Jackson and Webb conducted an investigation.   [Doc. 85 at 6 ¶ 21].

Williams and Grimes each met separately with Jackson and Webb on January 5,

2011, to explain their concerns pertaining to Gogel and Tyler.  [Doc. 119 at 98-100;

Doc. 123 at 153-54].  Williams reported that in the fall of 2010, Ledbetter had told

him that she, Gogel, and Tyler were going to use the same attorney and file charges

against KMMG. [Doc. 123 at 34 p. 130-31, 153].  Williams testified that Ledbetter was

"saying that [] Gog[el] was the leader," [Doc. 123 at 34 p. 131]; see also [id. at 153 (In

notes from the January 5, 2011, meeting with Williams, Webb indicated that

Williams "felt that [Gogel] was the catalyst for the trio of charges but said

[Ledbetter] was most swayed by [Tyler]")], and that Ledbetter "kept telling [him]

that something in the form of a lawsuit was coming," [id. at 50 p. 194].[48]   Both

_____

particular, Kevin Kim would not allow additional intercultural competency training
for Koreans who came to work at KMMG to help them understand American laws,
and he became angry if Gogel attempted to educate him on American laws.  [Id.].
Gogel also testified that "Jackson told [her] that [she] had a responsibility to
understand and respect the Korean culture by supporting the 'Patriarchal' culture
of the Koreans."  [Doc. 93-3 at 6 ¶ 21; Doc. 101-1 at 18 ¶ 65].  Jackson testified that
he took steps to address the cultural differences, educate Korean management, and
foster respect towards both cultures.  [Doc. 120 at 41-42 pp. 160-61, 50-51 pp. 196-97,
52 p. 203, 54 p. 211, 130].

[48] Gogel points out that Williams testified that he did not recall saying that she
was the leader of filing the EEOC charges, [Doc. 123 at 34 p. 130], and that Ledbetter
stated she "never told [] Williams that [Gogel] was the 'leader' of [her] and [Tyler]
in filing a [c]harge with the EEOC," or that "all three of [them] were going to sue

Williams and Grimes signed written statements that summarized their concerns pertaining to Gogel.[49]  [Doc. 119 at 59 pp. 229-30, 98-100; Doc. 123 at 79 pp. 311-12, 153-54].

Gogel testified that she "met with [] Ledbetter multiple times throughout [her] employment [at KMMG], for different reasons," with the first meeting occurring in the fall of 2008 regarding her complaints about Tarver and President Ahn, and that she was "aware that [Ledbetter] had concerns" regarding her employment at KMMG.[50]  [Doc. 117 at 50 pp. 199-200].   On one occasion, Williams met with Ledbetter, and he reported Ledbetter's concerns to Gogel.  [Id. at 51 p. 201].   The concerns that Ledbetter brought to the attention of Team Relations included a request to remove a pregnant server from an event she was planning, an alleged relationship between President Ahn and Tarver, not being hired for Team Relations,

---

[KMMG] and had the same attorney," [Doc. 101-2 at 4 ¶ 10].  Gogel also submits that Williams did not know that she had been complaining or for how long she had been complaining or whether she was trying to "work it out."  [Doc. 123 at 50 pp. 195-96].

[49] Jackson testified that neither Grimes or Williams had complained to him about Gogel before January 2011.  [Doc. 120 at 74 p. 292].

[50] Gogel asserts that this was one of her responsibilities as Manager of Team Relations, [Doc. 101-9 at 2-4], and that she "didn't have a lot of meetings with [Ledbetter] about [her] complaints," but she did have "a lot of meetings with [her] about work related things," [Doc. 117 at 51 p. 203].

and "things that upset [Ledbetter] about her job duties."[51]  [Id. at 51 pp. 201-03]; see also [Doc. 101-1 at 16 ¶ 56].  Gogel testified that she explained to Ledbetter that "many of the things that she was doing were very important," that KMMG "had strides to make in culture," and that she should "just be patient" as "[c]hange is very slow."  [Doc. 117 at 51 p. 203].

In the summer of 2010, Ledbetter approached Gogel to express her concern that her pregnancy would impact her ability to be promoted.  [Doc. 117 at 51 pp. 203-04].  Gogel explained that her "pregnancy should not impact [her] ability to be promoted," and she encouraged her to stay at KMMG.  [Id. at 51 p. 204].  Gogel took notes during her meetings with Ledbetter.[52]  [Id. at 51-52 pp. 204-05]; see also [Doc. 118 at 2-8].  Gogel kept these notes until her termination, despite the instruction to destroy the notes related to her investigation into the relationship between President Ahn and Tarver, and made copies for her attorney.[53]  [Doc. 117 at 51 p. 204, 53-54 pp. 211-13]; see also [id. at 31 p. 122].  Also, Gogel occasionally met with both Tyler and

---

[51] Gogel maintains that Jackson was aware of some of Ledbetter's complaints, including her complaint about a relationship between President Ahn and Tarver. [Doc. 101-2 at 2 ¶¶ 3-4].

[52] Gogel explains that she did not take notes for general meetings and that she only took notes when a team member made a complaint to her.  [Doc. 101-1 at 4 ¶ 12].

[53] Gogel maintains that it would have been improper for her to destroy her notes pertaining to an investigation.  [Doc. 122 at 3-4 pp. 8-9].

Ledbetter.[54]  [Id. at 52 pp. 205-06].  The meetings between Ledbetter and Gogel and

between Ledbetter, Gogel, and Tyler usually took place in one of KMMG's

conference rooms.  [Id. at 51 p. 203, 52 p. 206].  Most of KMMG's conference rooms

had glass doors.[55]  [Id. at 52 p. 206].

On January 7, 2011, while Gogel was on leave, Jackson requested she come

into work to discuss the allegations that had been raised against her.[56]  [Doc. 85 at

6-7 ¶¶ 22-23]; see also [Doc. 117 at 66 pp. 261, 264; Doc. 118 at 26].  Because she had

to come in on her scheduled day off, Jackson requested the Payroll Department

credit Gogel for half a day of PTO.  [Doc. 85 at 7 ¶ 23, 12; Doc. 120 at 67 pp. 263-64].

After the meeting, Gogel was put on paid administrative leave pending further

---

[54] Gogel testified that meetings between the three of them "absolutely could have" happened, but "[n]ot very often."  [Doc. 117 at 52 pp. 205-06].

[55] Tyler was terminated on January 6, 2011, after having been placed on administrative leave on December 16, 2010.  [Doc. 115 at 42 pp. 161-62; Doc. 122 at 3 p. 6]

[56] In particular, Jackson and Webb informed her that they were investigating "an allegation that [she] had been colluding with [] [Ledbetter]," [Doc. 117 at 66 p. 264], asked her when she had met with Ledbetter and what the meetings were about, [id. at 66 pp. 261-62], and said that she had violated the agreement she had signed on December 6, 2010, [id. at 66 p. 261].  Gogel testified that she informed Jackson and Webb that her conversations with Ledbetter were about "cafeteria coverage during the shutdown and a holiday meal" and a misunderstanding with Justin Yoo about food, [id. at 66 p. 262, 42 p. 166], and went over Ledbetter's complaints with them, [Doc. 101-1 at 16 ¶ 58].

investigation,[57] [Doc. 85 at 6 ¶ 22; Doc. 115 at 39 p. 151; Doc. 117 at 66 pp. 263-64; Doc. 120 at 69 p. 270, 142], and escorted out of KMMG, [Doc. 117 at 66 p. 264]. KMMG concluded that there was enough information at that time to show that Gogel did solicit Ledbetter and that Gogel, Ledbetter, and Tyler had used the same attorney.  [Doc. 115 at 13 p. 45].  Gogel testified that she explained to Ledbetter that she "didn't feel like [she] could trust the people internally [at KMMG] to listen to or deal with any concerns that [Gogel] had and that [she] was going to seek outside assistance," and that Ledbetter asked her if she had an attorney, and Gogel testified that she did not at the time, but she provided Ledbetter the name of the attorney that she "had chosen" and "was going to meet[.]"[58]  [Doc. 117 at 52-53 pp. 208-09].

By letter dated January 19, 2011, Jackson terminated Gogel's employment with KMMG.[59]  [Doc. 115 at 41 p. 159, 95-96; Doc. 117 at 54 pp. 214-15; Doc. 118 at 26-27].

---

[57] Gogel maintains that she asked how long it would be before she received feedback from them and Webb said he would contact her, [Doc. 117 at 66 pp. 263-64], and that she asked Jackson if she was being replaced, and he said no, [Doc. 101-1 at 17 ¶ 58].

[58] Gogel submits that this conversation with Ledbetter occurred after Ledbetter heard from others that Gogel had filed an EEOC charge, and she approached Gogel to ask her about her charge, [Doc. 101-1 at 14 ¶ 47], and that Ledbetter decided on her own to retain an attorney, [Doc. 101-2 at 4 ¶ 11].

[59] Gogel testified that she actually found out that she had been terminated prior to receiving the letter of termination when other KMMG employees contacted her to express their sympathies regarding her termination, [Doc. 117 at 54 p. 215], and that from the time KMMG received notice of her EEOC charge, she only worked

In particular, the letter referenced the agreement that Gogel signed on December 6,

2010, and provided:

> As you know, your position as Manager of Team Relations in Human Resources is critically important to KMMG.  One of your primary duties is to investigate potential discrimination or harassment claims, either personally or by directly supervising those conducting the investigations, in order to protect KMMG by taking prompt action when warranted.  You and KMMG previously recognized the potential for conflict of interest in the discharge of your duties, and on December 6, 2010, you signed the attached document.  In this document you agreed that you would not solicit or influence team members to make claims against KMMG, you would not put any team members in a conflict of interest, you would not make any written or verbal statements to team members that malign the company, and that you would not seek to access files or documents that relate in any way to the merits of your claims.

> As we discussed on January 7, 2011, [] Ledbetter filed a cha[r]ge of discrimination against KMMG on December 10, 2010.  Part of this charge alludes to claims that [KMMG], including Human Resources, did not properly investigate her complaints against KMMG.  In investigating this charge, KMMG received credible reports that [Ledbetter] discussed her intent to file a claim with you in advance of doing so, that you did not attempt to encourage the individual to internalize the complaint (rather than to externalize the complaint), and that you did not notify [KMMG] about the likely filing of a charge by another individual.  You were seen by multiple people having numerous, lengthy private conferences with [] Ledbetter during the last two-three months, yet you denied having any significant recent interaction with her.  Based on our investigation, one could conclude

---

17 days until she was terminated and that she was placed on administrative leave twice, [id. at 63 pp. 251-52].  KMMG adds that  Gogel was off work from December 23, 2010, through January 3, 20111, for the shutdown and then took off the 4 days following the shutdown.  [Doc. 85 at 6 ¶ 19, 11; Doc. 115 at 39 pp. 151-52; Doc. 120 at 67 p. 263].

that you encouraged or even solicited the filing of the charge.  At the very least, there is an appearance of a conflict of interest sufficient to cause [KMMG] to lose confidence in the loyalty and trust that is required by your position.

Also, since your administrative leave began, we have received additional reports from within your department and elsewhere which caused KMMG to lose faith in you as a manager.  Team Members fear retaliation from you, find inappropriate your stated and demonstrated personal dislike for many of the managers at KMMG, and are concerned by your demonstrated animus toward the Korean culture at KMMG.  Finally, some of the Team Members you supervise perceive that you do not support KMMG's positive conciliatory approach to dealing with issues, but instead prefer a combative win-lose approach which often escalates issues unnecessarily.

Therefore, KMMG has no alternative but to discharge you immediately.

[Doc. 115 at 95-96 (internal citation omitted)].[60]  Jackson testified that he was "totally convinced that [Gogel] had solicited and encouraged other team members to file a lawsuit against [KMMG]" and that he "had lost total confidence and trust in her to perform her jobs, her job duties that she was hired to do, and [he] could not continue her employment with [KMMG]."  [Doc. 120 at 69-70 pp. 272-73]; see also [Doc. 115 at 13 p. 46 (Bailey's testimony that Gogel's planning with others to file a lawsuit

---

[60] Gogel submits that she reported numerous complaints to Jackson and that he did nothing to rectify those complaints.  [Doc. 115 at 37 p. 141, 53 pp. 205-07, 97].  In particular, she asserts that Jackson knew about Ledbetter's complaints, but did nothing about them.  [Id. at 49-50 pp. 190-94, 51 p. 199]; see also [Doc. 101-2 at 2-3 ¶¶ 3-5, 8].  She also points out that Jackson testified that he did not remember any additional people who provided "additional reports" aside from Grimes and Williams.  [Doc. 120 at 74 p. 291].

against KMMG was "in direct contradiction to what she was actually hired for")].
He further testified that he "had a major concern with [his] manager of Team
Relations soliciting and encouraging other team members to file a lawsuit against
[KMMG]" as she was paid "to help people and prevent lawsuits from being filed,
not to encourage and solicit lawsuits to be filed" and "to do everything possible to
keep–or basically not to encourage other team members to file lawsuits against
[KMMG]."[61]  [Doc. 120 at 67 pp. 262-63]; see also [Doc. 115 at 52 pp. 201-02, 56 p. 217,
129].

On January 24, 2011, Jackson completed Gogel's Separation Notice, which
stated that she was terminated for "Violation of Rules (Other)."  [Doc. 120 at 140];
see also [id. at 70 p. 274].  On February 3, 2011, someone at KMMG completed the
Department of Labor's form that requested KMMG's information on Gogel's
discharge and  Jackson approved the content and signed the form.  [Doc. 120 at 70
p. 276, 141-42].  In response to questions on the form that sought the reason for
Gogel's termination and any effect she had on KMMG, Jackson stated that the
reason for her termination was provided in full detail in the attached termination
letter and that she "[e]xposed KMMG to potential liability by failing to properly

---

[61] Gogel points to Bailey's testimony, on behalf of KMMG, that "[i]t's beyond
[] belief that someone in [a manger role in HR] would file a charge."  [Doc. 115 at 52
p. 201].

investigate claims and fail[ing] to properly record efforts to investigate/resolve problems." [Id. at 141].  When asked to explain the policy or rule that Gogel failed to follow and when the violation occurred, Jackson provided that one of her "main duties was to investigate internal complaints of discrimination and harassment," and "[a]s detailed in the attached letter of termination, [she] failed to discharge her duties properly" from October through December of 2010.  [Id.].  When asked how Gogel would have known about the rule or policy, Jackson stated that her "primary duty was to investigate claims and protect the company's interest[] since the time of her hire in March of 2008."  [Id.].  The form also asked whether Gogel received any warnings, and Jackson explained that "[d]ue to [the] extreme nature of [the] offense, progressive discipline was not applicable."  [Id.].  Finally, Jackson provided that Gogel's discharge occurred promptly after the discovery of her inappropriate behavior on January 5, 2011, and an investigation into said behavior.  [Id.].

Gogel filed a second charge of discrimination with the EEOC on February 8, 2011, alleging retaliation.  [Doc. 117 at 54-55 pp. 216-17; Doc. 118 at 28; Doc. 120 at 143].  In particular, she alleged that KMMG terminated her employment on January 19, 2011, after she filed her EEOC charge on November 10, 2010.  [Doc. 118 at 28].  In its March 14, 2011, Position Statement, [Doc. 120 at 144-49], KMMG provided:

> [Gogel] was terminated for a legitimate non-retaliatory reason.  Put
> simply, her actions caused KMMG to lose all trust and confidence in

her and her ability to perform her job.  She was intentionally dishonest
with the company and she failed to perform her job duties, essentially
externalizing a complaint for work place discrimination which was her
duty to handle internally.  Instead, she referred a team member to an
outside party without informing KMMG.

[Id. at 148].

After Gogel was terminated, Williams was promoted to Manager of Team

Relations, effective April 11, 2011.  [Doc. 120 at 114; Doc. 123 at 129].  At the same

time, Farmer was promoted to Senior Manager of Quality Control, becoming the

first Caucasian American female HOD at KMMG.  [Doc. 119 at 21 p. 79, 45 p. 173;

Doc. 120 at 48 p. 188, 114; Doc. 123 at 54 pp. 211-12, 129].  In April 2012, Williams

was designated as Acting HOD of Team Relations and was promoted to Senior

Manager of Team Relations one year later.[62]  [Doc. 123 at 132, 134].  Also in April of

2012, Tarver was promoted to Acting HOD of General Affairs, and in April of 2013,

she was promoted to Senior Manager of General Affairs.  [Doc. 119 at 45 p. 173; Doc.

123 at 59 p. 231, 132, 134]; see also [Doc. 114 at 16 p. 59, 49-50].  Farmer was

promoted by Jackson to Senior Manager of General Affairs after the position was

---

[62] Williams does not and has never held the SPHR certification.  [Doc. 123 at
16 p. 60, 61 p. 240].  After Williams was promoted to Senior Manger of Team
Relations, Grimes was promoted to Manager of Team Relations.  [Doc. 119 at 17 p.
63].

vacated by Tarver.[63]  [Doc. 116 at 13 p. 47, 14 pp. 50-51; Doc. 120 at 40 p. 156].  In

January 2014, Bailey, who at the time was Manager of Legal, became Acting HOD

of Human Resources, and in April 2015, she was designated as HOD of Human

Resources.  [Doc. 115 at 5 p. 13, 10-11 pp. 35-37, 94].

On March 21, 2014, the EEOC mailed two Notices of Right to Sue to Gogel.

[Doc. 93-12 at 2-3].  On June 19, 2014, Gogel filed this action against KMMG in the

Superior Court of Fulton County, asserting discrimination and retaliation claims in

violation of Title VII and § 1981.  See [Doc. 1-1].  KMMG removed Gogel's complaint

to this Court on July 24, 2014, see [Doc. 1], and thereafter moved to transfer the case

to the Newnan Division of the United States District Court for the Northern District

of Georgia, see [Doc. 5].  On September 18, 2014, Gogel, with KMMG's consent,

moved to amend her complaint to correctly identify KMMG.  [Doc. 17].  United

States Magistrate Judge Janet F. King granted Gogel's motion to amend her

complaint on September 22, 2014, see [Docket entry dated 09/22/2014], and Gogel

filed her amended complaint on the same day, correctly identifying KMMG, see

[Doc. 19].  On September 29, 2014, Judge King granted KMMG's motion to transfer

the case to the Newnan Division.  See [Doc. 21].  KMMG has now moved for

---

[63] Gogel contends that Farmer does not have experience in general affairs.
[Doc. 116 at 14 pp. 51-52].

summary judgment, [Doc. 83], which Gogel opposes, [Doc. 101].  Gogel has moved

for partial summary judgment, [Doc. 93], which KMMG opposes, [Doc. 99].

## II.  SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views all evidence in

the light most favorable to and draws all reasonable inferences in the favor of the

non-moving party.  Gray v. City of Jacksonville, 492 F. App'x 1, 3 (11th Cir. 2012)

(per curiam) (unpublished) (citations omitted).   "Summary judgment shall be

granted if the movant shows that there is 'no genuine issue as to any material fact',

such that the movant is entitled to judgment as a matter of law."[64] Jerome v. Barcelo

Crestline, Inc., 507 F. App'x 861, 863 (11th Cir. 2013) (per curiam) (unpublished)

(quoting Fed. R. Civ. P. 56(a)); see also Holmes v. Ga. ex rel. Strickland, 503 F. App'x

870, 872 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted); Young v.

FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished)

(citation omitted).

The party moving for summary judgment bears the initial burden of

demonstrating the absence of any genuine issue of material facts, upon which the

non-moving party must then submit specific facts showing a genuine issue for trial.

---

[64] "A fact is material only if it might affect the outcome of the suit under
governing law."  Bostic v. Lauragina Prof'l Transp., LLC, No. CV 414–083, 2015 WL
3650731, at *2 (S.D. Ga. June 5, 2015) (citation omitted).

Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL

2838497, at *8 (N.D. Ga. July 19, 2010), aff'd in part, 507 F. App'x 831 (11th Cir. 2013)

(unpublished) (citations omitted). "[A] party opposing a properly supported motion

for summary judgment may not rest upon mere allegation[s] or denials of [her]

pleading, but must set forth specific facts showing that there is a genuine issue for

trial." Jackson v. B & L Disposal, Inc., 425 F. App'x 819, 820 (11th Cir. 2011) (per

curiam) (unpublished) (first alteration in original) (citation and internal marks

omitted); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011)

(per curiam) (unpublished) (citation and internal marks omitted); Bryant v. U.S.

Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished)

(citation omitted). "Speculation or conjecture cannot create a genuine issue of

material fact." Shuler, 441 F. App'x at 715 (citation omitted); see also Howard v. Or.

Television, Inc., 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished)

(citation omitted); Goodman v. Ga. Sw., 147 F. App'x 888, 891 (11th Cir. 2005) (per

curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable

inferences arising from the undisputed facts should be made in favor of the

nonmovant, but an inference based on speculation and conjecture is not

reasonable."). "Moreover, the non-moving party cannot create a genuine issue

through evidence that is 'merely colorable' or 'not significantly probative.'" <u>Morales v. Ga. Dep't of Human Res.</u>, 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  And, "the nonmoving party must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." <u>Everidge v. Wells Fargo Bank, N.A.</u>, CASE NOS.: 5:12-CV-497 (LJA), 2015 WL 5786738, at *11 (M.D. Ga. Sept. 29, 2015), <u>aff'd</u>, No. 15-15041, 2016 WL 2997193 (11th Cir. May 25, 2016) (per curiam) (unpublished) (citation and internal marks omitted).  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," <u>Anyanwu v. Brumos Motor Cars, Inc.</u>, 496 F. App'x 943, 945-46 (11th Cir. 2012) (per curiam) (unpublished) (citation and internal marks omitted), and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper," <u>Premier Assocs., Inc.</u>, 2010 WL 2838497, at *9 (alteration in original) (citation and internal marks omitted).

## III.   DISCUSSION

Gogel claims that KMMG discriminated against her because of her race, alienage, national origin, and gender in violation of § 1981 and Title VII.  [Doc. 19 at 17-19 ¶¶ 53-59, 21-23 ¶¶ 65-72].  She further claims that she was retaliated against for her complaints of discrimination and her filing of an EEOC charge in violation

of § 1981 and Title VII.  [Id. at 19-21 ¶¶ 60-64, 23-26 ¶¶ 73-83].  KMMG argues that it is entitled to summary judgment on all of Gogel's claims and makes several arguments in support of its motion.  [Doc. 83].  First, KMMG asserts that any allegations of conduct that occurred over 180 days prior to the filing of Gogel's EEOC charge and over four years prior to the filing of her complaint in the Superior Court of Fulton County are untimely.  [Doc. 83-1 at 10-11].  KMMG also argues that, to the extent her allegations are timely, Gogel's failure to promote claims fail as a matter of law, [id. at 11-13], and that Gogel cannot set forth a prima facie case of discrimination under Title VII or § 1981 with regard to certain alleged conduct, [id. at 13-17], though it does not dispute that she can establish a prima facie case of discrimination as it pertains to her termination and concedes, for the purposes of summary judgment, that she can set forth a prima facie case of retaliation, [id. at 13-17; Doc. 110 at 14 n.3; Doc. 99 at 15 n.5].  Finally, KMMG argues that it has articulated legitimate, non-discriminatory and non-retaliatory reasons for its employment actions, which she has failed to show are pretextual.  [Doc. 83-1 at 23-26]. Gogel opposes KMMG's motion for summary judgment, [Doc. 101], and argues that she is entitled to partial summary judgment on the inapplicability of certain affirmative defenses asserted by KMMG and in regard to the establishment of prima facie claims of retaliation under Title VII and § 1981.  [Doc. 93-1 at 11-36].

47

A.   **Timeliness**

KMMG argues that many of Gogel's claims are time-barred.  [Doc. 83-1 at 10-

11].  In particular, KMMG asserts that any of Gogel's Title VII claims pertaining to

discrete acts that occurred before May 14, 2010, are barred and that "to the extent

[she] seeks to recover under [§] 1981 for any events occurring before June 19, 2010,

such recovery is prohibited by [§] 1981's four-year statute of limitations."[65]  [Id.

(emphasis omitted)].  The Court will address each argument.

1.   *Title VII*

A plaintiff pursuing a private action under Title VII must first timely file a

charge of discrimination "within one hundred and eighty days after the alleged

unlawful employment practice occurred[.]"[66] 42 U.S.C. § 2000e-5(e)(1); Nat'l R.R.

---

[65] These arguments were asserted by KMMG as affirmative defenses in its answer to Gogel's complaint, see [Doc. 2 at 18], and Gogel claims she is entitled to summary judgment on these affirmative defenses, see [Doc. 93-1 at 29-31].  In particular, she alleges that she "was well within the applicable statutes of limitations, and accordingly, [KMMG's] Seventh and Eighth Defenses fail as a matter of law."  [Id. at 30].  However, as addressed in detail hereinafter, many of Gogel's allegations, see generally [Doc. 19], as argued by KMMG, see [Doc. 99 at 24-26], are clearly untimely.   Accordingly, Gogel's motion for partial summary judgment, [Doc. 93-1], in this respect is without merit and due to be denied.

[66] "The clock for the 180-day filing period starts when the discrete unlawful practice takes place."  Jordan v. City of Montgomery, 283 F. App'x 766, 767 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Barnes v. Hillhaven Rehab. & Convalescent Ctr., 686 F. Supp. 311, 312 (N.D. Ga. 1988) (citations omitted) ("The 180 day filing period begins to run from the date the adverse employment decision is communicated to the employee.").

Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); Gay v. AirTran Airways, Inc.,

427 F. App'x 743, 745 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).

"Accordingly, in general, only those claims arising within 180 days prior to the filing

of the EEOC discrimination charge are actionable under Title VII." Manley v.

DeKalb Cty., 587 F. App'x 507, 511 (11th Cir. 2014) (per curiam) (unpublished)

(citation omitted). "The continuing violation doctrine permits a plaintiff to sue on

an otherwise time-barred claim where at least one other violation occurred within

the statutory period." Brooks v. CSX Transp., Inc., 555 F. App'x 878, 880 (11th Cir.

2014) (per curiam) (unpublished) (citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d

1208, 1221 (11th Cir. 2001) (per curiam)). "However, the doctrine does not apply to

discrete acts of discrimination, such as a promotion denial or refusal to hire." Id.

(citing Nat'l R.R. Passenger Corp., 536 U.S. at 114).

Gogel filed her first charge of discrimination with the EEOC on November 10,

2010, [Doc. 117 at 137]; see also [id. at 38 pp. 149-51], and KMMG thus argues that

"any discrete act that occurred before May 14, 2010 is barred," [Doc. 83-1 at 10

(footnote and citation omitted)].[67]   The Court agrees.  "While [Gogel] alleged that

---

[67] KMMG specifically points to the following discrete acts claimed by Gogel
as time-barred: her claim that she should have been designated HOD in March 2009,
her assertions that she should have been sent to the SHRM on June 12, 2009, her
claim that she was abandoned on a trip to Korea in the summer of 2009, her claim
that she was told not to speak strongly after the fall of 2009, and her claim that she
should have been made HOD on April 12, 2010.  [Doc. 83-1 at 11].

[s]he suffered from numerous discriminatory and retaliatory acts from the day that

[s]he was hired through [January 19, 2011], the date that [s]he was fired, only

incidents that took place within the timely filing period are actionable." Nat'l R.R.

Passenger Corp., 536 U.S. at 114.  Because Gogel first filed her EEOC charge on

November 10, 2011, only those acts that occurred 180 days before this date are

actionable.[68] Id.  Accordingly, the Court finds that any allegations of conduct that

occurred more than 180 days prior to the filing of her EEOC charge, including

Gogel's allegations that she was denied a promotion to HOD in March of 2009 and

April of 2010, are time-barred.  See Manley, 587 F. App'x at 511-12 (affirming the

district court's ruling that plaintiff's claims based on alleged denial of promotions

were time-barred as they occurred outside the 180-day limitations period); see also

---

[68] Gogel maintains that her claim that she was not designated HOD occurred within 180 days of her filing her first EEOC charge because the "last time [she] recalled asking [] Jackson about her not being promoted to HOD of Team Relations was in June or July 2010."  [Doc. 93-1 at 30 (citing [Doc. 117 at 62 p. 248])]; see also [Doc. 109 at 20].  However, "the Eleventh Circuit has held that the denial of a promotion is a one time violation, the present consequences of which only are felt at the present time, and not a continuing violation."  Johnson v. Austal, U.S.A., L.L.C., 805 F. Supp. 2d 1299, 1308 (S.D. Ala. 2011) (citations omitted).  Gogel claims that she was not designated HOD in March 2009 and April 2010, see [Doc. 101 at 3; Doc. 117 at 116-22, 140], and failure to promote is a discrete act, see Price v. M & H Valve Co., 177 F. App'x 1, 7 (11th Cir. 2006) (per curiam) (unpublished) (citing Nat'l R.R. Passenger Corp., 536 U.S. at 114) ("[A]n employer's failure to promote is a discrete act or single occurrence.").  As KMMG correctly contends, Gogel cannot "revive her untimely HOD promotion allegations by contending that she continued to complain about the 'promotion' within the 180-day statutory period."  [Doc. 110 at 7].

Anderson v. City of Fort Pierce, Case Number: 14-14095-CIV-MARTINEZ-LYNCH, 2015 WL 10857439, at *3 (S.D. Fla. July 29, 2015) (finding the discrete discriminatory acts alleged by plaintiff that occurred outside the timely filing period were time-barred).[69]

### 2.    *Section 1981*

"Congress created a catchall 4-year statute of limitations for actions arising under federal statutes enacted after December 1, 1990, that do not contain a statute of limitations provision." Palmer v. Stewart Cty. Sch. Dist., 178 F. App'x 999, 1002-

---

[69] Gogel asserts that "[e]vidence of discrimination that occurred more than 180 days prior to the filling of [her] EEOC [c]harge is relevant and probative." [Doc. 101 at 48]. She further argues that because "KMMG, for two years in a row, prevented [her] from being promoted by filling the HOD of Team Relations position with a Caucasian male," and she, "at the same time, was witnessing other instances of discrimination against other American females," "her claims should be considered in full in determining whether she was discriminated against and retaliated against for engaging in protected activity." [Id. at 52]. Although these time-barred allegations cannot serve as the basis of her claims, they may still be relevant to timely claims as evidence which "illuminate[s] current practices which, viewed in isolation, may not indicate discriminatory [and retaliatory] motives." Allen v. Montgomery Cty., 788 F.2d 1485, 1488 (11th Cir. 1986) (citations omitted); see also Eubanks v. Henry Cty., Civil Action File No. 1:11-CV-3969-AJB, 2014 WL 1309338, at *15 (N.D. Ga. Mar. 31, 2014), aff'd, 626 F. App'x 250 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted) (agreeing with the plaintiff that the court could consider time-barred instances to demonstrate discrimination); E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC, No. Civ.A.1:05CV2504-TWT, 2007 WL 602212, at *14 (N.D. Ga. Feb. 16, 2007), adopted at *1 (alterations in original) (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)) ("As noted by the Supreme Court, a discriminatory act 'which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue[.]'").

03 (11th Cir. 2006) (per curiam) (unpublished) (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004); 28 U.S.C. § 1658).  "Section 1981 was amended by the Civil Rights Act of 1991," but "the four year statute of limitations applies only if the cause of action was not available before the 1991 amendments to the statute."  Id. (citing Jones, 541 U.S. at 373, 383).  "In 1981, the Supreme Court concluded that § 1981 cover[ed] only conduct at the initial formation of the contract and conduct which impairs the right to enforce cont[r]act obligations through legal process." Edwards v. Nat'l Vision Inc., 568 F. App'x 854, 859 (11th Cir. 2014) (per curiam) (unpublished) (first alteration in original) (internal marks omitted) (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 179 (1989), superseded by statute on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074). However, "[t]he 1991 Act . . . defin[ed] the key 'make and enforce contracts' language in § 1981 to include the 'termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"  Jones, 541 U.S. at 383 (quoting 42 U.S.C. § 1981(b)).

KMMG asserts that the four-year statute of limitations applies in this case and bars "any events occurring before June 19, 2010."  [Doc. 83 at 11 (citation and emphasis omitted)].  As KMMG correctly contends, [Doc. 110 at 2-3], Gogel has failed to respond to its argument regarding the timeliness of her § 1981 claims, see

[Doc. 101].[70] "When a party does not 'respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.'" Sherk v. Adesa Atlanta, LLC, 432 F. Supp. 2d 1358, 1374 (N.D. Ga. 2006) (quoting Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001)) (collecting cases). Nevertheless, the Court will address KMMG's argument.

"Because [Gogel's] retaliation [and discrimination] claims relate to post-contract-formation conduct of a type that was not actionable before the Civil Rights act of 1991, they are governed by the four-year statute of limitations established by 28 U.S.C. § 1658(a)."[71] Belton v. Russell Cty. Bd. of Educ., Civil Action No.

---

[70] The Court notes that Gogel has argued that her claims are timely under § 1981 in her reply in support of her motion for partial summary judgment, [Doc. 109 at 19]; however, she has not responded to KMMG's arguments in this respect in her response in opposition to its motion for summary judgment, see [Doc. 101].

[71] With respect to Gogel's failure to promote claims, "[b]efore the 1991 Act, a failure to promote claim could be brought under § 1981 only if the promotion rose to the level of an 'opportunity for a new and distinct relationship between the employee and the employer.'" Bryant v. Jones, 696 F. Supp. 2d 1313, 1321 (N.D. Ga. 2010) (quoting Patterson, 491 U.S. at 186-87). "The 1991 Act, which permits claims based on existing contracts, enabled a plaintiff to bring a failure to promote claim under § 1981(b) even where the promotion would not amount to a new and distinct relationship." Id. Gogel alleges that "[a]lthough the HOD designation was a promotion, it would not have constituted a separate contract of employment, as [she] was performing the duties and held the responsibilities of a HOD, without the title or compensation associated therewith." [Doc. 19 at 18 ¶ 57]. Thus, though Gogel has not specifically addressed KMMG's arguments with respect to the untimeliness of her claims under § 1981 in her response to KMMG's motion, she does agree that the four-year statute of limitations applies in this case. [Doc. 109 at 19]. The Court will therefore apply the four-year statute of limitations to Gogel's

3:10CV814-MHT, 2012 WL 4478668, at *2 (M.D. Ala. Aug. 1, 2012), adopted by 2012

WL 4476075, at *1 (M.D. Ala. Sept. 26, 2012); see also Jones, 541 U.S. at 383; Bryant,

696 F. Supp. 2d at 1321-22.  Gogel filed her complaint against KMMG on June 19,

2014, in the Superior Court of Fulton County.  [Doc. 1-1].  Accordingly, any alleged

conduct that occurred before June 19, 2010, including Gogel's allegations that she

was denied a promotion to HOD in March of 2009 and April of 2010, is time-barred.

See McCray v. Wal-Mart Stores, Inc., 377 F. App'x 921, 924 (11th Cir. 2010) (per

curiam) (unpublished) (finding the factual bases for plaintiff's § 1981 claims that

took place four years prior to her complaint were time-barred); Sobutay v. Intermet

Int'l, Inc., No. 4:06-CV-87(CDL), 2007 WL 4166168, at *2 (M.D. Ga. Nov. 20, 2007)

(finding plaintiff's § 1981 failure to promote claim time-barred as the act occurred

more than four years prior to his filing suit).

**B.**     **Title VII and § 1981**

Title VII  prohibits discrimination in employment decisions on the basis of

"race, color, religion, sex or national origin."  See 42 U.S.C. § 2000e-2(a)(1); Blue v.

Dunn Constr. Co., 453 F. App'x 881, 883 (11th Cir. 2011) (per curiam) (unpublished)

(citation omitted); Bolton v. Potter, No. 8:03-CV-2205-T-27EAJ, 2006 WL 118286, at

*5 (M.D. Fla. Jan. 13, 2006), aff'd, 198 F. App'x 914 (11th Cir. 2006) (per curiam)

---

failure to promote claims.

(unpublished) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15

(1977)); see also Branham v. Astrue, Civil Action No. 7:08-CV-123(HL), 2010 WL

419395, at *3 (M.D. Ga. Jan. 28, 2010) (citation omitted).  Title VII also prohibits an

employer from retaliating against an employee "because [s]he has opposed any

practice made an unlawful employment practice by this subchapter, or because [s]he

has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a);

see also Smithers v. Wynne, 319 F. App'x 755, 756 (11th Cir. 2008) (per curiam)

(unpublished) (citation omitted).  Section 1981 provides that "[a]ll persons within

the jurisdiction of the United States shall have the same right . . . to make and

enforce contracts[72] . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), and

"prohibits an employer from retaliating against its employee in response to the

employee's complaint of race-based discrimination," Braswell v. Allen, 586 F. Supp.

2d 1297, 1310 (M.D. Ala. 2008) (citation omitted).

Title VII and § 1981 use the same analysis for discrimination and retaliation

claims.  See Worley v. City of Lilburn, 408 F. App'x 248, 250 (11th Cir. 2011) (per

curiam) (unpublished) (citations omitted) ("The elements required to establish

---

[72] "Make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

retaliation claims under § 1981 are the same as those required for Title VII claims."); Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (noting that discrimination claims brought under § 1981 and Title VII are subject to the same standards of proof and employ the same analytical framework); Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1215 (11th Cir. 2008) (analyzing discrimination claim under § 1981 under same framework as Title VII); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework").  Therefore, the Court will address Gogel's Title VII discrimination and retaliation claims in connection with her § 1981 claims.

Where, as here, there is no direct evidence of discrimination or retaliation, the Court evaluates Title VII claims by using the burden shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Maddox-Jones v. Bd. of Regents of Univ. Sys. of Ga., 448 F. App'x 17, 19 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); see also Miller-Goodwin v. City of Panama City Beach, Fla., 385 F. App'x 966, 969 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); Coar v. Pemco Aeroplex, Inc., 372 F. App'x 1, 3 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).  Gogel must first establish a prima facie case.  Berman v. Orkin Exterminating Co., 160 F.3d 697, 701 (11th Cir. 1998) (footnote omitted).  "Demonstrating a prima facie case is not onerous; it requires

only that the plaintiff establish facts adequate to permit an inference of discrimination [or retaliation]." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam) (citations omitted); <u>see also</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253-54 (1981).

If Gogel establishes a prima facie case as to each of her claims, an inference of discrimination and retaliation arises, and the burden shifts to KMMG to articulate legitimate, non-discriminatory and non-retaliatory reasons for its actions. <u>Berman</u>, 160 F.3d at 702 (footnote omitted); <u>see also</u> <u>Jefferson v. Burger King Corp.</u>, 505 F. App'x 830, 833 (11th Cir. 2013) (per curiam) (unpublished); <u>Entrekin v. City of Panama City Fla.</u>, 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); <u>Batts v. Silver Line Bldg. Prods. Corp.</u>, Civil Action File No. 1:08-CV-3355-WSD-ECS, 2010 WL 966860, at *9 (N.D. Ga. Feb. 22, 2010), adopted by 2010 WL 966861, at *2 (N.D. Ga. Mar. 12, 2010) (citation omitted).  KMMG's burden, one of production and not of persuasion, is "exceedingly light." <u>Smith v. Horner</u>, 839 F.2d 1530, 1537 (11th Cir. 1988) (citations and internal marks omitted); <u>see also</u> <u>Bagwell v. Peachtree Doors & Windows, Inc.</u>, Civil Action File No. 2:08–CV–191–RWS–SSC, 2011 WL 1497831, at *21 (N.D. Ga. Feb. 8, 2011) (citations omitted), adopted by 2011 WL 1497658, at *1 (N.D. Ga. Apr. 19, 2011).  "It is not necessary that the court believe the evidence; the court's analysis can involve no

credibility assessment." <u>Matthews v. City of Dothan</u>, No. 1:04–CV–640–WKW, 2006 WL 3742237, at *5 (M.D. Ala. Dec. 18, 2006) (citation and internal marks omitted). "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory [and non-retaliatory] basis for its actions, it has discharged its burden of production." <u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 770 (11th Cir. 2005) (per curiam) (citation omitted).

If KMMG meets its burden of production with respect to each claim, the inference of discrimination and retaliation is erased, and the burden shifts back to Gogel to show that KMMG's articulated reason is merely a pretext for discrimination and retaliation. <u>Entrekin</u>, 376 F. App'x at 997 (citation omitted); <u>Berman</u>, 160 F.3d at 702 (footnote omitted); <u>see also</u> <u>Wigfall v. St. Leo Univ., Inc.</u>, No. 12–11316, 2013 WL 1798341, at *1 (11th Cir. Apr. 29, 2013) (per curiam) (unpublished) (footnote omitted); <u>Saunders v. Emory Healthcare, Inc.</u>, 360 F. App'x 110, 113, 115 (11th Cir. 2010) (per curiam) (unpublished). That is, "[o]nce [KMMG] proffers a legitimate, non-discriminatory [and non-retaliatory] reason, in order to survive summary judgment, [Gogel] must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of [KMMG's] . . . articulated reasons [are] pretextual." <u>Dockery v. Nicholson</u>, 170 F. App'x 63, 65-66 (11th Cir. 2006) (per curiam) (unpublished) (last alteration in original) (citation and internal

marks omitted); <u>Bagwell</u>, 2011 WL 1497831, at *25 (citation omitted).  Despite this

burden-shifting framework, the "ultimate burden of persuading the trier of fact that

[KMMG] intentionally [discriminated or retaliated] against [Gogel] remains at all

times with [Gogel]."  <u>See</u> <u>Burdine</u>, 450 U.S. at 253 (citations omitted); <u>see also</u> <u>Walker</u>

<u>v. St. Joseph's/Candler Health Sys., Inc.</u>, 506 F. App'x 886, 886 (11th Cir. 2013) (per

curiam) (unpublished) (citation omitted).[73]

---

[73] Even if Gogel's failure to promote allegations were not time-barred, these claims would still fail because she cannot establish a prima facie claim with respect to the April 2010 claim, and KMMG has articulated legitimate, non-discriminatory and non-retaliatory reasons with respect to the March 2009 claim, which Gogel has not shown are pretext for discrimination.  Gogel claims that she was not designated HOD of Team Relations when Tyler was designated as HOD of both Human Resources and Team Relations in March of 2009.  <u>See</u> [Doc. 19 at 7 ¶ 21; Doc. 93-2 at 7 ¶ 28, 8 ¶ 32; Doc. 101 at 33].  Even if she could establish a prima facie case as to this allegation, KMMG has articulated a legitimate, non-discriminatory and non-retaliatory reason for not selecting Gogel for HOD of Team Relations as Jackson chose to designate one HOD over both personnel departments in order to reduce his direct reports, and he chose Tyler for this role based on his greater experience and longer tenure at KMMG.  [Doc. 85 at 2-3 ¶¶ 6-8].  Gogel has failed to show that Jackson's reasons were pretextual, and thus KMMG's summary judgment motion with respect to this claim is due to be granted on this alternative basis as well.  <u>See</u> <u>Price</u>, 177 F. App'x at 9 (footnote omitted) ("[E]ven if [plaintiff's] claim of failure to promote . . . was not time-barred, and even assuming [plaintiff] established a *prima facie* case, he failed to show that genuine issues of material fact existed as to whether [defendant's] non-discriminatory reasons for not promoting him were pretextual and that summary judgment was not warranted."); <u>Brooks v. Cty. Comm'n of Jefferson Cty.</u>, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation and internal marks omitted) (finding defendant's reason of superior qualifications and experience were legitimate, non-discriminatory reasons and plaintiff failed to prove pretext as she did not show that "the disparities between the successful applicant's and her own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the

1.    *Retaliation Claims*

Gogel claims that she was terminated in retaliation for her internal complaints

of discrimination and for filing an EEOC charge.[74]  To establish a prima facie case of

---

plaintiff"); Denney v. City of Albany, 247 F.3d 1172, 1184-90 (11th Cir. 2001) (finding plaintiffs' evidence insufficient to show defendant's reasons for not promoting plaintiffs were pretext for intentional discrimination).  Gogel also claims that she was denied a promotion to HOD of Team Relations in April 2010.  [Doc. 93-2 at 13 ¶ 55; Doc. 101 at 33].  However, as KMMG asserts, "there was no opening to promote [her] into at that time because [] Tyler was HOD for both Team Relations and Human Resources."  [Doc. 83-1 at 11 n.3 (citing [Doc. 120 at 47 p. 184])]; see also [Doc. 99 at 25; Doc. 119 at 50 p. 196].  Thus, she has failed to establish a prima facie case pertaining to her 2010 failure to promote claim, and KMMG's motion for summary judgment is due to be granted on this alternative basis.  Lane v. Ogden Entm't, Inc., 13 F. Supp. 2d 1261, 1267 (M.D. Ala. 1998) (granting summary judgment on plaintiff's failure to promote claim where there was no opening as the prima facie case assumes that there is actually an opening to be filled); see also Adesalu v. Copps, 606 F. Supp. 2d 97, 104 (D.D.C. 2009) (citation and internal marks omitted) ("Lacking evidence of an available position, plaintiff cannot establish a prima facie case of employment discrimination based on non-promotion.").

[74] Gogel also claims that KMMG retaliated against her by excluding her from management meetings, labeling her as uncooperative, taking away her resources, and prohibiting her from advising employees of their right to file a charge with the EEOC.  See [Doc. 19 at 19-20 ¶ 60, 23-24 ¶ 74, 25 ¶ 80].  However, these actions do not constitute materially adverse actions. See Wells v. General Dynamic Info. Tech. Inc., 571 F. App'x 732, 736-37 (11th Cir. 2014) (per curiam) (unpublished) (emphasis omitted) (finding plaintiff's allegations that she was cut off from resources that she needed to perform her duties and that she was excluded from meetings "do not rise to the level of a materially adverse action required for a retaliation claim under Title VII or § 1981"); Edwards, 568 F. App'x at 862 (holding that telling other employees not to talk to plaintiff, among other actions, was not materially adverse); Moat v. Aaron's Inc., No. 4:13-CV-181-VEH, 2014 WL 5860574, at *9 (N.D. Ala. Nov. 12, 2014) (citations omitted) (holding that hostility and avoidance of communication have "consistently been held not to qualify as materially adverse" actions under Burlington); Ewald v. Royal Norwegian Embassy, 2 F. Supp. 3d 1101, 1121 (D. Minn.

retaliation, Gogel must show that (1) she engaged in statutorily protected activity[75];

(2) she suffered a materially adverse employment action; and (3) the adverse

employment action was caused by her engaging in protected activity.  Bailey v. City

of Huntsville, 517 F. App'x 857, 861 (11th Cir. 2013) (per curiam) (unpublished)

(citation omitted); see also Hawk v. Atlanta Peach Movers, 469 F. App'x 783, 785

(11th Cir. 2012) (per curiam) (unpublished) (citation omitted); Hawthorne v. Baptist

Hosp. Inc., 448 F. App'x 965, 968 (11th Cir. 2011) (per curiam) (unpublished) (citation

omitted); Cleveland v. Sec'y of the Treasury, 407 F. App'x 386, 387-88 (11th Cir.

2011) (per curiam) (unpublished) (citation omitted).  KMMG  concedes that Gogel

can satisfy the elements of a prima facie case of retaliation for her termination, [Doc.

110 at 15 n.3; Doc. 99 at 15 n.5],[76] but maintains that her claim still fails because she

---

2014) (holding that exclusion from work-related events and communications not
sufficient to support retaliation claim).

   [75] Under Title VII, "[s]tatutorily protected expression includes internal
complaints of discrimination to superiors, as well as complaints lodged with the
EEOC and discrimination-based lawsuits."  Gerard v. Bd. of Regents State of Ga.,
324 F. App'x 818, 825 (11th Cir. 2009) (per curiam) (unpublished) (citing Pipkins v.
City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001)).  Likewise, "[i]n the §
1981 context, '[s]tatutorily protected expression includes complaining to superiors
about harassment in the work place, lodging complaints with the EEOC and
participating in discrimination-based lawsuits.'"  Page v. Winn-Dixie Montgomery,
Inc., 702 F. Supp. 2d 1334, 1354 (S.D. Ala. 2010) (second alteration in original)
(citation omitted).

   [76] Although KMMG argues in its motion for summary judgment, [Doc. 83-1
at 17-22], and in its response in opposition to Gogel's motion for partial summary

has not shown that its proffered legitimate, non-retaliatory reason for her termination is a pretext for retaliation, [Doc. 83-1 at 23-26; Doc. 99 at 19-23; Doc. 110 at 9-21].

KMMG asserts that Gogel was terminated on January 19, 2011, because it lost confidence in her abilities to perform her job duties after an investigation showed that she had solicited Ledbetter to file a charge against KMMG, which was in violation of the agreement she signed on December 6, 2010.  [Doc. 83-1 at 23; Doc. 99 at 16-18; Doc. 110 at 17-19].   Because this reason constitutes a "'clear and reasonably specific'" non-retaliatory explanation for KMMG's decision to terminate Gogel, KMMG has discharged its burden of production, see Vessels, 408 F.3d at 770 (citation omitted); see also Wilson v. Bellsouth Telecomms. Inc., 386 F. App'x 971, 972 (11th Cir. 2010) (per curiam) (unpublished); Jones v. Flagship Int'l, 793 F.2d 714, 728 (5th Cir. 1986), and the burden shifts back to Gogel to prove by a preponderance of the evidence that the reason provided by KMMG is pretext for a prohibited, retaliatory motive, see Edmond v. Univ. of Miami, 441 F. App'x 721, 724 (11th Cir.

---

judgment, [Doc. 99 at 8-14], that Gogel cannot establish a prima facie case of retaliation, in its reply in support of its motion for summary judgment, KMMG states that it "does not contest that [Gogel's] filing of her EEOC Charge on November 3, 2010, was protected activity and assumes (for summary judgment purposes) that [she] has made out the minimal requirements for a *prima facie* retaliation claim."  [Doc. 110 at 14 n.3]; see also [Doc. 99 at 15 n.5].

2011) (per curiam) (unpublished); <u>Tiggs-Vaughn v. Tuscaloosa Hous. Auth.</u>, 385 F. App'x 919, 923 (11th Cir. 2010) (per curiam) (unpublished).

To demonstrate pretext, Gogel's evidence must reveal "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [KMMG's] proffered legitimate reason[] for its actions that a reasonable factfinder could find them unworthy of credence.'" <u>Maples v. UHS of Ga., Inc.</u>, 716 F. Supp. 2d 1266, 1274 (N.D. Ga. 2010) (quoting <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997)). Gogel may prove pretext by "either proving that intentional [retaliation] motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal [retaliation]." <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1088 (11th Cir. 2004). Gogel may thus create an issue of fact at the pretext stage by (1) presenting evidence that KMMG's proffered reason is not worthy of belief, or (2) presenting evidence that retaliation was, in fact, KMMG's real reason. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146-47 (2000); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993).

"Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." <u>Tolley v. United Parcel Serv.</u>, No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006)

(citation and internal marks omitted). "Thus, the inquiry is limited to whether the employer offered an honest, [non-retaliatory] explanation for [the materially adverse action], regardless of whether the decision might have been mistaken." Id. (citations omitted). "Ultimately, an employee must meet the employer's stated reason 'head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.'" Young, 432 F. App'x at 917 (citation omitted). Gogel "cannot establish pretext by simply demonstrating facts that suggest [retaliatory] animus, but must specifically respond to . . . [KMMG's] explanation[] and rebut [it]." Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "If [Gogel] fails to demonstrate that there is a genuine issue of material fact concerning whether [KMMG's] articulated reason[] for the [materially] adverse [] action [is] pretextual, then [KMMG] is entitled to summary judgment on the retaliation claim." Johnson v. Advertiser Co., 778 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011) (citing Combs, 106 F.3d at 1528). Finally, despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that [KMMG] intentionally [retaliated] against [Gogel] remains at all times with [Gogel]." Burdine, 450 U.S. at 253 (citations omitted).

Gogel first argues that KMMG's proffered reason for her termination is pretextual because she did not, in fact, encourage, solicit, or coerce Ledbetter to file

an EEOC charge or to sue KMMG.  [Doc. 101 at 28 (citation omitted)].  Gogel points

to Ledbetter's testimony that she "decided for [her]self . . . to file a Charge with the

EEOC," that Gogel "did not encourage [Ledbetter] nor solicit [her] to get an attorney

and sue [KMMG] or file an EEOC Charge," that Ledbetter "never told [] Williams

that [Gogel] was the 'leader' of [her] and [Tyler] in filing a Charge with the EEOC"

or that "all three of [them] were going to sue [KMMG] and had the same attorney,"

and that there was no collusion.  [Doc. 101-2 at 3-4 ¶¶ 7-11].  Despite Gogel's focus

on whether she actually solicited Ledbetter and thus violated the December 2010

agreement, the Court need not address these arguments any further since the issue

is not whether she actually solicited Ledbetter to file a charge or a lawsuit or

whether KMMG was wrong in believing that she did, but whether KMMG, at the

time it terminated her, honestly believed that she had solicited Ledbetter to pursue

legal action against KMMG.  See Clark v. S. Broward Hosp. Dist., 601 F. App'x 886,

896 (11th Cir. 2015) (unpublished) (citations omitted) ("[S]ignificantly, the question

is not whether Plaintiff actually engaged in the alleged misconduct.  Rather, it is

whether the [defendant] in good faith believed the reports of misconduct."); Elrod

v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted) ("That

the employee did not in fact engage in misconduct reported to the employer is

irrelevant to the question whether the employer believed the employee had done

wrong."); <u>Berstein v. Ga. Dep't of Educ.</u>, 970 F. Supp. 2d 1340, 1360-61 (N.D. Ga. 2013), adopted at 1347 (citing <u>Holifield</u>, 115 F.3d at 1565); <u>Butts v. Ameripath, Inc.</u>, 794 F. Supp. 2d 1277, 1298 (S.D. Fla. 2011), adopted at 1279 (citation omitted) ("With respect to . . . proving pretext, 'the ultimate issue is whether the decision-maker believed that the employee violated the rule, not whether the employee actually violated the rule.'").

Indeed, the "inquiry is not whether [Gogel] was guilty of misconduct but whether [KMMG] in good faith believed [Gogel] had done wrong and whether this belief was the reason for [her] termination." <u>Butts</u>, 794 F. Supp. at 1299 (citing <u>Entrekin</u>, 376 F. App'x at 997); <u>see also</u> <u>Hankins v. AirTran Airways, Inc.</u>, 237 F. App'x 513, 522 (11th Cir. 2007) (per curiam) (unpublished) (alterations in original) (citation omitted) ("'The relevant issue here is not whether [the employee] actually falsified the entry, but rather whether [the employer] honestly *believed* [the employee] falsified the entry.'"); <u>Grey v. City of Oak Grove</u>, 396 F.3d 1031, 1035 (8th Cir. 2005) (citation omitted) ("The question is whether [the employer's] articulated reasons for discharge were a pretext for retaliation, not whether [the employee] actually did what he was accused of doing or whether discharge was warranted."). That is, "[a] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, as

long as the reason is one that might motivate a reasonable employer." <u>Philson v.</u> <u>Hosp. Auth. of Houston Cty.</u>, Civil Action No. 5:08-CV-155 (HL), 2009 WL 2477255, at *14 (M.D. Ga. Aug. 10, 2009) (citation and internal marks omitted).  In fact, "[a]n employer may fire an employee for [a] good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason." <u>Brown v. Mobile Cty. Comm'rs</u>, 79 F. Supp. 3d 1259, 1276 (S.D. Ala. 2015) (internal marks omitted) (quoting <u>Nix v. WLCY Radio/Rahall</u> <u>Commc'ns</u>, 738 F.2d 1181, 1186 (11th Cir. 1984)).

Here, as KMMG correctly contends, [Doc. 110 at 9-10], the undisputed evidence shows that KMMG received Ledbetter's EEOC charge in a fax from Gogel's lawyer on December 23, 2010,  [Doc. 120 at 59-60 pp. 232-33, 62 pp. 241-42, 134-36]; <u>see also</u> [Doc. 83-2 at 6-7 ¶ 23; Doc. 102 at 21 ¶ 23]; that Williams, of his own accord, approached Jackson on January 4, 2011, to inform him of plans by Gogel, Tyler, and Ledbetter to sue KMMG, [Doc. 85 at 6 ¶ 20; Doc. 120 at 63-65 pp. 248-53, 72 p. 283, 137; Doc. 123 at 50 pp. 193-94]; <u>see also</u> [Doc. 83-2 at 31 ¶ 158; Doc. 102 at 101 ¶ 158]; that Gogel was interviewed regarding the allegations on January 7, 2011, and thereafter placed on paid administrative leave pending further investigation, [Doc. 85 at 6-7 ¶¶ 22-23; Doc. 115 at 39 p. 151; Doc. 117 at 66 pp. 261, 263-64; Doc. 118 at 26; Doc. 120 at 69 p. 270, 142]; <u>see also</u> [Doc. 83-2 at 8 ¶¶ 30-31, 31 ¶ 159; Doc. 102 at

26-28 ¶¶ 30-31, 102 ¶ 159]; that on January 11, 2011, both Williams and Grimes signed written statements summarizing their allegations against Gogel that were expressed during individual meetings with Jackson and Webb on January 5, 2011, [Doc. 119 at 59 pp. 229-30, 98-110; Doc. 123 at 79 pp. 311-12, 153-54]; see also [Doc. Doc. 83-2 at 8 ¶¶ 28-29, 32 ¶ 160; Doc. 102 at 25 ¶¶ 28-29, 104 ¶ 160]; and that on January 19, 2011, Jackson terminated Gogel because "[b]ased on [KMMG's] investigation, one could conclude that [she] encouraged or even solicited the filing of [Ledbetter's] charge" and "[a]t the very least, there [was] a conflict of interest sufficient to cause [KMMG] to lose confidence in the loyalty and trust that is required by [her] position," [Doc. 115 at 95-96]; see also [id. at 41 p. 159; Doc. 117 at 54 pp. 214-15; Doc. 118 at 26-27]; see also [Doc. 83-2 at 9 ¶ 34, 32-33 ¶¶ 161, 164; Doc. 102 at 30-31 ¶ 34, 105 ¶ 161, 108 ¶ 164].  In fact, Jackson testified that based on the information he had before him, he was "totally convinced" that she had solicited Ledbetter to file a lawsuit against KMMG, which caused him to lose confidence and trust in her ability to perform her job duties.  [Doc. 120 at 69-70 pp. 272-73].  Gogel's own testimony supplies some validation of Jackson's concerns as Gogel testified that she told Ledbetter that she was going to seek outside assistance and provided Ledbetter the name of the attorney that she was going to meet.  [Doc. 117 at 52-53 pp. 208-09].

Gogel has failed to present any evidence showing that Jackson did not honestly believe that she had solicited Ledbetter in violation of the agreement she signed on December 6, 2010.  See DeLong v. Best Buy Co. Inc., 211 F. App'x 856, 859 (11th Cir. 2006) (per curiam) (unpublished) (citations omitted) ("[Plaintiff] has not shown that [the employer] did not honestly believe, following an investigation into the allegations against her, that she had on two separate occasions engaged in activities that violated the [employer's] policies.  Accordingly, she has not created a genuine issue of fact on the question whether [the employer's] proffered reason was a pretext for retaliation."); see also Jones v. Fulton Cty., 446 F. App'x 187, 191 (11th Cir. 2011) (per curiam) (unpublished) (finding plaintiff had not presented sufficient evidence to show the employer's reasons were pretext for discrimination or retaliation as she did not show that the employer "did not honestly believe that she had attempted to fix equipment with which she was unfamiliar or that she had failed to follow proper procedures by notifying the help desk"); Jones, 793 F.2d at 729 (finding the employer "had reasonable grounds, or in good faith though[t] it did, for its suspension and termination of [plaintiff's] employment" for engaging in solicitation); Flowers v. Troup Cty., Ga., Sch. Dist., 1 F. Supp. 3d 1363, 1377 (N.D. Ga. 2014), aff'd, 803 F.3d 1327 (11th Cir. 2015) ("[Plaintiff] has presented no evidence that calls into question the sincerity of [the decisionmaker's] belief that [plaintiff] had

69

committed a recruiting violation . . . . Thus, [plaintiff] has failed to present any evidence from which a reasonable jury could conclude that the proffered reason was pretext for race discrimination.").[77]

Next, Gogel points to "me too" evidence to show that KMMG retaliated against other employees who had lodged internal complaints and filed EEOC charges. [Doc. 101 at 29-30]. In particular, she argues that "Tyler was terminated after lodging discrimination complaints and filing an EEOC [c]harge shortly before [she] was terminated" and that after she and Tyler were terminated, "KMMG bullied Ledbetter to drop her EEOC [c]harge[.]" [Id. at 29-31]. In support of her argument, Gogel cites Goldsmith v. Bagby Elevator Co., 513 F.3d 1261 (11th Cir. 2008). See [Doc. 101 at 29]. "In Goldsmith, the Eleventh Circuit found no abuse of discretion in the admission of evidence of discrimination and retaliation against the plaintiff's coworkers, where that evidence was offered to support a pattern and practice claim and to rebut certain defenses." Lane v. Terry, Civil Action File No.

---

[77] Gogel challenges KMMG's investigation into her alleged solicitation. In particular, she claims that the investigation "only included gathering self-serving information from [her] subordinates, [] Grimes and [] Williams." [Doc. 102 at 28-29 ¶ 32]; see also [Doc. 109 at 17]. However, Gogel's argument is misplaced, as she has still not shown that Jackson did not honestly believe that she had solicited Ledbetter. See DeLong, 211 F. App'x at 859; see also Jernigan v. Dollar General Corp., Civil Action No, 2:11-CV-01448-WMA, 2013 WL 452820, at * 6 (N.D. Ala. Jan. 31, 2013) (Plaintiff "must show that, following the investigation, [defendant] did not arrive at a good faith belief that she had violated company policy, wise or unwise."). Thus, Gogel's argument is without merit.

1:08-CV-3781-TWT-WEJ, 2010 WL 2721896, at *17 (N.D. Ga. June 4, 2010), adopted by 2010 WL 2721536, at *1 (N.D. Ga. Jul. 7, 2010) (citing Goldsmith, 513 F.3d at 1285). "However, unlike _Goldsmith_, this action does not include a pattern or practice claim. Rather, the only relevant evidence is that pertaining to the actions taken against [Gogel]." Id.; see also Brown v. Berg Spiral Pipe Corp., Civil Action No. 10-237-CG-B, 2011 WL 3610646, at *14 (S.D. Ala. Aug. 17, 2011) (citation omitted) (finding because plaintiff's complaint did not include a pattern and practice claim, "me too" evidence was not relevant). Moreover, even if the evidence Gogel offers was relevant, "when offered to show pretext . . ., me too evidence is suspect," and "generally, courts are reluctant to consider prior bad acts in this [employment discrimination] context where those acts do not relate directly to the plaintiff[]." Hamilton v. Coffee Health Grp., 949 F. Supp. 2d 1119, 1158 (N.D. Ala. 2013) (citations and internal marks omitted). Here, none of the "me too" evidence rebuts KMMG's non-retaliatory reason for terminating Gogel. See Jackson, 593 F. App'x at 877; Lane, 2010 WL 2721896, at *17. Thus, Gogel's "me too"evidence is insufficient to establish pretext.

Finally, Gogel argues that she has shown pretext based on the close temporal proximity between the protected acts and her termination. [Doc. 101 at 31-32]. She claims that "KMMG placed [her] on administrative leave thirty-four [] days after

filing her EEOC [c]harge and terminated [her] employment eight [] days later."
[Id.].  However, Gogel's time line of events is erroneous.  In fact, Gogel filed her
EEOC charge on November 10, 2010, [Doc. 117 at 137], and KMMG received her
charge on November 22, 2010, [Doc. 120 at 127].  She was placed on paid
administrative leave on January 7, 2011, [Doc. 85 at 6 ¶ 22; Doc. 115 at 39 p. 151; Doc.
117 at 66 pp. 263-64; Doc. 120 at 69 p. 270, 142], and she was terminated on January
19, 2011, [Doc. 115 at 41 p. 159, 95-96; Doc. 117 at 54 pp. 214-15; Doc. 118 at 26-27].
Thus, it was approximately two months between the time KMMG received Gogel's
EEOC charge and the time at which she was terminated.  "Although temporal
proximity can sometimes be sufficient to establish a causal link, temporal proximity
alone is insufficient evidence of pretext to survive summary judgment."  Archard
v. Potter, Civil Action No. 08–0746–CG–N, 2010 WL 1926747, at *10 (S.D. Ala. May
12, 2010) (citations omitted); see also Matias v. Sears Home Improvement Prods.,
Inc., 391 F. App'x 782, 787 (11th Cir. 2010) (per curiam) (unpublished) (citation
omitted) (citing Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1289
(11th Cir. 2006)); Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997)
(footnote and internal citation omitted) ("Close timing between an employee's
protected activity and an adverse action against him may provide the 'causal
connection' required to make out a prima facie case of retaliation.  However, once the

employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive."); Coleman v. Ala. State Univ., 904 F. Supp. 2d 1245, 1256 (M.D. Ala. 2012) ("The court is unaware of any authority establishing, however, that where the *prima facie* case has been successfully rebutted, the temporal closeness between the protected activity and the adverse action is sufficient on its own to sustain a pretext finding."). Thus, "[s]ummary judgment is proper when the defendant offers legitimate reasons and the employee only offers temporal proximity." Archard, 2010 WL 1926747, at *10 (citing Wascura v. City of S. Miami, 257 F.3d 1238, 1247 (11th Cir. 2001)).

While the Court recognizes the close timing of the filing of Gogel's EEOC charge, her suspension, and her termination, see Padron v. BellSouth Telecomms., Inc., 196 F. Supp. 2d 1250, 1256-57 (S.D. Fla. 2002), aff'd, 62 F. App'x 317 (11th Cir. 2003) (unpublished), "this fact is not dispositive of pretext" and "does not undercut [KMMG's] stated reason[] for the termination," Corning v. LodgeNet Interactive Corp., 896 F. Supp. 2d 1138, 1154 (M.D. Fla. 2012) (citation omitted); see also Barnes v. Crowne Invs., Inc., 391 F. Supp. 2d 1108, 1117-18 (S.D. Ala. 2005) (finding temporal proximity insufficient to show pretext where defendant offered legitimate reasons for suspending and terminating plaintiffs, i.e., reports of misconduct at

work, despite plaintiff's contentions that the reports were false); Padron, 196 F. Supp. 2d at 1257 (citations omitted) ("Standing alone against Defendant's strongly supported legitimate reason for terminating [plaintiff], temporal proximity does not amount to more than a scintilla of evidence of retaliation.  This is insufficient.").

Thus, Gogel's arguments regarding pretext fail to demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[] for its action that a reasonable fact finder could find [that reason] unworthy of credence.'"  Standard, 161 F.3d at 1333 (quoting Combs, 106 F.3d at 1538).  Simply put, Gogel has produced insufficient evidence to create a genuine issue of material fact that KMMG's reason for terminating her was pretext for retaliation.  See Barnes, 391 F. Supp. 2d at 1118.  Because Gogel has failed to show that KMMG's proffered reason is so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief, she has failed to create any genuine issue with regard to pretext, and it is **RECOMMENDED** that KMMG's motion for summary judgment, [Doc. 83], be **GRANTED** on Gogel's Title VII and § 1981 retaliation claims and that Gogel's motion for partial summary judgment, [Doc. 93], be **DENIED**.[78]

---

[78] Gogel has not argued that there is a "convincing mosaic of circumstantial evidence that would allow a jury to infer [] [retaliation] by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote, citations, and internal marks omitted).  However, she has made this argument with

## 2.     *Discrimination Claims*

Gogel claims that KMMG discriminated against her because of her race, alienage, national origin, and gender by terminating her employment.[79]   See generally [Doc. 19]. Gogel "may establish a prima facie case of discrimination through circumstantial evidence by proving that (1) she belongs to a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her classification more favorably; and (4) she was qualified to do the job."[80]   Wilson, 376 F.3d at 1091 (citations omitted) (citing

---

respect to her discrimination claims, which the Court will address hereinafter.

[79] Gogel also claims KMMG discriminated against her by excluding her from management meetings, asking her not to speak in meetings, maintaining a general dismissive attitude toward women, singling out American employees, questioning employees' loyalty, and ignoring American workplace laws. See [Doc. 19 at 18 ¶ 57, 21 ¶ 66, 22-23 ¶ 70]. Putting aside that Gogel's claim that she was asked not to speak too strongly in the fall of 2009 is untimely, none of these acts constitute adverse employment actions, as "[t]here was no serious and material change in the terms of [Gogel's] employment as a result of this conduct." McQueen v. Wells Fargo Home Mortg., 955 F. Supp. 2d 1256, 1273-74 (N.D. Ala. 2013), aff'd, 573 F. App'x 836 (11th Cir. 2014) (per curiam) (unpublished) (fifth alteration in original) (finding plaintiff's claims that her supervisor "always made [her] mistakes seem like they were worse than other employees; loudly announced every time [she] made a mistake . . .; spoke to [her] in a condescending manner; acted like [she] was retarded . . .; [and] ignored [her]" were not adverse actions).

[80] Rather than show that other similarly situated employees outside her protected class were treated more favorably, Gogel may instead demonstrate that she was replaced by someone outside of her protected class. Hudson v. Middle Flint Behavioral Healthcare, 522 F. App'x 594, 596 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted).

Holifield, 115 F.3d at 1562); see also Ivey v. Paulson, 222 F. App'x 815, 817 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted). KMMG does not contest that Gogel can establish a prima facie case of discrimination regarding her termination.[81] See [Docs. 83-1 & 110]. Rather, KMMG asserts that it is entitled to summary judgment on Gogel's discriminatory termination claims because she has not shown that its proffered legitimate, non-discriminatory reason for her termination is pretext for discrimination. [Doc. 83-1 at 23-26; Doc. 110 at 9-21].

As previously discussed in detail, KMMG asserts that it terminated Gogel's employment after an investigation showed that she had solicited another employee to file a charge against KMMG, violating the December 2010 agreement and causing Jackson to lose confidence in her ability to be Manager of Team Relations. [Doc. 83-1 at 23; Doc. 99 at 16-18; Doc. 110 at 17-19]. Because this reason constitutes a legitimate, non-discriminatory reason for Gogel's termination, which satisfies KMMG's "exceedingly light" burden, the onus is on Gogel to prove by a preponderance of the evidence that KMMG's reason is pretext for prohibited, discriminatory conduct. See Vessels, 408 F.3d at 770 (citation omitted); Gray, 492 F.

---

[81] KMMG does assert that Gogel has failed to establish a prima facie case with respect to her 2009 Korea trip and the photograph from the management workshop in addition to other actions previously addressed, [Doc. 83-1 at 13-17]; however, the 2009 Korea trip is untimely and is also not included as an allegation in Gogel's complaint, see [Doc. 19], and being asked to stand in a photograph is not, as KMMG correctly contends, an adverse action, see McQueen, 955 F. Supp. 2d at 1273-74.

App'x at 5.  To establish pretext, Gogel "must present concrete evidence in the form of specific facts which show [KMMG's] proffered reason is mere pretext." Smith v. Harvey, 421 F. Supp. 2d 1370, 1378 (S.D. Ala. 2006) (citation and internal marks omitted).  Again, Gogel must meet KMMG's reason "head on and rebut it." Chapman v. Al Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation omitted).

Gogel attempts to show pretext with respect to her discrimination claims in the same ways she attempted to show pretext on her retaliation claims, [Doc. 101 at 25-33, 48], and thus, "[f]or the same reasons that this Court rejected her attempts to establish pretext for those claims, the Court finds that she has failed to introduce any evidence from which a jury could infer pretext for her [discrimination] claim[s]," Philson, 2009 WL 2477255, at *15; see also Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1315-1316 (N.D. Ga. 2009), adopted at 1290.  "Since [KMMG has] proffered evidence supporting a legitimate, nondiscriminatory reason for [Gogel's] . . . termination, and [she] has not come forward with [sufficient] evidence to show that this reason is pretextual, summary judgment is warranted." Holifield, 115 F.3d at 1565-66 (citations omitted); see also Boone v. City of McDonough, No. 1:12-cv-1036-WSD, 2013 WL 4670480, at *25 (N.D. Ga. Aug. 29, 2013), adopted at *5, aff'd, 571 F. App'x 746 (11th Cir. 2014) (per curiam) (unpublished) (alteration in original) (citation omitted) ("'If the plaintiff fails to demonstrate that there is a genuine issue

of material fact concerning whether the employer's articulated reasons for the adverse employment action are pretextual, then the employer is entitled to summary judgment on the [discrimination and] retaliation claim.'").

Gogel contends that she has demonstrated a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination. [Doc. 101 at 45].  "Although [Gogel] has failed to show that [KMMG's] proffered reason is unworthy of credence . . ., [she] can still survive summary judgment by establishing 'a convincing mosaic of circumstantial evidence' that would allow a reasonable jury to infer that [s]he was the victim of [] discrimination." Flowers, 1 F. Supp. 3d at 1381 (quoting Smith, 644 F.3d at 1328).  Gogel asserts that a "convincing mosaic" exists because she "was openly critical of how Korean Management was treating her and their apparent unwillingness to learn and comply with American workplace laws," "Kevin Kim would not allow [Team Relations] and [Human Resources] to do additional intercultural training with Korean expatriates who came to work at KMMG to help them understand American laws," "Kevin Kim became angry if [she] ever tried to educate him on American culture and laws," and Justin Yoo would ask her why she was giving him this when she tried to share American laws.  [Doc. 101 at 45 (citations omitted)].  In addition, she points to Grimes and Williams' testimony that the Koreans did not respect her and that they felt bad for

her,  Ledbetter's belief that it was because Gogel was not a stereotypical female, and Tyler's complaints to Jackson that Kevin Kim and K.S. Kim did not listen to her.  [Id. at 46 (citations omitted)].  Lastly, she points to Jackson's instructions not to speak strongly in meetings and an email she sent to Jackson expressing her concerns with Korean management.  [Id. (citations omitted)].  Gogel submits that the proffered evidence shows that "Korean Management not only resented [her] as a Caucasian American woman who was in a position of authority, but did not want to work with her, and that Jackson, who knew this, believed [she] should be terminated from KMMG because the Koreans did not want to work with her."  [Id. (citation omitted)].

However, this circumstantial evidence cited by Gogel does not support an inference of intentional discrimination on the part of KMMG, much less establish a "convincing mosaic" sufficient to withstand KMMG's motion for summary judgment.  See Williams v. Cleaver-Brooks, Inc., Civil Action No. 7:11-CV-144 (HL), 2012 WL 6151141, at *8 (M.D. Ga. Dec. 11, 2012), aff'd, 529 F. App'x 979 (11th Cir. 2013) (per curiam) (unpublished).  There is no evidence linking any of these statements to Gogel's termination, and more importantly, almost all of these statements are made by non-decision makers.  See Tate v. Ancell, 551 F. App'x 877, 887-88 (7th Cir. 2014) (unpublished) (finding no mosaic of circumstantial evidence

where statements did not relate to alleged adverse action and statements were made by non-decision makers); <u>Gustin v. Schneider Corp.</u>, No. 1:09-cv-1452-TWP-TAB, 2011 WL 1486007, at *7 (S.D. Ind, Apr. 19, 2011) (citations omitted).  Gogel's own conclusory say-so that Jackson terminated her "because the Koreans did not want to work with her" is insufficient to support an inference of discrimination.  <u>Flowers</u>, 803 F.3d at 1337-38; <u>see also</u> <u>Turner v. Fla. Prepaid Coll. Bd.</u>, 522 F. App'x 829, 833 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) (noting the Eleventh Circuit has "never suggested that a plaintiff's generalized averment that her employer treated her differently than employees of a different race[, national origin, or gender] can, alone, create a 'convincing mosaic of circumstantial evidence' from which a jury could find intentional discrimination").  Thus, Gogel has failed to create a genuine issue of material fact as to whether KMMG terminated her because of her race, alienage, national origin, or gender.  <u>See</u> <u>Smith</u>, 644 F.3d at 1328 (footnote and citations omitted) ("A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'").  Accordingly, it is **RECOMMENDED** that KMMG's motion for

summary judgment, [Doc. 83], be **GRANTED** as to Gogel's Title VII and § 1981 discrimination claims.[82]

## IV.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that KMMG's motion for summary judgment, [Doc. 83], be **GRANTED** and that Gogel's motion for partial summary judgment, [Doc. 93], be **DENIED**.

The Clerk is **DIRECTED** to terminate this reference.

**IT IS SO RECOMMENDED**, this 5th day of August, 2016.

*Russell G. Vineyard*
_____
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[82] Gogel argues that the "ultimate issue of causation, as it relates to pretext, is before the Court on [KMMG's] motion for summary judgment, and . . . that it is not proper for judgment without a trial." [Doc. 109 at 2]. However, KMMG "is entitled to summary judgment in its favor [as] [Gogel does not proffer sufficient evidence of pretext[.]" Chapman, 229 F.3d at 1025 & n.11. Thus, Gogel's argument is without merit. Gogel has also moved for partial summary judgment on several other defenses KMMG articulated in its answer, see [Doc. 93-1 at 31-36]; see also [Doc. 2], and although KMMG has not responded with respect to these defenses, see [Doc. 99], Gogel's motion is nevertheless due to be denied since it is recommended that KMMG's summary judgment motion be granted in its entirety, and thus, the Court need not reach the issue of whether KMMG is entitled to assert these defenses. Accordingly, it is **RECOMMENDED** that Gogel's motion for partial summary judgment, [Doc. 93], be **DENIED**.